IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ESTATE OF LOUIS W. CHANCE JR.,)
                              )
          Plaintiff,          )
                              )
     v.                       )    Civ. No. 05-449-SLR
                              )
FIRST CORRECTIONAL MEDICAL    )
INC., DR. NIRANJANA SHAH,     )
DR. JOSE A. ARAMBURO, JR.,    )
COMMISSIONER STANLEY TAYLOR,  )
and JOYCE TALLEY,             )
                              )
          Defendants.         )

**MEMORANDUM ORDER**

**I.   INTRODUCTION**

Plaintiffs Amanda Humphreys and Louis Chance, III are the

mother and son of decedent Louis W. Chance Jr. ("Chance").  (D.I.

1, 3)  They were appointed administrators of his estate on June

20, 2005 and soon after filed this 42 U.S.C. § 1983 action

alleging that defendants[1] violated Chance's right under the

_____

[1]According to plaintiffs, First Correctional Medical, Inc.
("FCM") contracted with the Delaware Department of Correction
("DOC") to provide medical care for inmates incarcerated at State
of Delaware penal institutions, including Gander Hill and Webb.
Defendants Dr. Niranjana Shah ("Shah") and Dr. Jose A. Aramburo
("Aramburo") are licensed Delaware physicians employed by FCM to
provide medical care to inmates at Gander Hill and Webb.
Defendant Stanley Taylor ("Taylor") is the Commissioner of the
DOC, who entered into an agreement with FCM on June 17, 2002 to
provide comprehensive medical care for inmates incarcerated by
the DOC.  (D.I. 3 at ¶ 5)  Defendant Joyce Talley ("Talley") is
the Bureau Chief for the Bureau of Management Services for DOC,
responsible for oversight of inmate health care services.  (D.I.

Eighth Amendment to be free from the infliction of cruel and
unusual punishment or death by the intentional denial of medical
treatment.  (<u>Id.</u>)  They also raise supplemental state claims
under Delaware law for negligence.  In response, defendants
Taylor and Talley filed a motion to dismiss the complaint
pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).² Plaintiffs
have filed opposition, to which defendants have replied.  (D.I.
9, 10)  The court has jurisdiction over this matter pursuant to
28 U.S.C. § 1331.

## II.  BACKGROUND.³

After pleading guilty to his fourth DUI charge, Chance was
sentenced to six months of imprisonment under the custody of the
DOC beginning on April 1, 2003.⁴  His prospective release date
was September 30, 2003.  (D.I. 3)  On September 8, 2003, Chance
submitted a sick call request concerning a headache he had been

_____

3 at ¶ 6)

²The remaining defendants have answered the complaint.
Discovery is ongoing among all parties pursuant to the court's
January 1, 25, 2006 scheduling order.  (D.I. 22, 24, 26, 19, 29)

³Since this is a motion to dismiss pursuant to R. 12(b)(6),
the court must accept as true all material allegations of the
complaint and it must construe the complaint in favor of the
plaintiffs.  <u>See</u> <u>Trump Hotels & Casino Resorts, Inc. v. Mirage
Resorts, Inc.</u>, 140 F.3d 478, 483 (3d Cir. 1998).

⁴It appears Chance was imprisoned at the Webb facility;
however, specific information about his incarceration there is
absent from the complaint.  (D.I. 3)

2

experiencing for three days.[5]  He was examined by a registered
nurse and given six Excedrin pills.  Because the headache did not
resolve by the next day, Chance was prescribed Motrin by an
unidentified physician.

On September 10, 2003, Chance told a registered nurse that
the pain was excruciating and that "he could not take it any
longer."  (Id. at ¶ 14)  The following day, Chance was seen by a
physician for headache pain that had started the previous week.
The physician noted that Chance stated he was unable to see, "was
dizzy, appeared ataxic, was agitated and rude."  (Id. at ¶ 15)

On September 12, 2003, a correctional officer thought Chance
had overdosed on medication because he appeared confused.  As a
result, Chance was transferred to the Gander Hill Infirmary.
Upon arrival, Chance was characterized as disoriented, hostile,

---

[5]Pursuant to a July 17, 2002 contract between FCM and
Taylor, on behalf of DOC, FCM was solely responsible for
providing comprehensive medical care for inmates incarcerated by
DOC.  (D.I. 3 at ¶ 5)  Specifically, between April 1 and
September 23, 2003, FCM was responsible for the "staffing,
policies, procedures, protocol, staff qualifications, staff
training and staff education required to meet the medical needs
of inmates" at Gander Hill and Webb.  (Id. at ¶ 7)  Plaintiffs
state that, as part of this contract, DOC required FCM to
minimize offsite transport of inmates for medical services
because such services were deemed expensive.  (Id. at ¶ 8)
According to plaintiff, defendant Talley was responsible for
ensuring the efficient and effective delivery of health care to
Chance at a time when she had knowledge of complaints about
inadequate medical care and, consequently, was deliberately
indifferent to the plight of inmates, in general, and Chance, in
particular, by failing to order or require that inmates receive
adequate medical care.

non-co-operative and "unable to contract for his own safety."
(Id. at ¶ 17)  In response, members of the nursing staff summoned
the Quick Response Team[6] to subdue and immobilize Chance in
preparation for the introduction of an intravenous line.

Without examining Chance, Abramburo ordered, by telephone,
the administration of "intravenous Ativan, Benadryl and Haldol."
(Id. at ¶ 18)  On September 13, 2003, a medical employee "without
medical or psychiatric training, evaluated [Chance], describing
him as being unable to process questions, without orientation
times 3, with hostile affect" and in need of close medical
monitoring and evaluation.  (Id. at ¶ 19)

On September 16, 2003, Shah examined Chance and noted his
complaint of continued headaches.  Shah prescribed Tylenol and
one cup of coffee per day.  (Id. at ¶ 20)  On September 18, 2003,
despite his continued complaints of headaches, Chance was
transferred from the infirmary and returned to the Webb facility.
(Id. at ¶ 21)  Chance continued to complain of headaches, daily,
up until September 22, 2003.  (Id.)

On September 23, 2003, Chance was discovered unresponsive
and transported emergently to St. Francis Hospital.  Chance died

---

[6]Plaintiffs describe this is six armored correctional
officers.  (Id. at ¶ 17)

4

later that day of cryptococcal meningitis[7] - approximately one
week before his scheduled release date.

Sometime after his death, defendants Shah and Aramburo made
out-of-sequence entries in Chance's progress chart.
Specifically, a notation for the urgent scheduling of a brain
scan by CT or MRI was added after Chance's death.

## III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6),
the court must accept as true all material allegations of the
complaint and it must construe the complaint in favor of the
plaintiffs.  See Trump Hotels & Casino Resorts, Inc. v. Mirage
Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).  "A complaint
should be dismissed only if, after accepting as true all of the
facts alleged in the complaint, and drawing all reasonable
inferences in the plaintiff's favor, no relief could be granted
under any set of facts consistent with the allegations of the
complaint."  Id.  Claims may be dismissed pursuant to a Rule
12(b)(6) motion only if the plaintiffs cannot demonstrate any set
of facts that would entitle them to relief.  See Conley v.
Gibson, 355 U.S. 41, 45-46 (1957).  The purpose of a motion to
dismiss is to test the sufficiency of a complaint not to resolve

_____

[7]According to plaintiffs, this is "a commonly encountered,
opportunistic, treatable infection causing swelling inside the
cranial cavity" that could have been diagnosed by an MRI exam,
but was not ordered because of cost containment policies of FCM
and Taylor.  (Id. at ¶¶ 23, 26)

disputed facts or decide the merits of the case.  Kost v.
Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).  The moving party
has the burden of persuasion.  See Kehr Packages, Inc. v.
Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV.  DISCUSSION

Defendants Taylor and Talley move to dismiss on several
grounds.[8]  (D.I. 8, 10)  They contend that the court lacks
subject matter jurisdiction because the Eleventh Amendment bars
suits against defendants in their official capacity.  Pennhurst
State Sch. & Hosp. v. Hadlerman, 465 U.S. 89, 100 (1984); Lavia
v. Commonwealth of Pennsylvania, 224 F.3d 190, 195 (3d Cir.
2000).  Defendants argue there are no allegations of personal
involvement with Chance or his medical care and that plaintiffs
have failed to allege sufficient facts to demonstrate that either
of the moving defendants acquiesced or participated in the
medical treatment given to Chance.  Farmer v. Brennan, 511 U.S.
825 (1994).  Specifically, their counsel submits that Taylor's
responsibilities were limited to those mandated by 11 Del.C. §

---

[8]Although defendants urge dismissal of the state law claims,
it unnecessary to review these arguments because plaintiffs have
stated that those claims are not against Stanley or Talley.
(D.I. 9 at ¶ 7)

6

6157.[9]  (D.I. 8, 10)  Defendants also contend that they are

---

[9]11 Del.C. § 6157 provides that the DOC Commissioner shall carry out and provide for:
1.  (1) Promulgating rules and regulations to carry out the Commissioner's duties and operate the Department which shall not be inconsistent with the general policies of the Board;

(2) The organization, maintenance, control and operation of the Department;

(3) The custody, study, training, treatment, correction and rehabilitation of persons committed to the Department;

(4) Regulating the nature and limitations of authorized punishments for violations of the rules established for the government of any institution or facility under the jurisdiction of the Department, but corporal punishment shall not be inflicted therefor; providing by general rule for a merit system for reduction of confinement;

(5) The administration, supervision, operation, management and control of state correction institutions, farms or any other institution or facility under the jurisdiction of the Department;

(6) The management and control of institutional labor and industry;

(7) The operation of probation and parole field services;

(8) The employment of such officers, employees and agents as may be deemed necessary to discharge the functions of the Department, together with establishing their qualifications and the establishment of a merit system and training programs;

(9) Developing a suitable administrative structure providing for divisions, bureaus and services within the Department;

(10) Governing the transportation and transfer of offenders and persons between the various institutions and facilities under its jurisdiction or elsewhere as provided in this chapter, transfers to be made by issued orders, the reasons thereof to be made a matter of record, in each case. No female offender or person shall be transferred unless accompanied by at least 1 female officer or guard;

(11) Managing and supervising the Department and doing any and all things necessary to carry out and to fulfill the purposes of this chapter;

(12) Periodic reports to the Board of an analysis of the institutions and services within the Department, and analysis and evaluation of the adequacy and effectiveness of personnel and buildings.

**(13) Administering the medical/treatment services contract, or appointing a designee to administer the medical/treatment contract.**  (Emphasis added)

7

protected by qualified immunity.

Plaintiffs respond that defendants are being sued in their individual capacities for Taylor's cost containment practices that caused inadequate staffing, training, and medical services; and Talley's actions related to ensuring efficient and effective delivery of medical services that caused the other defendants to deny Chance appropriate testing and treatment, culminating in his death.  (D.I. 9)  Personal involvement can be shown through actual participation in the misconduct, knowledge of and acquiescence in the misconduct or circumstances where inaction sends a message of approval for the misconduct.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Chincello v. Fenton, 805 F.2d 126 (3d Cir. 1986).

## A.  Medical Care

It is undisputed that the State of Delaware has an obligation under the Eighth Amendment to provide "adequate medical care" to the individuals who are incarcerated in its prisons.  See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3rd Cir. 1979)(citations omitted).  To state a violation of his constitutional right to adequate medical care, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976); accord White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).  Plaintiff must

8

demonstrate that:  (1) he had a serious medical need; and (2)
the defendants were aware of this need and were deliberately
indifferent to it.  See West v. Keve, 571 F.2d 158, 161 (3d Cir.
1978); see also Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir.
1987).  Either actual intent or recklessness will afford an
adequate basis to show deliberate indifference.  See Estelle, 429
U.S. at 105.

    The seriousness of a medical need may be demonstrated by
showing that the need is "'one that has been diagnosed by a
physician as requiring treatment or one that is so obvious that a
lay person would easily recognize the necessity for a doctor's
attention.'"  Monmouth County Corr. Inst. Inmates v. Lanzaro, 834
F.2d 326, 347 (3d Cir. 1987) (quoting Pace v. Fauver, 479 F.
Supp. 456, 458 (D. N.J. 1979)).  "[W]here denial or delay causes
an inmate to suffer a life-long handicap or permanent loss, the
medical need is considered serious."  Id.  Deliberate
indifference may also be present if necessary medical treatment
is delayed for non-medical reasons, or if an official bars access
to a physician capable of evaluating a prisoner's need for
medical treatment.  Id. at 347.  An official's conduct, however,
does not constitute deliberate indifference unless it is
accompanied by the requisite mental state.  Specifically, "the
official [must] know . . . of and disregard . . . an excessive
risk to inmate health and safety; the official must be both aware

9

of facts from which the inference can be drawn that a substantial
risk of serious harm exists, and he must also draw the
inference." Farmer v. Brennan, 511 U.S. at 837.  While a
plaintiff must allege that the official was subjectively aware of
the requisite risk, he may demonstrate that the official had
knowledge of the risk through circumstantial evidence and "a fact
finder may conclude that a[n] . . . official knew of a
substantial risk from the very fact that the risk was obvious."
Id. at 842.

    The Third Circuit has found "deliberate indifference" in a
variety of circumstances, including where the prison official:
(1) knows of a prisoner's need for medical treatment but
intentionally refuses to provide it; (2) delays necessary medical
treatment based on a non-medical reason; or (3) prevents a
prisoner from receiving needed or recommended medical treatment.
See Durmer v. Carroll, 991 F.2d 64, 68 (D. N.J. 1993) (citing
Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326,
346-47 (3d Cir. 1987)).  When denial of an inmate's request for
medical care causes "undue suffering or the threat of tangible
residual injury, deliberate indifference is manifest." Monmouth,
834 F.2d at 346.

    When viewed in the light most favorable to plaintiffs and
with all well-pleaded factual allegations taken as true, the
court concludes that the complaint states a viable claim for

relief based on alleged deliberate indifference to a serious medical need, in contravention of the Eighth Amendment, that was the result of a policy or practice promoted by or acquiesced to by defendants. To the extent that defendants deny personal involvement with Chance through the arguments presented by counsel, i.e., defendants only "administered the medical/treatment contract," the court cannot accept these representations in place of sworn affidavits submitted by the parties themselves. (D.I. 10 at 2)

### B. Qualified Immunity

Under certain circumstances, the qualified immunity defense can shield public officials from liability for civil damages as long as their conduct does not contravene "clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305 (1996); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). "The immunity is intended to protect officials from the potential consequences of suit, including distraction from official duties, inhibition of discretionary action, and deterrence of able people from public service." Thomas v. Independence Township, 2006 WL 2621094, *3.

Qualified immunity analysis requires a two-step inquiry. First to be determined is whether the facts alleged show that the defendants' conduct violated a constitutional or statutory right.

11

Williams, 455 F.3d at 190.  If there is no constitutional

violation, then the inquiry ends.  If answered affirmatively, the

court must then determine whether the constitutional or statutory

right allegedly violated by the defendant was "clearly

established."  Id.  If the court concludes that the defendants'

conduct violated a clearly established constitutional or

statutory right, then it must deny the defendant the protection

afforded by qualified immunity.  Id.  The United States Supreme

Court has emphasized the importance of deciding immunity

questions at the earliest possible stage of litigation and, until

the immunity inquiry is resolved, "discovery should not be

allowed."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The

Third Circuit, however, has stated that "qualified immunity will

be upheld on a 12(b)(6) motion only when the immunity is

established on the face of the complaint."  Thomas v.

Independence Township, __ F.3d __, 2006 WL 2621094 (3d Cir.

September 14, 2006) (quoting Leveto v. Lapina, 258 F.3d 156, 161

(3d Cir. 2001)).

        Defendants assert the doctrine of qualified immunity applies

because there is no clearly established right that they are

alleged to have violated.  Instead, they were carrying out

statutory obligations and they cannot be held liable for merely

entering into a contractual agreement with FCM to provide care,

when it is undisputed that Chance received medical care.

12

As noted in the above analysis, plaintiffs' allegations are sufficient to constitute a constitutional violation. At this juncture, the court cannot determine whether the second part of the qualified immunity analysis is satisfied; instead, the discovery process needs to continue. Along these lines, in denying the motion to dismiss, the court is not deciding the issue of whether plaintiffs will ultimately prevail, but is deciding if plaintiffs are entitled to offer evidence to support their claims. See Lake v. Arnold, 112 F.3d 682 (3d Cir. 1997).

## V.   CONCLUSION

Therefore, at Wilmington this ∂l∌ day of September, 2006;

IT IS ORDERED that defendants' motion to dismiss (D.I. 8) is denied.

United States District Judge

13