IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESTATE OF LOUIS W. CHANCE JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-449-SLR |
| | ) |
| FIRST CORRECTIONAL MEDICAL INC., DR. NIRANJANA SHAH, DR. JOSE A. ARAMBURO, JR., COMMISSIONER STANLEY TAYLOR, and JOYCE TALLEY, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM ORDER**

**I.  INTRODUCTION**

Plaintiffs Amanda Humphreys and Louis Chance, III are the mother and son of decedent Louis W. Chance Jr. ("Chance"). (D.I. 1, 3) They were appointed administrators of his estate on June 20, 2005 and soon after filed this 42 U.S.C. § 1983 action alleging that defendants[1] violated Chance's right under the

---

[1]According to plaintiffs, First Correctional Medical, Inc. ("FCM") contracted with the Delaware Department of Correction ("DOC") to provide medical care for inmates incarcerated at State of Delaware penal institutions, including Gander Hill and Webb. Defendants Dr. Niranjana Shah ("Shah") and Dr. Jose A. Aramburo ("Aramburo") are licensed Delaware physicians employed by FCM to provide medical care to inmates at Gander Hill and Webb. Defendant Stanley Taylor ("Taylor") is the Commissioner of the DOC, who entered into an agreement with FCM on June 17, 2002 to provide comprehensive medical care for inmates incarcerated by the DOC. (D.I. 3 at ¶ 5) Defendant Joyce Talley ("Talley") is the Bureau Chief for the Bureau of Management Services for DOC, responsible for oversight of inmate health care services. (D.I.

Eighth Amendment to be free from the infliction of cruel and unusual punishment or death by the intentional denial of medical treatment. (Id.) They also raise supplemental state claims under Delaware law for negligence. In response, defendants Taylor and Talley filed a motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[2] Plaintiffs have filed opposition, to which defendants have replied. (D.I. 9, 10) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## II. BACKGROUND.[3]

After pleading guilty to his fourth DUI charge, Chance was sentenced to six months of imprisonment under the custody of the DOC beginning on April 1, 2003.[4] His prospective release date was September 30, 2003. (D.I. 3) On September 8, 2003, Chance submitted a sick call request concerning a headache he had been

---

3 at ¶ 6)

[2]The remaining defendants have answered the complaint. Discovery is ongoing among all parties pursuant to the court's January 1, 25, 2006 scheduling order. (D.I. 22, 24, 26, 19, 29)

[3]Since this is a motion to dismiss pursuant to R. 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiffs. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).

[4]It appears Chance was imprisoned at the Webb facility; however, specific information about his incarceration there is absent from the complaint. (D.I. 3)

2

experiencing for three days.[5] He was examined by a registered nurse and given six Excedrin pills. Because the headache did not resolve by the next day, Chance was prescribed Motrin by an unidentified physician.

On September 10, 2003, Chance told a registered nurse that the pain was excruciating and that "he could not take it any longer." (Id. at ¶ 14) The following day, Chance was seen by a physician for headache pain that had started the previous week. The physician noted that Chance stated he was unable to see, "was dizzy, appeared ataxic, was agitated and rude." (Id. at ¶ 15)

On September 12, 2003, a correctional officer thought Chance had overdosed on medication because he appeared confused. As a result, Chance was transferred to the Gander Hill Infirmary. Upon arrival, Chance was characterized as disoriented, hostile,

---

[5] Pursuant to a July 17, 2002 contract between FCM and Taylor, on behalf of DOC, FCM was solely responsible for providing comprehensive medical care for inmates incarcerated by DOC. (D.I. 3 at ¶ 5) Specifically, between April 1 and September 23, 2003, FCM was responsible for the "staffing, policies, procedures, protocol, staff qualifications, staff training and staff education required to meet the medical needs of inmates" at Gander Hill and Webb. (Id. at ¶ 7) Plaintiffs state that, as part of this contract, DOC required FCM to minimize offsite transport of inmates for medical services because such services were deemed expensive. (Id. at ¶ 8) According to plaintiff, defendant Talley was responsible for ensuring the efficient and effective delivery of health care to Chance at a time when she had knowledge of complaints about inadequate medical care and, consequently, was deliberately indifferent to the plight of inmates, in general, and Chance, in particular, by failing to order or require that inmates receive adequate medical care.

non-co-operative and "unable to contract for his own safety." (Id. at ¶ 17) In response, members of the nursing staff summoned the Quick Response Team[6] to subdue and immobilize Chance in preparation for the introduction of an intravenous line.

Without examining Chance, Abramburo ordered, by telephone, the administration of "intravenous Ativan, Benadryl and Haldol." (Id. at ¶ 18) On September 13, 2003, a medical employee "without medical or psychiatric training, evaluated [Chance], describing him as being unable to process questions, without orientation times 3, with hostile affect" and in need of close medical monitoring and evaluation. (Id. at ¶ 19)

On September 16, 2003, Shah examined Chance and noted his complaint of continued headaches. Shah prescribed Tylenol and one cup of coffee per day. (Id. at ¶ 20) On September 18, 2003, despite his continued complaints of headaches, Chance was transferred from the infirmary and returned to the Webb facility. (Id. at ¶ 21) Chance continued to complain of headaches, daily, up until September 22, 2003. (Id.)

On September 23, 2003, Chance was discovered unresponsive and transported emergently to St. Francis Hospital. Chance died

---

[6]Plaintiffs describe this is six armored correctional officers. (Id. at ¶ 17)

4

later that day of cryptococcal meningitis[7] - approximately one week before his scheduled release date.

Sometime after his death, defendants Shah and Aramburo made out-of-sequence entries in Chance's progress chart. Specifically, a notation for the urgent scheduling of a brain scan by CT or MRI was added after Chance's death.

### III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiffs. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiffs cannot demonstrate any set of facts that would entitle them to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The purpose of a motion to dismiss is to test the sufficiency of a complaint not to resolve

---

[7]According to plaintiffs, this is "a commonly encountered, opportunistic, treatable infection causing swelling inside the cranial cavity" that could have been diagnosed by an MRI exam, but was not ordered because of cost containment policies of FCM and Taylor. (Id. at ¶¶ 23, 26)

5

disputed facts or decide the merits of the case. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV. DISCUSSION

Defendants Taylor and Talley move to dismiss on several grounds.[8] (D.I. 8, 10) They contend that the court lacks subject matter jurisdiction because the Eleventh Amendment bars suits against defendants in their official capacity. Pennhurst State Sch. & Hosp. v. Hadlerman, 465 U.S. 89, 100 (1984); Lavia v. Commonwealth of Pennsylvania, 224 F.3d 190, 195 (3d Cir. 2000). Defendants argue there are no allegations of personal involvement with Chance or his medical care and that plaintiffs have failed to allege sufficient facts to demonstrate that either of the moving defendants acquiesced or participated in the medical treatment given to Chance. Farmer v. Brennan, 511 U.S. 825 (1994). Specifically, their counsel submits that Taylor's responsibilities were limited to those mandated by 11 Del.C. §

---

[8]Although defendants urge dismissal of the state law claims, it unnecessary to review these arguments because plaintiffs have stated that those claims are not against Stanley or Talley. (D.I. 9 at ¶ 7)

6157.[9] (D.I. 8, 10) Defendants also contend that they are

---

[9]11 Del.C. § 6157 provides that the DOC Commissioner shall carry out and provide for:
1.   (1) Promulgating rules and regulations to carry out the Commissioner's duties and operate the Department which shall not be inconsistent with the general policies of the Board;
  (2) The organization, maintenance, control and operation of the Department;
  (3) The custody, study, training, treatment, correction and rehabilitation of persons committed to the Department;
  (4) Regulating the nature and limitations of authorized punishments for violations of the rules established for the government of any institution or facility under the jurisdiction of the Department, but corporal punishment shall not be inflicted therefor; providing by general rule for a merit system for reduction of confinement;
  (5) The administration, supervision, operation, management and control of state correction institutions, farms or any other institution or facility under the jurisdiction of the Department;
  (6) The management and control of institutional labor and industry;
  (7) The operation of probation and parole field services;
  (8) The employment of such officers, employees and agents as may be deemed necessary to discharge the functions of the Department, together with establishing their qualifications and the establishment of a merit system and training programs;
  (9) Developing a suitable administrative structure providing for divisions, bureaus and services within the Department;
  (10) Governing the transportation and transfer of offenders and persons between the various institutions and facilities under its jurisdiction or elsewhere as provided in this chapter, transfers to be made by issued orders, the reasons thereof to be made a matter of record, in each case. No female offender or person shall be transferred unless accompanied by at least 1 female officer or guard;
  (11) Managing and supervising the Department and doing any and all things necessary to carry out and to fulfill the purposes of this chapter;
  (12) Periodic reports to the Board of an analysis of the institutions and services within the Department, and analysis and evaluation of the adequacy and effectiveness of personnel and buildings.
  **(13) Administering the medical/treatment services contract, or appointing a designee to administer the medical/treatment contract.** (Emphasis added)

7

protected by qualified immunity.

Plaintiffs respond that defendants are being sued in their individual capacities for Taylor's cost containment practices that caused inadequate staffing, training, and medical services; and Talley's actions related to ensuring efficient and effective delivery of medical services that caused the other defendants to deny Chance appropriate testing and treatment, culminating in his death. (D.I. 9) Personal involvement can be shown through actual participation in the misconduct, knowledge of and acquiescence in the misconduct or circumstances where inaction sends a message of approval for the misconduct. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Chincello v. Fenton, 805 F.2d 126 (3d Cir. 1986).

### A. Medical Care

It is undisputed that the State of Delaware has an obligation under the Eighth Amendment to provide "adequate medical care" to the individuals who are incarcerated in its prisons. See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3rd Cir. 1979)(citations omitted). To state a violation of his constitutional right to adequate medical care, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976); accord White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). Plaintiff must

demonstrate that: (1) he had a serious medical need; and (2) the defendants were aware of this need and were deliberately indifferent to it. See West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978); see also Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir. 1987). Either actual intent or recklessness will afford an adequate basis to show deliberate indifference. See Estelle, 429 U.S. at 105.

The seriousness of a medical need may be demonstrated by showing that the need is "'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D. N.J. 1979)). "[W]here denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." Id. Deliberate indifference may also be present if necessary medical treatment is delayed for non-medical reasons, or if an official bars access to a physician capable of evaluating a prisoner's need for medical treatment. Id. at 347. An official's conduct, however, does not constitute deliberate indifference unless it is accompanied by the requisite mental state. Specifically, "the official [must] know . . . of and disregard . . . an excessive risk to inmate health and safety; the official must be both aware

9

of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837. While a plaintiff must allege that the official was subjectively aware of the requisite risk, he may demonstrate that the official had knowledge of the risk through circumstantial evidence and "a fact finder may conclude that a[n] . . . official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842.

The Third Circuit has found "deliberate indifference" in a variety of circumstances, including where the prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment. See Durmer v. Carroll, 991 F.2d 64, 68 (D. N.J. 1993) (citing Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346-47 (3d Cir. 1987)). When denial of an inmate's request for medical care causes "undue suffering or the threat of tangible residual injury, deliberate indifference is manifest." Monmouth, 834 F.2d at 346.

When viewed in the light most favorable to plaintiffs and with all well-pleaded factual allegations taken as true, the court concludes that the complaint states a viable claim for

relief based on alleged deliberate indifference to a serious medical need, in contravention of the Eighth Amendment, that was the result of a policy or practice promoted by or acquiesced to by defendants. To the extent that defendants deny personal involvement with Chance through the arguments presented by counsel, i.e., defendants only "administered the medical/treatment contract," the court cannot accept these representations in place of sworn affidavits submitted by the parties themselves. (D.I. 10 at 2)

### B. Qualified Immunity

Under certain circumstances, the qualified immunity defense can shield public officials from liability for civil damages as long as their conduct does not contravene "clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305 (1996); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). "The immunity is intended to protect officials from the potential consequences of suit, including distraction from official duties, inhibition of discretionary action, and deterrence of able people from public service." Thomas v. Independence Township, 2006 WL 2621094, *3.

Qualified immunity analysis requires a two-step inquiry. First to be determined is whether the facts alleged show that the defendants' conduct violated a constitutional or statutory right.

11

Williams, 455 F.3d at 190. If there is no constitutional violation, then the inquiry ends. If answered affirmatively, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established." Id. If the court concludes that the defendants' conduct violated a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity. Id. The United States Supreme Court has emphasized the importance of deciding immunity questions at the earliest possible stage of litigation and, until the immunity inquiry is resolved, "discovery should not be allowed." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Third Circuit, however, has stated that "qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." Thomas v. Independence Township, __ F.3d __, 2006 WL 2621094 (3d Cir. September 14, 2006) (quoting Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001)).

Defendants assert the doctrine of qualified immunity applies because there is no clearly established right that they are alleged to have violated. Instead, they were carrying out statutory obligations and they cannot be held liable for merely entering into a contractual agreement with FCM to provide care, when it is undisputed that Chance received medical care.

12

As noted in the above analysis, plaintiffs' allegations are sufficient to constitute a constitutional violation. At this juncture, the court cannot determine whether the second part of the qualified immunity analysis is satisfied; instead, the discovery process needs to continue. Along these lines, in denying the motion to dismiss, the court is not deciding the issue of whether plaintiffs will ultimately prevail, but is deciding if plaintiffs are entitled to offer evidence to support their claims. See Lake v. Arnold, 112 F.3d 682 (3d Cir. 1997).

## V.  CONCLUSION

Therefore, at Wilmington this 21st day of September, 2006;

IT IS ORDERED that defendants' motion to dismiss (D.I. 8) is denied.

_____
United States District Judge

13