# IN THE UNITED STATES DISTRICT COURT

# FOR THE STATE OF DELAWARE

ESTATE OF LOUIS  W. CHANCE JR.

                   Plaintiff

         v.                                                    C.A No: 05-449-SLR

FIRST CORRECTIONAL MEDICAL
INC., DR. NIRANJANA SHAH, DR
JOSE A. ARAMBURO, JR.,
COMMISSIONER STANLEY TAYLOR
and JOYCE TALLEY

               Defendants

## O R D E R

AND NOW this _____day of_____,2007, it is hereby
ORDERED that the Scheduling Order of January 26, 2006 in the above captioned
matter is recinded.  A new Scheduling Order conference will take place at
on_____following production of documents related to the
published Department of Justice Findings concerning the Delaware Department of
Correction dated December 29, 2006.  The parties will meet and agree to a new
proposed scheduling order in conformity with local rules.

                                    _____

                                                  J.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF DELAWARE

ESTATE OF LOUIS W. CHANCE JR.

                Plaintiff

         v.                                  C.A No: 05-449-SLR

FIRST CORRECTIONAL MEDICAL
INC., DR. NIRANJANA SHAH, DR
JOSE A. ARAMBURO, JR.,
COMMISSIONER STANLEY TAYLOR
and JOYCE TALLEY

                Defendants

## PLAINTIFF'S RULE 16.5 REQUEST FOR
## EXTENSION OF DEADLINES

     AND NOW, comes the plaintiff, Estate of Louis W. Chance, by
undersigned counsel to move the Court for an extension of deadlines established
by the Scheduling Order of January 26, 2006, and as grounds therefore,
respectfully alleges that:

1.     Plaintiff filed a lawsuit pursuant to 42 U.S.C.S. § 1983 alleging that
Defendants, Taylor and Talley acting under color of state law, had violated his
U.S. Const. amend. VIII rights by  indifference to cruel and unusual punishment
resulting from their grossly negligent oversight of the poor medical treatment that
led to his death on September 23, 2003 during a six-month incarceration.

2.     Pursuant to local rules, on January 26, 2006, the Court entered a scheduling
order which is attached hereto as Exhibit "A" setting forth deadlines for the

completion of plaintiff's discovery and certain limitations on the number of witnesses and expert opinions.

3.      Subsequent to the entry of the above order, on Sunday, December 31, 2006 it was reported in the local Wilmington News Journal that the U.S. Department of Justice had concluded an investigation and that the Delaware Department of Correction had entered into an agreement that stipulated to facts found by the Civil Rights Division of the U.S. Department of Justice.

4.      On January 3, 2006, the Findings of the U.S. Department of Justice and the Agreement were produced, copies of which are attached hereto as Exhibit "B"

5.      On the basis of facts stipulated to by the Department of Correction, the investigators stated,

> "Our investigation revealed that the medical care provided at the facilities falls below the standard of care constitutionally required in the following areas, all of which were also identified by the State as deficient: intake; medication administration and management; nursing sick call; provider sick call; scheduling, tracking, and follow-up on outside consults; monitoring and treatment of communicable diseases; monitoring and treatment of chronic diseases; medical records documentation; scheduling; infirmary care; continuity of care following hospitalizations; grievances; and patient confidentiality. In addition, we found ***that care for patients with acute medical urgencies was also constitutionally inadequate."*** (emphasis added).

6.      The findings, in part, resulted from the broad ranging investigations of health care experts hired by the State of Delaware and presented to the U.S. Department of Justice.

7.    At no time through the present has the Department of Corrections provided the reports of the investigations as required by Rule 26 despite the fact that the findings covered health care for inmates at least as far back as 2002, and certainly included the period complained of the in instant matter.

8.    These findings and the stipulated facts that led to them were the product of expert investigations, all of which are discoverable and not provided as required by the Rule 26 even though the reports predated the release of the Department of Justice findings by at least several months.

9.    As a result of the delay in producing the investigatory material, the Plaintiff in the present case has been prejudiced in the planning for discovery, the location of witnesses and ultimately, in the preparation for the trial of the case.

10.    The agreement between the Department of Correction and Department of Justice purports to restrict its own admissibility in any proceeding, but the facts which have been stipulated that resulted in the DOJ conclusions, are just that-stipulated facts, and these facts address the Defendants' neglect, the Defendants' poor prison oversight, and the unlawful prison medical conditions that predated the agreement which were uncovered by witness interviews, medical record reviews and investigations by medical experts retained by the State of Delaware.

Wherefore, the Plaintiff respectfully prays that the present Scheduling Order be rescinded due to changed circumstances and that a new scheduling conference be arranged after the production of the materials produced for and by the U. S. Department of Justice that relate to prison health care in Delaware.

Respectfully submitted,

/s/_____

Jeffrey K. Bartels, Esq.
Kenneth W. Richmond, Esq. *pro hac*
401 South Maryland Ave.
Wilmington, DE. 19804

**EXHIBIT "A"**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF DELAWARE

ESTATE OF LOUIS W. CHANCE JR.

Plaintiff

v.

C.A No: 05-449-SLR

FIRST CORRECTIONAL MEDICAL
INC., DR. NIRANJANA SHAH, DR
JOSE A. ARAMBURO, JR.,
COMMISSIONER STANLEY TAYLOR
and JOYCE TALLEY

Defendants

## ORDER

At Wilmington this  $\partial 5\rlap{\raise0.5ex\hbox{-}}{}$  day  of January,2006, the

parties having satisfied their obligations under Fed. R.

Civ. P. 26(f), and the court having conducted a pretrial

scheduling conference pursuant to Fed. R. Civ. P. 16 and D.

Del. LR 16.2(a) and (b).

IT IS ORDERED that:

1. **Pre-Discovery Disclosures**. The parties  have

exchanged  the information required by

Fed. R. Civ. P. 26(a)(1) and D. Del. LR 16.2. 2.

2. **Discovery.**

(a) Discovery will be needed on the following subjects:

Contract; Contract performance by Defendants;
Institutional/Custodial Conditions; Department of
Corrections Oversight of Medical Contract/Conditions;
Witnesses who made entries in Custodial/Medical Records;
Decedent's social history, employment, education, training,
survivors; statements, etc.

(b) All discovery shall be commenced in time to be
completed byFebruary, 28, 2007

(c) Maximum of 100 interrogatories by each party to
any other party.

(d) Maximum of 35 requests for admission by each party
to any other party.

(e) Maximum of 15 depositions by plaintiff and 15 by
defendant.

(f) Each deposition is limited to a maximum of 3 hours
unless extended by agreement of parties.

(g) Reports from retained experts under Rule 26(a)(2)
on issues for which any party has the burden of proof due
by October 31, 2006. Rebuttal expert reports due by
February 28, 2007.

(h) **Discovery Disputes.**

Any discovery dispute shall be submitted to the court
pursuant to Fed. R. Civ. P. 37. During the course of
discovery, each party is limited to two (2) Rule 37

motions. The court shall make itself available, however, to resolve through a telephone conference, disputes that arise during the course of a deposition and disputes related to entry of a protective order.

### 3. **Joinder of other Parties, Amendment of Pleadings, and Class Certification.**

All motions to join other parties, amend the pleadings, and certify a class action shall be filed on or before October 31, 2006.

### 4. **Settlement Conference.**

Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring ADR.

### 5. **Summary Judgment Motions.**

All summary judgment motions shall be served and filed with an opening brief on or before March 15, 2007. Briefing shall be pursuant to D. Del. LR 7.1.2. No summary judgment motion may be filed more than ten (10) days from the above date without leave of the court.

### 6. **Applications by Motion.**

Any application to the court shall be by written motion filed with the clerk. Unless otherwise requested by the court, counsel shall not deliver copies of papers or correspondence to chambers. **Any nondispositive motion shall**

**contain the statement required by D. Del. LR 7.1.1.**

7. **Motions in Limine.** All motions in limine shall be filed on or before June 14, 2007. All responses to said motions shall be filed on or before June 21, 2007.

8. **Pretrial Conference.**

A pretrial conference will be held on June 28, 2007 at 4:30 PM courtroom 6B, sixth floor Federal Building, 844 King Street, Wilmington, Delaware. The Federal Rules of Civil Procedure and D. Del. LR 16.4 shall govern the pretrial conference.

9. **Trial.**

This matter is scheduled for a **Two Week** jury trial commencing on July 30, 2007 in courtroom 6B, sixth floor Federal Building, 844 King Street, Wilmington, Delaware. For purposes of completing pretrial preparations, the parties should plan on being allocated a total number of___N/A____ hours in which to present their respective cases.

_____
United States District Judge

ec: Copy to Magistrate Judge Mary Pat Thynge

# EXHIBIT B



**U.S. Department of Justice**

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

DEC 2 9 2006

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl.
Dover, DE  19901

      RE:  <u>Investigation of Delaware Correctional Center, Symrna,</u>
              <u>Delaware; Howard R. Young Correctional Institution,</u>
              <u>Wilmington, Delaware; Sussex Correctional Institution,</u>
              <u>Georgetown, Delaware; John L. Webb Correctional</u>
              <u>Facility, Wilmington, Delaware; and Delores J. Baylor</u>
              <u>Women's Correctional Institution, New Castle, Delaware</u>

Dear Governor Minner:

     I am writing to report the findings of the Civil Rights
Division's investigation of conditions and practices at the
following five Delaware Department of Correction ("DOC")
facilities:  the Delaware Correctional Center ("DCC"), the
Howard R. Young Correctional Institution ("HRYCI"), the Sussex
Correctional Institution ("SCI"), the John L. Webb Correctional
Facility ("Webb"), and the Delores J. Baylor Women's Correctional
Institution ("BWCI").

     On March 7, 2006, we notified you of our intent to conduct
an investigation of these facilities pursuant to the Civil Rights
of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997,
which gives the Department of Justice authority to seek remedies
for any pattern and practice of conduct that violates the
constitutional or federal rights of incarcerated persons.  We
informed you that our investigation would focus on medical and
mental health care.

     We note that the State has cooperated thoroughly with our
investigation and, under the leadership of DOC Commissioner
Stanley W. Taylor, Jr., has unequivocally indicated its clear
desire to improve medical and mental health care services at the

- 2 -

facilities. From the outset of our investigation, the State has been proactive in evaluating the conditions at the facilities. Indeed, the State retained its own expert consultants, Dr. Ronald Shansky and Dr. Roberta Stellman, to evaluate medical and mental health care services, respectively, at DCC, HRYCI, SCI, Webb, and BWCI in July and September 2006. Following these evaluations, the State shared the results of its internal evaluations with us.

The State's experts identified systemic deficiencies in medical and mental health care at four of the five facilities: DCC, HRYCI, SCI, and BWCI (hereinafter, "the facilities"). These findings were presented to the Department of Justice in oral and written presentations by Fried, Frank, Harris, Shriver & Jacobson, outside counsel for the State. To facilitate our investigation, the State agreed to stipulate to the accuracy of these factual findings. Given the State's complete cooperation with our investigation, the unsolicited disclosure of its comprehensive internal audit of medical and mental health care services, and the State's stipulation, we elected to limit our expert tours to a representative subset of the facilities.

Department of Justice staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006. We conducted additional tours of HRYCI, Webb and BWCI, accompanied by expert consultants in the fields of medicine, mental health care, and suicide prevention on October 4-6, 2006, October 23-25, 2006, and November 15-17, 2006. During these tours, we reviewed a wide variety of State and facility documents, including policies, procedures, and medical and mental health records relating to the care and treatment of inmates. We interviewed prison administrators, professionals, staff and inmates at each facility. In keeping with our pledge of transparency and to provide technical assistance where appropriate regarding our investigatory findings, we conveyed our preliminary findings to certain State and facility administrators and staff during verbal exit presentations at the close of each of our on-site visits. As detailed below, our investigative findings mirrored those of the State's experts.

We commend the administrators and staff of the five facilities we toured for their helpful and professional conduct throughout the course of the investigation. In particular, facility personnel cooperated fully and expeditiously with our document requests.

We are confident that our work with the State will continue in the same cooperative manner we have enjoyed throughout our investigation. However, consistent with our statutory obligation

- 3 -

under CRIPA, we set forth below the findings of our
investigation, the facts supporting them, including those facts
stipulated to by the State, and the minimum remedial steps that
are necessary to address the deficiencies we have identified.  As
described below, we conclude that inmates confined at the
facilities suffer harm or are placed at the risk of harm from
constitutional deficiencies in certain aspects of the medical and
mental health care services, including suicide prevention.
Notwithstanding the foregoing, we are pleased to report that we
find no constitutional deficiencies at Webb.

## I.    BACKGROUND

Delaware is one of six states that house both pre-trial
detainees and sentenced prisoners in a single unified system,
although detainees and prisoners are not housed together.
Medical and mental health care services at the facilities are
provided through a contract with a private vendor.  DCC is
located in Smyrna, Delaware, and houses approximately 2,500 male
inmates, including both pre-trial detainees and sentenced
prisoners.  DCC also contains the Security Housing Unit ("SHU"),
which houses inmates with disciplinary problems or who otherwise
require the maximum level of security.  DCC also contains the
State's death row.  HRYCI is located in Wilmington, Delaware.
The facility houses approximately 1800 males, both pre-trial
detainees and sentenced inmates.  SCI is located in Georgetown,
Delaware, and houses approximately 1200 male inmates, including a
100-bed boot camp.  BWCI is located in New Castle, Delaware, and
houses approximately 400 female pre-trial detainees and sentenced
inmates at all security levels.  Webb is located in Wilmington,
Delaware, and houses approximately 80 minimum security male
inmates.

## II.    FINDINGS

### A.  MEDICAL CARE

Under CRIPA, the Department of Justice has authority to
investigate violations of the constitutional rights of inmates in
prisons, and pre-trial detainees in jails.  The rights of
sentenced inmates fall under the Eighth Amendment, which
prohibits the imposition of cruel and unusual punishment.  Under
the Eighth Amendment, jails must provide humane conditions of
confinement, which include adequate medical care.  Farmer v.
Brennan. 511 U.S. 825, 832 (1994).  Failure to provide adequate
care to address the serious medical needs of inmates can
constitute deliberate indifference, a violation of the Eighth
Amendment prohibition against cruel and unusual punishment.

- 4 -

Estelle v. Gamble, 429 U.S. 27 (1976).  The responsibility to
provide adequate medical care includes mental health care.
Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990).  Failure to
protect a suicidal prisoner from self-harm can also amount to a
constitutional violation.  Inmates of Allegheny County v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Colburn v. Upper Darby
Township, 838 F.2d 663 (3d Cir. 1988).  The responsibility to
protect inmates from harm includes the possibility of future harm
as well as present harm.  Helling v. McKinney, 509 U.S. 25, 33
(1993); Tillery, 907 F.2d at 426.

     With regard to pre-trial detainees, the Fourteenth Amendment
prohibits imposing conditions or practices on detainees not
reasonably related to the legitimate governmental objectives of
safety, order, and security.  Bell v. Wolfish, 441 U.S. 420
(1979).  The Third Circuit has opined that the protections
afforded to pre-trial detainees are at least as great as those
afforded to sentenced prisoners.  Hubbard v. Taylor, 399 F.3d
150, 166-167 (3d Cir. 2005) (pre-trial detainees claims of
constitutional violations to be analyzed under Fourteenth
Amendment).

     Our investigation revealed that the medical care provided at
the facilities falls below the standard of care constitutionally
required in the following areas, all of which were also
identified by the State as deficient:  intake; medication
administration and management; nursing sick call; provider sick
call; scheduling, tracking, and follow-up on outside consults;
monitoring and treatment of communicable diseases; monitoring and
treatment of chronic diseases; medical records documentation;
scheduling; infirmary care; continuity of care following
hospitalizations; grievances; and patient confidentiality. In
addition, we found that care for patients with acute medical
urgencies was also constitutionally inadequate.

     1.  Sick Call

     The State's expert found that sick call is not being
regularly conducted at the facilities and that sick call
"no-shows" (inmates who do not appear for their scheduled medical
appointments) are not tracked.  Our investigation confirmed that
there are inadequate sick call systems in place which directly
interferes with inmates' access to care for their serious medical
needs.  Specifically, the systems are deficient in scheduling
appointments, and tracking no-shows.  For example, the inadequate
scheduling system at HRYCI resulted in only seven of the
representative sample of 14 patients scheduled for sick call on
one day being seen.  In addition, we found that inmates who

- 5 -

missed sick call were not tracked and, as a consequence, often
not rescheduled. The sick call process for inmates' requiring
mental health care suffers from similar inadequacies in
scheduling and follow-up. During our tours of BWCI and HRYCI, we
found that the sick call process is not functioning properly and
that there were significant delays for inmates who had requested
to see the psychiatrist. Overall, these conditions place inmates
at serious risk of harm.

## 2. Acute Care

Our investigation revealed that patients with life-
threatening conditions are not receiving timely care. We
reviewed the records of ten patients sent to the local emergency
room; six of these patients were admitted. One patient, known to
be infected with HIV, was admitted from HRYCI with pneumocystis
carinii pneumonia ("PCP"), a potentially fatal infection in
people with AIDS. We determined that this inmate's care had been
mismanaged at HRYCI for one month before the inmate was finally
sent to the hospital. In addition, this inmate was never tested
for active tuberculosis, a likely diagnosis for patients with HIV
and pneumonia. The failure to properly diagnose and treat this
inmate could have put other inmates and staff at risk of
contracting tuberculosis.

## 3. Chronic Care

The State's expert found that there are consistent backlogs
with respect to the treatment of chronic care inmates as
evidenced by infrequent scheduled appointments. When
appointments are scheduled, they are subject to cancellation
without explanation or follow-up. The State's expert also found
that the chronic care rosters are not adequately maintained.

Our investigation confirmed that there is no functioning
chronic disease registry at HRYCI. The absence of a chronic
disease registry means that patients with chronic diseases, such
as diabetes, hypertension, asthma, HIV, and Hepatitis C are not
being followed and treated according to generally accepted
medical standards for chronic care. As a result, inmates with
chronic disease are at risk for deterioration in function,
including blindness, kidney disease, heart disease, liver
failure, and death.

We found that care was especially poor for inmates with
diabetes, asthma, and HIV. Of nine inmates with diabetes whose
charts we reviewed, only four had received tests deemed necessary
pursuant to generally accepted professional standards for care of

- 6 -

persons with these serious, chronic diseases.  In addition, only
two inmates had been immunized against pneumococcus, a bacterium
that is the leading cause of bacterial pneumonia.  The failure to
immunize chronically ill inmates against pneumococcus places them
at serious risk of harm, including death from pneumococcal
pneumonia, and constitutes a substantial departure from generally
accepted standards of care.  Another diabetic inmate whose chart
we reviewed went without insulin for three days, despite severely
elevated blood sugar levels that were known to staff, placing him
at risk of death.

Similarly, for inmates with asthma, the chronic care
practices also fall below a minimally acceptable standard of
care.  For example, of nine asthmatic inmates who should have
been seen in the chronic care clinic over a three month period,
only three were seen.  Only two had documented measurement of
peak expiratory flow, which is a departure from the generally
accepted standard of care for asthmatic patients.

Finally, with respect to HIV-infected inmates, we found that
chronic care practices also fall below a minimally acceptable
standard of care.  Only two of five patients whose records our
medical consultant reviewed had documented laboratory
measurements of their CD4 cells[1] and their viral load, both of
which are necessary to gauge response to medication.

### 4.  Specialty Care

The State's expert found that outside consultations are
delayed by days or even weeks in non-emergency situations because
of bureaucratic obstacles within the private vendor's system for
obtaining authorization.  The State's expert also found that
shortages of security staff available to transport inmates to
outside medical appointments contributes to the inadequacy of
care.  In addition, the State's expert determined that, even when
outside consults are scheduled, post-consult follow-up does not
consistently occur.

Similarly, our investigation found that access to specialty
care is untimely, and that tracking of outside care is deficient,
creating an unacceptable barrier to adequate medical care ordered
by physicians.  For example, of 10 patients who were referred by
facility doctors for outside care, three received no care at all.

_____

[1]     CD4 cells are white blood cells that identify, attack
and destroy infections.  A normal CD4 cell count measures the
strength of a person's immune system.

- 7 -

All three patients had serious medical issues: two had upper gastrointestinal symptoms, including one patient who had documented possibly cancerous polyps with a biopsy ordered and performed, but no results in his file. A third patient had no documented follow-up with an orthopedist following serious trauma to his finger.

And, in the most extreme example, specialty care may have been denied altogether: in March, 2002, an SCI inmate died from a malignant brain tumor that had grown so large that it distorted his facial features, and was so noticeable that other inmates referred to him as "the brother with two heads." Fourteen months before he died, SCI medical staff allegedly misdiagnosed the cancerous growth as a cyst or an ingrown hair, and allegedly made no specialty care referral nor provided any specialty care to the inmate before he died.

### 5. Skin Infections

It is well-documented that, across the country, the incidence of skin infections among inmates is rising. These skin infections can include methicillin-resistant staphylococcus aureus ("MRSA"), a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death. MRSA transmission can be prevented by environmental controls, scrupulous laundry practices, early identification, effective treatment, wound care, and follow-up.

The State's expert found that, until recently, the medical staff were generally unfamiliar with the diagnosis and treatment of MRSA, and that the medical staff did not culture potential MRSA infections or educate inmates on proper precautions against the spread of MRSA until Fall 2005.

Our investigation revealed that proper diagnosis of and care for skin infections falls below the minimally acceptable level of care. We also found that medical staff routinely failed to culture skin infections; in addition, we found that wound care and follow-up were inadequate. For example, we reviewed the charts of eight inmates with skin infections at HRYCI; only two of these inmates received adequate care. One had a deep skin infection of the neck, but had no follow-up to see if his infection was spreading. Another inmate had inappropriate treatment for an infection that was accompanied by fever and chills, indicative of a systemic infection that could have led to pneumonia, brain infection, and death. Both of these patients were treated with the antibiotics that are ineffective in treating MRSA. With respect to wound care, we found another

- 8 -

inmate at BWCI who was inappropriately treated with a topical cream for an infection on her face, but who did not see the doctor for six days, by which time she had developed cellulitis, a deep skin infection that ultimately required hospitalization. Our investigative findings and the State's stipulation are also consistent with reports that DCC staff failed to properly diagnose and treat an MRSA infection in an inmate for four months in 2005.  This failure to recognize and treat MRSA allegedly caused the inmate to be hospitalized for five weeks, lose the skin on his scrotum, and undergo painful skin grafts, resulting in permanent deformity.

Our investigation confirmed that the existence of the above inadequacies place inmates and staff at risk of acquiring the infection and passing it to others in the community beyond the prison walls.  We also found that identification and treatment of skin infections at the facilities is inadequate, including failure to culture and treat wounds.  We found that facility staff does not keep adequate logs of skin infections, which prevents staff from being able to analyze data and identify potential sources of transmission.  Notably, in many cases physicians were prescribing the antibiotic Keflex, which not only is rarely effective for skin infections, including MRSA, but actually leads to prolonged infection and increased opportunities for the infection to spread.  Finally, we found that laundry practices at the Facilities are inadequate to prevent the spread of skin infections, including MRSA.

## 6.  Medication Administration and Management

The State's expert found that prescribed medications are routinely discontinued or delayed and that the current vendor has no systems in place for ensuring that medications do not run out, for notifying inmates when their medications have arrived, or for verifying that the vendor is providing inmates with the correct medications.

Our investigation confirmed these deficiencies which put inmates at risk of harm, particularly those with chronic conditions such as HIV.  We observed significant lapses in medication, due either to lack of availability of medications or the failure to administer medications consistently.  For example, one inmate had missed 20 consecutive days of his anti-viral medication used to treat the HIV, a potentially life-threatening situation; another inmate with HIV had a one month lag in receiving his HIV medications.

- 9 -

We also found that serial refusals to take medications were not monitored. Numerous inmates missed three or more doses of medications on three consecutive days, without any evidence of follow-up by the prescribing practitioner, or evidence that the inmate was sought out or counseled.

The State's expert found that numerous systemic problems with medication administration and management exist at the facilities, including: failure to distribute medications at the proper time intervals, leading to over- or under-prescribing medications; failure to provide necessary food at night to diabetic inmates; failure to properly monitor whether inmates are actually swallowing their medications; and pre-pouring medications.

Our investigation found similar deficiencies. Our review of medication administration records at HRYCI revealed that approximately ten percent of the entries were left blank, indicating that inmates had not received their medication, or that the medication administration was undocumented. We also found that the State routinely prescribes Keflex, an antibiotic, for skin infections, despite the fact that Keflex is rarely effective when used to treat skin infections. We also learned that the State plans to administer each dose of medication from stock bottles, instead of filling prescriptions for each patient, a practice which we believe will lead to poor inventory control, diversion, error, and lack of accountability.

## B. MENTAL HEALTH CARE

The responsibility to provide adequate medical care includes mental health care. <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 763 (3d Cir. 1979); <u>Tillery v. Owens</u>, 907 F.2d 418 (3d Cir. 1990). The State is constitutionally required to provide adequate mental health care to inmates with serious mental or emotional disturbances. The failure to provide necessary psychological or psychiatric treatment to such individuals will result in the "infliction of pain and suffering just as real as would result from the failure to treat serious physical ailments." <u>Inmates of Allegheny County Jail</u>, 612 F.2d at 763. The key to determining whether the State has provided constitutionally adequate mental health care depends on whether inmates have reasonable access to "medical personnel qualified to diagnose and treat such illnesses or disturbances." Id.

The State's mental health expert found substantial deficiencies with the mental health care provided at the facilities. The State's expert conducted a number of on-site

- 10 -

visits and determined that there is a "continuing need for
substantial remedial efforts, training and auditing of mental
health services provided by [the State's medical care provider]."
The State identified the following deficiencies: poor responses
to sick call requests, particularly in cases involving
potentially suicidal inmates; inadequate group and individualized
therapy; staffing inadequacies, lack of privacy for inmate mental
health counseling, insufficient discharge planning, inadequate
administration and management of psychotropic medications,
failure to properly develop treatment plans that are regularly
updated, failure to develop site-specific policies and procedures
for mental health care, failure to properly document
medical/mental health records, and failure to obtain consent
forms.  Our investigation confirmed the serious systemic
deficiencies in psychiatric staffing, treatment and counseling,
medication administration and management, and intake and
screening identified by the State's mental health expert.  We
conclude that these deficiencies violate inmates' constitutional
right to adequate care for serious mental illness.

### 1.  Psychiatric Staffing Deficiencies

The State's expert found that low psychiatric staffing at
the facilities have caused a backlog of inmates requiring
psychiatric care.  Although the facilities do have psychiatrists
who are available to provide care on-site, their hours at the
various facilities are limited.

Our investigation confirmed that psychiatric staffing is
inadequate to provide for inmates' serious mental health needs.
For example, during our tour of HRYCI, the State informed us that
there are two part-time psychiatrists who provide care at HRYCI,
but our investigation revealed that their combined time on-site
totals less than twenty hours, and there is no on-site
psychiatric coverage provided for two days out of the week.
Psychiatric coverage at BWCI is even more limited.  Our
investigation revealed that a psychiatrist is on site only four
hours per week, and the "on-call psychiatrist" generally provides
guidance only via telephone.  Further, we understand that
included in the four hours is time that the psychiatrist spends
at the Violation of Probation Center attached to BWCI for two
hours every other week.  Such limited psychiatric staffing is not
constitutionally adequate care because inmates do not have
reasonable access to psychiatrists.  See Inmates of Allegheny
County Jail v. Pierce, 487 F. Supp. 638, 643 (W.D. Pa. 1980).

As a result of inadequate psychiatric staffing, we found
numerous instances in which the mental health clinical staff are

providing care that they are not licensed to provide (e.g.,
diagnosis of mental health disorders, treatment development
without proper psychiatric consultation, decisions regarding
suicide watch step-downs, etc.). We found that psychiatrists are
routinely unavailable for treatment team and staff meetings, and
often are not involved in crucial decision-making, and are not
adequately involved in monitoring and supervision of staff. In
addition, we found that the psychiatrist who provides most of the
care at HRYCI was not familiar with the procedures utilized for
making decisions about which medications to prescribe for
patients with psychotic disorders. Generally accepted standards
of care dictate that a psychiatrist be responsible for providing
mental health treatment to seriously mentally ill patients should
lead treatment teams, direct medication procedures, and be
meaningfully involved in treatment decisions.

### 2. Treatment Planning and Counseling Deficiencies

The State's expert found that treatment plans for inmates
need to be developed more regularly so that psychologists do not
unnecessarily change diagnoses and so that patients are put on
the appropriate problem list. Treatment plan development is an
integral part of mental health care. One aspect of treatment
planning consists of psychiatric and clinical staff providing
consistent notations in medical records to ensure that important
information regarding an inmate's care is documented. The
State's expert, Dr. Stellman, concluded that there is a continued
need for remedial efforts and training in the area of medical
records documentation at DOC facilities. Dr. Stellman also found
that many medical records do not contain consent forms, and
contain improperly completed mental health forms.

Likewise, we found that the poor documentation impacts
treatment because it is virtually impossible for a qualified
mental health professional to review patient medical records and
determine how basic clinical decisions are being made (e.g., why
an inmate was admitted to the infirmary; why medications are
prescribed; why and how psychiatric close observation levels are
changed; what are the bases for diagnostic conclusions). During
our tour of BWCI, we reviewed the medical record of an inmate who
had recently attempted suicide and found the psychiatric notes
were deficient and difficult to interpret. Both the on-site and
"on-call" psychiatrists made adjustments to this inmate's
medication without any explanation. Also, despite the fact that
this inmate had been on suicide watch on three occasions within a
four-month period and was obviously in distress, there were
sparse psychiatric notes in her file.

- 12 -

Generally accepted standards of care dictate that discharge treatment planning be provided for inmates who have serious mental illness to ensure continuity of care.  The State's expert found that its inmate treatment plans fail to address how the patient's care will continue once he or she is released from the DOC facility.[2]

The State's expert also found deficiencies in the individual and group counseling services provided at DOC correctional facilities.  There appears to be a limited ability to provide individual counseling sessions to inmates because of a lack of privacy.  The State's expert found that when inmates are housed in the infirmary, psychiatrists and mental health staff do their interviews through the cell door and that, because cells typically have at least one other occupant when these interviews are being conducted, the encounters are not confidential.  This is a wholly inadequate practice evidencing a denial of reasonable access to psychiatric diagnosis and care.  See Inmates of Allegheny County Jail, 612 F.2d at 763.

Group counseling services at the facilities fall below accepted standards, as well.  The State's expert found that there was a need for remedial measures and training with respect to the provision of group and individualized therapy.

Similarly, we found the counseling services to be constitutionally inadequate.  Because the facilities are substantially understaffed with respect to psychiatrists, physicians generally do not participate in the treatment team or staff meetings.  For example, during our tour of BWCI we found that the master's level clinicians who run the group psychotherapy program (e.g., depression group, anger management group, and addiction group) in the Harbor House Unit do not receive any oversight from a psychiatrist.  Generally accepted professional standards dictate that the psychiatrist be the treatment team leader and be meaningfully involved in key treatment decisions.  However, clinicians are making important treatment decisions that should be left to the professional

---

[2]     NCCHC standards J-E-13 and P-E-13 require jurisdictions to develop discharge planning for inmates with serious mental illness (e.g., medication for a short period of time following release and referrals to community health providers).  Also see, Foster v. Fulton County, 223 F. Supp 2d 1301, 1310 (N.D. Ga. 2002) (holding that a jurisdiction was required to develop meaningful discharge planning for physically and mentally ill prisoners).

- 13 -

judgment of a psychiatrist, or at least made with the
consultation of a psychiatrist.  Our review of the medical
records at BWCI and HRYCI revealed that clinicians are recording
psychiatric diagnoses and making observation status decisions
about patients in the infirmary, including which inmates should
be removed from suicide watch, and at what pace.  Psychiatrists
should be performing these tasks because psychiatric diagnoses
drive treatment decisions.

    The State's practice of allowing clinicians to make
important decisions regarding the care and treatment of inmates
with serious mental illness puts patients at risk.  There were
three suicides at HRYCI in 2006.  A clinician's decision, in May
2006, to downgrade an inmate's observation status may have aided
the inmate's ability to commit suicide a few days after he
entered the facility.  The State took custody of this inmate
after his release from a local hospital for treatment related to
a suicide attempt.  Apparently he was initially placed on one-to-
one observation status, but he was later downgraded to a less-
restrictive suicide watch despite warnings from a mental health
advocate about his vulnerable mental state and need for a mental
health evaluation.

### 3.  Psychotropic Medication Administration and Management

    The State's expert found that there is a continuing need for
substantial remedial efforts, training, and auditing with respect
to the management of psychotropic medications.

    Our investigation revealed that the medication
administration and management of psychotropics at DOC facilities
is constitutionally inadequate.  We observed during our tours at
BWCI and HRYCI that there are systemic problems with initiating
drug therapy for newly admitted inmates.  It appears that this
problem may be partially the result of a deficient intake and
screening process.  Because the intake process is deficient there
is rarely an attempt to obtain psychiatric records from community
providers which would identify any psychotropic medications that
were previously prescribed.  If outside records were routinely
obtained the delay that we observed with regard to initiating
drug therapy for newly admitted inmates might be eradicated or at
least greatly diminished.

    We also found that the psychotropic medications that newly
admitted inmates are often prescribed by community providers were
substituted with other medications which may not be as
therapeutically effective.  We encountered inmates at HRYCI who
appeared to have diminished symptom control and decreased

- 14 -

functional ability as a result of the substitution of
psychotropic medications.  Another deficiency that we found with
psychotropic medication administration is a lack of consistent
and timely distribution of medications.  Because the medication
inventory does not appear to be properly controlled, medication
shortages have resulted in interrupted drug therapy.

Finally, we found that monitoring of medication is deficient
at the facilities.  The use of certain psychotropic medications
may cause metabolic effects, such as weight gain, hyperlipidemia,
and type II diabetes mellitus.  As such, generally accepted
standards of care require prescribing physicians to monitor
weight, body mass index, and abdominal girth on a regular basis.
Our review of medical records at BWCI and HRYCI indicate that the
State is not following this practice.  Another side effect of
certain psychotropic drugs is tardive dyskinesia (involuntary
movement disorder).  Psychiatrists generally monitor this side
effect by performing the Abnormal Involuntary Movement Scale
("AIMS") on a regular bases.  The State's expert found that AIMS
tests are not being done once every six months as required.

## 4.  Intake and Screening

We found the intake and screening process with respect to
the identification of seriously mentally ill inmates to be
constitutionally inadequate.  The intake and screening process
for medical and mental health is combined and performed by
nursing staff members who do not appear to have received adequate
mental health training or have a sufficient background in mental
health.  Accordingly, they are unable to appropriately identify
symptoms of mental illness.

During our tour of HRYCI, we found that the staff's lack of
experience with mental health issues is exacerbated by the high
volume of newly admitted inmates that are processed per shift.
These deficiencies have resulted in the failure to identify
inmates with serious mental illness which causes delays in
treatment.  Another impact of failing to identify inmates with
mental illness is that disciplinary sanctions may be
inappropriately imposed on mentally ill inmates, because of
behavior that could be more appropriately addressed by mental
health care and treatment instead of discipline.  For example,
during our tour of BWCI, we observed inmates in isolation who had
not been properly identified has having mental illness, or who
had not received adequate treatment for their diagnosed mental
illness.  For such inmates, care should be taken to ensure that
they are not unfairly disciplined for "acting out" when mental
health intervention is a more appropriate response.

- 15 -

    We also found that intake and screening for juveniles was constitutionally inadequate at HRYCI.  During our tour, we reviewed a number of juvenile medical records to determine whether this special needs population was receiving comprehensive mental health evaluations subsequent to their initial intake survey.  However, it appeared that such evaluations were not being routinely performed.

    C.  Suicide Prevention

    Our investigation revealed that the State's practices regarding suicide prevention substantially depart from generally accepted professional standards and expose inmates to significant risk of harm.  Our investigation uncovered a system in which inmates at risk for suicide are not adequately identified, housed and supervised.

    The State fails to adequately assess and identify inmates at risk for suicide.  While the form used to conduct intake assessments is good, the personnel conducting the assessment lack appropriate training and experience with issues related to mental health and suicide prevention.  Assessments are often performed by contract or agency LPN's who have not been trained adequately in suicide prevention techniques.  Additionally, while the State's medical provider conducts training of its employees on suicide prevention, it has not implemented its training curricula as policy or standard operating procedure.  Similarly, correctional staff receive insufficient training in the area of suicide prevention.  Training at the academy is only two or three hours, and annual refresher training methods are not adequate.

    The intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions.  In these instances, the inmate signs a release, but outside confirmations of their medical and mental health records/histories are not consistently obtained and verified.  Furthermore, post-intake follow-up of new inmates, which should be conducted within 14 days, is not done.  Instead, follow-up is rolled into the initial intake process, increasing the possibility that at-risk inmates will not be identified.

    The State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety.  Protrusions from walls and ceilings, window frames and grates, and even the design of bunk beds in some cells provide potential anchors strong enough to support an inmate's weight in an attempt at hanging.  For example, in August 2006, an

- 16 -

HRYCI inmate who hanged himself at HRYCI was housed in an infirmary cell following his admission because he was recovering from a gunshot wound sustained during his arrest. It is not clear what fixture the inmate used to hang himself, but it is apparent that the cells in the infirmary, like those in the other areas of the facility, are not sufficient to ensure the safety of inmates with suicidal ideations. Hanging was the means used in the May 2006 and February 2005 suicides at HRYCI. Additionally, unsafe light fixtures in some cells, if broken, provide a potential source of sharp-edged pieces of plastic or glass that could be used for self-harm.

The State fails to ensure that appropriate levels of observation are maintained. Documentation of 15- and 30-minute checks does not indicate that these checks are being done. Staff at one facility reported conflicting requirements for checks at lesser levels of observation, highlighting confusion about which interval was the actual policy. Rounds by mental health staff for inmates in isolation and on special units are not regularly done. Additionally, staff at some facilities incorrectly suggested that the various undocumented incidental contacts with at-risk inmates throughout the day, such as dispensing medication or picking up sick call slips, sufficed as a periodic check for inmates' safety.

### III.  MINIMUM REMEDIAL MEASURES

In order to address the constitutional deficiencies identified above and to protect the constitutional rights of inmates, we recommend the following measures:

1.  The State should ensure that appropriate access to medical care, including development and implementation of a functional sick call system that appropriately schedules medical appointments, and properly tracks and reschedules "no shows."

2.  The State should ensure that chronic disease registries are implemented and maintained at DOC facilities.

3.  The State should provide appropriate continuing care for patients with chronic diseases and ensure that backlogs are eliminated and do not redevelop.

4.  The State should ensure that outside consultations are not unnecessarily delayed and that appropriate post-consult follow-up care is provided.  The State should ensure that

- 17 -

security staffing levels do not negatively impact the
provision of outside consultations.

5.  The State should implement appropriate measures to identify,
    track, and treat skin infections, including culturing and
    treating wounds and prescribing effective antibiotics.

6.  The State should ensure the distribution of medication to
    patients at proper time intervals.  The State should
    implement a system to ensure that proper medications are
    being received and that sufficient stocks of medications are
    maintained to avoid interruptions or delays in their
    delivery.

7.  The State should track serial refusals of medication by
    patients and ensure that prescribing physicians are notified
    of such occurrences and that appropriate follow-up with
    patients takes place.

8.  The State should ensure that there is adequate psychiatric
    coverage provided at DOC facilities.

9.  The State should ensure that psychiatrists are actively
    involved in inmate care, including:  functioning as the
    treatment team leader; making psychiatric diagnoses;
    providing necessary monitoring and supervision of staff; and
    promoting quality mental health care.

10. The State should provide appropriate medication distribution
    and management systems to ensure that psychotropic
    medications are available, distributed in a timely manner,
    and adequately monitored.

11. The State should ensure that psychiatrists prescribe
    therapeutically effective medications.  If a decision is
    made to adjust or substitute the medications that an inmate
    was on prior to their detention or incarceration at a DOC
    facility, the psychiatrist should provide a clear
    justification for making the adjustment or substitution in
    the inmate's medical record.

12. The State should ensure that appropriately trained staff
    perform a mental health screening at intake.

13. The State should provide appropriate counseling space for
    qualified mental health professionals to provide mental
    health treatment to inmates with serious mental illness.

- 18 -

14. The State should ensure that the mental health staff is
    appropriately documenting the care provided to inmates with
    serious mental illness.

15. The State should provide appropriate treatment plans for
    inmates with serious mental illness.  The treatment plans
    will be reviewed on a routine bases to ensure quality of
    care.

16. The State should develop site specific mental health
    policies for HRYCI and DCC.

17. The State should develop a comprehensive policy regarding
    suicide prevention for DOC facilities.

18. The State should ensure that all medical, mental health and
    correctional staff are appropriately trained regarding
    issues of suicide prevention, and that the content of their
    training is reflective of that State's suicide prevention
    policy.

19. The State should ensure that intake staff are sufficiently
    experienced and qualified to identify inmates that pose a
    risk for suicide, and that follow mental health staff
    conduct appropriate follow-up evaluations of new inmates
    within 14 days of intake.

20. The State should ensure that inmates identified as at risk
    for suicide are housed in safe cells, free from fixtures and
    design features that could facilitate a suicide attempt.

21. The State should ensure that 15- and 30-minute checks of
    inmates under observation for risk of suicide are timely
    performed and appropriately documented.

\* \* \*

Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website and we
will provide a copy of this letter to any individual or entity
upon request.

- 19 -

As stated above, we appreciate the cooperation we have received throughout this investigation from State officials and staff at the facilities. We appreciate the State's proactive measures to respond to its own internal audit and our feedback to date to improve the quality of services at the facilities. We hope to be able to continue working with the State in an amicable and cooperative fashion to resolve the deficiencies we found at the facilities. Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover. Although their report are their work – and do not necessarily represent the official conclusions of the Department of Justice – their observations, analyses and recommendations provide further elaboration of the relevant concerns, and offer practical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you. Accordingly, we will soon contact State officials and counsel to discuss this matter in further detail.

If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

Wan J. Kim
Assistant Attorney General

cc:  Carl C. Danberg
     Attorney General

     Stanley W. Taylor, Jr.
     Department of Correction Commissioner

     Thomas L. Carroll, Warden
     Delaware Correctional Center

- 20 -

Raphael Williams, Warden
Howard R. Young Correctional Institution

Rick Kearney, Warden
Sussex Correctional Institution

Robert Young, Acting Warden
John L. Webb Correctional Facility

Patrick Ryan, Warden
Delores J. Baylor Women's Correctional Institution

Colm Connelly
United States Attorney
District of Delaware

Michael R. Bromwich, Esq.
Beth C. McClain, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP

MEMORANDUM OF AGREEMENT BETWEEN THE UNITED STATES
DEPARTMENT OF JUSTICE AND THE STATE OF DELAWARE REGARDING THE
DELORES J. BAYLOR WOMEN'S CORRECTIONAL INSTITUTION, THE
DELAWARE CORRECTIONAL CENTER, THE HOWARD R. YOUNG
CORRECTIONAL INSTITUTION, AND THE SUSSEX CORRECTIONAL
INSTITUTION

# **TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

II.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .    4

III.  MEDICAL AND MENTAL HEALTH CARE . . . . . . . . . . . . . . . . . . . .    6

IV.   SUICIDE PREVENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

V.    QUALITY ASSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

VI.   IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

VII.  MONITORING, ENFORCEMENT, AND TERMINATION . . . . . . . . .    18

I.    **INTRODUCTION**

A.    On March 7, 2006, the United States Department of Justice ("DOJ"), notified the State of Delaware ("the State") of DOJ's intent to investigate the adequacy of medical and mental health care services in five facilities operated by the State's Department of Correction pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 to determine whether those services violated inmates' constitutional rights. The facilities investigated were:

1. Delores J. Baylor Women's Correctional Institution ("Baylor");

2. Howard R. Young Correctional Institution, ("Howard Young");

3. John L. Webb Correctional Facility ("Webb");

4. Delaware Correctional Center ("DCC"); and

5. Sussex Correctional Institution ("Sussex").

B.    DOJ staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006. In addition, DOJ staff, accompanied by consultants in medical care, mental health care and suicide prevention, toured Howard Young on October 4-6, 2006, Baylor and Webb on October 23-25, 2006 and Baylor again on November 15-17, 2006.

C.    On December 29, 2006, the DOJ issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1) which alleged that certain conditions at Baylor, DCC, Howard Young, and Sussex violated the constitutional rights of Delaware inmates. It is the position of the DOJ that deficiencies in medical care, mental health care and suicide prevention at these four facilities [collectively referred to herein as "the Facilities"; see Definitions, paragraph A] were inconsistent with constitutional standards of care. The DOJ made no findings with respect to Webb.

D.    Before the investigation began, the State had initiated its own efforts to improve conditions at the Facilities. During the investigation, the State also commissioned an extensive internal review of the Facilities with the assistance of medical, mental health, and legal consultants, the detailed results of which they subsequently shared with DOJ and DOJ's consultants. Throughout the course of the investigation, the State of Delaware and the staff at each Facility cooperated thoroughly and indicated a willingness to proactively and voluntarily undertake measures to improve conditions throughout the system. Consequently, the Parties enter into this Memorandum of Agreement ("Agreement") for the purpose of utilizing their resources in support of improving medical and mental health care at

3

the Facilities, rather than allocating such resources to the risks and burdens of litigation.

E.     The Parties to this Agreement do not intend to create in any non-party the status of third party beneficiary. This Agreement shall not be construed so as to create a private right of action to any non-party against the State or the United States. The rights, duties and obligations contained in this Agreement shall bind only the Parties to this Agreement.

F.     In entering into this Agreement, the State does not admit any violations of the constitutional rights of inmates confined at the Facilities nor does it admit any violation of state or federal law. This Agreement may not be used as evidence of liability in any other legal proceeding. However, the State remains firmly committed to improving medical and mental health care at the Facilities.

G.     The Parties acknowledge that Correctional Medical Services ("CMS") currently provides medical and mental health care to inmates at the Facilities and that such care is provided pursuant to a contract with CMS that sets forth the terms and conditions of the relationship between the State and CMS. The State shall be responsible for ensuring that CMS (or any successor contractor) complies with the terms of this Agreement. Nothing in this paragraph shall abrogate the State's responsibility to comply fully with the terms of this Agreement.

H.     It is expressly understood and acknowledged that, while this Agreement makes no distinctions between those issues concerning inmate medical and mental health care that were previously modified and improved prior to the issuance of the findings letter and those that shall be modified and/or improved by virtue of the terms of this Agreement, the Parties acknowledge that a number of the policies and/or procedures which this Agreement addresses were implemented or in the process of being implemented prior to the issuance of the findings letter.

## II.  DEFINITIONS

In this Agreement, the following definitions apply:

A.     "The Facilities" means Baylor, DCC, Howard Young, and Sussex, collectively, as well as any facility that is built to replace or supplement any one of them.

B.     "Effective date" means the date the Agreement is executed by the Parties.

C.     "Generally accepted professional standards" means those industry standards accepted by a significant majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National

4

Commission on Correctional Health Care (NCCHC) . DOJ acknowledges that NCCHC has established different standards for jail and prison populations, and that the relevant standard that applies under this Agreement may differ for pre-trial and sentenced inmates. As used in this Agreement, the terms "adequate," "appropriate," and "sufficient" refer to standards established by clinical guidelines in the relevant field. The Parties shall consider clinical guidelines promulgated by professional organizations in assessing whether generally accepted professional standards have been met.

D.   "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

E.   "Inmates" means individuals sentenced to, incarcerated in, detained at, or otherwise confined at any of the Facilities.

F.   "Inmates with special needs" means inmates who are identified as suicidal, mentally ill, developmentally disabled, seriously or chronically ill, who are physically disabled, who have trouble performing activities of daily living, or who are a danger to themselves.

G.   "Isolation" means the placement of an inmate alone in a locked room or cell, except that it does not refer to adults single celled in general population.

H.   "Juveniles" means individuals detained at a facility who are under the age of eighteen (18).

I.   "Medical staff" means medical professionals, nursing staff, and certified medical assistants.

J.   "Medical professional" means a licensed physician, licensed physician assistant, or a licensed nurse practitioner providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services he or she has undertaken to provide.

K.   "Mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, psychiatric social work, activity therapy, recreational therapy or psychiatric nursing, currently licensed to the extent required by the State of Delaware to deliver those mental health services he or she has undertaken to provide.

L.   "Monitor" as used in this Agreement means the Monitor established by Section VII of this Agreement, and all persons or entities associated by the Monitor to assist in performing the monitoring tasks.

M.   "Nursing staff" means registered nurses, licensed practical nurses, and licensed vocational nurses providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services they have undertaken to provide.

N.   "The Parties" means the State and the DOJ.

O.   "Security staff" means all employees, irrespective of job title, whose regular duties include the supervision of inmates at the Facilities.

P.   "The State" means officials of the State of Delaware, including officials of the Department of Correction and its Bureau of Prisons, and their successors, contractors and agents.

Q.   "Train," when the term is used in remedial provisions of this Agreement, means to adequately instruct in the skills addressed, including assessment of mastery of instructional material.

## III.   MEDICAL AND MENTAL HEALTH CARE

### GENERAL PROVISIONS

(1)   Standard  The State shall ensure that services to address the serious medical and mental health needs of all inmates meet generally accepted professional standards.

(2)   Policies and Procedures  The State shall develop and revise its policies and procedures including those involving intake, communicable disease screening, sick call, chronic disease management, acute care, infection control, infirmary care, and dental care to ensure that staff provide adequate ongoing care to inmates determined to need such care. Medical and mental health policies and procedures shall be readily available to relevant staff.

(3)   Record keeping  The State shall develop and implement a unitary record-keeping system to ensure adequate and timely documentation of assessments and treatment and adequate and timely access by medical and mental health care staff to documents that are relevant to the care and treatment of inmates. A unitary record-keeping system consists of a system in which all clinically appropriate documents for the inmate's treatment are readily available to each clinician. The State shall maintain a unified medical and mental health file for each inmate and all medical records, including laboratory reports, shall be timely filed in the medical file. The medical records unit shall be adequately staffed to prevent significant lags in filing records in an inmate's medical record. The State shall maintain the medical records such that persons providing medical or mental health

6

treatment may gain access to the record as needed. The medical record should be complete, and should include information from prior incarcerations. The State shall implement an adequate system for medical records management.

(4)  <u>Medication and Laboratory Orders</u>  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure timely responses to orders for medications and laboratory tests. Such policies, procedures, and practices shall be periodically evaluated to ensure that delays in inmates' timely receipt of medications and laboratory tests are prevented.

## Staffing and Training

(5)  <u>Job Descriptions and Licensure</u>  The State shall ensure that all persons providing medical or mental health treatment meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. The State shall establish a credentialing program that meets generally accepted professional standards, such as those required for accreditation by the National Committee for Quality Assurance.

(6)  <u>Staffing</u>  The State shall maintain sufficient staffing levels of qualified medical staff and mental health professionals to provide care for inmates' serious medical and mental health needs that meets generally accepted professional standards.

(7)  <u>Medical and Mental Health Staff Management</u>  The State shall ensure that a full-time medical director is responsible for the management of the medical program. The State shall also provide a director of nursing and adequate administrative medical and mental health management. In addition, the State shall ensure that a designated clinical director shall supervise inmates' mental health treatment at the Facilities. These positions may be filled either by State employees, by independent contractors retained by the State, or pursuant to the State's contract with a correctional health care vendor.

(8)  <u>Medical and Mental Health Staff Training</u>  The State shall continue to ensure that all medical staff and mental health professionals are adequately trained to meet the serious medical and mental health needs of inmates. All such staff shall continue to receive documented orientation and in-service training in accordance with their job classifications, and training topics shall include suicide prevention and the identification and care of inmates with mental disorders.

(9)  <u>Security Staff Training</u>  The State shall ensure that security staff are adequately trained in the identification, timely referral, and proper supervision of inmates with serious medical or mental health needs. The State shall ensure that security staff assigned to mental health units receive additional training related to the proper supervision of inmates suffering from mental illness.

7

## Screening and Treatment

(10)   Medical Screening  The State shall ensure that all inmates receive an appropriate and timely medical screening by a medical staff member upon arrival at a facility.  The State shall ensure that such screening enables staff to identify individuals with serious medical or mental health conditions, including acute medical needs, infectious diseases, chronic conditions, physical disabilities, mental illness, suicide risk, and drug and/or alcohol withdrawal.  Separate mental health screening shall be provided as described in Paragraph 34.

(11)   Privacy  The State shall make reasonable efforts to ensure inmate privacy when conducting medical and mental health screening, assessments, and treatment.  However, maintaining inmate privacy shall be subject to legitimate security concerns and emergency situations.

(12)   Health Assessments  The State shall ensure that all inmates receive timely medical and mental health assessments.  Upon intake, the State shall ensure that a medical professional identifies those persons who have chronic illness.  Those persons with chronic illness shall receive a full health assessment between one (1) and seven (7) days of intake, depending on their physical condition.  Persons without chronic illness should receive full health assessment within fourteen (14) days of intake.  The State will ensure that inmates with chronic illnesses will be tracked in a standardized fashion.  A re-admitted inmate or an inmate transferred from another facility who has received a documented full health assessment within the previous twelve (12) months, and whose receiving screening shows no change in health status, need not receive a new full medical and mental health assessment.  For such inmates, medical staff and mental health professionals shall review prior records and update tests and examinations as needed.

(13)   Referrals for Specialty Care  The State shall ensure that: a) inmates whose serious medical or mental health needs exceed the services available at their facility shall be referred in a timely manner to appropriate medical or mental health care professionals; b) the findings and recommendations of such professionals are tracked and documented in inmates' medical files; and c) treatment recommendations are followed as clinically indicated.

(14)   Treatment or Accommodation Plans  Inmates with special needs shall have special needs plans.  For inmates with special needs who have been at the facility for thirty (30) days, this shall include appropriate discharge planning.  The DOJ acknowledges that for sentenced inmates with special needs, such discharge planning shall be developed in relation to the anticipated date of release.

(15) <u>Drug and Alcohol Withdrawal</u> The State shall develop and implement appropriate written policies, protocols, and practices, consistent with standards of appropriate medical care, to identify, monitor, and treat inmates at risk for, or who are experiencing, drug or alcohol withdrawal. The State shall implement appropriate withdrawal and detoxification programs. Methadone maintenance programs shall be offered for pregnant inmates who were addicted to opiates and/or participating in a legitimate methadone maintenance program when they entered the Facilities.

(16) <u>Pregnant Inmates</u> The State shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.

(17) <u>Communicable and Infectious Disease Management</u> The State shall adequately maintain statistical information regarding contagious disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

(18) <u>Clinic Space and Equipment</u> The State shall ensure that all face-to-face nursing and physician examinations occur in settings that provide appropriate privacy and permit a proper clinical evaluation including an adequately-sized examination room that contains an examination table, an operable sink for hand-washing, adequate lighting, and adequate equipment, including an adequate microscope for diagnostic evaluations. The State shall submit a comprehensive action plan as described in Paragraph 65 of this Agreement identifying the specific measures the State intends to take in order to bring the Facilities into compliance with this paragraph.

**Access to Care**

(19) <u>Access to Medical and Mental Health Services</u> The State shall ensure that all inmates have adequate opportunity to request and receive medical and mental health care. Appropriate medical staff shall screen all written requests for medical and/or mental health care within twenty-four (24) hours of submission, and see patients within the next 72 hours, or sooner if medically appropriate. The State shall maintain sufficient security staff to ensure that inmates requiring treatment are escorted in a timely manner to treatment areas. The State shall develop and implement a sick call policy and procedure which includes an explanation of the order in which to schedule patients, a procedure for scheduling patients, where patients should be treated, the requirements for clinical evaluations, and the maintenance of a sick call log. Treatment of inmates in response to a sick call slip should occur in a clinical setting.

(20) <u>Isolation Rounds</u> The State shall ensure that medical staff make daily sick call rounds in the isolation areas, and that nursing staff make rounds at least three times a week, to give inmates in isolation adequate opportunities to contact and discuss health and mental

9

health concerns with medical staff and mental health professionals in a setting that affords as much privacy as security will allow.

(21)    Grievances  The State shall develop and implement a system to ensure that medical grievances are processed and addressed in a timely manner.  The State shall ensure that medical grievances and written responses thereto are included in inmates' files, and that grievances and their outcomes are logged, reviewed, and analyzed on a regular basis to identify systemic issues in need of redress.  The State shall develop and implement a procedure for discovering and addressing all systemic problems raised through the grievance system.

## Chronic Disease Care

(22)    Chronic Disease Management Program  The State shall develop and implement a written chronic care disease management program, consistent with generally accepted professional standards, which provides inmates suffering from chronic illnesses with appropriate diagnosis, treatment, monitoring, and continuity of care.  As part of this program, the State shall maintain a registry of inmates with chronic diseases.

(23)    Immunizations  The State shall make reasonable efforts to obtain immunization records for all juveniles who are detained at the Facilities for more than one (1) month.  The State shall ensure that medical staff update immunizations for such juveniles in accordance with nationally recognized guidelines and state school admission requirements.  The physicians who determine that the vaccination of a juvenile or adult inmate is medically inappropriate shall properly record such determination in the inmate's medical record.  The State shall develop policies and procedures to ensure that inmates for whom influenza, pneumonia and Hepatitis A and B vaccines are medically indicated are offered these vaccines.

## Medication

(24)    Medication Administration  The State shall ensure that all medications, including psychotropic medications, are prescribed appropriately and administered in a timely manner to adequately address the serious medical and mental health needs of inmates.  The State shall ensure that inmates who are prescribed medications for chronic illnesses that are not used on a routine schedule, including inhalers for the treatment of asthma, have access to those medications as medically appropriate.  The State shall develop and implement adequate policies and procedures for medication administration and adherence.  The State shall ensure that the prescribing practitioner is notified if a patient misses a medication dose on three consecutive days, and shall document that notice.  The State's formulary shall not unduly restrict medications.  The State shall review its medication administration policies and procedures and make any appropriate revisions.

10

The State shall ensure that medication administration records ("MARs") are appropriately completed and maintained in each inmate's medical record.

(25)   <u>Continuity of Medication</u>   The State shall ensure that arriving inmates who report that they have been prescribed medications shall receive the same or comparable medication as soon as is reasonably possible, unless a medical professional determines such medication is inconsistent with generally accepted professional standards.  If the inmate's reported medication is ordered discontinued or changed by a medical professional, a medical professional shall conduct a face-to-face evaluation of the inmate as medically appropriate.

(26)   <u>Medication Management</u>   The State shall develop and implement guidelines and controls regarding the access to, and storage of, medication as well as the safe and appropriate disposal of medication and medical waste.

## Emergency Care

(27)   <u>Access to Emergency Care</u>   The State shall train medical, mental health and security staff to recognize and respond appropriately to medical and mental health emergencies. Furthermore, the State shall ensure that inmates with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary.

(28)   <u>First Responder Assistance</u>   The State shall train all security staff to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in an emergency situation.   The State shall provide all security staff with the necessary protective gear, including masks and gloves, to provide first line emergency response.

## Mental Health Care

(29)   <u>Treatment</u>   The State shall ensure that qualified mental health professionals provide timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities to inmates requesting mental health services, inmates who become suicidal, and inmates who enter with serious mental health needs or develop serious mental health needs while incarcerated.

(30)   <u>Psychiatrist Staffing</u>   The State shall retain sufficient psychiatrists to enable the Facilities to address the serious mental health needs of all inmates with timely and appropriate mental health care consistent with generally accepted professional standards.  This shall include retaining appropriately licensed and qualified psychiatrists for a sufficient number of hours per week to see patients, prescribe and adequately monitor psychotropic medications, participate in the development of individualized treatment plans for inmates

11

with serious mental health needs, review charts in the context of rendering appropriate mental health care, review and respond to the results of diagnostic and laboratory tests, and be familiar with and follow policies, procedures, and protocols. The psychiatrist shall collaborate with the chief psychologist in mental health services management as well as clinical treatment, shall communicate problems and resource needs to the Warden and chief psychologist, and shall have medically appropriate autonomy for clinical decisions at the facility. The psychiatrist shall supervise and oversee the treatment team.

(31)    Administration of Mental Health Medications  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that psychotropic medications are prescribed, distributed, and monitored properly and safely and consistent with generally accepted professional standards. The State shall ensure that all psychotropic medications are administered by qualified medical professionals or other health care personnel qualified under Delaware state law to administer medications, who consistently implement adequate policies and procedures to monitor for adverse reactions and potential side effects and to adequately document the administration of such medications in the MARs. Documentation in the MARs shall include a clear and consistent indication of whether the inmate refused or otherwise missed any doses of medication, as well as doses consumed. As part of the quality assurance program set forth in Section V of this Agreement, a qualified medical professional or registered nurse supervisor shall review MARs on a regular and periodic basis to determine whether policies and procedures are being followed.

(32)    Mental Illness Training  The State shall conduct initial and periodic training for all security staff on how to recognize symptoms of mental illness and respond appropriately. Such training shall be conducted by a qualified mental health professional, registered psychiatric nurse, or other appropriately trained and qualified individual, and shall include instruction on how to recognize and respond to mental health emergencies.

(33)    Mental Health Screening  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted correctional mental health care standards to ensure that all inmates receive an adequate initial mental health screening by appropriately trained staff within twenty-four (24) hours after intake. Such screening shall include an individual private (consistent with security limitations) interview of each incoming inmate, including whether the inmate has a history of mental illness, is currently receiving or has received psychotropic medications, has attempted suicide, or has suicidal propensities. Documentation of the screening shall be maintained in the appropriate medical record. Inmates who have been on psychotropic medications prior to intake will be assessed by a psychiatrist as to the need to continue those medications, in a timely manner, no later than 7-10 days after intake or sooner if clinically appropriate. These inmates shall remain on previously prescribed psychotropic medications pending psychiatrist assessment. Incoming inmates who are in need of emergency mental health services shall receive such care immediately after intake.

12

Incoming inmates who require resumption of psychotropic medications shall be seen by a psychiatrist as soon as clinically appropriate.

(34)  <u>Mental Health Assessment and Referral</u>  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted professional standards to ensure timely and appropriate mental health assessments by qualified mental health professionals for those inmates whose mental health histories, or whose responses to initial screening questions, indicate a need for such an assessment.  Such assessments shall occur within seventy-two (72) hours of the inmate's mental health screening or the identification of the need for such assessment, whichever is later.  The State shall also ensure that inmates have access to a confidential self-referral system by which they may request mental health care without revealing the substance of their request to security staff.  Written requests for mental health services shall be forwarded to a qualified mental health professional and timely evaluated by him or her.  The State shall ensure adequate and timely treatment for inmates whose assessments reveal serious mental illness, including timely and appropriate referrals for specialty care and regularly scheduled visits with qualified mental health professionals.

(35)  <u>Mental Health Treatment Plans</u>  The State shall ensure that a qualified mental health professional prepares in a timely manner and regularly updates an individual mental health treatment plan for each inmate who requires mental health services.  The State shall also ensure that the plan is timely and consistently implemented.  Implementation of and any changes to the plan shall be documented in the inmate's medical/mental health record.

(36)  <u>Crisis Services</u>  The State shall ensure an adequate array of crisis services to appropriately manage psychiatric emergencies.  Crisis services shall not be limited to administrative/disciplinary isolation or observation status.  Inmates shall have access to appropriate in-patient psychiatric care when clinically appropriate.

(37)  <u>Treatment for Seriously Mentally Ill Inmates</u>  The State shall ensure timely and appropriate therapy, counseling, and other mental health programs for all inmates with serious mental illness.  This includes adequate space for treatment, adequate staff to provide treatment, and an adequate array of therapeutic programming.  The State shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, in accordance with generally accepted correctional mental health care standards.

(38)  <u>Review of Disciplinary Charges for Mental Illness Symptoms</u>  The State shall ensure that disciplinary charges against inmates with serious mental illness who are placed in Isolation are reviewed by a qualified mental health professional to determine the extent to which the charge may have been related to serious mental illness, and to determine

13

whether an inmate's serious mental illness should be considered by the State as a mitigating factor when punishment is imposed on inmates with a serious mental illness.

(39)    <u>Procedures for Mentally Ill Inmates in Isolation or Observation Status</u>  The State shall implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that all mentally ill inmates on the facility's mental health caseload and who are housed in Isolation receive timely and appropriate treatment, including completion and documentation of regular rounds in the Isolation units at least once per week by qualified mental health professionals in order to assess the serious mental health needs of those inmates.  Inmates with serious mental illness who are placed in Isolation shall be evaluated by a qualified mental health professional within twenty-four hours and regularly thereafter to determine the inmate's mental health status, which shall include an assessment of the potential effect of the Isolation on the inmate's mental health.  During these regular evaluations, the State shall evaluate whether continued Isolation is appropriate for that inmate, considering the assessment of the qualified mental health professional, or whether the inmate would be appropriate for graduated alternatives.  The State shall adequately document all admissions to, and discharges from, Isolation, including a review of treatment by a psychiatrist.  The State shall provide adequate facilities for observation, with no more than two inmates per room.

(40)    <u>Mental Health Services Logs and Documentation</u>  The State shall ensure that the State maintains an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication.  The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment.  Each clinician shall have ready access to a current log listing any prescribed medication(s) and dosages for inmates on psychotropic medications.  In addition, inmate's files shall contain current and accurate information regarding any medication changes ordered in at least the past year.

## IV.    **SUICIDE PREVENTION**

(41)    <u>Suicide Prevention Policy</u>  The State shall review and, to the extent necessary, revise its suicide prevention policy to ensure that it includes the following provisions:  1) training; 2) intake screening/assessment; 3) communication; 4) housing; 5) observation; 6) intervention; and 7) mortality and morbidity review.

(42)    <u>Suicide Prevention Training Curriculum</u>  The State shall review and, to the extent necessary, revise its suicide prevention training curriculum, which shall include the following topics:  1) the suicide prevention policy as revised consistent with this Agreement; 2) why facility environments may contribute to suicidal behavior; 3) potential predisposing factors to suicide; 4) high risk suicide periods; 5) warning signs and symptoms of suicidal behavior; 6) case studies of recent suicides and serious suicide

14

attempts; 7) mock demonstrations regarding the proper response to a suicide attempt; and 8) the proper use of emergency equipment.

(43) Staff Training  Within twelve months of the effective date of this Agreement, the State shall ensure that all existing and newly hired correctional, medical, and mental health staff receive an initial eight-hour training on suicide prevention curriculum described above. Following completion of the initial training, the State shall ensure that a minimum of two hours of refresher training on the curriculum are completed by all correctional care, medical, and mental health staff each year.

(44) Intake Screening/Assessment  The State shall develop and implement policies and procedures pertaining to intake screening in order to identify newly arrived inmates who may be at risk for suicide.  The screening process shall include inquiry regarding:  1) past suicidal ideation and/or attempts; 2) current ideation, threat, plan; 3) prior mental health treatment/hospitalization; 4) recent significant loss (job, relationship, death of family member/close friend, etc.); 5) history of suicidal behavior by family member/close friend; 6) suicide risk during prior confinement in a state facility; and 7) arresting/transporting officer(s) belief that the inmate is currently at risk.

(45) Mental Health Records  Upon admission, the State shall immediately request all pertinent mental health records regarding the inmate's prior hospitalization, court-ordered evaluations, medication, and other treatment.  DOJ acknowledges that the State's ability to obtain such records depends on the inmate's consent to the release of such records.

(46) Identification of Inmates at Risk of Suicide  Inmates at risk for suicide shall be placed on suicide precautions until they can be assessed by qualified mental health personnel. Inmates at risk of suicide include those who are actively suicidal, either threatening or engaging in self-injurious behavior; inmates who are not actively suicidal, but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent prior history of self-destructive behavior; and inmates who deny suicidal ideation or do not threaten suicide, but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury.

(47) Suicide Risk Assessment  The State shall ensure that a formalized suicide risk assessment by a qualified mental health professional is performed within an appropriate time not to exceed 24 hours of the initiation of suicide precautions.  The assessment of suicide risk by qualified mental health professionals shall include, but not be limited to, the following: description of the antecedent events and precipitating factors; suicidal indicators; mental status examination; previous psychiatric and suicide risk history, level of lethality; current medication and diagnosis; and recommendations/treatment plan. Findings from the assessment shall be documented on both the assessment form and health care record.

15

(48)  Communication  The State shall ensure that any staff member who places an inmate on suicide precautions shall document the initiation of the precautions, level of observation, housing location, and conditions of the precautions.  The State shall develop and implement policies and procedures to ensure that the documentation described above is provided to mental health staff and that in-person contact is made with mental health staff to alert them of the placement of an inmate on suicide precautions.  The State shall ensure that mental health staff thoroughly review an inmate's health care record for documentation of any prior suicidal behavior.  The State shall promulgate a policy requiring mental health to utilize progress notes to document each interaction and/or assessment of a suicidal inmate.  The decision to upgrade, downgrade, discharge, or maintain an inmate on suicide precautions shall be fully justified in each progress note. An inmate shall not be downgraded or discharged from suicide precautions until the responsible mental health staff has thoroughly reviewed the inmate's health care record, as well as conferred with correctional personnel regarding the inmate's stability. Multidisciplinary case management team meetings (to include facility officials and available medical and mental health personnel) shall occur on a weekly basis to discuss the status of inmates on suicide precautions.

(49)  Housing  The State shall ensure that all inmates placed on suicide precautions are housed in suicide-resistant cells (i.e., cells without protrusions that would enable inmates to hang themselves).  The location of the cells shall provide full visibility to staff.  At the time of placement on suicide precautions, medical or mental health staff shall write orders setting forth the conditions of the observation, including but not limited to allowable clothing, property, and utensils, and orders addressing continuation of privileges, such as showers, telephone, visiting, recreation, etc., commensurate with the inmate's security level.  Removal of an inmate's prison jumpsuit (excluding belts and shoelaces) and the use of any restraints shall be avoided whenever possible, and used only as a last resort when the inmate is engaging in self-destructive behavior.  The Parties recognize that security and mental health staff are working towards the common goal of protecting inmates from self-injury and from harm inflicted by other inmates.  Such orders must therefore take into account all relevant security concerns, which can include issues relating to the commingling of certain prison populations and the smuggling of contraband.  Mental health staff shall give due consideration to such factors when setting forth the conditions of the observation, and any disputes over the privileges that are appropriate shall be resolved by the Warden or his or her designee.  Scheduled court hearings shall not be cancelled because an inmate is on suicide precautions.

(50)  Observation  The State shall develop and implement policies and procedures pertaining to observation of suicidal inmates, whereby an inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or has a recent prior history of self-destructive behavior, or an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the

16

potential for self-injury, shall be placed under close observation status and observed by staff at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes).  An inmate who is actively suicidal, either threatening or engaging in self-injurious behavior, shall be placed on constant observation status and observed by staff on a continuous, uninterrupted basis.  Mental health staff shall assess and interact with (not just observe) inmates on suicide precautions on a daily basis.

(51)    "Step-Down Observation"  The State shall develop and implement a "step-down" level of observation whereby inmates on suicide precaution are released gradually from more restrictive levels of supervision to less restrictive levels for an appropriate period of time prior to their discharge from suicide precautions.  The State shall ensure that all inmates discharged from suicide precautions continue to receive follow-up assessment in accordance with a treatment plan developed by a qualified mental health professional.

(52)    Intervention  The State shall develop and implement an intervention policy to ensure that all staff who come into contact with inmates are trained in standard first aid and cardiopulmonary resuscitation; all staff who come into contact with inmates participate in annual "mock drill" training to ensure a prompt emergency response to all suicide attempts; and shall ensure that an emergency response bag that includes appropriate equipment, including a first aid kit and emergency rescue tool, shall be in close proximity to all housing units.  All staff who come into regular contact with inmates shall know the location of this emergency response bag and be trained in its use.

(53)    Mortality and Morbidity Review  The State shall develop and implement policies, procedures, and practices to ensure that a multidisciplinary review is established to review all suicides and serious suicide attempts (e.g., those incidents requiring hospitalization for medical treatment).  At a minimum, the review shall comprise an inquiry of: a) circumstances surrounding the incident; b) facility procedures relevant to the incident; c) all relevant training received by involved staff; d) pertinent medical and mental health services/reports involving the victim; e) possible precipitating factors leading to the suicide; and f) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.  When appropriate, the review team shall develop a written plan (and timetable) to address areas that require corrective action.

## V.    QUALITY ASSURANCE

(54)    Policies and Procedures  The State shall develop and implement written quality assurance policies and procedures to regularly assess and ensure compliance with the terms of this Agreement.  These policies and procedures should include, at a minimum:  provisions requiring an annual quality management plan and annual evaluation; quantitative performance measurement with tools to be approved in advance by DOJ; tracking and trending of data; creation of a multidisciplinary team; morbidity and mortality reviews

with self-critical analysis, and periodic review of emergency room visits and hospitalizations for ambulatory-sensitive conditions.

(55)  Corrective Action Plans  The State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.

## VI.     IMPLEMENTATION

(56)  Revision of Activities and Documents  The State shall revise and/or develop as necessary its current policies, procedures, protocols, training, staffing and practices to ensure that they are consistent with, incorporate, address and implement all provisions of this Agreement.  The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

(57)  Dissemination of Agreement  Within thirty (30) days of the effective date of this Agreement, the State shall distribute copies of the Agreement to all relevant staff, including all medical, mental health and security staff at the Facilities and explain it as appropriate.

(58)  In Service Training  Training academy staff shall develop, on an on-going basis, scripts for in service training directed at issues related to effective implementation of the Agreement.  In service training shall be provided regularly and shall be documented.  In service training scripts shall be provided to DOJ for its review in accordance with the time frames for compliance set forth below.

## VII.    MONITORING, ENFORCEMENT AND TERMINATION

(59)  Termination  This Agreement shall terminate three (3) years after its effective date.

(60)  Satisfaction of the Agreement and Early Termination  This Agreement may be terminated prior to the conclusion of the three (3) year period described in Paragraph 59 if the State reaches substantial compliance with all provisions of this Agreement and sustains it for one (1) year. "Substantial Compliance" with each and every term of this Agreement for a period of one (1) year shall fully satisfy the Agreement.  Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance.  At the same time, temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance.  The State may submit a written request for early termination of the Agreement based upon an assertion of one (1) year of substantial compliance with all substantive paragraphs set forth in Sections III

18

through VIII of this Agreement. The DOJ, in its good faith discretion, will determine whether the State has maintained substantial compliance for the one (1) year period.

(61)  <u>Review and Approval</u>  All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be consistent with the substantive terms of this Agreement. All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be submitted to the DOJ for its review and approval within sixty (60) calendar days after approval of the Action Plan described in Paragraph 65 of this Agreement. Any such plans, policies, procedures and protocols for which this Agreement requires review and approval by DOJ shall be expeditiously reviewed by the DOJ. The DOJ shall not unreasonably withhold any such approval. Absent unforeseen circumstances beyond the Parties' control, if DOJ does not provide a written objection to said materials within sixty (60) days of receipt of same, the materials will be deemed approved by DOJ.

(62)  <u>State Response to DOJ Questions</u>  Within thirty (30) days of receipt of written questions from the DOJ concerning the State's compliance with this Agreement, the State shall provide the DOJ with written answers and any requested documents regarding the State's compliance with the requirements of this Agreement.

(63)  <u>State Documentation of Compliance</u>  The State shall maintain sufficient records to document its compliance with all of the requirements of this Agreement. The State shall also maintain (so long as this Agreement remains in effect) any and all records required by or developed under this Agreement.

(64)  <u>Implementation</u>  The State shall implement policies, procedures, plans, and protocols consistent with the Action Plan referred to in Paragraph 65 of this Agreement.

(65)  <u>Action Plan</u>  Within one hundred and twenty (120) days after the effective date of this Agreement, the State shall prepare and submit to the DOJ a comprehensive action plan ("Action Plan") identifying the specific measures the State intends to take in order to bring the Facilities into compliance with each paragraph containing substantive requirements in Sections III through V of this Agreement ("Substantive Provisions"), including a timeline for completion of each of the measures.

(66)  <u>Compliance Reporting</u>  The State shall prepare and submit reports regarding compliance ("Compliance Reports") with each of the Substantive Provisions of this Agreement. The State shall submit its first Compliance Report within ninety (90) days after submitting the Action Plan described in Paragraph 65 of this Agreement, and then every six (6) months. The Compliance Reports shall identify the State's progress in implementing the Action Plan, any revisions to the Action Plan, and shall include a summary of steps taken to implement this Agreement, along with supporting documentation and certifications. Upon achieving substantial compliance as determined by DOJ with any substantive

paragraph(s) of this Agreement for one (1) year, no further **reporting** shall be required on that paragraph.

(67) <u>Selection of Monitor</u> Within ninety (90) days after entry of **this** Agreement, the State and DOJ shall together select a Monitor. If the Parties are **unable to** agree on a Monitor, each Party shall submit two names of persons who have experience **in** corrections and who may have served as a correctional practices expert or monitor, **or** as a Federal, state, or county prosecutor or judge along with resumes or curricula **vitae** and cost proposals to a third party neutral, selected with the assistance of the Federal Mediation and Conciliation Service, and the third party neutral shall appoint the Monitor **from** among the names of qualified persons submitted. The selection of the Monitor **shall** be conducted solely pursuant to the procedures set forth in this Agreement, and **will** not be governed by any formal or legal procurement requirements.

(68) <u>Limitations on Public Disclosures by Monitor</u> The Monitor **shall** not be retained by any current or future litigant or claimant in a claim or suit against **the** State, its agents or employees. The Monitor shall not issue statements or make **findings** with regard to any act or omission of the State, or their agents or representatives, **except** as required by the terms of this Agreement. The Monitor may testify in any **case brought** by any Party to this Agreement regarding any matter relating to the implementation, enforcement, or dissolution of this Agreement.

(69) <u>Monitoring Resources</u> The Monitor, at any time, may **associate** such additional persons or entities as are reasonably necessary to perform the **monitoring** tasks specified by this Agreement. The Monitor shall notify in writing DOJ and **the State** if and when such additional persons or entities are selected for association by **the** Monitor. The notice shall identify and describe the qualifications of the person or entity **to be** associated and the monitoring task to be performed.

(70) <u>Monitor's Fees</u> The State shall bear all reasonable fees and **costs** of the Monitor. In selecting the Monitor, DOJ and the State recognize the **importance** of ensuring that the fees and costs borne by the State are reasonable, and **accordingly fees** and costs shall be one factor considered in selecting the Monitor. In the event **that any** dispute arises regarding the payment of the Monitor's fees and costs, the **State, DOJ**, and the Monitor shall attempt to resolve such dispute cooperatively.

(71) <u>Monitor's Duties and Responsibilities</u> The Monitor shall **review** and report on the State's implementation of, and assist with the State's compliance **with, this** Agreement. The Monitor shall only have the duties, responsibilities and authority conferred by this Agreement. The Monitor shall not, and is not intended to, **replace** or take over the role and duties of the State or the Commissioner of the Delaware **Department** of Corrections. The Monitor may testify in any action brought to enforce this **Agreement** regarding any matter relating to the implementation or enforcement of the **Agreement**. The Monitor

20

shall not testify in any other litigation or proceeding with regard to any act or omission of the State, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his or her performance under this Agreement. Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees. The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records. The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement. Provided, however, that this paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

(72)   Technical Assistance by the Monitor   The Monitor shall offer the State technical assistance regarding compliance with this Agreement. The Monitor may not modify, amend, diminish, or expand this Agreement.

(73)   Monitor's Access   The State shall provide the Monitor with full and unrestricted access to all of the Facilities, relevant State and facility staff and employees, and any documents (including databases) necessary to carry out the duties assigned to the State by this Agreement. The Monitor's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention, or protocols or analyses involving one of those subject areas. The Monitor shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or DOJ, absent written notice to the State and either written consent by the State or a court order authorizing disclosure.

(74)   Monitor's Communication with the Parties   In monitoring the implementation of this Agreement, the Monitor shall maintain regular contact with the State and DOJ. The Monitor shall be permitted to initiate and receive ex parte communications with the Parties and the Parties' consultants.

(75)   Compliance Monitoring   In order to monitor and report on the State's implementation of each substantive provision of this Agreement, the Monitor shall conduct periodic reviews as the Monitor deems appropriate, but no less than quarterly at each of the Facilities. The Monitor may make recommendations to the Parties regarding measures necessary to ensure full and timely implementation of this Agreement.

(76)   Compliance Coordinator   The Parties agree that the State shall hire and retain, or reassign a current State employee, for the duration of this Agreement, a Compliance Coordinator.

21

The Compliance Coordinator shall serve as a liaison between the State, the Monitor and DOJ, and shall assist with the State's compliance with this Agreement. At a minimum, the Compliance Coordinator shall: (a) coordinate the State's compliance and implementation of activities required by this Agreement; (b) facilitate the provision of data, documents and other access to State employees and material to the Monitor and DOJ as needed; (c) ensure that all documents and records are maintained as provided in this Agreement; (d) assist in assigning compliance tasks to State personnel, as directed by the Commissioner of the Delaware Department of Corrections or his designee; take primary responsibility for collecting information to provide the State's status reports specified in paragraph 61.

(77)    <u>DOJ Access</u>  DOJ shall continue to have full and unrestricted access to all documents (including databases), staff, inmates and the Facilities that are relevant to evaluate compliance with this Agreement, except any documents protected by the attorney-client privilege or applicable self-evaluative privileges (e.g., 24 Del. C § 1768). Should the State decline to provide DOJ with access to a document based on attorney-client privilege, the State shall provide the Monitor and DOJ with a log describing the document. DOJ's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention and any protocols or analyses involving those subject areas. This Agreement does not authorize, nor shall it be construed to authorize, access to any State documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the State, and the Monitor. DOJ shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or the Monitor, absent written notice to the State and either written consent by the State or a court order authorizing disclosure. Throughout the duration of this Settlement Agreement, letters between counsel for the DOJ and counsel for the State shall be confidential and subject to the Confidentiality Agreement between the DOJ and the State entered into on May 3, 2006 and supplemented by the Non-Waiver Agreement dated September 28, 2006.

(78)    <u>Timeliness of DOJ Review of Documents and Information</u>  DOJ shall review documents and information provided by the State and the Monitor and shall provide its analysis and comments to the State and the Monitor at appropriate times and in an appropriate manner, consistent with the purpose of this Agreement to promote cooperative efforts.

(79)    <u>Monitor Reports</u>  The Monitor shall issue semi-annual public reports detailing the State's compliance with and implementation of this Agreement. The first report shall issue six months from the effective date of this Agreement. The Monitor may issue reports more frequently if the Monitor determines it appropriate to do so. At least ten business days prior to issuing a report, the Monitor shall provide a draft to the Parties for review and comment to determine if any factual errors have been made. The Monitor shall consider the Parties' responses and then promptly issue the report.

22

(80)  <u>Noncompliance</u>  If DOJ believes that the State has failed to substantially comply with any obligation under this Agreement, DOJ will, prior to seeking judicial action to enforce the terms of this Agreement, give written notice of the failure to the State. The Parties shall conduct good-faith discussions to resolve the dispute. If the Parties are unable to reach agreement within 15 days of the DOJ's written notice, the Parties shall submit the dispute to mediation. Michael Bromwich, Esq., shall serve as the mediator unless the Parties expressly agree to an alternative selection. The Parties shall split the cost of the mediator. The Parties shall attempt in good faith to mediate the dispute for a minimum of 30 days prior to initiating any court action. DOJ commits to work in good faith with the State to avoid enforcement actions. However, in case of an emergency posing an immediate threat to the health or safety of inmates, the DOJ may omit the notice and cure requirements herein (including the provision regarding mediation), before seeing judicial action. Non-action by the DOJ shall not constitute a waiver of the right to seek judicial action.

(81)  <u>Successors</u>  This Agreement shall be binding on all successors, assignees, employees, and all those working for or on behalf of the State.

(82)  <u>Defense of Agreement</u>  The Parties agree to defend the provisions of this Agreement. The Parties shall notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, the Parties shall seek to remove the matter to a federal court.

(83)  <u>Enforcement</u>  Failure by either Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreement.

(84)  <u>Non-Retaliation</u>  The State agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Agreement.

(85)  <u>Severability</u>  In the event any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

(86)  <u>Notice</u>  "Notice" under this Agreement shall be provided via overnight delivery and shall be provided to the Governor of the State of Delaware and to the Attorney General of the State of Delaware.

(87)  <u>Subheadings</u>  All subheadings in this Agreement are written for convenience of locating individual provisions.  If questions arise as to the meanings of individual provisions, the parties shall follow the text of each provision.

For the DOJ:

WAN J. KIM
Assistant Attorney General
Civil Rights Division

SHANETTA Y. CUTLAR
Chief
Special Litigation Section

DANIEL H. WEISS
Deputy Chief

CATHLEEN S. TRAINOR
LASHANDA BRANCH CHIRUNGA
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB Room 5908
Washington, D.C. 20530
(202) 514-6255

24

For the State of Delaware:    December 29, 2006

CARL C. DANBERG
Attorney General of Delaware

STANLEY W. TAYLOR, Jr.
Commissioner
Delaware Department of Correction
245 McKee Road
Dover, DE 19904

MICHAEL R. BROMWICH
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004