UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESTATE OF LOUIS W. CHANCE | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | C.A. No. 05-449-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL | ) | JURY OF 12 DEMANDED |
| LLC, DR. NIRANJANA SHAH, AND | ) | |
| DR. JOSE ARAMBURO, | ) | |
| | ) | |
| Defendants. | ) | |

### FCM DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO COMPEL PURSUANT TO RULE 37

First Correctional Medical, Inc., Dr. Niranjana Shah, and Dr. Jose A. Aramburo, Jr., (hereinafter the "FCM Defendants"), through their undersigned counsel, hereby request that this honorable Court deny plaintiff's Motion to Compel because the documents and testimony that plaintiff seeks (1) are not relevant and thus inadmissible evidence, (2) their probative value is substantially outweighed by the danger of unfair prejudice, (3) they constitute subsequent remedial measures, and (4) are privileged pursuant to Delaware statute 24 *Del. C.* §1768 and should be recognized as privileged medical peer review pursuant to F.R.E. 501. In support of their position, the FCM Defendants offer the following:

**I.   Background**

1.   First Correctional Medical - Delaware, LLC, (hereinafter "FCM"), contracted with the State of Delaware Department of Correction to provide health care to the Delaware prison system from July 1, 2002 - June 30, 2005.

2.    Defendants Niranjana Shah, M.D. and Jose A. Aramburo M.D. were employees of FCM at all times relevant to this lawsuit.

3.    Louis W. Chance, Jr., (hereinafter "Decedent"), was incarcerated in April 2003 in the Delaware correctional system for a fourth driving under the influence violation. While incarcerated, Decedent served at the Webb Correctional Institution, (hereinafter "WCI").

4.    Upon his intake[1] to medical, and throughout his numerous medical visits, Decedent consistently denied being HIV positive or having any of the risk factors associated with HIV disease, such as intravenous drug use[2] or sexually transmitted diseases[3]. While incarcerated, Decedent did not avail himself of the no-cost, but non-mandatory[4], HIV test offered by the State of Delaware Department of Correction.

---

[1] At the commencement of a period of incarceration, an inmate is assessed medically by an employee (usually a registered nurse) of the medical provider at the prison. This physical assessment is referred to as "intake" and includes current vital signs, discussions about the inmate's medical history (including intravenous drug use, alcohol abuse, narcotic abuse, sexually transmitted disease history, and exposure to HIV), daily habits, current illnesses/diseases, medications, mental health status and dental problems.

[2] At the deposition of Louis W. Chance, III, it was learned that Decedent used heroin on a daily basis. See Deposition of Louis W. Chance, III, p. 44, ll. 8 - 25, relevant portion attached as Exhibit 1.

[3] Decedent's Saint Francis Hospital medical records, obtained via subpoena, indicate that Decedent treated at Saint Francis Hospital, in Wilmington, for the sexually transmitted disease epididymitis (inflammation of the long, tightly coiled tube, the epididymis, that carries sperm from the testicle to the spermatic duct; www.webmd.com) less than one year prior to his incarceration. Decedent did not disclose this information to health care professionals at First Correctional Medical at intake or any time thereafter.

[4] Delaware law prevents the Department of Correction from requiring HIV testing for inmates.

5.     On September 8, 2003, Decedent presented to the infirmary at WCI for complaints of a bad headache. Decedent again denied that he had HIV. Decedent was treated that day and every day through September 23, 2003, by nurses, medical doctors, physician's assistants, mental health professionals, and a psychiatrist for his medical complaints. Various examinations, treatments and medications were performed/prescribed in an attempt to relieve Decedent's discomfort.

6.     On September 23, 2003, at 07:30, Decedent was found unresponsive in his cell. Decedent was immediately transported to Saint Francis hospital, where he expired a few hours later. The State Medical Examiner's autopsy indicates that Decedent's cause of death was Cryptococcal Meningitis[5], an HIV/AIDS related infection. It was not until the autopsy report findings were published, that FCM or its employees learned that the Decedent had AIDS.

7.     On September 23, 2003, FCM conducted a Mortality Review on the death of Decedent. A Peer Review Committee of FCM employees reviewed and discussed the medical treatment provided to the Decedent, including the actions of their colleagues in the Decedent's medical treatment. The purpose of this Mortality Review was to ensure professional standards were maintained and to improve the overall quality of medical care provided to inmates. During its tenure in Delaware, FCM medical staff understood the Mortality Review process to be an open and uninhibited peer review forum - designed to provide constructive criticism to their colleagues without fear of legal repercussions.

---

[5]Cryptococcal Meningitis is "a life-threatening infection that can occur if there has been exposure to a fungus called Cryptococcus neoformas." http://www.tthhivclinic.com/cryptomen.htm . The infection most commonly affects the brain, causing swelling of meninges (the lining of the brain) and the condition meningitis. *Id*.

**II.     The Audit**

8.     The National Commission on Correctional Health Care, (hereafter "NCCHC"), is an organization which seeks to improve the health care in jails, prisons, and juvenile confinement facilities in the United States.  In an attempt to help correctional health care systems provide efficient and high quality care, NCCHC provides an array of services including: facility accreditation, quality reviews, and clinical guidelines.

9.     In early 2005, more than fourteen months after the death of the Decedent, NCCHC performed an audit of the Delaware prison health system.  NCCHC's audit consisted of an external peer review of the Delaware prison medical facilities.  A report was published by the NCCHC shortly after the audit listing their findings as well as improvement suggestions.  All Delaware prison medical facilities remained accredited by the NCCHC after the audit.

10.     The Decedent's medical records were not reviewed or referenced in the audit and neither the Decedent nor his medical records were mentioned in the subsequent report.

**III.     Procedural History**

11.     On June 29, 2005, plaintiff, the Estate of Louis Chance, Jr., filed a lawsuit in this Court alleging medical malpractice and 42 U.S.C. § 1983 violations against the defendants.

12.     On January 18, 2007, plaintiff filed a Motion to Compel, D.I. 48, requesting that this Court compel answers to deposition questions and issue an order requiring any reports characterized as "peer review" be produced.

13.     The discovery deadline in this case is February 28, 2007.  A two week trial is scheduled to commence July 30, 2007.

**IV.     Legal Standards**

14.     Federal Rule of Evidence (F.R.E.) 401 defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence".

15.     F.R.E. 402 notes that "[e]vidence which is not relevant is not admissible."

16.     F.R.E. 403 provides for the "exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

17.     F.R.E. 407 permits the exclusion of evidence which is a subsequent remedial measure. "When . . . measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct . . . ." *Id*.

18.     F.R.E. 501 states, "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may interpreted by the Courts of the United States in the light of reason and experience."

19.     24 *Del.C.* § 1768 provides for the immunity of medical peer review committees and maintains that the records and proceedings of such committees and organizations are confidential, not public record, not available for court subpoena, and not subject to discovery.

V.   **NCCHC Audit And Report**

   A.   **Pursuant To F.R.E. 401 And 402, The NCCHC Audit And Subsequent Report Are Not Relevant To Plaintiff's Case And Should Not Be Produced Or Discussed**

   20.   The 2005 NCCHC audit and report are not relevant to the medical malpractice or 42 U.S.C. § 1983 claims asserted by the plaintiff as the Decedent was not mentioned in the report nor was his medical file reviewed or considered during the audit or in preparation of the report.

   21.   To be relevant, evidence must make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. F.R.E. 401. A report that does not reference or consider the Decedent is not going to make the determination of negligence during Decedent's medical treatment or of deliberate indifference to Decedent's serious medical needs more probable than it would be without the report. *Id*.

   22.   The NCCHC audit report contains suggestions for improvement and an overall performance review and is not of consequence to the determination of this action. F.R.E. 401. The NCCHC audit and report do not relate to defendants' alleged negligence and/or deliberate indifference. *Id.*

   23.   In *Surtees v. First Correctional Medical*, C.A. 05C-09-236 (PLA), Memorandum Order, (Del. Super. Ct. March 14, 2006)(attached as Exhibit 2), Judge Peggy L. Ableman, upon an *in camera* review of the 2005 NCCHC audit report, found that the NCCHC audit report was not relevant to the plaintiff's claims against First Correctional Medical. Judge Ableman further opined that to the extent that any information in the report was relevant (the NCCHC audit report specifically referenced the plaintiff Michael Surtees, his medical chart, and his medical care), the

report was privileged and not discoverable under 24 *Del C.* § 1768. *Id*.

24. The Superior Court of Delaware has concluded that plaintiffs, even those named in the report, are prohibited from disclosure of the audit report on the basis of relevance as well as privilege. Judge Ableman's decision in *Surtees* was based upon sound policy. Litigants, especially those who were not named in the audit report, should not be permitted to circumvent the decisions of the State Court by simply asserting a cause of action in the District Court. A decision of this Court in opposition to the established Superior Court precedent may result in a flood of litigation in the District Court, if for no other reason than to obtain an otherwise irrelevant privileged document.

25. The Decedent's medical records document his extensive care from FCM and its employees. The plaintiff has deposed the various doctors who provided treatment to the Decedent and questioned them extensively about the relevant medical records. Medical malpractice and deliberate indifference actions require a causal connection to the injured party. See *Losch v. Borough of Parkesburg, Pa*, 736 F.2d 903, 910 (3d Cir. 1984); *Timblin v. Kent General Hospital*, 640 A.2d 1021, 1024 (Del. Super. Ct. 1994). Either the Decedent's care was adequate, or it was not. Either the standard of care was breached when treating the Decedent, or it was not. Either the defendants were deliberately indifferent to Decedent's serious medical needs, or they were not. If this information cannot be gleaned from the medical records of the Decedent and the depositions of the doctors who treated him, it most certainly will not be gleaned from a document that does not consider or mention the Decedent or the care he was given.

26. Decedent was treated every day from September 8, 2003, through his death on September 23, 2003. His medical chart, a compilation of all relevant data, is replete with information regarding his treatment and care. The NCCHC audit report, drafted more than 14

months after the death of Decedent, contains none of that information. Plaintiff has failed to demonstrate the relevance of the NCCHC audit and report and FCM Defendants submit that: (1) pursuant to F.R.E. 401 and 402, the audit and report are not relevant, crucial, or probative and thus are inadmissible, (2) this Court should rely upon the decision in *Surtees* regarding relevance of the audit report, (3) information pertinent to this case can be obtained elsewhere, and (4) that the sought production of the report and the facts surrounding the audit is nothing more than a fishing expedition.

    **B.**    **Should This Court Determine That The NCCHC Audit Is Relevant, The Audit, Report, And Discussions Thereof Should Be Excluded Pursuant To F.R.E. 403 Because Any Probative Value Is Substantially Outweighed By The Danger Of Unfair Prejudice**

    27.    Should this Court determine that the NCCHC audit is relevant, the report and facts surrounding the audit should be excluded from evidence as their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." F.R.E. 403.

    28.    The 2005 NCCHC audit and subsequent report are part of the quality review services provided to correctional health care systems by the NCCHC. As an organization designed to improve quality of care in the prison setting, the NCCHC will approach an audit, such as the one that occurred in 2005, with a scrutinizing eye to all areas needing improvement. The audit report points out areas needing improvement and provides helpful suggestions. The fact that an area needs improvement, or would benefit from a different approach, does not affirmatively indicate that something is remiss, substandard, or broken. The distinction between suggestions for improvement in name of progress and suggestions for improvement because something is substandard can be subtle, and was not a criterion used in the report itself. In this instance, admission of the audit and

report is likely to confuse the issues and mislead the jury - thus unfairly prejudicing the defendants.

29.     Additionally, admission of the NCCHC audit and report will unfairly prejudice the defendants because it will link in the fact finder's mind the extensive media coverage, by the *News Journal* and other local media sources, of the existence/contents[6] of the report and the government's unwillingness to produce the report to this case. As the report does not concern this case, there is prejudice without any probative value.

30.     In light of the fact that not one Delaware prison facility lost its NCCHC accreditation as a result of the 2005 NCCHC audit, any probative value of the NCCHC audit report is substantially outweighed by the likelihood that: (1) it will create confusion regarding the duty of the defendants towards Decedent; (2) it will create confusion about the weight and value of the findings and suggestions of a national organization designed to improve health care; (3) it is misleading to a jury, and (4) it unduly prejudices the defendants. F.R.E. 403.

**C.    The Audit And The Subsequent Report Are Not Relevant Pursuant To F.R.E. 407 As The Audit And Report Are Subsequent Remedial Measures**

31.     It is the FCM Defendant's understanding that when the Department of Correction developed concerns regarding the provision of health care in the prison system, it contacted the NCCHC to help investigate the situation, resolve any current problems, and prevent any future problems. The NCCHC conducted an audit and developed a report which was designed to offer constructive criticism and develop achievement goals. FCM and the Department of Correction worked together to implement the suggestions of the NCCHC and improve the overall provision of

---

[6] As the audit report has only been made available to the Delaware Department of Correction and First Correctional Medical, and neither party has commented publicly regarding the contents of the report, the media can only speculate as to the contents and implications of the report.

health care in the Delaware prison system.

32.     The audit, report, and implementation of report suggestions constitute subsequent remedial measures to improve the health care provided to the Delaware prison system after concerns were raised about the quality of health care. The plaintiff seeks the report and testimony surrounding the audit and report implementation to demonstrate that the defendants were negligent or deliberately indifferent in the medical treatment of the Decedent.

33.     F.R.E. 407 stands for the notion that the quest for improvement following censure or injury should be commended, not punished. The defendants should not be penalized because professional criticism was sought and advice for improvement was taken. Admitting as evidence such remedial measures as the NCCHC audit and report will only chill future attempts at improving prison health care. The audit, report, and implementation of report suggestions cannot be used to prove negligence or culpable conduct. See *Complaint of Consolidation Coal Co.*, 123 F.3d 126 (3d. 1997).

        **D.**     **Pursuant To F.R.E. 501 And 24 Del. C. § 1768, The NCCHC Audit And Report Are Privileged**

34.     This Court should hold that the 2005 NCCHC audit and report are privileged as medical peer review.

35.     Although there is no codified federal peer review privilege, F.R.E. 501 does not preclude the recognition of a federal peer review privilege. The Court is to determine federal confidentiality privileges on a "case-by-case" basis. *Pearson v. Miller*, 211 F. 3d 57, 66 (3d Cir. 2000)(citing *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996)) (acknowledging the *Jaffee* Court ruling that "Rule 501 should be understood as reflecting the view that the recognition of a privilege based on

a confidential relationship . . . should be determined on a case-by-case basis").

36.  The case-by-case basis for the recognition of a federal privilege is strengthened when, as in this case, the "information sought is protected by a state privilege." *Pearson*, 211 F.3d at 67. Plaintiff is seeking the production of the NCCHC report and information regarding the audit which have been deemed confidential, privileged, not subject to subpoena, and non-discoverable in Superior Court pursuant to 24 *Del.C.* § 1768.  See e.g., *Surtees*, Exhibit 2.  Comity "impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *Pearson*, 211 F.3d at 67.

37.  This Court can preclude the production of the NCCHC report and information regarding the audit, not only on a case-by-case basis, but also because the medical peer review privilege has already been recognized by the Third Circuit. In *Sklaroff v. Allegheny Health*, 1996 WL 311456 (E.D.Pa. 1996)(*affirmed,* 118 F.3d 1578 (1997))(attached as Exhibit 3), the District Court relied upon Pennsylvania's peer review statute in precluding discovery of peer review documents in a RICO case.

38.  Other District Courts have also recognized the medical peer review privilege. In *Hadix v. Caruso*, 2006 WL 2925270 (W.D. Mich. 2006)(attached as Exhibit 4), a case directly on-point, the District Court affirmed a Magistrate's Order recognizing a medical peer review privilege in a prisoner civil rights case. The Western District of Michigan noted, "[p]risoner civil rights cases founded on Eighth Amendment claims that doctors failed to provide adequate medical care are the federal equivalent of state medical malpractice suits . . . . These suits are the very object of the state statutes which create the peer review privilege, especially as it relates to peer review of prison facilities." *Id.* at *2.

39. Plaintiff relies upon *Pearson* as support for its position that there is not a federal peer review privilege in the Third Circuit. However, plaintiff's reliance is misguided as *Pearson* does not stand for the principle that the Third Circuit does not recognize a federal peer review privilege, but rather that the Third Circuit declined to recognize a peer review privilege where there was an express waiver of the privilege. *Id*. at 72 (noting "Rule 501 [was] unsuited for the kind of privilege that appellants have requested; one that maintains its protections despite the express waiver of the primary holder of the interests in confidentiality"). The defendants in this case have not expressly, or otherwise, waived their rights to the confidentiality of the NCCHC report or facts surrounding the audit.

40. Any reliance plaintiff may have upon *Univ. of Pa v. EEOC*, 493 U.S. 182 (1990), as support for its position that there is no peer review privilege can be easily distinguished from this case by using the Western District of Michigan's analysis in the *Hadix* case. The Western District of Michigan distinguished the *Hadix* ruling from *Univ. of Pa* by noting that *Univ. of Pa* refused to adopt an academic peer review privilege, not a medical peer review privilege. *Hadix*, 2006 WL 2925270 at *1. The Court of the Western District of Michigan went on to rule that prisoners' Eighth Amendment "interests may be protected by an individualized review of the prisoners' own medical records . . . ."

41. Plaintiff also relies upon the only known case in this District which addresses the medical peer review privilege - *Quinn v. Kent General Hospital*, 617 F. Supp. 1226 (D. Del 1985). Again the plaintiff's reliance is misguided as this case is not on point. While *Quinn* ultimately required that the peer review documents be produced, it can be distinguished from this case as *Quinn* was a RICO/anti-trust case and the case stemmed from problems with the peer review process itself.

In this case, plaintiff has not alleged RICO/anti-trust allegations and has never expressed concerns that the NCCHC peer review process was corrupt.

42. This Court should be guided by the precedent established in the Third Circuit's rulings in *Pearson* and *Sklaroff,* Delaware's Superior Court ruling in *Surtees*, and its sister court's ruling in *Hadix* as determinative that, when using a case-by-case basis approach and recognizing Delaware law, the NCCHC audit and subsequent report are privileged medical peer review documents pursuant to F.R.E. 501.

## VI. The Mortality Review And Testimony Pertaining Thereto

43. A Peer Review Committee of FCM conducts a mortality review after the death of an inmate who was in the care of FCM. As stated in ¶ 7 above, the purpose of the review is to ensure professional standards were maintained during a specific inmate's medical care and to improve the overall quality of medical care provided to all inmates.

44. FCM considers these to be confidential internal peer review documents. Plaintiff produced the Mortality Review of the Decedent in its Rule 26(a)(1) disclosures. The FCM Defendants did not produce this document to the plaintiff and the FCM Defendants do not have any information about how this document came to be in the possession of the plaintiff[7].

### A. FCM's Mortality Review Of Decedent And Testimony Pertaining Thereto Should Be Excluded Pursuant To F.R.E. 403 Because Any Probative Value Is Substantially Outweighed By The Danger Of Unfair Prejudice

45. As the Mortality Review directly addresses the medical care of the Decedent, FCM

---

[7] As to the Mortality Review, Plaintiff's Motion to Compel is to require deponents to testify about the Mortality Review of the Decedent - its contents, who was consulted, etc. FCM Defendants object to Plaintiff's use of the Mortality Review document itself and will be filing a Motion in *Limine* preventing its use at trial depending upon the Court's ruling on this Motion to Compel.

Defendants do not contend that this evidence is not relevant. Rather, the FCM Defendants contend that the Mortality Review and testimony pertaining thereto, should be excluded from evidence as its probative value is substantially outweighed by the danger of unfair prejudice. F.R.E. 403.

46.    FCM was the prison medical provider in Delaware from July 1, 2002, through June 30, 2005. During that time, mortality reviews were conducted the same way. FCM employees reviewed and discussed the medical treatment provided to an inmate, including the actions of their colleagues, in open and uninhibited peer review forum knowing that their comments were protected pursuant to Delaware law. The forum was designed to provide constructive criticism to their colleagues without fear of legal repercussions. In light of the openness of the forum, comments and criticisms may have been made which could have legal implications on the medical provider or its employees.

47.    The FCM Defendants would be unduly prejudiced if their own self-critical comments were used as evidence against them in medical malpractice and 42 U.S.C. § 1983 actions. Furthermore, FCM's internal comments regarding areas to improve or comparisons of various approaches/techniques in a specific inmate's care, do not affirmatively indicate that a specific inmate's care was lacking. This distinction is very nuanced, and thus is likely to confuse the issues and mislead the jury - thus unfairly prejudicing the defendants. The plaintiff should be required to prove its case without the aid of the FCM employees' untempered criticisms/comments upon the matter.

48.    Any probative value of the Mortality Review and testimony pertaining thereto is substantially outweighed by the likelihood that: (1) it will create confusion regarding the duty of the FCM Defendants towards Decedent; (2) it is misleading to a jury, (3) it unduly prejudices the FCM

Defendants and allows the plaintiff to use FCM's state protected peer review to bolster plaintiff's federal case. F.R.E. 403.

> B. **The Mortality Review And Testimony Pertaining Thereto Is Not Relevant Pursuant To F.R.E. 407 Because It Is A Subsequent Remedial Measure**

49. A mortality review is the type of post-injury measure F.R.E. 407 contemplated when it precluded evidence of subsequent remedial measures to prove negligence or culpable conduct. Mortality reviews are designed to prevent or lessen future harm and serve as a learning tool to those who have access to them. To admit a mortality review as evidence of negligence or culpable conduct would likely prevent health care providers from conducting such reviews. This ameliorative process is conduct that F.R.E. 407 seeks to protect. Allowing disclosure of material that has been designated as protected will have a "chilling effect" on the open and candid process that is to be encouraged.

50. Mortality reviews are used as a tool across the entire medical industry. Although FCM is no longer the health care provider in Delaware and a ruling in this Court would have little effect on FCM's future actions in Delaware, a ruling that mortality reviews are not protected pursuant to F.R.E. 407 will likely cause the current prison health care provider to reconsider using them - thus jeopardizing the health care of all inmates in Delaware and beyond. Moreover, such disclosure may have even broader rippling effects. This Court's ruling allowing such disclosure of peer review materials could lead to wide spread requests for disclosure of otherwise protected peer review materials in litigation - affecting the entire health care industry.

> C. **Pursuant To F.R.E. 501 And 24 Del. C. § 1768, The Mortality Review And Testimony Pertaining Thereto Is Privileged**

51. FCM Defendants direct the Court's attention to their argument set forth above in Section V, Paragraph D, and assert that pursuant to F.R.E. 501 and 24 *Del. C.* § 1768, the Mortality

Review and testimony pertaining thereto is privileged. For the reasons set forth above, FCM Defendants submit the Decedent's Mortality Review was performed by a peer review committee and that the ruminations of the peer review committee as well as the contents the Mortality Review, are privileged and non-discoverable as protected medical peer review.

**VII.    Conclusion**

For the reasons set forth above, the FCM Defendants respectfully request this Court deny Plaintiff's Motion to Compel. By denying plaintiff's motion, this Court will be ruling consistently and in accordance with the Third Circuit Court of Appeals, the State of Delaware, as well as other sister District Courts and maintaining sound public policy. To hold otherwise, may result in far-reaching consequences that will adversely affect the medical service providers not only to inmates, but to the public at large.

**McCULLOUGH & McKENTY, P.A.**

/s/ Dana Spring Monzo
Daniel L. McKenty, Del. Bar No. 2689
Dana M. Spring, Del. Bar No. 4605
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397
(302) 655-6749
Attorneys for First Correctional Medical, Niranjana Shah, M.D. and Jose Aramburo, M.D.

Dated: February 5, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESTATE OF LOUIS W. CHANCE | ) | |
| | ) | |
| | ) | |
| **Plaintiffs** | ) | C.A. No. 05-449-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL LLC, DR. NIRANJANA SHAH, AND DR. JOSE ARAMBURO, | ) ) ) | JURY OF 12 DEMANDED |
| | ) | |
| **Defendants.** | ) | |

## ORDER

And now this _____ day of _____, 2007 having considered *Plaintiff's Motion to Compel Pursuant to Rule 37* and *FCM Defendants' Response to Plaintiff's Motion to Compel Pursuant to Rule 37*,

**IT IS HEREBY ORDERED** that *Plaintiff's Motion to Compel Pursuant to Rule 37* is **DENIED**.

_____

J.

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| ESTATE OF LOUIS W. CHANCE )<br>)<br>)<br>**Plaintiffs** )<br>)<br>v. )<br>)<br>FIRST CORRECTIONAL MEDICAL )<br>LLC, DR. NIRANJANA SHAH, AND )<br>DR. JOSE ARAMBURO, )<br>)<br>**Defendants.** ) | <br><br><br>C.A. No. 05-449-SLR<br><br><br><br><br>JURY OF 12 DEMANDED<br><br><br> |

### CERTIFICATE OF SERVICE

I certify that, on this date, one copy of the attached *FCM Defendants' Response to Plaintiff's Motion to Compel Pursuant to Rule 37* was electronically served upon the following:

Jeffrey K. Bartels, Esquire.
401 South Maryland Avenue
Wilmington, DE 19804

Kenneth W. Richmond, Esq.
2019 Walnut Street
Philadelphia, PA  19103

Marc Niedzielski, Esquire
Department of Justice
Carvel State Office Building
820 N. French St.
Wilmington, DE 19801

                                                                    **McCULLOUGH & McKENTY, P.A.**

                                          /s/ Dana Spring Monzo
                                          Daniel L. McKenty, Del. Bar No. 2689
Dana M. Spring, Del. Bar No. 4605
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397
(302) 655-6749
Attorneys for First Correctional Medical, Niranjana Shah, M.D. and Jose Aramburo, M.D.

Dated: February 5, 2007