# IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF DELAWARE

ESTATE OF LOUIS W. CHANCE JR.

Plaintiff

v.                                               C.A No: 05-449-SLR

FIRST CORRECTIONAL MEDICAL
INC., DR. NIRANJANA SHAH, DR
JOSE A. ARAMBURO, JR.,
COMMISSIONER STANLEY TAYLOR
and JOYCE TALLEY

Defendants

**PLAINTIFF'S REPLY TO DEFENDANTS TAYLOR
AND TALLEY'S OPPOSITION TO Rule 16.5 EXTENSION
AND PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

ATTORNEYS FOR PLAINTIFF

Jeffrey K. Bartels, Esq.
Kenneth W. Richmond, Esq. *pro hac*
401 South Maryland Ave.
February 11, 2007                    Wilmington, DE. 19804

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………..2

SUMMARY OF REPLY ARGUMENT…………….. …………….3

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES:</u>**

**<u>Cain v. Villare,</u>** 2005 Del. Super, LEXIS 360
(Del. Super. Ct. Oct. 19, 2005)…………………………………8

**<u>D'Oench, Duhme & Co. v. FDIC</u>**, 315 U.S. 447, 471, 86 L.
Ed. 956, 62 S. Ct. 676 (1942)…………………………………..4

**<u>EEOC v. ASTRA</u>** F.3d 738, 1996 U.S. App. LEXIS 23355,
68 Empl. Prac. Dec. (CCH) P44220, 71 Fair Empl. Prac. Cas.
(BNA) 1267 (1st Cir. Mass. 1996)…………………………………7

**<u>Pearson v. Miller, et al</u>**. 211 F.3d 57; 2000 U.S. App. LEXIS
8072; 53 Fed. R. Evid. Serv. (Callaghan) 1309…………………4

**<u>Univ. of Pennsylvania v. EEOC,</u>** 493 U.S. 182, 189,
107 L. Ed. 2d 571, 110 S. Ct. 577 (1990)…………………………

**<u>Riley v. City of Chester,</u>** 612 F.2d 708, 715 (3d Cir. 1979) ……..4

**<u>Surtees v. First Correctional Medical,</u>** C.A.
No. 05C-08-236-PLA …………………………………………..7

**<u>Quinn v. Kent General Hospital, Inc.</u>**, 617 F. Supp.
1226, 1985 U.S. Dist. LEXIS 16729, (1985)………………………8

**<u>Wm. T. Thompson Co. v. Gen. Nutrition Corp.,</u>** 671
F.2d 100, 104 (1982)…………………………………………7

**<u>STATUTES:</u>**

*24 Del.C. §1768* …………………………………….……..7

**TREATISES:**

17 **C.J.S. Contracts** Section 191 (1963)…………………………8

**Restatement Second Torts  2nd**. Section 757 comment d………..8

**ARTICLE: AT WHAT PRICE SILENCE: ARE CONFIDENTIALITY AGREEMENTS ENFORCEABLE?**,
25 Wm. Mitchell L. Rev. 627 (1999)………………………………8

## SUMMARY OF THE REPLY ARGUMENT

1.    The District Court of Delaware should reject Defendants' contention that evidence submitted to the United States Department of Justice is privileged under 24 *Del. C.* §1768 and therefore provides no basis for a Rule 16.5 extension. Such a conclusion has vast potential for mischief in shielding civil rights violators from investigation.

2.    The audit report of the National Commission on Correctional Health Care of 2005 is likewise, for reasons stated above, unprivileged in the context of a Civil Rights, amend. VIII claim, even though there is a pendent state claim for medical malpractice.

3.    Federal District Courts can not support contractual non-disclosure agreements that would potentially bar access to evidence that Civil Rights were violated.

## ARGUMENT 1 AND 2

3

THE DISTRICT COURT OF DELAWARE MUST REJECT DEFENDANT'S
CONTENTION THAT EVIDENCE SUBMITTED TO THE UNITED STATES
DEPARTMENT OF JUSTICE  IS PRIVILEGED UNDER 24 *Del. C. §1768*,
AND THEREFORE PROVIDES NO BASIS FOR A RULE 16.5 EXTENSION.
SIMILARLY THE AUDIT REPORT OF THE NATIONAL COMMISSION ON
CORRECTIONAL HEALTH CARE OF 2005 IS LIKEWISE UNPRIVILEGED
IN THE CONTEXT OF A CIVIL RIGHTS CLAIM EVEN THOUGH THERE IS
A PENDENT STATE CLAIM FOR MEDICAL MALPRACTICE.

(a)      In paragraphs 28 of the Plaintiff's amended complaint, it was alleged that,

"…in spite of numerous inmate complaints, numerous inmate deaths due to

"lengthy illnesses" and the identification of "medical issues" under the contract,

Joyce Talley remained deliberately indifferent to the medical plight of inmates in

general, and decedent Chance in particular by failing to order or require inmates to

receive adequate, needed medical care when she had a duty to do so."

At paragraph 29, the Plaintiff alleges that, "… In addition to the foregoing,

the specific failure to provide access to required diagnostic care in the case of the

decedent resulted from a contractual agreement between Defendant Taylor and

FCM and the failure to insure efficient and effective medical care under the

contract created a policy of deliberate indifference to the decedent's medical plight

in violation of the proscriptions contained in the United States Constitution,

amend. VIII.

In spite of these allegations and the incriminating expert reports generated

during the DOJ investigation a year after the Complaint in the present case was

filed, the Defendants did not voluntarily produce the reports or seek a protective

order.

In the case of **Pearson v. Miller, et al**. 211 F.3d 57; 2000 U.S. App. LEXIS 8072; 53 Fed. R. Evid. Serv. (Callaghan) 1309,  language, particularly instructive in the present case and first announced in **Riley v. City of Chester,** 612 F.2d 708, 715 (3d Cir. 1979) (quoting **D'Oench, Duhme & Co. v. FDIC**, 315 U.S. 447, 471, 86 L. Ed. 956, 62 S. Ct. 676 (1942)) was re-cited with the Court's added emphasis,

> *The appropriateness of deference to a state's law of privilege is diminished, however, in cases in which a defendant state actor alleged to have violated citizens' federal rights is asserting the privilege. "There is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged." ACLU v. Finch, 638 F.2d 1336, 1344 (5th Cir. 1981); see also Longenbach, 750 F. Supp. at 180-81 ("Nor does it make any sense to allow the state, under whose color of authority officers have allegedly violated rights, to limit unilaterally the availability of evidence."). n10*

> *n10 This concern is especially strong where, as here, a government agency asserting the privilege is itself a defendant (as distinct from being the employer of a defendant governmental official).* at 211 F 3rd. 25

In the Plaintiffs claim of systemic violations of the Eighth Amendment, it is inconceivable that the now palpable gross indifference to serious medical needs by Defendant officials could be shielded by a collusive arrangement for an extensive "peer" review.  The subtext of the Defense argument against a Rule 16.5 Extension is that a twenty-six thousand page, electronically indexed body of evidence submitted to the Department of Justice "cooperatively" during a Federal Civil Rights Investigation has somehow acquired a peer or non-disclosure privilege, is therefore legally irrelevant-hence there is no need for an extension.

The Defendants' restive objections to Plaintiff's request take two forms; First, that the facts adduced in the investigation are relevant *only to the moment when the investigation commenced* and second, that the Plaintiff is undeserving. Although the facts asserted in the brief on the latter point are unsupported mischaracterizations, and meaningless to the motion[1], if taken as true each of the allegations describing the final three weeks of the Decedent's life actually embellish the Amended Complaint.

The defense seemingly concedes the conclusions of the Plaintiff's expert and appears to be asserting that there is already ample proof of the Defendant's unconstitutional conduct. The Defendants actually suggest that additional more convincing evidence is somehow irrelevant. But to use a regrettably overwrought term, this concession is "disingenuous", especially when considering that one of the defendants accused in the present case cleverly "agreed" that the evidence supporting the Department of Justice conclusions could not be disclosed or used in any other legal proceeding. We can agree for the present purposes that the Department of Justice *conclusions* may not be admissible, but the *facts* gathered *cooperatively* are indisputably probative in the context of a claim of unconstitutional neglect of a duty to prevent cruel and unusual punishment.

---

[1] For example, there is no evidence that the Decedent was an intravenous drug user. On the contrary, the Decedent specifically denied, in writing, his use of drugs *intravenously*. His son's "guess" at the possibility was negated under the very interrogation of the defense at a deposition. Louis the son never saw "works", needles, or paraphernalia, and although he never observed his father's use of heroin, he knew he "snorted" it. "No, He never showed me. I knew he used it, he never really showed me." p. 44, lines 6-21 Dep. Louis Chance III, April 27, 2006. Decedent's intake physicals never reported "tracks" or needle scars of any kind.

Therefore the Plaintiff should be afforded a reasonable opportunity to review the expert evidence which should have been provided under Rule 26.   Whatever the merits were before the Department of Justice involvement, the landscape has been irrevocably changed.  There is a large file of accessible information that has been labeled "unconstitutional care" by medical experts hired by Defendant Taylor.

(b)      The application of *24 Del.C.  §1768* to certain medical reviews within a malpractice claim, standing alone, is supportable.  However, when coupled with a federal claim, the principal is, "Where there are federal question claims and pendent state law claims present, the federal law of privilege applies." 3rd. Circuit in: **Wm. T. Thompson Co. v. Gen. Nutrition Corp.,** 671 F.2d 100, 104 (1982). Accord, the Supreme Court in: **Univ. of Pennsylvania v. EEOC**, 493 U.S. 182, 189, 107 L. Ed. 2d 571, 110 S. Ct. 577 (1990).  The Delaware Superior Court letter ruling in the matter of  **Surtees v. First Correctional Medical,** C.A. No. 05C-08-236-PLA was a pure medical malpractice claim as noted in the first sentence of the second paragraph of the opinion.  This ruling cannot possibly find application in 3rd. Circuit Federal Question claims in light of the decisions cited by the Plaintiff here and in the original motion.  Another reason why the "Audit" of the NCCHC should not be afforded any privilege turns on the reason why the audit was requested.    As the Exhibits attached here make clear, it was not undertaken purely for medical reasons as *24 Del.C. §1768* requires. ie.  24 *Del.C.* § 1768 confers immunity upon the good faith actions of members of medical peer review

committees "*whose function is the review of medical records, medical care and physicians' work,* with a view to the quality of care and utilization of *hospital or nursing home facilities . . .",* and exempts the records and proceedings of such committees from discovery.  **Quinn v. Kent General Hospital, Inc.**, 617 F. Supp. 1226, 1985 U.S. Dist. LEXIS 16729, (Del.1985).  According to the testimony of Commissioner Taylor, the audit came about after third party vendors complained that they were not being paid. (Dep. Stanley Taylor, Nov. 28, 2006, pp 70-71. attached as Exhibit "C").  The "major" part of the conversation that led to the NCCHC audit was the complaint of outside vendors who were owed money by [Defendant FCM].  p. 71, line 4-16.  Indeed, the minutes of the Department of Correction Medical Review Committee unequivocally establishes that unpaid vendors were owed $800,000 to one million dollars and this brought about the "audit" request to Commissioner Taylor. ( July, 2003 Medical Review meeting attached as Exhibit "D").  Strictly construed, 24 *Del.C*. § 1768 has no application to the prison setting or the facts of this case.  "Privileges are repugnant to the adversarial judicial system in the United States and are therefore narrowly construed. The need to develop relevant facts is fundamental in an adversarial system. The integrity of the judicial system in the United States relies on full disclosure of all relevant facts with the framework of rules of evidence."  **Cain v. Villare,** 2005 Del. Super, LEXIS 360 (Del. Super. Ct. Oct. 19, 2005).  In **Cain** the application of the privilege was narrowly interpreted to afford access to peer review proceedings by a plaintiff because the purpose of the review was not

medical care, but  the qualifications of a practioner who was admitted to the staff

of a hospital.

## **ARGUMENT 3**

FEDERAL DISTRICT COURTS CAN NOT SUPPORT CONTRACTUAL
NON-DISCLOSURE AGREEMENTS THAT WOULD POTENTIALLY BAR
ACCESS TO EVIDENCE THAT CIVIL RIGHT WERE VIOLATED.

As a general rule, all contracts or agreements which directly or indirectly

have for their object a violation of the law are illegal." 17 **C.J.S. Contracts**

Section 191 (1963). Further, a privilege to disclose may also be given by the law,

independently of the others consent, in order to promote some public interest."

**Restatement Second Torts  2ⁿᵈ**. Section 757 comment d.   A long line of EEOC

cases illustrates the reluctance of federal courts to enforce extremely common

non-disclosure provisions of a settlement agreement in a Title VII context.  In the

extensively cited case of **EEOC v ASTRA,** 94 F.3d 738, 1996 U.S. App. LEXIS

23355, 68 Empl. Prac. Dec. (CCH) P44220, 71 Fair Empl. Prac. Cas. (BNA) 1267

(1st Cir. Mass. 1996).  The federal district court enjoined Astra "from entering into

or enforcing provisions of any Settlement Agreements which prohibit current or

former employees from filing charges with the EEOC and/or assisting the

commission in its investigation of any charges." The Astra court stated: "In

performing that balancing here, we must weigh the impact of settlement provisions

that effectively bar cooperation with the EEOC on the enforcement of Title VII

against the impact that outlawing such provisions would have on private dispute resolution... Clearly, if victims of or witnesses to sexual harassment are unable to approach the EEOC or even to answer its questions, the investigatory powers that Congress conferred would be sharply curtailed and the efficacy of investigations would be severely hampered. What is more, the EEOC acts not only on behalf of private parties but also, to vindicate the public interest in preventing employment discrimination. ... In many cases of widespread discrimination, victims suffer in silence. ***In such instances, a sprinkling of settlement agreements that contain stipulations prohibiting cooperation with the EEOC could effectively thwart an agency investigation.*** (Emphasis added)  A survey of the law on this point appears at: *AT WHAT PRICE SILENCE: ARE CONFIDENTIALITY AGREEMENTS ENFORCEABLE?*, 25 Wm. Mitchell L. Rev. 627 (1999).

## CONCLUSION

For the foregoing reasons it is respectfully requested that the Court decline the privilege asserted under *24 Del.C. §1768* and order the extension of the discovery deadlines until after the Defendants have produced all investigatory documents with identities of inmates redacted as appropriate, including the NCCHC "audit".

Respectfully submitted,

/s/_____

Jeffrey K. Bartels, Esq.
Kenneth W. Richmond, Esq. *pro hac*
401 South Maryland Ave.
Wilmington, DE. 19804

## CERTIFICATION OF SERVICE

I, Kenneth W. Richmond, Esq., pro hac vice counsel for the Plaintiff, hereby certify that on Thursday, February 11, 2007 a copy of the foregoing Reply to Defendant's Taylor and Talley's Opposition to Rule 16.5 Extension was served by e-mail upon Marc Neidzielski, Esquire, Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, DE, 19801, and  Daniel L. McKenty 1225 N. King Street, Suite 1100, Wilmington,  DE, 19899

Date:   February 11, 2007

/s/_____

Kenneth W. Richmond, Esq.
2019 Walnut Street
Philadelphia, PA  19103
215-523-9200
Pro Hac Counsel for Plaintiff

# EXHIBIT C

STANLEY TAYLOR

Page 69

1  information from The Medical Review Committee, I assume
2  it addressed some concerns about the quality of medical
3  care being provided by the vendor FCM; is that correct?
4      A.  You're talking about the verbal request to me
5  from my staff?  I'm not -- please restate the question.
6      Q.  Sure.  I'm sorry.
7          The Medical Review Committee in some form,
8  verbal or in writing, expressed concerns about the
9  quality of the medical care being delivered by the
10  vendor FCM; am I correct?
11     A.  That's correct.
12     Q.  All right.  Upon receiving that information,
13  what immediate, if any, action was taken to determine
14  or to address those concerns other than arranging for a
15  secret audit or unannounced audit, a surprise audit by
16  NCCHC?
17     A.  The Medical Review Committee would continue
18  to make efforts to address items of their concern.
19     Q.  Was any outside doctor, physician called in
20  to review the grievances that were being reviewed by
21  The Medical Review Committee?
22     A.  I couldn't specifically say.
23     Q.  Was that a matter of concern to you
24  personally as Commissioner?
25     A.  Was what a matter of concern to me?

Page 70

1      Q.  The grievances that were being filed by
2  inmates at the time that led to the Medical Review
3  Committee's request to you for an audit, was the
4  medical care being provided to the inmates, or the
5  grievances that were submitted by the inmates, were
6  they of any personal concern to you?
7      A.  I am not saying that it was inmate grievances
8  that specifically led The Medical Review Committee to
9  make that request of me.  I don't know the total of the
10  details that had The Medical Review Committee make the
11  request to me.  The answer is yes, that would be a
12  concern having the NCCHC come in and do the audit would
13  dispel any disagreements between the medical staff and
14  my administrative staff, and so, we were looking for
15  this objective body who also has the medical
16  credentials to come in and give us an assessment of
17  what is really going on.  And in the meantime, my staff
18  have to continue to work with the existing staff that
19  are there to try to make the improvements they can make
20  as best they can.
21         They may have -- I don't want to sit here
22  and speculate as to what all they did.
23     Q.  Okay.  You don't have any personal knowledge?
24  That was all I was getting at at this point.
25     A.  That's correct.

Page 71

1      Q.  Was that --
2      A.  That would be speculating and I don't want to
3  do that.
4      Q.  Of course not.
5          Was any part of the complaint that The
6  Medical Review Committee brought to you, was any part
7  of that complaint made up of outside vendors that were
8  not being paid by FCM?
9      A.  That was part of the conversation.
10     Q.  Was that the only part of the conversation?
11     A.  That was at least the major part of the
12  conversation as I recall.
13     Q.  Was the care of any inmate discussed with
14  you, or presented to you, by the medical grievance
15  committee, medical care being provided by FCM?
16     A.  No specific inmate, no.
17     Q.  Are you acquainted with Dr. Keith Ivens,
18  I-V-E-N-S, do you know who that is?
19     A.  I know the name, yes.
20     Q.  Who is that?
21     A.  He is a doctor that I know has worked for us
22  with one or more vendors.  I'm going to be careful
23  about -- I'm not sure which contract he was with and
24  when, but I know he's been employed with vendors that
25  have worked for us.

Page 72

1      Q.  At any time prior to the termination of the
2  Department of Correction contract with CMS in 2002, did
3  you become aware of any dispute concerning Dr. Ivens'
4  surgical qualifications?
5      A.  Not that I recall.
6          MR. NIEDZIELSKI:  Can I just say, I know
7  we reserved our objections, but this is so irrelevant
8  to this case.  I mean, I know that this is a favorite
9  of Steve Hampton, Dr. Keith Ivens, but he has nothing
10  to do with this case, absolutely nothing.
11         MR. RICHMOND:  Okay.
12         MR. NIEDZIELSKI:  Okay.
13         MR. RICHMOND:  Anything else?
14         MR. NIEDZIELSKI:  Well, I just think that
15  we're wasting a lot of time here.  I mean, really none
16  of this has anything to do with Louis Chance and I just
17  thought -- I mean, I think we've been fairly patient
18  here, but can you go on to something that has something
19  to do with Louis Chance?
20         MR. RICHMOND:  All of this has to do with
21  Louis Chance.
22         MR. NIEDZIELSKI:  No.  Keith Ivens has
23  nothing to do with Louis Chance, absolutely nothing.
24         MR. RICHMOND:  All of this has to do with
25  the quality of care that should have been addressed --

18 (Pages 69 to 72)

# EXHIBIT D

Kathy English stated that SCI did a drill early this morning and took a nurse hostage.
One of the issues is ensuring that someone is available to be contacted to give profile
information about the hostage. The information may be at the facility but if access cannot
be gained to that facility someone else may have to be called.

Information should the hostage's family, where he/she lives, any contacts, people he/she
may know in the facility, why this particular person was taken hostage, etc.

Linda Hunter will be the contact person.


The staffing matrix of the monthly report is very confusing to read and will be put into a
different format. FCM will have the updated version in next month report.


The hourly base rate for RN's across the state (except at DCC) is $23.00 per hour. They
also get paid for shift differentials and weekend differentials.

LPN hourly base rates are $18.00 per hour.


**Contract Compliance:**
Kathy English informed Dr. Kastre of a very critical issue in relationship to contract
compliance and it revolves around the Medicaid issue.

In review of the contract by the DOC's attorneys the DOC is considering the fact that
FCM is currently in breach of the contract.

Page 31 of the contract specifically says that FCM will pay their sub-vendors their bills
within two weeks.

The DOC has notification from Bayhealth and written notification from their attorneys
stating that they have not been paid. The bills are well over $800,000.00 at this point.

The DOC also has notification from private providers that had been offering services, as
well as x-ray providers that FCM has not been paying their bills either.

The DOC anticipates that the bills are at least $1,000.000.00 and that they currently only
have a $500,000.00 retainer from FCM.

Kathy English gave verbal notice to FCM considering them of being in breach of
contract.

The MRC has had conversations with the Commissioner. He is extremely concerned
about this issue.

Dr. Kastre stated that FCM's attorneys had sent a letter to the Commissioner.

Kathy English said that the Commissioner had not received the letter yet.

She added that the DOC is in receipt of a letter from the Medicaid office and their
attorneys in relationship to their position on the issue and that the DOC also has
notification from their attorneys and the DOC's position on the issue.

Dr. Kastre stated that there is a very simple answer.

Kathy English stated that it might be in relationship to Medicaid but that the real critical
issue is how FCM handled the situation and not paying their providers. This is bad

business practice and the DOC cannot tolerate it. It makes the DOC liable for FCM's medical bills.

Dr. Kastre stated that there is a quick answer this can be fixed in a couple of weeks. She feels that FCM has pushed very, very diligently to try to get people to return phone calls from the Medicaid office and from a variety of sources FCM has been working with since November.

Dr. Kastre feels as if FCM has been put in a business position of no return and they have to evade this move or they will not survive it.

She stated that it is very clear that FCM obviously needs some help from the DOC because FCM is not getting the answer from the Medicaid office.

She added that these bills could be processed under Medicaid; the DOC would receive 50% of that money back from the Feds and the other 50% back from FCM. The consequence is that FCM stays viable and gets to use the way they do business under instead of having to pay the hospitals at 95% of the cost. The hospitals would get the appropriate amount of money; they would get the Medicaid rate.

Dr. Kastre stated that FCM wants to pay these hospitals but they need to get paid at the Medicaid rate.

Dr. Kastre thinks that if the attorneys sit down with FCM, and the AG actually gets on the phone with Medicaid and FCM, it could be solved in 10 days and FCM would release the funds and it would go out.

Kathy English noted that this may be true but that is not DOC's contractual issue. The DOC paid FCM $17,000.000.00 to provide hospital care for Delaware's inmate population.

Dr. Kastre said that there is no other option. The losses that FCM has experienced in the first six months of the contract, because they could not get Medicaid to pay and FCM went ahead and kept paying the bills anyway, were phenomenal. She will not be able to recover those losses and as of January 1 FCM was not prepared to go through that again.

Dr. Kastre said that Kay Holmes and the Medicaid office have an obligation to issue Medicaid cards and ironically after pushing very hard for about nine months FCM is receiving some cards.

Dr. Kastre stated that they have only processed applications for people that fall under the waiver criteria, people that are hospitalized for greater than 23 hours. It is the Medicaid's office to decide under the federal regulations whether the people are Medicaid qualified.

Kathy English told Dr. Kastre that she could not require a hospital to access Medicaid. The letter that Dr. Kastre sent the hospitals on May 26 clearly tells them to go and get Medicaid reimbursement for that.

Kathy English stated that the Medicaid office under the 1115 waiver only allows the Medicaid office to apply for the funds. The Medicaid office has clearly told that to the DOC in a letter; Kathy English will give a copy of that letter to Dr. Kastre as well.

Dr. Kastre commented that FCM couldn't pay the bills at the current rate that is not how the contract was negotiated; that was not how FCM went into it. FCM went in believing that they would be paying 50%.

Kathy English stated that the DOC gave no indication in the contract or in FCM's fee that Medicaid would kick in. She said that nowhere in the current contract is Medicaid

DOC000260

mentioned at all and that Medicaid is a payer of last resort. Medicaid clearly states that there is exclusion for inmates.

Dr. Kastre said that Medicaid has a qualifier in the 1115 waiver and that there is no exclusion for inmates. Dr. Kastre stated that she even spoke to the contracting people that build the Delaware waiver and they said that it could be used the same way as Vermont and the other states that have the waivers.

Kathy English stated that the DOC will give FCM 30 days to fix it and that FCM has to schedule the attorney meeting within 30 days.

Dr. Kastre stated that the letter should already be at Stan Taylor's desk; it went out by FedEx yesterday afternoon.

Dr. Kastre stated that this will terminate FCM and the DOC will obliterate FCM Delaware if this cannot be resolved. She sees no reason in the world why it would not be pursued to the fullest to get this money back form the Feds.

Kathy English said that the DOC cannot be pushed to do it in a certain timeframe and the approach FCM is taking is just not good business practice.

Dr. Kastre stated that from a business perspective, sitting here and trying to deal with this for nine months and getting no response from people like Stuart Drowos, gives FCM the perception that when there is an issue that relates to money or other really tough issues, FCM gets no responses.

FCM's attorney has contacted Stuart Drowos 8 or 9 times and had no answer back. They cannot have a dialog with people they need to have dialogs with.

Phil Soule, Deputy Director of Medical Services for DHSS, will not return FCM's phone calls; they cannot set up a meeting with him.

Dr. Kastre said that she does not have a lot of recourse since she has not been here a long time, long enough to have a Congressman to talk to or anybody else and she really does not want to do that, usually FCM starts with the low man on the totem pole and works their way up.

Kathy English stated that the DOC and FCM have had extensive conference calls. Carl Danberg has clearly said where the DOC stands on the issue.

The AG clearly said that the DOC's contract with FCM is in black and white.

Medicaid is final on the issue; it is not a DOC issue; it is a Medicaid office issue. If FCM wants a contract specifically with DHSS in reference to Medicaid that is FCM's issue not the DOC's.

The DOC is paying FCM $17,000.000.00 to pay for those services.

Dr. Kastre said that the DOC paid FCM to pay those services out at 50% of Medicaid for the patients that qualify.

Kathy English said that the DOC did not.

Dr. Kastre said that is what their assumption was when they ran the bid. She added that when the DOC changes vendors or does it themselves instead of paying 2 or 3 million dollars for outside hospitalization it is going to end up being 8 million.

Phil Morgan stated that the MRC is at a loss. They have never had a vendor that made the statements and the moves that FCM is making, and that Medicaid never crossed the minds of the people involved with the RFP.

DOC000261

Dr. Kastre stated that she has 30 days to work on the potential breach and if there would have been another avenue she would have much rather taken it and she clearly hears what the DOC is saying.

Dr. Kastre stated that she does not have any other venues or avenues to pursue for assistance; it is not a workable arrangement. All the other option doors are closed.

FCM is not going to pay the hospitals at full rate. Their interpretation on all of this is that it clearly is legal, it is a win-win situation, the DOC gets money back from the Feds and the rest of the money from FCM and the hospitals still get payment for services at a State rate.

Kathy English said that she understands the process completely but it is not a DOC process and if FCM needs a contract in reference to Medicaid then FCM has to work directly with DHSS.

Dr. Kastre stated that she does not need a contract with Medicaid to pursue this she needs them to actually do their job; she needs them to actually function in the office capacity that they have been given by their state.

Dr. Kastre said that FCM needed help with this whether it is Kathy English, Joyce Talley, Stan Taylor, or somebody; they need to understand that this is a very real issue.

Kathy English said that the DOC has tried to help. She sat with Kay, sat with Elaine, and she sat with Norma and they had extensive conference calls to Vermont, they talked to everyone. But the DOC is not the 1115 waiver and they cannot tell Medicaid what to do and what not to do.

When FCM puts it in perspective that now they are not paying bills, from a contract FCM has with the DOC, it makes the DOC liable.

Kathy English told Dr. Kastre that she used the wrong technique to make her point and now putting it on the DOC making the DOC liable to pay those bills. Which in return translates to the DOC that FCM has breached the contract, which would mean that the DOC holds future payments to ensure that liabilities that FCM is not paying are covered.

Dr. Kastre asked how FCM could get the Medicaid office to work so FCM does not only receive 1 in 10 Medicaid cards.

Kathy English told Dr. Kastre that threatening and not paying the bills will not get her anywhere.

Kathy English told Dr. Kastre she would give her a contact number to call Elaine Archangelo, Kay Holms' boss. She will also give Dr. Kastre a copy of the letter from Elaine Archangelo that tells specifically where DHSS stands on the issue; it is not a closed door but it is not a DOC issue. DHSS is willing to work with FCM.

Dr. Kastre will definitely try going to Elaine. Dr. Kastre stated that FCM has worked very hard this year and she is not going to see it fail because FCM cannot get a State agency to participate.

Kathy English stressed that FCM needs to understand too what Medicaid's participation level really is. She believes that there is some misinterpretation of what the 1115 waiver really allows. Kathy English realizes that FCM has had their policy advisors review it but the Medicaid folks do it everyday and they have had their policy advisors review it.

DOC000262

Kathy English stated that the DOC couldn't get claims information either so that is a battle too.

Dr. Kastre stated that she was told by Theresa not to pass out the claims information because the DOC was going to illegally use that to try to guard the federal funds without paying the claims.

Kathy English stated that was not true. The DOC claimed all of CMS' prior year data, every one of them. Refusing to give claims information to the DOC, again just puts a bad taste in the mouth of the Medicaid office.

Medicaid asked FCM for claims information and FCM said no and FCM wants Medicaid information and Medicaid says no.

Kathy English is very concerned that even at last month's MRC meeting FCM did not bring this up as an issue to be brought to the Commissioner's attention and it was not referenced in June's minutes either, but yet Kathy English had to sit in a meeting with the Commissioner 2-3 weeks ago and bring it to his attention.

The DOC had received a letter from the attorneys at Bayhealth stating that there are outstanding bills over $800,000.00. That is a big problem since the DOC only has a $500,000.00 retainer; chances are that any future payment will be held until the DOC is sure that they can cover those medical costs. The DOC does not know how much the bills for Christiana Care, Beebe hospital, etc.

Kathy English stated that their issue is that FCM is not paying their bills and if FCM is not paying their bills the DOC has to hold their money.

This issue needs to be brought to the Commissioner's attention.

        Adjourn
* The next monthly meeting will be August 28, 2003 at 10:15 am at the DOC's Administration Building in Dover in conference room #300*