# IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF DELAWARE

ESTATE OF LOUIS  W. CHANCE JR.

                Plaintiff

       v.                             C.A No: 05-449-SLR

FIRST CORRECTIONAL MEDICAL
INC., DR. NIRANJANA SHAH, DR
JOSE A. ARAMBURO, JR.,
COMMISSIONER STANLEY TAYLOR
and JOYCE TALLEY

                Defendants

## PLAINTIFF'S REPLY TO
## OPPOSITION OF DEFENDANT FIRST CORRECTIONAL
## MEDICAL TO Rule 16.5 EXTENSION
## AND PLAINTIFF'S MOTION TO COMPEL DISCOVERY

ATTORNEYS FOR PLAINTIFF

Jeffrey K. Bartels, Esq.

Kenneth W. Richmond, Esq. *pro hac*

401 South Maryland Ave.

February 11, 2007        Wilmington, DE. 19804

## BACKGROUND

Plaintiff has sought an Extension of Time under Rule 16.5 following the December 29, 2006 publicity announcing the conclusion of an investigation by the Department of Justice and its findings of constitutional violations in the Delaware Department of Correction.  The Defendants never disclosed the existence of an investigation and, on November 28, 2006, Defendant Taylor indicated repeatedly during a deposition that no investigation of FCM had been undertaken by the Department of Correction except for the NCCHC review (Taylor Deposition pp 77-80 Exhibit E attached hereto).  The DOJ findings relate back to 2002, during FCM's tenure, yet Commissioner Taylor denied that any investigation had been conducted or was underway.

Since June, 29, 2005, the Defendants Taylor and Talley have been aware of investigations and contracted for the assembly and electronic indexing of 26,000 pages of evidence.  On June 29, 2005, the Plaintiff commenced this action alleging that "…in spite of numerous inmate complaints, numerous inmate deaths due to "lengthy illnesses" and the identification of "medical issues" under the contract, Joyce Talley remained deliberately indifferent to the medical plight of inmates in general, and decedent Chance in particular by failing to order or require inmates to receive adequate, needed medical care when she had a duty to do so."

At paragraph 29, the Plaintiff alleges that, "… In addition to the foregoing, the specific failure to provide access to required diagnostic care in the case of the decedent resulted from a contractual agreement between Defendant Taylor and

FCM and the failure to insure efficient and effective medical care under the contract created a policy of deliberate indifference to the decedent's medical plight in violation of the proscriptions contained in the United States Constitution, amend. VIII.

In spite of the requirement of Rule 26, the Defendants have failed to disclose the investigation or provide any document relating to expert findings or to the constitutionality of the medical care. On February 6, 2007, responding to Plaintiffs second Request for Production filed on January 6, 2007, Defendant Taylor and Talley declined to produce the evidence submitted to the Department of Justice citing relevance, privilege and a non-disclosure agreement. Secondarily, the Defendants collectively assert 24 Del.C. 1768 as a basis for instructing witnesses not to answer questions relating to the decedent's mortality review or the 24 pages of findings of the National Commission on Correctional Health Care 2005 "audit". The issues raised, even the cases cited are virtually identical to those of Defendants Taylor and Talley, and for that reason the entirety of the Plaintiff's Reply there will be incorporated by reference here sparing the Court the necessity of reviewing a second lengthy exposition. The Plaintiff's Exhibits have been arranged sequentially A through E.

ATTORNEYS FOR PLAINTIFF

/s/_____

Jeffrey K. Bartels, Esq.

Kenneth W. Richmond, Esq. *pro hac*

401 South Maryland Ave.

February 11, 2007                Wilmington, DE. 19804

## CERTIFICATION OF SERVICE

I, Kenneth W. Richmond, Esq., pro hac vice counsel for the Plaintiff, hereby certify that on Thursday, February 11, 2007 a copy of the foregoing Reply to Defendant First Correctional Medical's Opposition to Rule 16-5 Extension was served by e-mail upon Marc Neidzielski, Esquire, Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, DE, 19801, and  Daniel L. McKenty 1225 N. King Street, Suite 1100, Wilmington,  DE, 19899

Date:   February 11, 2007

/s/_____

Kenneth W. Richmond, Esq.

2019 Walnut Street

Philadelphia, PA  19103

215-523-9200

Pro Hac Counsel for Plaintiff

# **<u>EXHIBIT E</u>**

STANLEY TAYLOR

Page 77

1    Q.  All right.
2    A.  So I'm not sure what your -- maybe we should
3  start again.
4    Q.  I assumed, and I apologize for the
5  assumption, but I had assumed that Lee Williams'
6  articles were in 2005, there were the earlier articles?
7    A.  He was very late to the game.  He was trying
8  to take credit --
9    Q.  Yeah, he was very late to the game.
10   A.  He was trying to take credit for work that
11  the state was already well involved in.  Wouldn't be
12  the first time a news journal has done that.
13   Q.  Well, I understand that.  And that's what I'm
14  referring to, sir.
15      You were already involved in an
16  investigation, I take it, as a result of other reports
17  that you received through the news media at the time
18  that the Williams articles were being published?
19   A.  I'm not aware of any.  Number one, news media
20  doesn't generate investigations for us.
21   Q.  Okay.  Let me back it up.
22   A.  Yeah, I'm going to stop assuming that I
23  understand what you're asking me.  Let's start over.
24   Q.  All right.  What I'm getting at is that apart
25  from the audit that was performed by NCCHC, the

Page 78

1  Department of Correction had an investigation going on;
2  is that correct of FCM?
3    A.  No.
4    Q.  Oh, they did not?
5    A.  An investigation?
6    Q.  Yeah, other than the report.
7    A.  An investigation of what?
8    Q.  The medical care that was being delivered by
9  FCM.
10   A.  No.
11   Q.  There was no investigation and other than the
12  audit report?
13   A.  I think if you look back, I said we had the
14  audit report, we had efforts working with FCM with
15  staff from NCCHC and my staff to work with FCM to
16  develop a corrective action plan to address
17  deficiencies in the report.  That effort was in place
18  for two to three months was not successful and
19  ultimately they left.  We had a very -- if you heard
20  me say an hour ago -- typical transition is six months,
21  we now had 30 days to find a new vendor, get them in
22  place, and assume medical healthcare in 30 days.
23  That's where our energies were at that point in time.
24   Q.  Now, with respect to the compliance with the
25  NCCHC standards, how did you insure that the staff that

Page 79

1  was put in place by FCM and immediately after they took
2  over the contract for the provision of medical care in
3  the Department of Correction, what, if anything, did
4  your staff do to insure compliance with those
5  standards?
6    A.  You're going back to 2002, the beginning of
7  FCM's --
8    Q.  Correct.
9    A.  -- taking over?
10      Again, as part of the -- their applying to
11  the RFP, they had to assure us that they understood and
12  could operate by NCCHC standards.  My staff have been
13  working with those kinds of standards for a number of
14  years, and members of my staff, members of The Medical
15  Review Committee have attended a number of conferences
16  by The American Correctional Association that include
17  presentations by The National Commission on
18  Correctional Healthcare to assist them in monitoring
19  contracts of that nature, and have conversation with
20  staff From The National Commission on Correctional
21  Healthcare to help in that process as well.
22   Q.  So if I can assume, then, that there were
23  earlier problems, either financial problems, or
24  problems with staff, or problems with staff
25  qualifications within CMS in spite of the objection to

Page 80

1  the question concerning Dr. Ivens, what, if anything,
2  did your staff do to address the qualifications of the
3  new staff coming in by FCM other than what you've just
4  described as receiving their assurance that they were
5  going to comply with the standards of the NCCHC?
6    A.  I don't recall making any statement about
7  problems with quality or standards or anything about
8  CMS prior to FCM.  As I recall, most of that
9  conversation was about their departure was relative to
10  their financial constraints.
11   Q.  Weren't you named in lawsuits addressing the
12  medical care prior to 2002?
13   A.  That's quite possible.  I'm named in lawsuits
14  a lot.
15   Q.  All right.  I'm talking about specifically
16  with regard to medical care.
17      Did any of these lawsuits result in
18  investigation or inquiry on your part or direction to
19  any of your subordinate staff to investigate the
20  quality of care in the qualifications of the people
21  rendering care?
22   A.  An investigation, no.
23   Q.  It did not?
24   A.  Not beyond The National Commission on
25  Correctional Healthcare reviews.

20 (Pages 77 to 80)