# IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF DELAWARE

ESTATE OF LOUIS W. CHANCE JR.

                Plaintiff

      v.

FIRST CORRECTIONAL MEDICAL
INC., DR. NIRANJANA SHAH, DR
JOSE A. ARAMBURO, JR.,
COMMISSIONER STANLEY TAYLOR
and JOYCE TALLEY

             Defendants

C.A No: 05-449-SLR

## PLAINTIFF'S MOTION TO COMPELL PRODUCTION OF DOCUMENTS REQUESTED FROM DEFENDANTS TAYLOR AND TALLEY AND FOR THE AWARD OF SANCTIONS PURSUANT TO RULE 37

ATTORNEYS FOR PLAINTIFF

Jeffrey K. Bartels, Esq.

Kenneth W. Richmond, Esq. *pro hac*

401 South Maryland Ave.

February 15, 2007        Wilmington, DE. 19804

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………..2

SUMMARY ARGUMENT…………………………………………….3

BACKGROUND………………………………………………………4

## TABLE OF AUTHORITIES

### CASES:

**Bordanoaro v. McLeod,** 871 F.2d at 1166-67(1989)……………12

**City of Canton v. Harris,** 489 U.S. 378 (1989)…………………13, 14

**Consolo v. George,** 58 F.3d 791 (1st Cir. 1995)…………………15

**Estelle v. Gamble,** 429 U.S. 97, 104-105,
50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)……………………………14

**Ferranti v. Moran,** 618 F.2d 888 (1st Cir. 1980)…………………15

**Gaudreault v. Municipality of Salem, Massachusetts,**
 923 F.2d 203 (1st Cir. 1990)………………………………………15

**Harris v City of Pagedale**, 821 F.2d 499 (8th Cir. 1987)………….13

**Holestine v. Terhune**, 2003 U.S. Dist. LEXIS 24584,
2003 WL 23281594 (N.D.Cal. Nov. 21, 2003)……………………16

**Layne v. Vinzant,** 657 F.2d 468 (1st Cir. 1981)…………………..15

**Mahan v. Plymouth County House of Corrections,**
 64 F.3d 14 (1st Cir. 1995)…………………………………………15

**Martinez v Cornell Corrections of Texas,** 229 F.R.D. 215;
 2005 U.S. Dist. LEXIS 14618; 62 Fed. R. Serv. 3d
 (Callaghan) 6 (February 15, 2005)………………………………12, 17

 **Miranda v. Munoz**, 770 F.2d 255 (1st Cir. 1985); ……………...15

**Monell v. Department of Social Services,** 436 U.S. 658 (1978)...13

**Spell v. McDaniel,** 824 F.2d 1380, 1387 (4th Cir 1987)………….13

**Surtees v. First Correctional Medical,** C.A.
 No. 05C-08-236-PLA. ………………………………………………11

**Wilson v. Seiter**, 501 U.S. 294, 298, 115 L. Ed. 2d 271,
 111 S. Ct. 2321 (1991)…………………………………………………..14

**STATUTES:**

45 CFR §164.512……………………………………………………8, 11

*11 Del. C. 4322*…………………………………………………….. 8, 11

*16 Del. C. §711* …………………………………………………..8, 11

*24 Del.C. §1768* …………………………………………………11

**TREATISES:**

## SUMMARY OF ARGUMENT

I.      PARTIES MAY OBTAIN DISCOVERY REGARDING ANY MATTER NOT PRIVILEGED THAT IS RFELEVANT TO THE CLAIM OR DEFENSE INCLUDING THE EXISTENCE, DESCRIPTION, NATURE, CUSTODY CONDITION AND LOCATION OF ANY DOCUMENTS OR OTHER TANGIBLE THINGS, AND THE IDENTITY AND LOCATION OF PERSONS HAVING KNOWLEDGE OF ANY DISCOVERABLE MATTER. RELEVANT INFORMATION NEED NOT BE ADMISSIBLE AT TRIAL SO LONG AS IT IS CALCULATED TO LEAD TO DISCOVERABLE INFMATION.

II.      THE PLAINTIFF IS ENTITLED TO SANCTIONS UNDER RULE 37 FOR THE DEFENDANTS OBSTREPEROUS OBJECTIONS AND FAILURE TO PROCEED WITH DISCOVERY IN THE MANNER AND SPIRIT THE FEDERAL RULES OF DISCOVERY CONTEMPLATE.

AND NOW, comes the Plaintiff, the Estate of Louis Chance, by and through

undersigned counsel to move this Court to compel production of documents and for the

award of attorney fees as sanctions, and as grounds therefore, respectfully alleges that

Defendant's objections are improper, lack conformity with the rules, lack specificity, lack

legal merit and were interposed for delay and obstruction.


## BACKGROUND

1.     On June 29, 2005, the Plaintiff commenced this action against Defendants First

Correctional Medical, Dr. Niranjana Shaw and Dr. Jose Aramburo and thereafter,  on

September 17, 2005 filed an Amended Complaint naming Defendants Taylor,  Delaware

Commissioner of Correction and Joyce Talley, Director of Contract Compliance for the

Department of Correction.


2.     The allegations of the Plaintiffs Amended Complaint state, commencing at

paragraph 28, "…in spite of numerous inmate complaints, numerous inmate deaths due to

"lengthy illnesses" and the identification of "medical issues" under the contract,  Joyce

Talley remained deliberately indifferent to the medical plight of inmates in general, and

decedent Chance in particular by failing to order or require inmates to receive adequate,

needed medical care when she had a duty to do so."

     At paragraph 29, the Plaintiff alleges that, "… In addition to the foregoing, the

specific failure to provide access to required diagnostic care in the case of the decedent

resulted from a contractual agreement between Defendant Taylor and FCM and the

failure to insure efficient and effective medical care under the contract created a policy of

deliberate indifference to the decedent's medical plight in violation of the proscriptions

contained in the United States Constitution, amend. VIII.


3.      On December 29, 2006 Defendant Taylor executed a copy of an agreement that

was referenced in the media together with the opinion and findings of the United States

Department of Justice on December 31, 2006.


4.      On January 4, 2007, a copy of the Department of Justice findings and a copy of the

Agreement entered was produced by Defendants.  A copy of the findings and agreement

is incorporated herein by reference and is attached hereto

as Exhibit "B"[1].  On the basis of the contents of the "findings" one must conclude that no

objections were asserted by the Defendant Taylor and that each of the alleged 26,000

documents, including medical investigations were relevant and non-privileged for a

Department of Justice civil rights investigation.  Obviously no HIPAA, or other

protections for the medical records were asserted.


5.      On January 6, 2007, Plaintiff served a 2nd Request for Production of Documents, a

copy of which is attached hereto as Exhibit "F" following a discussion among counsel in

---

[1] For convenience, the Exhibit identities are made consistent with the Plaintiff's Motion under Rule 16.5 which is based upon the need for additional time to examine the evidence arising out of the Department of Justice "CRIPA" 42 U.S.C. 1997 Civil Rights of Institutionalized Persons Act.  The central issue to this and the Rule 16.5 Motion is the Plaintiffs access to the evidence underlying Defendant Taylor's agreement with the Justice Department.

a good faith attempt to secure the documents supporting the findings in a voluntary manner.

6.     On February 6, 2007, the Defendants Taylor and Talley filed the terse response to the Plaintiffs request which is attached hereto as Exhibit "G".

7.     Defendants Taylor and Talley concede that the Department of Justice findings of unconstitutional medical care relate to the John L. Webb and Howard R. Young facilities where the medical care the Plaintiff complains of occurred.

8.     At page 4 of the findings, the Department of Justice Investigator stated:

> "Our investigation revealed that the medical care provided at the facilities falls below the standard of care constitutionally required in the following areas, all of which were also identified by the State as deficient: intake; medication administration and management; nursing sick call; provider sick call; scheduling, tracking, and follow-up on outside consults; monitoring and treatment of communicable diseases; monitoring and treatment of chronic diseases; medical records documentation; scheduling; infirmary care; continuity of care following hospitalizations; grievances; and patient confidentiality. In addition, we found that care for patients with acute medical urgencies was also constitutionally inadequate."

9.     Plaintiffs Decedent died as a result of an acute medical urgency, ie. Cryptococcal meningitis that went undiagnosed over a period of three weeks in a manner that was not only a departure from medical standards but, according to the

Plaintiff's expert, it constituted a deliberate indifference to a serious, life threatening

medical need.

10.     Obviously, the DOJ investigation examined evidence as far back as 2002,

because at page 7 of the findings it is reported,

> "And, in the most extreme example,
> specialty care may have been denied altogether:
> in March, 2002, an SCI inmate died from a
> malignant brain tumor that had grown so large
> that it distorted his facial features, and was
> so noticeable that other inmates referred to
> him as "the brother with two heads." Fourteen
> months before he died, SCI medical staff
> allegedly misdiagnosed the cancerous growth as
> a cyst or an ingrown hair, and allegedly made no
> specialty care referral nor provided any
> specialty care to the inmate before he died."

11.     The concluding paragraph of the DOJ findings notes that the contents are being

made public and, in fact, the letter was posted on the Department of Justice Civil

Rights Division web site.

12.     Defendants Taylor and Talley objected to the production of the documents,

correspondence, memoranda, addressing, pertaining to or referencing the reasons for

the entry of a Consent Decree or Agreement relating to the medical care provided to

inmates in the Delaware Department of Correction first because it was "irrelevant"

and not reasonably calculated to lead to admissible evidence and secondly, the

documents requested are "privileged" and not discoverable, "under a number of laws"

including attorney client privilege, peer, review, "self-critical analysis" HIPAA, *11*

*Del. C. §711,* and 42 USC § 260 [sic].  Because of lack of specificity and conformity

to the Federal Discovery Rules, all objections should be deemed waived.


13.    The Defendants have, astonishingly, identified only a single document among

26,000 indexed and produced for the DOJ to which any of the "laws" or privileges

they claim might pertain.  Indeed, the "laws" cited by the Defendants are either non-

existent (42 USC §260), or *actually authorize* a court to provide inmate records.  For

example the HIPAA "Health Insurance Portability and Accountability Act" has rather

specific provisions that relate to persons in custody that appear at 45 CFR §164.512.

To wit, prisoner health information *can* be provided without consent of the inmate (a)

as required by law or (e) as authorized by discovery in a judicial proceeding (i) in

response to a discovery request or as set forth in §164.512(iii)(A) by providing notice;

(B) or by agreement with a qualifying protective order or (C)(f)(ii)(3) by "De-

identifying" the inmate.  The Defendant's objection based upon *16 Del. C. §711* is

unavailing because it applies only to the Delaware Division of Public Health, and is,

of course, a state provision that might run afoul of federal discovery rulings of the 3rd

Circuit Court of Appeals.  Reliance upon *11 Del. C. 4322* provides no protection from

any document because it states that "no inmate shall be provided a copy of the

Department of Correction Policy/Procedure or Administrative Regulations except

upon *written consent of the Commissioner* (italics added for emphasis).  No *inmate*

has requested this information, and if this information is included in the documents

request, it could have been easily secured with a non-disclosure provision.  The "peer" privilege has been extensively briefed in connection with Plaintiff's two earlier motions and for economy, it is requested that the contents of Plaintiff's Reply to Defense Objections to a Rule 16.5 Extension, and the Motion to Compel be incorporated here as though fully set forth.

14.    The objections to the requested production are not only without merit, but frivolous and contemptuous of the federal discovery rules.  It was specifically requested that the Defense state objections to discovery within the context of a federal claim and the holdings of this Circuit and that identifying inmate information be redacted from medical records as appropriate in the first Request for Production.

WHEREFORE, the Plaintiff respectfully prays that the Court Order the production of the requested documents for the reason that all objections are deemed waived, and award sanctions for twenty (20) hours invested in review, research, preparation, revision and proof-reading of this Motion.

## **ARGUMENT**

### I.    THE PLAINTIFF IS ENTITLED TO DISCOVER EACH DOCUMENT THAT WAS SUBMITTED TO THE DEPARTMENT OF JUSTICE UNDER FEDERAL RULE OF CIVIL PROCEDURE 26(B)(1)

Before it was amended in 2000, Rule 26(b) fixed the outer bounds of discovery in terms of the "subject matter involved in the pending action." The amended version of this

provision, clearly intended to shrink the universe of presumptively accessible material, declares that matter sought through discovery must be "relevant to the claim or defense of any party. Thus, the Plaintiff in this action must look to decisions post 2000 for modern application of the Rule and Relevance.

Fed. R. Civ. P. 26 permits discovery of any relevant and non-privileged matter which appears reasonably calculated to lead to the discovery of admissible evidence. Rule 26(b)(1) provides that discovery shall be limited if discovery is unduly burdensome or expensive, taking into account the needs of the case and other factors. The Defendants Taylor and Talley, in response to the Plaintiffs request for copies of all documents produced for the Department of Justice indicate that the request is burdensome because it consists of 26,000 documents (that have already been indexed, bates stamped and are retrievable by "Concordia searches" for content). Thus, the response actually establishes that the "burden" of assembling, indexing and packaging the requested material has already been accomplished and the material is already conveniently packaged in a searchable, indexed electronic format.

A second objection to the single document identified, that is number 008896, that relates specifically to the Decedent Chance, is "work product" produced, not by an attorney, but by a "representative" of the Department of Correction on October 4, 2006. This objection caused considerable consternation because it fits no known category of privilege and has not been sufficiently described to qualify as "attorney thoughts or impressions". It has obviously been sent to the DOJ as part of the body of evidenced that led to its conclusion that the medical care provided while Louis Chance was an inmate

was constitutionally deficient.  It is impossible to imagine how a document freely published, without objection,  to the Department of Justice takes on a "work product" identity.

The "statutory" objections have been addressed in the background statement above, and either do not exist (42 USC §260), have not been read for content 45 CFR §164.512 (HIPAA), or do not apply (*11 Del. C. 4322; 16 Del. C. §711* ). The application of *24 Del.C. §1768* to certain medical reviews within a  malpractice claim, standing alone, is supportable.  However, when coupled with a federal claim, the principal to be applied, "Where there are federal question claims and pendent state law claims present, the federal law of privilege applies."  This specific issue has been addressed in the Plaintiff's Reply to the Defense Objections to the Rule 16.5 Extension and discussions of the letter ruling in the case of **Surtees v. First Correctional Medical,** C.A. No. 05C-08-236-PLA.  The "peer" privilege has no application to the present request for all of the reasons set forth there.  What we are left with is the general consideration of relevance, and two recent cases (from other Circuits) are instructive in defining the scope of relevance in the context of a prisoner's request for discovery, and also for the application of Rule 37 sanctions.

1

The first case, **Martinez v Cornell Corrections of Texas,** 229 F.R.D. 215; 2005 U.S. Dist. LEXIS 14618; 62 Fed. R. Serv. 3d (Callaghan) 6 (February 15, 2005)

[2]involved a post release lawsuit by a female who had been raped while in a jail.  The

discovery issue was whether "post-event" evidence could be compelled in a former

inmates request for, among other things, [the jailer's] communications with Santa Fe

County regarding sexual misconduct before and after the alleged incident giving rise to

Martinez' lawsuit. MTC [the jailer] agreed to provide communications concerning sexual

misconduct during the time period in which Martinez was incarcerated in the SFCADC

under MTC's operation and became or was pregnant. MTC has objected to providing

such communications, if there were any, during the time periods: (i) after Martinez left

the SFCADC; and (ii) before MTC assumed operational responsibility for SFCADC on

October 1, 2001. MTC contends that such communications are not relevant to the subject

matter of this lawsuit or are not reasonably calculated to lead to the discovery of evidence

admissible at trial.  Citing the United States Court of Appeals for the First Circuit in

**Bordanoaro v. McLeod,** 871 F.2d at 1166-67(1989),  the District Court held that in the

context of discovery, post-event evidence can shed some light on what policies existed on

the date of an alleged deprivation of constitutional right. These rulings are not the same

as allowing discovery of evidence of other incidents unrelated to the incident at issue in

the suit.

        In the present Chance case, the jailer's lack of oversight before the events

leading up to Chance's death is at issue.  The evidence submitted to the Department of

Justice pre and post date the events leading up to his death is relevant to the policy of the

---

[2]  There was a later decision by the 1st Circuit Court of Appeals in this matter, but it did not address the discovery
issue.

Department of Correction administration which has been the subject of extensive Plaintiff investigation.  To preserve the issue, Plaintiff here feels compelled to re-recite decisions applying the reasoning of the United States Supreme Court in **Monell v. Department of Social Services,** 436 U.S. 658 (1978), which established that liability can be imposed on officials acting in their official capacity where the unconstitutional action results from governmental "custom" of ignoring inmate complaints even where the "custom" has not received formal approval. (policy and custom of ignoring sexual abuse complaints of arrestees).  The Department of Justice, in the present case has found that the inmate grievance procedure was inadequate, that medications and appropriate follow-up was not being provided, and that acute or urgently needed care was not being addressed,  all of which is probative to the Chance claim of a formal or informal policy that creates liability for Defendants Taylor and Talley.  **Harris v City of Pagedale**, 821 F.2d 499 (8th Cir. 1987); **Spell v. McDaniel,**  824 F.2d 1380, 1387 (4th Cir 1987).  In **City of Canton v. Harris,** 489 U.S. 378 (1989) the Supreme Court held that where training and supervision was necessary to avoid constitutional violations and the government entity *is deliberately indifferent* to the need to properly train and supervise, a cause of action is stated.  "…in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious *and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers …can be reasonably said to have been deliberately indifferent to the need…[Under these circumstances] the failure to provide proper training may fairly be said to represent a policy for which the city is responsible."* **City of Canton v Harris** at 489 U.S. 390. (italics added here)

Delaware prisoners are entitled to reasonable medical care and  they may hold *prison officials* liable under the Eighth Amendment if such care is inadequate. **Estelle v. Gamble,** 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976).  However, in order to establish an Eighth Amendment violation a plaintiff must allege that he has endured a sufficiently serious deprivation, and that the defendant has acted with deliberate indifference to the plaintiff's plight. **Wilson v. Seiter**, 501 U.S. 294, 298, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. Farmer v. Brennan, 511 U.S. 825, 837, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." **Estelle v. Gamble,** (supra) 429 U.S. at 104-05. **Mahan v. Plymouth County House of Corrections,** 64 F.3d 14 (1st Cir. 1995); **Consolo v. George,** 58 F.3d 791 (1st Cir. 1995); **Gaudreault v. Municipality of Salem, Massachusetts,** 923 F.2d 203 (1st Cir. 1990); **Miranda v. Munoz**, 770 F.2d 255 (1st Cir. 1985); **Ferranti v. Moran,** 618 F.2d 888 (1st Cir. 1980); **Layne v. Vinzant,** 657 F.2d 468 (1st Cir. 1981). Indeed, in the Supreme Court case that established deliberate indifference to serious medical needs in the prison context as a constitutional violation, the Court stated:

> "…These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of

> the Amendment. In less serious cases, denial of medical care may result
> in pain and suffering which no one suggests would serve any
> penological purpose. The infliction of such unnecessary suffering is
> inconsistent with contemporary standards of decency as manifested in
> modern legislation codifying the common law view that "it is but just
> that the public be required to care for the prisoner, who cannot by
> reason of the deprivation of his liberty, care for himself."

The evidence submitted to the Department of Justice, including the investigation

by medically qualified contractors is nothing more than a negative report on conduct that

the Defendants would like to avoid producing, but cannot.

2

The opinion in the second prison discovery case is less instructive because it

involved a *pro se* litigant who requested five years worth of inmate medical grievances

from his warders without limitation on identities in medical records.  In **Holestine v.**

**Terhune**, 2003 U.S. Dist. LEXIS 24584, 2003 WL 23281594 (N.D.Cal. Nov. 21, 2003)[3],

an inmate of Pelican Bay State Prison filed a civil rights action alleging a violation of the

Eighth Amendment. 2003 U.S. Dist. LEXIS 24584 at 3. Plaintiff accused defendants of

failing to prescribe interferon to treat Hepatitis C.  In a motion to compel, Plaintiff

requested "all documents referring or relating to any and all complaints, grievances or

reports made by any prisoner incarcerated at Pelican Bay State Prison against You [sic]

and/or any Defendants, at any time from January 1, 1997 through December 31, 2002."

2003 U.S. Dist. LEXIS 24584 at 5. Plaintiff asserted that these complaints would prove

that defendants were aware of deficiencies in prisoner medical care. 2003 U.S. Dist.

LEXIS 24584 at 9. Defendants responded that prisoner grievances by other inmates

---

[3]  This case has no FRD or F. 2nd citation.

lacked relevance and that their disclosure would violate prisoner privacy. Id.

Furthermore, the request included grievances unrelated to Hepatitis C treatment. Id. The

district court held in **Holestine** that Plaintiff's discovery request exceeded the scope and

relevance of Plaintiff's claims.  The court reasoned that Plaintiff failed to show the

relevance of highly confidential documents. Id. The court used a balancing test to weigh

the privacy rights of the inmates and found that this request was not justified. The district

court denied the motion to compel without prejudice.  In the Chance case, no inmate

identity is sought for any medical record, and unlike Mr. Holstine, the Estate of Louis

Chance seeks to place no undue burden upon the Defendants.

In the final analysis of the issue in the present matter, the Court has to ask

whether, if the information was relevant to the Department of Justice Investigation of

amend. VIII civil rights violations, why is it not relevant for the Estate of Louis Chance?

Each of the investigations proceeds under federal statute and has the same burden of

proof.  There was no peer, statutory or non-disclosure privilege asserted to the

Department of Justice to the medical investigation undertaken by the Defendant Taylor,

so in reality, such objections, however weak, have been waived.

## **ARGUMENT II**

THE PLAINTIFF IS ENTITLED TO SANCTIONS UNDER RULE 37 FOR THE
DEFENDANTS OBSTREPEROUS OBJECTIONS AND FAILURE TO PROCEED
WITH DISCOVERY IN THE MANNER AND SPIRIT THE FEDERAL RULES OF
DISCOVERY CONTEMPLATE.

In reading the **Martinez** decision (supra) one finds an illustration of the rather

extensive negotiation and exchange of correspondence as a precursor to the final

presentation of the issue to the District Court.  The issues there could be addressed in a

narrowed framework because the objections to the requests were detailed and stated with

precision.  As the court noted, there was little precedent for the discovery and the "post-

event" material that was sought to establish an official policy "conducive to rape".

Nevertheless, attorney fees were awarded in keeping with Rule 37 and even though some

of the objections to production were sustained.   In the present investigation by the

Department of Justice, its praise for Defendant Taylor's cooperation can only be

described as effusive.  The legal issues are precisely the same here, but the obstructions

for the Estate of Louis Chance are steadfast, frivolous and without justification, unless of

course they are justified by the damage claims or the more significant potential for a

finding of personal liability.  Neither case relieves the defense of sanctions.


## <u>CONCLUSION</u>

For the foregoing reasons, the Plaintiff respectfully requests that the Defendant's

Objections to the Plaintiff's 2nd Request for Production be overruled and that attorney

fees for 20 hours be awarded pursuant to Rule 37.

Respectfully submitted,


ATTORNEYS  FOR THE PLAINTIFF

/s/_____

Jeffrey K. Bartels, Esq.

Kenneth W. Richmond, Esq. *pro hac*

401 South Maryland Ave.

February 15, 2007                    Wilmington, DE. 19804

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ESTATE OF LOUIS W. CHANCE )
         )
         )
     Plaintiffs )  C.A. No. 05-449-SLR
         )
   v.      )
         )
FIRST CORRECTIONAL MEDICAL )  JURY OF 12 DEMANDED
LLC, DR. NIRANJANA SHAH, AND )
DR. JOSE ARAMBURO   )
    Defendants. )

## CERTIFICATE OF SERVICE

   I certify that, on this date, one copy of the attached Motion for Sanction and Motion to Compel was electronically mailed to:

Marc Niedzielsky
Department of Justice
Carvel State Office Building
820 N. French St.
Wilmington, DE 19801

Daniel L. McKenty,
Dana M. Spring,
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397

       /s/_____

       Jeffrey K. Bartels, Esq.
       Kenneth W. Richmond, Esq. *pro hac*
       401 South Maryland Ave.
February 15, 2007    Wilmington, DE. 19804

# EXHIBIT B



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

DEC 29 2006

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl.
Dover, DE  19901

     RE:  <u>Investigation of Delaware Correctional Center, Symrna,
Delaware; Howard R. Young Correctional Institution,
Wilmington, Delaware; Sussex Correctional Institution,
Georgetown, Delaware; John L. Webb Correctional
Facility, Wilmington, Delaware; and Delores J. Baylor
Women's Correctional Institution, New Castle, Delaware</u>

Dear Governor Minner:

    I am writing to report the findings of the Civil Rights
Division's investigation of conditions and practices at the
following five Delaware Department of Correction ("DOC")
facilities:  the Delaware Correctional Center ("DCC"), the
Howard R. Young Correctional Institution ("HRYCI"), the Sussex
Correctional Institution ("SCI"), the John L. Webb Correctional
Facility ("Webb"), and the Delores J. Baylor Women's Correctional
Institution ("BWCI").

    On March 7, 2006, we notified you of our intent to conduct
an investigation of these facilities pursuant to the Civil Rights
of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997,
which gives the Department of Justice authority to seek remedies
for any pattern and practice of conduct that violates the
constitutional or federal rights of incarcerated persons.  We
informed you that our investigation would focus on medical and
mental health care.

    We note that the State has cooperated thoroughly with our
investigation and, under the leadership of DOC Commissioner
Stanley W. Taylor, Jr., has unequivocally indicated its clear
desire to improve medical and mental health care services at the

- 2 -

facilities.  From the outset of our investigation, the State has been proactive in evaluating the conditions at the facilities. Indeed, the State retained its own expert consultants, Dr. Ronald Shansky and Dr. Roberta Stellman, to evaluate medical and mental health care services, respectively, at DCC, HRYCI, SCI, Webb, and BWCI in July and September 2006.  Following these evaluations, the State shared the results of its internal evaluations with us.

The State's experts identified systemic deficiencies in medical and mental health care at four of the five facilities: DCC, HRYCI, SCI, and BWCI (hereinafter, "the facilities").  These findings were presented to the Department of Justice in oral and written presentations by Fried, Frank, Harris, Shriver & Jacobson, outside counsel for the State.  To facilitate our investigation, the State agreed to stipulate to the accuracy of these factual findings.  Given the State's complete cooperation with our investigation, the unsolicited disclosure of its comprehensive internal audit of medical and mental health care services, and the State's stipulation, we elected to limit our expert tours to a representative subset of the facilities.

Department of Justice staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006.  We conducted additional tours of HRYCI, Webb and BWCI, accompanied by expert consultants in the fields of medicine, mental health care, and suicide prevention on October 4-6, 2006, October 23-25, 2006, and November 15-17, 2006.  During these tours, we reviewed a wide variety of State and facility documents, including policies, procedures, and medical and mental health records relating to the care and treatment of inmates.  We interviewed prison administrators, professionals, staff and inmates at each facility.  In keeping with our pledge of transparency and to provide technical assistance where appropriate regarding our investigatory findings, we conveyed our preliminary findings to certain State and facility administrators and staff during verbal exit presentations at the close of each of our on-site visits. As detailed below, our investigative findings mirrored those of the State's experts.

We commend the administrators and staff of the five facilities we toured for their helpful and professional conduct throughout the course of the investigation.  In particular, facility personnel cooperated fully and expeditiously with our document requests.

We are confident that our work with the State will continue in the same cooperative manner we have enjoyed throughout our investigation.  However, consistent with our statutory obligation

- 3 -

under CRIPA, we set forth below the findings of our investigation, the facts supporting them, including those facts stipulated to by the State, and the minimum remedial steps that are necessary to address the deficiencies we have identified. As described below, we conclude that inmates confined at the facilities suffer harm or are placed at the risk of harm from constitutional deficiencies in certain aspects of the medical and mental health care services, including suicide prevention. Notwithstanding the foregoing, we are pleased to report that we find no constitutional deficiencies at Webb.

## I.  BACKGROUND

Delaware is one of six states that house both pre-trial detainees and sentenced prisoners in a single unified system, although detainees and prisoners are not housed together. Medical and mental health care services at the facilities are provided through a contract with a private vendor. DCC is located in Smyrna, Delaware, and houses approximately 2,500 male inmates, including both pre-trial detainees and sentenced prisoners. DCC also contains the Security Housing Unit ("SHU"), which houses inmates with disciplinary problems or who otherwise require the maximum level of security. DCC also contains the State's death row. HRYCI is located in Wilmington, Delaware. The facility houses approximately 1800 males, both pre-trial detainees and sentenced inmates. SCI is located in Georgetown, Delaware, and houses approximately 1200 male inmates, including a 100-bed boot camp. BWCI is located in New Castle, Delaware, and houses approximately 400 female pre-trial detainees and sentenced inmates at all security levels. Webb is located in Wilmington, Delaware, and houses approximately 80 minimum security male inmates.

## II.  FINDINGS

### A.  MEDICAL CARE

Under CRIPA, the Department of Justice has authority to investigate violations of the constitutional rights of inmates in prisons, and pre-trial detainees in jails. The rights of sentenced inmates fall under the Eighth Amendment, which prohibits the imposition of cruel and unusual punishment. Under the Eighth Amendment, jails must provide humane conditions of confinement, which include adequate medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). Failure to provide adequate care to address the serious medical needs of inmates can constitute deliberate indifference, a violation of the Eighth Amendment prohibition against cruel and unusual punishment.

- 4 -

Estelle v. Gamble, 429 U.S. 27 (1976).  The responsibility to
provide adequate medical care includes mental health care.
Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990).  Failure to
protect a suicidal prisoner from self-harm can also amount to a
constitutional violation.  Inmates of Allegheny County v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Colburn v. Upper Darby
Township, 838 F.2d 663 (3d Cir. 1988).  The responsibility to
protect inmates from harm includes the possibility of future harm
as well as present harm.  Helling v. McKinney, 509 U.S. 25, 33
(1993); Tillery, 907 F.2d at 426.

With regard to pre-trial detainees, the Fourteenth Amendment
prohibits imposing conditions or practices on detainees not
reasonably related to the legitimate governmental objectives of
safety, order, and security.  Bell v. Wolfish, 441 U.S. 420
(1979).  The Third Circuit has opined that the protections
afforded to pre-trial detainees are at least as great as those
afforded to sentenced prisoners.  Hubbard v. Taylor, 399 F.3d
150, 166-167 (3d Cir. 2005) (pre-trial detainees claims of
constitutional violations to be analyzed under Fourteenth
Amendment).

Our investigation revealed that the medical care provided at
the facilities falls below the standard of care constitutionally
required in the following areas, all of which were also
identified by the State as deficient:  intake; medication
administration and management; nursing sick call; provider sick
call; scheduling, tracking, and follow-up on outside consults;
monitoring and treatment of communicable diseases; monitoring and
treatment of chronic diseases; medical records documentation;
scheduling; infirmary care; continuity of care following
hospitalizations; grievances; and patient confidentiality. In
addition, we found that care for patients with acute medical
urgencies was also constitutionally inadequate.

1.  Sick Call

The State's expert found that sick call is not being
regularly conducted at the facilities and that sick call
"no-shows" (inmates who do not appear for their scheduled medical
appointments) are not tracked.  Our investigation confirmed that
there are inadequate sick call systems in place which directly
interferes with inmates' access to care for their serious medical
needs.  Specifically, the systems are deficient in scheduling
appointments, and tracking no-shows.  For example, the inadequate
scheduling system at HRYCI resulted in only seven of the
representative sample of 14 patients scheduled for sick call on
one day being seen.  In addition, we found that inmates who

- 5 -

missed sick call were not tracked and, as a consequence, often not rescheduled. The sick call process for inmates' requiring mental health care suffers from similar inadequacies in scheduling and follow-up. During our tours of BWCI and HRYCI, we found that the sick call process is not functioning properly and that there were significant delays for inmates who had requested to see the psychiatrist. Overall, these conditions place inmates at serious risk of harm.

### 2. Acute Care

Our investigation revealed that patients with life-threatening conditions are not receiving timely care. We reviewed the records of ten patients sent to the local emergency room; six of these patients were admitted. One patient, known to be infected with HIV, was admitted from HRYCI with pneumocystis carinii pneumonia ("PCP"), a potentially fatal infection in people with AIDS. We determined that this inmate's care had been mismanaged at HRYCI for one month before the inmate was finally sent to the hospital. In addition, this inmate was never tested for active tuberculosis, a likely diagnosis for patients with HIV and pneumonia. The failure to properly diagnose and treat this inmate could have put other inmates and staff at risk of contracting tuberculosis.

### 3. Chronic Care

The State's expert found that there are consistent backlogs with respect to the treatment of chronic care inmates as evidenced by infrequent scheduled appointments. When appointments are scheduled, they are subject to cancellation without explanation or follow-up. The State's expert also found that the chronic care rosters are not adequately maintained.

Our investigation confirmed that there is no functioning chronic disease registry at HRYCI. The absence of a chronic disease registry means that patients with chronic diseases, such as diabetes, hypertension, asthma, HIV, and Hepatitis C are not being followed and treated according to generally accepted medical standards for chronic care. As a result, inmates with chronic disease are at risk for deterioration in function, including blindness, kidney disease, heart disease, liver failure, and death.

We found that care was especially poor for inmates with diabetes, asthma, and HIV. Of nine inmates with diabetes whose charts we reviewed, only four had received tests deemed necessary pursuant to generally accepted professional standards for care of

- 6 -

persons with these serious, chronic diseases. In addition, only
two inmates had been immunized against pneumococcus, a bacterium
that is the leading cause of bacterial pneumonia. The failure to
immunize chronically ill inmates against pneumococcus places them
at serious risk of harm, including death from pneumococcal
pneumonia, and constitutes a substantial departure from generally
accepted standards of care. Another diabetic inmate whose chart
we reviewed went without insulin for three days, despite severely
elevated blood sugar levels that were known to staff, placing him
at risk of death.

Similarly, for inmates with asthma, the chronic care
practices also fall below a minimally acceptable standard of
care. For example, of nine asthmatic inmates who should have
been seen in the chronic care clinic over a three month period,
only three were seen. Only two had documented measurement of
peak expiratory flow, which is a departure from the generally
accepted standard of care for asthmatic patients.

Finally, with respect to HIV-infected inmates, we found that
chronic care practices also fall below a minimally acceptable
standard of care. Only two of five patients whose records our
medical consultant reviewed had documented laboratory
measurements of their CD4 cells[1] and their viral load, both of
which are necessary to gauge response to medication.

### 4. Specialty Care

The State's expert found that outside consultations are
delayed by days or even weeks in non-emergency situations because
of bureaucratic obstacles within the private vendor's system for
obtaining authorization. The State's expert also found that
shortages of security staff available to transport inmates to
outside medical appointments contributes to the inadequacy of
care. In addition, the State's expert determined that, even when
outside consults are scheduled, post-consult follow-up does not
consistently occur.

Similarly, our investigation found that access to specialty
care is untimely, and that tracking of outside care is deficient,
creating an unacceptable barrier to adequate medical care ordered
by physicians. For example, of 10 patients who were referred by
facility doctors for outside care, three received no care at all.

---

[1]    CD4 cells are white blood cells that identify, attack
and destroy infections. A normal CD4 cell count measures the
strength of a person's immune system.

- 7 -

All three patients had serious medical issues: two had upper gastrointestinal symptoms, including one patient who had documented possibly cancerous polyps with a biopsy ordered and performed, but no results in his file. A third patient had no documented follow-up with an orthopedist following serious trauma to his finger.

And, in the most extreme example, specialty care may have been denied altogether: in March, 2002, an SCI inmate died from a malignant brain tumor that had grown so large that it distorted his facial features, and was so noticeable that other inmates referred to him as "the brother with two heads." Fourteen months before he died, SCI medical staff allegedly misdiagnosed the cancerous growth as a cyst or an ingrown hair, and allegedly made no specialty care referral nor provided any specialty care to the inmate before he died.

### 5. Skin Infections

It is well-documented that, across the country, the incidence of skin infections among inmates is rising. These skin infections can include methicillin-resistant staphylococcus aureus ("MRSA"), a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death. MRSA transmission can be prevented by environmental controls, scrupulous laundry practices, early identification, effective treatment, wound care, and follow-up.

The State's expert found that, until recently, the medical staff were generally unfamiliar with the diagnosis and treatment of MRSA, and that the medical staff did not culture potential MRSA infections or educate inmates on proper precautions against the spread of MRSA until Fall 2005.

Our investigation revealed that proper diagnosis of and care for skin infections falls below the minimally acceptable level of care. We also found that medical staff routinely failed to culture skin infections; in addition, we found that wound care and follow-up were inadequate. For example, we reviewed the charts of eight inmates with skin infections at HRYCI; only two of these inmates received adequate care. One had a deep skin infection of the neck, but had no follow-up to see if his infection was spreading. Another inmate had inappropriate treatment for an infection that was accompanied by fever and chills, indicative of a systemic infection that could have led to pneumonia, brain infection, and death. Both of these patients were treated with the antibiotics that are ineffective in treating MRSA. With respect to wound care, we found another

- 8 -

inmate at BWCI who was inappropriately treated with a topical cream for an infection on her face, but who did not see the doctor for six days, by which time she had developed cellulitis, a deep skin infection that ultimately required hospitalization. Our investigative findings and the State's stipulation are also consistent with reports that DCC staff failed to properly diagnose and treat an MRSA infection in an inmate for four months in 2005.  This failure to recognize and treat MRSA allegedly caused the inmate to be hospitalized for five weeks, lose the skin on his scrotum, and undergo painful skin grafts, resulting in permanent deformity.

Our investigation confirmed that the existence of the above inadequacies place inmates and staff at risk of acquiring the infection and passing it to others in the community beyond the prison walls.  We also found that identification and treatment of skin infections at the facilities is inadequate, including failure to culture and treat wounds.  We found that facility staff does not keep adequate logs of skin infections, which prevents staff from being able to analyze data and identify potential sources of transmission.  Notably, in many cases physicians were prescribing the antibiotic Keflex, which not only is rarely effective for skin infections, including MRSA, but actually leads to prolonged infection and increased opportunities for the infection to spread.  Finally, we found that laundry practices at the Facilities are inadequate to prevent the spread of skin infections, including MRSA.

## 6.  Medication Administration and Management

The State's expert found that prescribed medications are routinely discontinued or delayed and that the current vendor has no systems in place for ensuring that medications do not run out, for notifying inmates when their medications have arrived, or for verifying that the vendor is providing inmates with the correct medications.

Our investigation confirmed these deficiencies which put inmates at risk of harm, particularly those with chronic conditions such as HIV.  We observed significant lapses in medication, due either to lack of availability of medications or the failure to administer medications consistently.  For example, one inmate had missed 20 consecutive days of his anti-viral medication used to treat the HIV, a potentially life-threatening situation; another inmate with HIV had a one month lag in receiving his HIV medications.

- 9 -

We also found that serial refusals to take medications were not monitored.  Numerous inmates missed three or more doses of medications on three consecutive days, without any evidence of follow-up by the prescribing practitioner, or evidence that the inmate was sought out or counseled.

The State's expert found that numerous systemic problems with medication administration and management exist at the facilities, including:  failure to distribute medications at the proper time intervals, leading to over- or under-prescribing medications; failure to provide necessary food at night to diabetic inmates; failure to properly monitor whether inmates are actually swallowing their medications; and pre-pouring medications.

Our investigation found similar deficiencies.  Our review of medication administration records at HRYCI revealed that approximately ten percent of the entries were left blank, indicating that inmates had not received their medication, or that the medication administration was undocumented.  We also found that the State routinely prescribes Keflex, an antibiotic, for skin infections, despite the fact that Keflex is rarely effective when used to treat skin infections.  We also learned that the State plans to administer each dose of medication from stock bottles, instead of filling prescriptions for each patient, a practice which we believe will lead to poor inventory control, diversion, error, and lack of accountability.

B.  **MENTAL HEALTH CARE**

The responsibility to provide adequate medical care includes mental health care.  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979); Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990).  The State is constitutionally required to provide adequate mental health care to inmates with serious mental or emotional disturbances.  The failure to provide necessary psychological or psychiatric treatment to such individuals will result in the "infliction of pain and suffering just as real as would result from the failure to treat serious physical ailments."  Inmates of Allegheny County Jail, 612 F.2d at 763.  The key to determining whether the State has provided constitutionally adequate mental health care depends on whether inmates have reasonable access to "medical personnel qualified to diagnose and treat such illnesses or disturbances."  Id.

The State's mental health expert found substantial deficiencies with the mental health care provided at the facilities.  The State's expert conducted a number of on-site

- 10 -

visits and determined that there is a "continuing need for
substantial remedial efforts, training and auditing of mental
health services provided by [the State's medical care provider]."
The State identified the following deficiencies:  poor responses
to sick call requests, particularly in cases involving
potentially suicidal inmates; inadequate group and individualized
therapy; staffing inadequacies, lack of privacy for inmate mental
health counseling, insufficient discharge planning, inadequate
administration and management of psychotropic medications,
failure to properly develop treatment plans that are regularly
updated, failure to develop site-specific policies and procedures
for mental health care, failure to properly document
medical/mental health records, and failure to obtain consent
forms.  Our investigation confirmed the serious systemic
deficiencies in psychiatric staffing, treatment and counseling,
medication administration and management, and intake and
screening identified by the State's mental health expert.  We
conclude that these deficiencies violate inmates' constitutional
right to adequate care for serious mental illness.

### 1.  Psychiatric Staffing Deficiencies

The State's expert found that low psychiatric staffing at
the facilities have caused a backlog of inmates requiring
psychiatric care.  Although the facilities do have psychiatrists
who are available to provide care on-site, their hours at the
various facilities are limited.

Our investigation confirmed that psychiatric staffing is
inadequate to provide for inmates' serious mental health needs.
For example, during our tour of HRYCI, the State informed us that
there are two part-time psychiatrists who provide care at HRYCI,
but our investigation revealed that their combined time on-site
totals less than twenty hours, and there is no on-site
psychiatric coverage provided for two days out of the week.
Psychiatric coverage at BWCI is even more limited.  Our
investigation revealed that a psychiatrist is on site only four
hours per week, and the "on-call psychiatrist" generally provides
guidance only via telephone.  Further, we understand that
included in the four hours is time that the psychiatrist spends
at the Violation of Probation Center attached to BWCI for two
hours every other week.  Such limited psychiatric staffing is not
constitutionally adequate care because inmates do not have
reasonable access to psychiatrists.  See Inmates of Allegheny
County Jail v. Pierce, 487 F. Supp. 638, 643 (W.D. Pa. 1980).

As a result of inadequate psychiatric staffing, we found
numerous instances in which the mental health clinical staff are

- 11 -

providing care that they are not licensed to provide (e.g., diagnosis of mental health disorders, treatment development without proper psychiatric consultation, decisions regarding suicide watch step-downs, etc.). We found that psychiatrists are routinely unavailable for treatment team and staff meetings, and often are not involved in crucial decision-making, and are not adequately involved in monitoring and supervision of staff. In addition, we found that the psychiatrist who provides most of the care at HRYCI was not familiar with the procedures utilized for making decisions about which medications to prescribe for patients with psychotic disorders. Generally accepted standards of care dictate that a psychiatrist be responsible for providing mental health treatment to seriously mentally ill patients should lead treatment teams, direct medication procedures, and be meaningfully involved in treatment decisions.

### 2. Treatment Planning and Counseling Deficiencies

The State's expert found that treatment plans for inmates need to be developed more regularly so that psychologists do not unnecessarily change diagnoses and so that patients are put on the appropriate problem list. Treatment plan development is an integral part of mental health care. One aspect of treatment planning consists of psychiatric and clinical staff providing consistent notations in medical records to ensure that important information regarding an inmate's care is documented. The State's expert, Dr. Stellman, concluded that there is a continued need for remedial efforts and training in the area of medical records documentation at DOC facilities. Dr. Stellman also found that many medical records do not contain consent forms, and contain improperly completed mental health forms.

Likewise, we found that the poor documentation impacts treatment because it is virtually impossible for a qualified mental health professional to review patient medical records and determine how basic clinical decisions are being made (e.g., why an inmate was admitted to the infirmary; why medications are prescribed; why and how psychiatric close observation levels are changed; what are the bases for diagnostic conclusions). During our tour of BWCI, we reviewed the medical record of an inmate who had recently attempted suicide and found the psychiatric notes were deficient and difficult to interpret. Both the on-site and "on-call" psychiatrists made adjustments to this inmate's medication without any explanation. Also, despite the fact that this inmate had been on suicide watch on three occasions within a four-month period and was obviously in distress, there were sparse psychiatric notes in her file.

- 12 -

Generally accepted standards of care dictate that discharge treatment planning be provided for inmates who have serious mental illness to ensure continuity of care. The State's expert found that its inmate treatment plans fail to address how the patient's care will continue once he or she is released from the DOC facility.[2]

The State's expert also found deficiencies in the individual and group counseling services provided at DOC correctional facilities. There appears to be a limited ability to provide individual counseling sessions to inmates because of a lack of privacy. The State's expert found that when inmates are housed in the infirmary, psychiatrists and mental health staff do their interviews through the cell door and that, because cells typically have at least one other occupant when these interviews are being conducted, the encounters are not confidential. This is a wholly inadequate practice evidencing a denial of reasonable access to psychiatric diagnosis and care. See Inmates of Allegheny County Jail, 612 F.2d at 763.

Group counseling services at the facilities fall below accepted standards, as well. The State's expert found that there was a need for remedial measures and training with respect to the provision of group and individualized therapy.

Similarly, we found the counseling services to be constitutionally inadequate. Because the facilities are substantially understaffed with respect to psychiatrists, physicians generally do not participate in the treatment team or staff meetings. For example, during our tour of BWCI we found that the master's level clinicians who run the group psychotherapy program (e.g., depression group, anger management group, and addiction group) in the Harbor House Unit do not receive any oversight from a psychiatrist. Generally accepted professional standards dictate that the psychiatrist be the treatment team leader and be meaningfully involved in key treatment decisions. However, clinicians are making important treatment decisions that should be left to the professional

_____

[2]    NCCHC standards J-E-13 and P-E-13 require jurisdictions to develop discharge planning for inmates with serious mental illness (e.g., medication for a short period of time following release and referrals to community health providers). Also see, Foster v. Fulton County, 223 F. Supp 2d 1301, 1310 (N.D. Ga. 2002) (holding that a jurisdiction was required to develop meaningful discharge planning for physically and mentally ill prisoners).

- 13 -

judgment of a psychiatrist, or at least made with the
consultation of a psychiatrist.  Our review of the medical
records at BWCI and HRYCI revealed that clinicians are recording
psychiatric diagnoses and making observation status decisions
about patients in the infirmary, including which inmates should
be removed from suicide watch, and at what pace.  Psychiatrists
should be performing these tasks because psychiatric diagnoses
drive treatment decisions.

The State's practice of allowing clinicians to make
important decisions regarding the care and treatment of inmates
with serious mental illness puts patients at risk.  There were
three suicides at HRYCI in 2006.  A clinician's decision, in May
2006, to downgrade an inmate's observation status may have aided
the inmate's ability to commit suicide a few days after he
entered the facility.  The State took custody of this inmate
after his release from a local hospital for treatment related to
a suicide attempt.  Apparently he was initially placed on one-to-
one observation status, but he was later downgraded to a less-
restrictive suicide watch despite warnings from a mental health
advocate about his vulnerable mental state and need for a mental
health evaluation.

### 3.  Psychotropic Medication Administration and Management

The State's expert found that there is a continuing need for
substantial remedial efforts, training, and auditing with respect
to the management of psychotropic medications.

Our investigation revealed that the medication
administration and management of psychotropics at DOC facilities
is constitutionally inadequate.  We observed during our tours at
BWCI and HRYCI that there are systemic problems with initiating
drug therapy for newly admitted inmates.  It appears that this
problem may be partially the result of a deficient intake and
screening process.  Because the intake process is deficient there
is rarely an attempt to obtain psychiatric records from community
providers which would identify any psychotropic medications that
were previously prescribed.  If outside records were routinely
obtained the delay that we observed with regard to initiating
drug therapy for newly admitted inmates might be eradicated or at
least greatly diminished.

We also found that the psychotropic medications that newly
admitted inmates are often prescribed by community providers were
substituted with other medications which may not be as
therapeutically effective.  We encountered inmates at HRYCI who
appeared to have diminished symptom control and decreased

- 14 -

functional ability as a result of the substitution of psychotropic medications. Another deficiency that we found with psychotropic medication administration is a lack of consistent and timely distribution of medications. Because the medication inventory does not appear to be properly controlled, medication shortages have resulted in interrupted drug therapy.

Finally, we found that monitoring of medication is deficient at the facilities. The use of certain psychotropic medications may cause metabolic effects, such as weight gain, hyperlipidemia, and type II diabetes mellitus. As such, generally accepted standards of care require prescribing physicians to monitor weight, body mass index, and abdominal girth on a regular basis. Our review of medical records at BWCI and HRYCI indicate that the State is not following this practice. Another side effect of certain psychotropic drugs is tardive dyskinesia (involuntary movement disorder). Psychiatrists generally monitor this side effect by performing the Abnormal Involuntary Movement Scale ("AIMS") on a regular bases. The State's expert found that AIMS tests are not being done once every six months as required.

## 4.  Intake and Screening

We found the intake and screening process with respect to the identification of seriously mentally ill inmates to be constitutionally inadequate. The intake and screening process for medical and mental health is combined and performed by nursing staff members who do not appear to have received adequate mental health training or have a sufficient background in mental health. Accordingly, they are unable to appropriately identify symptoms of mental illness.

During our tour of HRYCI, we found that the staff's lack of experience with mental health issues is exacerbated by the high volume of newly admitted inmates that are processed per shift. These deficiencies have resulted in the failure to identify inmates with serious mental illness which causes delays in treatment. Another impact of failing to identify inmates with mental illness is that disciplinary sanctions may be inappropriately imposed on mentally ill inmates, because of behavior that could be more appropriately addressed by mental health care and treatment instead of discipline. For example, during our tour of BWCI, we observed inmates in isolation who had not been properly identified has having mental illness, or who had not received adequate treatment for their diagnosed mental illness. For such inmates, care should be taken to ensure that they are not unfairly disciplined for "acting out" when mental health intervention is a more appropriate response.

- 15 -

We also found that intake and screening for juveniles was constitutionally inadequate at HRYCI.  During our tour, we reviewed a number of juvenile medical records to determine whether this special needs population was receiving comprehensive mental health evaluations subsequent to their initial intake survey.  However, it appeared that such evaluations were not being routinely performed.

C.  Suicide Prevention

Our investigation revealed that the State's practices regarding suicide prevention substantially depart from generally accepted professional standards and expose inmates to significant risk of harm.  Our investigation uncovered a system in which inmates at risk for suicide are not adequately identified, housed and supervised.

The State fails to adequately assess and identify inmates at risk for suicide.  While the form used to conduct intake assessments is good, the personnel conducting the assessment lack appropriate training and experience with issues related to mental health and suicide prevention.  Assessments are often performed by contract or agency LPN's who have not been trained adequately in suicide prevention techniques.  Additionally, while the State's medical provider conducts training of its employees on suicide prevention, it has not implemented its training curricula as policy or standard operating procedure.  Similarly, correctional staff receive insufficient training in the area of suicide prevention.  Training at the academy is only two or three hours, and annual refresher training methods are not adequate.

The intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions.  In these instances, the inmate signs a release, but outside confirmations of their medical and mental health records/histories are not consistently obtained and verified.  Furthermore, post-intake follow-up of new inmates, which should be conducted within 14 days, is not done.  Instead, follow-up is rolled into the initial intake process, increasing the possibility that at-risk inmates will not be identified.

The State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety.  Protrusions from walls and ceilings, window frames and grates, and even the design of bunk beds in some cells provide potential anchors strong enough to support an inmate's weight in an attempt at hanging.  For example, in August 2006, an

- 16 -

HRYCI inmate who hanged himself at HRYCI was housed in an infirmary cell following his admission because he was recovering from a gunshot wound sustained during his arrest. It is not clear what fixture the inmate used to hang himself, but it is apparent that the cells in the infirmary, like those in the other areas of the facility, are not sufficient to ensure the safety of inmates with suicidal ideations. Hanging was the means used in the May 2006 and February 2005 suicides at HRYCI. Additionally, unsafe light fixtures in some cells, if broken, provide a potential source of sharp-edged pieces of plastic or glass that could be used for self-harm.

The State fails to ensure that appropriate levels of observation are maintained. Documentation of 15- and 30-minute checks does not indicate that these checks are being done. Staff at one facility reported conflicting requirements for checks at lesser levels of observation, highlighting confusion about which interval was the actual policy. Rounds by mental health staff for inmates in isolation and on special units are not regularly done. Additionally, staff at some facilities incorrectly suggested that the various undocumented incidental contacts with at-risk inmates throughout the day, such as dispensing medication or picking up sick call slips, sufficed as a periodic check for inmates' safety.

### III.  MINIMUM REMEDIAL MEASURES

In order to address the constitutional deficiencies identified above and to protect the constitutional rights of inmates, we recommend the following measures:

1.   The State should ensure that appropriate access to medical care, including development and implementation of a functional sick call system that appropriately schedules medical appointments, and properly tracks and reschedules "no shows."

2.   The State should ensure that chronic disease registries are implemented and maintained at DOC facilities.

3.   The State should provide appropriate continuing care for patients with chronic diseases and ensure that backlogs are eliminated and do not redevelop.

4.   The State should ensure that outside consultations are not unnecessarily delayed and that appropriate post-consult follow-up care is provided.  The State should ensure that

- 17 -

security staffing levels do not negatively impact the provision of outside consultations.

5.  The State should implement appropriate measures to identify, track, and treat skin infections, including culturing and treating wounds and prescribing effective antibiotics.

6.  The State should ensure the distribution of medication to patients at proper time intervals.  The State should implement a system to ensure that proper medications are being received and that sufficient stocks of medications are maintained to avoid interruptions or delays in their delivery.

7.  The State should track serial refusals of medication by patients and ensure that prescribing physicians are notified of such occurrences and that appropriate follow-up with patients takes place.

8.  The State should ensure that there is adequate psychiatric coverage provided at DOC facilities.

9.  The State should ensure that psychiatrists are actively involved in inmate care, including:  functioning as the treatment team leader; making psychiatric diagnoses; providing necessary monitoring and supervision of staff; and promoting quality mental health care.

10. The State should provide appropriate medication distribution and management systems to ensure that psychotropic medications are available, distributed in a timely manner, and adequately monitored.

11. The State should ensure that psychiatrists prescribe therapeutically effective medications.  If a decision is made to adjust or substitute the medications that an inmate was on prior to their detention or incarceration at a DOC facility, the psychiatrist should provide a clear justification for making the adjustment or substitution in the inmate's medical record.

12. The State should ensure that appropriately trained staff perform a mental health screening at intake.

13. The State should provide appropriate counseling space for qualified mental health professionals to provide mental health treatment to inmates with serious mental illness.

- 18 -

14. The State should ensure that the mental health staff is appropriately documenting the care provided to inmates with serious mental illness.

15. The State should provide appropriate treatment plans for inmates with serious mental illness. The treatment plans will be reviewed on a routine bases to ensure quality of care.

16. The State should develop site specific mental health policies for HRYCI and DCC.

17. The State should develop a comprehensive policy regarding suicide prevention for DOC facilities.

18. The State should ensure that all medical, mental health and correctional staff are appropriately trained regarding issues of suicide prevention, and that the content of their training is reflective of that State's suicide prevention policy.

19. The State should ensure that intake staff are sufficiently experienced and qualified to identify inmates that pose a risk for suicide, and that follow mental health staff conduct appropriate follow-up evaluations of new inmates within 14 days of intake.

20. The State should ensure that inmates identified as at risk for suicide are housed in safe cells, free from fixtures and design features that could facilitate a suicide attempt.

21. The State should ensure that 15- and 30-minute checks of inmates under observation for risk of suicide are timely performed and appropriately documented.

* * *

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website and we will provide a copy of this letter to any individual or entity upon request.

- 19 -

As stated above, we appreciate the cooperation we have received throughout this investigation from State officials and staff at the facilities. We appreciate the State's proactive measures to respond to its own internal audit and our feedback to date to improve the quality of services at the facilities. We hope to be able to continue working with the State in an amicable and cooperative fashion to resolve the deficiencies we found at the facilities. Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover. Although their report are their work - and do not necessarily represent the official conclusions of the Department of Justice - their observations, analyses and recommendations provide further elaboration of the relevant concerns, and offer practical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you. Accordingly, we will soon contact State officials and counsel to discuss this matter in further detail.

If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

Wan J. Kim
Assistant Attorney General

cc:  Carl C. Danberg
     Attorney General

     Stanley W. Taylor, Jr.
     Department of Correction Commissioner

     Thomas L. Carroll, Warden
     Delaware Correctional Center

- 20 -

Raphael Williams, Warden
Howard R. Young Correctional Institution

Rick Kearney, Warden
Sussex Correctional Institution

Robert Young, Acting Warden
John L. Webb Correctional Facility

Patrick Ryan, Warden
Delores J. Baylor Women's Correctional Institution

Colm Connelly
United States Attorney
District of Delaware

Michael R. Bromwich, Esq.
Beth C. McClain, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP

MEMORANDUM OF AGREEMENT BETWEEN THE UNITED STATES
DEPARTMENT OF JUSTICE AND THE STATE OF DELAWARE REGARDING THE
DELORES J. BAYLOR WOMEN'S CORRECTIONAL INSTITUTION, THE
DELAWARE CORRECTIONAL CENTER, THE HOWARD R. YOUNG
CORRECTIONAL INSTITUTION, AND THE SUSSEX CORRECTIONAL
INSTITUTION

**TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

II.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .    4

III.  MEDICAL AND MENTAL HEALTH CARE . . . . . . . . . . . . . . . . . . .    6

IV.   SUICIDE PREVENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

V.    QUALITY ASSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

VI.   IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

VII.  MONITORING, ENFORCEMENT, AND TERMINATION . . . . . . . . .    18

I.    **INTRODUCTION**

A.    On March 7, 2006, the United States Department of Justice ("DOJ"), notified the State of Delaware ("the State") of DOJ's intent to investigate the adequacy of medical and mental health care services in five facilities operated by the State's Department of Correction pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 to determine whether those services violated inmates' constitutional rights. The facilities investigated were:

1. Delores J. Baylor Women's Correctional Institution ("Baylor");

2. Howard R. Young Correctional Institution, ("Howard Young");

3. John L. Webb Correctional Facility ("Webb");

4. Delaware Correctional Center ("DCC"); and

5. Sussex Correctional Institution ("Sussex").

B.    DOJ staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006. In addition, DOJ staff, accompanied by consultants in medical care, mental health care and suicide prevention, toured Howard Young on October 4-6, 2006, Baylor and Webb on October 23-25, 2006 and Baylor again on November 15-17, 2006.

C.    On December 29, 2006, the DOJ issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1) which alleged that certain conditions at Baylor, DCC, Howard Young, and Sussex violated the constitutional rights of Delaware inmates. It is the position of the DOJ that deficiencies in medical care, mental health care and suicide prevention at these four facilities [collectively referred to herein as "the Facilities"; see Definitions, paragraph A] were inconsistent with constitutional standards of care. The DOJ made no findings with respect to Webb.

D.    Before the investigation began, the State had initiated its own efforts to improve conditions at the Facilities. During the investigation, the State also commissioned an extensive internal review of the Facilities with the assistance of medical, mental health, and legal consultants, the detailed results of which they subsequently shared with DOJ and DOJ's consultants. Throughout the course of the investigation, the State of Delaware and the staff at each Facility cooperated thoroughly and indicated a willingness to proactively and voluntarily undertake measures to improve conditions throughout the system. Consequently, the Parties enter into this Memorandum of Agreement ("Agreement") for the purpose of utilizing their resources in support of improving medical and mental health care at

the Facilities, rather than allocating such resources to the risks and burdens of litigation.

E.  The Parties to this Agreement do not intend to create in any non-party the status of third party beneficiary. This Agreement shall not be construed so as to create a private right of action to any non-party against the State or the United States. The rights, duties and obligations contained in this Agreement shall bind only the Parties to this Agreement.

F.  In entering into this Agreement, the State does not admit any violations of the constitutional rights of inmates confined at the Facilities nor does it admit any violation of state or federal law. This Agreement may not be used as evidence of liability in any other legal proceeding. However, the State remains firmly committed to improving medical and mental health care at the Facilities.

G.  The Parties acknowledge that Correctional Medical Services ("CMS") currently provides medical and mental health care to inmates at the Facilities and that such care is provided pursuant to a contract with CMS that sets forth the terms and conditions of the relationship between the State and CMS. The State shall be responsible for ensuring that CMS (or any successor contractor) complies with the terms of this Agreement. Nothing in this paragraph shall abrogate the State's responsibility to comply fully with the terms of this Agreement.

H.  It is expressly understood and acknowledged that, while this Agreement makes no distinctions between those issues concerning inmate medical and mental health care that were previously modified and improved prior to the issuance of the findings letter and those that shall be modified and/or improved by virtue of the terms of this Agreement, the Parties acknowledge that a number of the policies and/or procedures which this Agreement addresses were implemented or in the process of being implemented prior to the issuance of the findings letter.

## II.  **DEFINITIONS**

In this Agreement, the following definitions apply:

A.  "The Facilities" means Baylor, DCC, Howard Young, and Sussex, collectively, as well as any facility that is built to replace or supplement any one of them.

B.  "Effective date" means the date the Agreement is executed by the Parties.

C.  "Generally accepted professional standards" means those industry standards accepted by a significant majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National

4

Commission on Correctional Health Care (NCCHC). DOJ acknowledges that NCCHC has established different standards for jail and prison populations, and that the relevant standard that applies under this Agreement may differ for pretrial and sentenced inmates. As used in this Agreement, the terms "adequate," "appropriate," and "sufficient" refer to standards established by clinical guidelines in the relevant field. The Parties shall consider clinical guidelines promulgated by professional organizations in assessing whether generally accepted professional standards have been met.

D.  "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

E.  "Inmates" means individuals sentenced to, incarcerated in, detained at, or otherwise confined at any of the Facilities.

F.  "Inmates with special needs" means inmates who are identified as suicidal, mentally ill, developmentally disabled, seriously or chronically ill, who are physically disabled, who have trouble performing activities of daily living, or who are a danger to themselves.

G.  "Isolation" means the placement of an inmate alone in a locked room or cell, except that it does not refer to adults single celled in general population.

H.  "Juveniles" means individuals detained at a facility who are under the age of eighteen (18).

I.  "Medical staff" means medical professionals, nursing staff, and certified medical assistants.

J.  "Medical professional" means a licensed physician, licensed physician assistant, or a licensed nurse practitioner providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services he or she has undertaken to provide.

K.  "Mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, psychiatric social work, activity therapy, recreational therapy or psychiatric nursing, currently licensed to the extent required by the State of Delaware to deliver those mental health services he or she has undertaken to provide.

L.  "Monitor" as used in this Agreement means the Monitor established by Section VII of this Agreement, and all persons or entities associated by the Monitor to assist in performing the monitoring tasks.

5

M.   "Nursing staff" means registered nurses, licensed practical nurses, and licensed vocational nurses providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services they have undertaken to provide.

N.   "The Parties" means the State and the DOJ.

O.   "Security staff" means all employees, irrespective of job title, whose regular duties include the supervision of inmates at the Facilities.

P.   "The State" means officials of the State of Delaware, including officials of the Department of Correction and its Bureau of Prisons, and their successors, contractors and agents.

Q.   "Train," when the term is used in remedial provisions of this Agreement, means to adequately instruct in the skills addressed, including assessment of mastery of instructional material.

## III.   MEDICAL AND MENTAL HEALTH CARE

### GENERAL PROVISIONS

(1)   Standard   The State shall ensure that services to address the serious medical and mental health needs of all inmates meet generally accepted professional standards.

(2)   Policies and Procedures   The State shall develop and revise its policies and procedures including those involving intake, communicable disease screening, sick call, chronic disease management, acute care, infection control, infirmary care, and dental care to ensure that staff provide adequate ongoing care to inmates determined to need such care. Medical and mental health policies and procedures shall be readily available to relevant staff.

(3)   Record keeping   The State shall develop and implement a unitary record-keeping system to ensure adequate and timely documentation of assessments and treatment and adequate and timely access by medical and mental health care staff to documents that are relevant to the care and treatment of inmates. A unitary-record-keeping system consists of a system in which all clinically appropriate documents for the inmate's treatment are readily available to each clinician. The State shall maintain a unified medical and mental health file for each inmate and all medical records, including laboratory reports, shall be timely filed in the medical file. The medical records unit shall be adequately staffed to prevent significant lags in filing records in an inmate's medical record. The State shall maintain the medical records such that persons providing medical or mental health

6

treatment may gain access to the record as needed. The medical record should be complete, and should include information from prior incarcerations. The State shall implement an adequate system for medical records management.

(4)  Medication and Laboratory Orders  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure timely responses to orders for medications and laboratory tests. Such policies, procedures, and practices shall be periodically evaluated to ensure that delays in inmates' timely receipt of medications and laboratory tests are prevented.

## Staffing and Training

(5)  Job Descriptions and Licensure  The State shall ensure that all persons providing medical or mental health treatment meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. The State shall establish a credentialing program that meets generally accepted professional standards, such as those required for accreditation by the National Committee for Quality Assurance.

(6)  Staffing  The State shall maintain sufficient staffing levels of qualified medical staff and mental health professionals to provide care for inmates' serious medical and mental health needs that meets generally accepted professional standards.

(7)  Medical and Mental Health Staff Management  The State shall ensure that a full-time medical director is responsible for the management of the medical program. The State shall also provide a director of nursing and adequate administrative medical and mental health management. In addition, the State shall ensure that a designated clinical director shall supervise inmates' mental health treatment at the Facilities. These positions may be filled either by State employees, by independent contractors retained by the State, or pursuant to the State's contract with a correctional health care vendor.

(8)  Medical and Mental Health Staff Training  The State shall continue to ensure that all medical staff and mental health professionals are adequately trained to meet the serious medical and mental health needs of inmates. All such staff shall continue to receive documented orientation and in-service training in accordance with their job classifications, and training topics shall include suicide prevention and the identification and care of inmates with mental disorders.

(9)  Security Staff Training  The State shall ensure that security staff are adequately trained in the identification, timely referral, and proper supervision of inmates with serious medical or mental health needs. The State shall ensure that security staff assigned to mental health units receive additional training related to the proper supervision of inmates suffering from mental illness.

### Screening and Treatment

(10)  <u>Medical Screening</u>  The State shall ensure that all inmates receive an appropriate and timely medical screening by a medical staff member upon arrival at a facility. The State shall ensure that such screening enables staff to identify individuals with serious medical or mental health conditions, including acute medical needs, infectious diseases, chronic conditions, physical disabilities, mental illness, suicide risk, and drug and/or alcohol withdrawal. Separate mental health screening shall be provided as described in Paragraph 34.

(11)  <u>Privacy</u>  The State shall make reasonable efforts to ensure inmate privacy when conducting medical and mental health screening, assessments, and treatment. However, maintaining inmate privacy shall be subject to legitimate security concerns and emergency situations.

(12)  <u>Health Assessments</u>  The State shall ensure that all inmates receive timely medical and mental health assessments. Upon intake, the State shall ensure that a medical professional identifies those persons who have chronic illness. Those persons with chronic illness shall receive a full health assessment between one (1) and seven (7) days of intake, depending on their physical condition. Persons without chronic illness should receive full health assessment within fourteen (14) days of intake. The State will ensure that inmates with chronic illnesses will be tracked in a standardized fashion. A re-admitted inmate or an inmate transferred from another facility who has received a documented full health assessment within the previous twelve (12) months, and whose receiving screening shows no change in health status, need not receive a new full medical and mental health assessment. For such inmates, medical staff and mental health professionals shall review prior records and update tests and examinations as needed.

(13)  <u>Referrals for Specialty Care</u>  The State shall ensure that: a) inmates whose serious medical or mental health needs exceed the services available at their facility shall be referred in a timely manner to appropriate medical or mental health care professionals; b) the findings and recommendations of such professionals are tracked and documented in inmates' medical files; and c) treatment recommendations are followed as clinically indicated.

(14)  <u>Treatment or Accommodation Plans</u>  Inmates with special needs shall have special needs plans. For inmates with special needs who have been at the facility for thirty (30) days, this shall include appropriate discharge planning. The DOJ acknowledges that for sentenced inmates with special needs, such discharge planning shall be developed in relation to the anticipated date of release.

(15) <u>Drug and Alcohol Withdrawal</u> The State shall develop and implement appropriate written policies, protocols, and practices, consistent with standards of appropriate medical care, to identify, monitor, and treat inmates at risk for, or who are experiencing, drug or alcohol withdrawal. The State shall implement appropriate withdrawal and detoxification programs. Methadone maintenance programs shall be offered for pregnant inmates who were addicted to opiates and/or participating in a legitimate methadone maintenance program when they entered the Facilities.

(16) <u>Pregnant Inmates</u> The State shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.

(17) <u>Communicable and Infectious Disease Management</u> The State shall adequately maintain statistical information regarding contagious disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

(18) <u>Clinic Space and Equipment</u> The State shall ensure that all face-to-face nursing and physician examinations occur in settings that provide appropriate privacy and permit a proper clinical evaluation including an adequately-sized examination room that contains an examination table, an operable sink for hand-washing, adequate lighting, and adequate equipment, including an adequate microscope for diagnostic evaluations. The State shall submit a comprehensive action plan as described in Paragraph 65 of this Agreement identifying the specific measures the State intends to take in order to bring the Facilities into compliance with this paragraph.

## Access to Care

(19) <u>Access to Medical and Mental Health Services</u> The State shall ensure that all inmates have adequate opportunity to request and receive medical and mental health care. Appropriate medical staff shall screen all written requests for medical and/or mental health care within twenty-four (24) hours of submission, and see patients within the next 72 hours, or sooner if medically appropriate. The State shall maintain sufficient security staff to ensure that inmates requiring treatment are escorted in a timely manner to treatment areas. The State shall develop and implement a sick call policy and procedure which includes an explanation of the order in which to schedule patients, a procedure for scheduling patients, where patients should be treated, the requirements for clinical evaluations, and the maintenance of a sick call log. Treatment of inmates in response to a sick call slip should occur in a clinical setting.

(20) <u>Isolation Rounds</u> The State shall ensure that medical staff make daily sick call rounds in the isolation areas, and that nursing staff make rounds at least three times a week, to give inmates in isolation adequate opportunities to contact and discuss health and mental

health concerns with medical staff and mental health professionals in a setting that affords as much privacy as security will allow.

(21)  Grievances  The State shall develop and implement a system to ensure that medical grievances are processed and addressed in a timely manner.  The State shall ensure that medical grievances and written responses thereto are included in inmates' files, and that grievances and their outcomes are logged, reviewed, and analyzed on a regular basis to identify systemic issues in need of redress.  The State shall develop and implement a procedure for discovering and addressing all systemic problems raised through the grievance system.

## Chronic Disease Care

(22)  Chronic Disease Management Program  The State shall develop and implement a written chronic care disease management program, consistent with generally accepted professional standards, which provides inmates suffering from chronic illnesses with appropriate diagnosis, treatment, monitoring, and continuity of care.  As part of this program, the State shall maintain a registry of inmates with chronic diseases.

(23)  Immunizations  The State shall make reasonable efforts to obtain immunization records for all juveniles who are detained at the Facilities for more than one (1) month.  The State shall ensure that medical staff update immunizations for such juveniles in accordance with nationally recognized guidelines and state school admission requirements.  The physicians who determine that the vaccination of a juvenile or adult inmate is medically inappropriate shall properly record such determination in the inmate's medical record.  The State shall develop policies and procedures to ensure that inmates for whom influenza, pneumonia and Hepatitis A and B vaccines are medically indicated are offered these vaccines.

## Medication

(24)  Medication Administration  The State shall ensure that all medications, including psychotropic medications, are prescribed appropriately and administered in a timely manner to adequately address the serious medical and mental health needs of inmates.  The State shall ensure that inmates who are prescribed medications for chronic illnesses that are not used on a routine schedule, including inhalers for the treatment of asthma, have access to those medications as medically appropriate.  The State shall develop and implement adequate policies and procedures for medication administration and adherence.  The State shall ensure that the prescribing practitioner is notified if a patient misses a medication dose on three consecutive days, and shall document that notice.  The State's formulary shall not unduly restrict medications.  The State shall review its medication administration policies and procedures and make any appropriate revisions.

The State shall ensure that medication administration records ("MARs") are appropriately completed and maintained in each inmate's medical record.

(25)   Continuity of Medication  The State shall ensure that arriving inmates who report that they have been prescribed medications shall receive the same or comparable medication as soon as is reasonably possible, unless a medical professional determines such medication is inconsistent with generally accepted professional standards.  If the inmate's reported medication is ordered discontinued or changed by a medical professional, a medical professional shall conduct a face-to-face evaluation of the inmate as medically appropriate.

(26)   Medication Management  The State shall develop and implement guidelines and controls regarding the access to, and storage of, medication as well as the safe and appropriate disposal of medication and medical waste.

### Emergency Care

(27)   Access to Emergency Care  The State shall train medical, mental health and security staff to recognize and respond appropriately to medical and mental health emergencies. Furthermore, the State shall ensure that inmates with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary.

(28)   First Responder Assistance  The State shall train all security staff to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in an emergency situation.  The State shall provide all security staff with the necessary protective gear, including masks and gloves, to provide first line emergency response.

### Mental Health Care

(29)   Treatment  The State shall ensure that qualified mental health professionals provide timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities to inmates requesting mental health services, inmates who become suicidal, and inmates who enter with serious mental health needs or develop serious mental health needs while incarcerated.

(30)   Psychiatrist Staffing  The State shall retain sufficient psychiatrists to enable the Facilities to address the serious mental health needs of all inmates with timely and appropriate mental health care consistent with generally accepted professional standards.  This shall include retaining appropriately licensed and qualified psychiatrists for a sufficient number of hours per week to see patients, prescribe and adequately monitor psychotropic medications, participate in the development of individualized treatment plans for inmates

11

with serious mental health needs, review charts in the context of rendering appropriate mental health care, review and respond to the results of diagnostic and laboratory tests, and be familiar with and follow policies, procedures, and protocols. The psychiatrist shall collaborate with the chief psychologist in mental health services management as well as clinical treatment, shall communicate problems and resource needs to the Warden and chief psychologist, and shall have medically appropriate autonomy for clinical decisions at the facility. The psychiatrist shall supervise and oversee the treatment team.

(31)    Administration of Mental Health Medications  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that psychotropic medications are prescribed, distributed, and monitored properly and safely and consistent with generally accepted professional standards. The State shall ensure that all psychotropic medications are administered by qualified medical professionals or other health care personnel qualified under Delaware state law to administer medications, who consistently implement adequate policies and procedures to monitor for adverse reactions and potential side effects and to adequately document the administration of such medications in the MARs. Documentation in the MARs shall include a clear and consistent indication of whether the inmate refused or otherwise missed any doses of medication, as well as doses consumed. As part of the quality assurance program set forth in Section V of this Agreement, a qualified medical professional or registered nurse supervisor shall review MARs on a regular and periodic basis to determine whether policies and procedures are being followed.

(32)    Mental Illness Training  The State shall conduct initial and periodic training for all security staff on how to recognize symptoms of mental illness and respond appropriately. Such training shall be conducted by a qualified mental health professional, registered psychiatric nurse, or other appropriately trained and qualified individual, and shall include instruction on how to recognize and respond to mental health emergencies.

(33)    Mental Health Screening  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted correctional mental health care standards to ensure that all inmates receive an adequate initial mental health screening by appropriately trained staff within twenty-four (24) hours after intake. Such screening shall include an individual private (consistent with security limitations) interview of each incoming inmate, including whether the inmate has a history of mental illness, is currently receiving or has received psychotropic medications, has attempted suicide, or has suicidal propensities. Documentation of the screening shall be maintained in the appropriate medical record. Inmates who have been on psychotropic medications prior to intake will be assessed by a psychiatrist as to the need to continue those medications, in a timely manner, no later than 7-10 days after intake or sooner if clinically appropriate. These inmates shall remain on previously prescribed psychotropic medications pending psychiatrist assessment. Incoming inmates who are in need of emergency mental health services shall receive such care immediately after intake.

12

Incoming inmates who require resumption of psychotropic medications shall be seen by a psychiatrist as soon as clinically appropriate.

(34)   <u>Mental Health Assessment and Referral</u>  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted professional standards to ensure timely and appropriate mental health assessments by qualified mental health professionals for those inmates whose mental health histories, or whose responses to initial screening questions, indicate a need for such an assessment. Such assessments shall occur within seventy-two (72) hours of the inmate's mental health screening or the identification of the need for such assessment, whichever is later. The State shall also ensure that inmates have access to a confidential self-referral system by which they may request mental health care without revealing the substance of their request to security staff. Written requests for mental health services shall be forwarded to a qualified mental health professional and timely evaluated by him or her. The State shall ensure adequate and timely treatment for inmates whose assessments reveal serious mental illness, including timely and appropriate referrals for specialty care and regularly scheduled visits with qualified mental health professionals.

(35)   <u>Mental Health Treatment Plans</u>  The State shall ensure that a qualified mental health professional prepares in a timely manner and regularly updates an individual mental health treatment plan for each inmate who requires mental health services. The State shall also ensure that the plan is timely and consistently implemented. Implementation of and any changes to the plan shall be documented in the inmate's medical/mental health record.

(36)   <u>Crisis Services</u>  The State shall ensure an adequate array of crisis services to appropriately manage psychiatric emergencies. Crisis services shall not be limited to administrative/disciplinary isolation or observation status. Inmates shall have access to appropriate in-patient psychiatric care when clinically appropriate.

(37)   <u>Treatment for Seriously Mentally Ill Inmates</u>  The State shall ensure timely and appropriate therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate space for treatment, adequate staff to provide treatment, and an adequate array of therapeutic programming. The State shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, in accordance with generally accepted correctional mental health care standards.

(38)   <u>Review of Disciplinary Charges for Mental Illness Symptoms</u>  The State shall ensure that disciplinary charges against inmates with serious mental illness who are placed in Isolation are reviewed by a qualified mental health professional to determine the extent to which the charge may have been related to serious mental illness, and to determine

13

whether an inmate's serious mental illness should be considered by the State as a mitigating factor when punishment is imposed on inmates with a serious mental illness.

(39)  <u>Procedures for Mentally Ill Inmates in Isolation or Observation Status</u>  The State shall implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that all mentally ill inmates on the facility's mental health caseload and who are housed in Isolation receive timely and appropriate treatment, including completion and documentation of regular rounds in the Isolation units at least once per week by qualified mental health professionals in order to assess the serious mental health needs of those inmates.  Inmates with serious mental illness who are placed in Isolation shall be evaluated by a qualified mental health professional within twenty-four hours and regularly thereafter to determine the inmate's mental health status, which shall include an assessment of the potential effect of the Isolation on the inmate's mental health.  During these regular evaluations, the State shall evaluate whether continued Isolation is appropriate for that inmate, considering the assessment of the qualified mental health professional, or whether the inmate would be appropriate for graduated alternatives.  The State shall adequately document all admissions to, and discharges from, Isolation, including a review of treatment by a psychiatrist.  The State shall provide adequate facilities for observation, with no more than two inmates per room.

(40)  <u>Mental Health Services Logs and Documentation</u>  The State shall ensure that the State maintains an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication.  The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment.  Each clinician shall have ready access to a current log listing any prescribed medication(s) and dosages for inmates on psychotropic medications.  In addition, inmate's files shall contain current and accurate information regarding any medication changes ordered in at least the past year.

## IV.  **SUICIDE PREVENTION**

(41)  <u>Suicide Prevention Policy</u>  The State shall review and, to the extent necessary, revise its suicide prevention policy to ensure that it includes the following provisions:  1) training; 2) intake screening/assessment; 3) communication; 4) housing; 5) observation; 6) intervention; and 7) mortality and morbidity review.

(42)  <u>Suicide Prevention Training Curriculum</u>  The State shall review and, to the extent necessary, revise its suicide prevention training curriculum, which shall include the following topics:  1) the suicide prevention policy as revised consistent with this Agreement; 2) why facility environments may contribute to suicidal behavior; 3) potential predisposing factors to suicide; 4) high risk suicide periods; 5) warning signs and symptoms of suicidal behavior; 6) case studies of recent suicides and serious suicide

14

attempts; 7) mock demonstrations regarding the proper response to a suicide attempt; and 8) the proper use of emergency equipment.

(43)  <u>Staff Training</u>  Within twelve months of the effective date of this Agreement, the State shall ensure that all existing and newly hired correctional, medical, and mental health staff receive an initial eight-hour training on suicide prevention curriculum described above. Following completion of the initial training, the State shall ensure that a minimum of two hours of refresher training on the curriculum are completed by all correctional care, medical, and mental health staff each year.

(44)  <u>Intake Screening/Assessment</u>  The State shall develop and implement policies and procedures pertaining to intake screening in order to identify newly arrived inmates who may be at risk for suicide. The screening process shall include inquiry regarding: 1) past suicidal ideation and/or attempts; 2) current ideation, threat, plan; 3) prior mental health treatment/hospitalization; 4) recent significant loss (job, relationship, death of family member/close friend, etc.); 5) history of suicidal behavior by family member/close friend; 6) suicide risk during prior confinement in a state facility; and 7) arresting/transporting officer(s) belief that the inmate is currently at risk.

(45)  <u>Mental Health Records</u>  Upon admission, the State shall immediately request all pertinent mental health records regarding the inmate's prior hospitalization, court-ordered evaluations, medication, and other treatment. DOJ acknowledges that the State's ability to obtain such records depends on the inmate's consent to the release of such records.

(46)  <u>Identification of Inmates at Risk of Suicide</u>  Inmates at risk for suicide shall be placed on suicide precautions until they can be assessed by qualified mental health personnel. Inmates at risk of suicide include those who are actively suicidal, either threatening or engaging in self-injurious behavior; inmates who are not actively suicidal, but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent prior history of self-destructive behavior; and inmates who deny suicidal ideation or do not threaten suicide, but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury.

(47)  <u>Suicide Risk Assessment</u>  The State shall ensure that a formalized suicide risk assessment by a qualified mental health professional is performed within an appropriate time not to exceed 24 hours of the initiation of suicide precautions. The assessment of suicide risk by qualified mental health professionals shall include, but not be limited to, the following: description of the antecedent events and precipitating factors; suicidal indicators; mental status examination; previous psychiatric and suicide risk history; level of lethality; current medication and diagnosis; and recommendations/treatment plan. Findings from the assessment shall be documented on both the assessment form and health care record.

15

(48)  Communication  The State shall ensure that any staff member who places an inmate on suicide precautions shall document the initiation of the precautions, level of observation, housing location, and conditions of the precautions. The State shall develop and implement policies and procedures to ensure that the documentation described above is provided to mental health staff and that in-person contact is made with mental health staff to alert them of the placement of an inmate on suicide precautions. The State shall ensure that mental health staff thoroughly review an inmate's health care record for documentation of any prior suicidal behavior. The State shall promulgate a policy requiring mental health to utilize progress notes to document each interaction and/or assessment of a suicidal inmate. The decision to upgrade, downgrade, discharge, or maintain an inmate on suicide precautions shall be fully justified in each progress note. An inmate shall not be downgraded or discharged from suicide precautions until the responsible mental health staff has thoroughly reviewed the inmate's health care record, as well as conferred with correctional personnel regarding the inmate's stability. Multidisciplinary case management team meetings (to include facility officials and available medical and mental health personnel) shall occur on a weekly basis to discuss the status of inmates on suicide precautions.

(49)  Housing  The State shall ensure that all inmates placed on suicide precautions are housed in suicide-resistant cells (i.e., cells without protrusions that would enable inmates to hang themselves). The location of the cells shall provide full visibility to staff. At the time of placement on suicide precautions, medical or mental health staff shall write orders setting forth the conditions of the observation, including but not limited to allowable clothing, property, and utensils, and orders addressing continuation of privileges, such as showers, telephone, visiting, recreation, etc., commensurate with the inmate's security level. Removal of an inmate's prison jumpsuit (excluding belts and shoelaces) and the use of any restraints shall be avoided whenever possible, and used only as a last resort when the inmate is engaging in self-destructive behavior. The Parties recognize that security and mental health staff are working towards the common goal of protecting inmates from self-injury and from harm inflicted by other inmates. Such orders must therefore take into account all relevant security concerns, which can include issues relating to the commingling of certain prison populations and the smuggling of contraband. Mental health staff shall give due consideration to such factors when setting forth the conditions of the observation, and any disputes over the privileges that are appropriate shall be resolved by the Warden or his or her designee. Scheduled court hearings shall not be cancelled because an inmate is on suicide precautions.

(50)  Observation  The State shall develop and implement policies and procedures pertaining to observation of suicidal inmates, whereby an inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or has a recent prior history of self-destructive behavior, or an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the

16

potential for self-injury, shall be placed under close observation status and observed by staff at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes). An inmate who is actively suicidal, either threatening or engaging in self-injurious behavior, shall be placed on constant observation status and observed by staff on a continuous, uninterrupted basis. Mental health staff shall assess and interact with (not just observe) inmates on suicide precautions on a daily basis.

(51)  "Step-Down Observation"  The State shall develop and implement a "step-down" level of observation whereby inmates on suicide precaution are released gradually from more restrictive levels of supervision to less restrictive levels for an appropriate period of time prior to their discharge from suicide precautions. The State shall ensure that all inmates discharged from suicide precautions continue to receive follow-up assessment in accordance with a treatment plan developed by a qualified mental health professional.

(52)  Intervention  The State shall develop and implement an intervention policy to ensure that all staff who come into contact with inmates are trained in standard first aid and cardiopulmonary resuscitation; all staff who come into contact with inmates participate in annual "mock drill" training to ensure a prompt emergency response to all suicide attempts; and shall ensure that an emergency response bag that includes appropriate equipment, including a first aid kit and emergency rescue tool, shall be in close proximity to all housing units. All staff who come into regular contact with inmates shall know the location of this emergency response bag and be trained in its use.

(53)  Mortality and Morbidity Review  The State shall develop and implement policies, procedures, and practices to ensure that a multidisciplinary review is established to review all suicides and serious suicide attempts (e.g., those incidents requiring hospitalization for medical treatment). At a minimum, the review shall comprise an inquiry of: a) circumstances surrounding the incident; b) facility procedures relevant to the incident; c) all relevant training received by involved staff; d) pertinent medical and mental health services/reports involving the victim; e) possible precipitating factors leading to the suicide; and f) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When appropriate, the review team shall develop a written plan (and timetable) to address areas that require corrective action.

## V.  QUALITY ASSURANCE

(54)  Policies and Procedures  The State shall develop and implement written quality assurance policies and procedures to regularly assess and ensure compliance with the terms of this Agreement. These policies and procedures should include, at a minimum:  provisions requiring an annual quality management plan and annual evaluation; quantitative performance measurement with tools to be approved in advance by DOJ; tracking and trending of data; creation of a multidisciplinary team; morbidity and mortality reviews

with self-critical analysis, and periodic review of emergency room visits and hospitalizations for ambulatory-sensitive conditions.

(55)    Corrective Action Plans  The State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.

## VI.    IMPLEMENTATION

(56)    Revision of Activities and Documents  The State shall revise and/or develop as necessary its current policies, procedures, protocols, training, staffing and practices to ensure that they are consistent with, incorporate, address and implement all provisions of this Agreement. The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

(57)    Dissemination of Agreement  Within thirty (30) days of the effective date of this Agreement, the State shall distribute copies of the Agreement to all relevant staff, including all medical, mental health and security staff at the Facilities and explain it as appropriate.

(58)    In Service Training  Training academy staff shall develop, on an on-going basis, scripts for in service training directed at issues related to effective implementation of the Agreement. In service training shall be provided regularly and shall be documented. In service training scripts shall be provided to DOJ for its review in accordance with the time frames for compliance set forth below.

## VII.    MONITORING, ENFORCEMENT AND TERMINATION

(59)    Termination  This Agreement shall terminate three (3) years after its effective date.

(60)    Satisfaction of the Agreement and Early Termination  This Agreement may be terminated prior to the conclusion of the three (3) year period described in Paragraph 59 if the State reaches substantial compliance with all provisions of this Agreement and sustains it for one (1) year. "Substantial Compliance" with each and every term of this Agreement for a period of one (1) year shall fully satisfy the Agreement. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance. The State may submit a written request for early termination of the Agreement based upon an assertion of one (1) year of substantial compliance with all substantive paragraphs set forth in Sections III

18

through VIII of this Agreement. The DOJ, in its good faith discretion, will determine whether the State has maintained substantial compliance for the one (1) year period.

(61) <u>Review and Approval</u> All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be consistent with the substantive terms of this Agreement. All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be submitted to the DOJ for its review and approval within sixty (60) calendar days after approval of the Action Plan described in Paragraph 65 of this Agreement. Any such plans, policies, procedures and protocols for which this Agreement requires review and approval by DOJ shall be expeditiously reviewed by the DOJ. The DOJ shall not unreasonably withhold any such approval. Absent unforeseen circumstances beyond the Parties' control, if DOJ does not provide a written objection to said materials within sixty (60) days of receipt of same, the materials will be deemed approved by DOJ.

(62) <u>State Response to DOJ Questions</u> Within thirty (30) days of receipt of written questions from the DOJ concerning the State's compliance with this Agreement, the State shall provide the DOJ with written answers and any requested documents regarding the State's compliance with the requirements of this Agreement.

(63) <u>State Documentation of Compliance</u> The State shall maintain sufficient records to document its compliance with all of the requirements of this Agreement. The State shall also maintain (so long as this Agreement remains in effect) any and all records required by or developed under this Agreement.

(64) <u>Implementation</u> The State shall implement policies, procedures, plans, and protocols consistent with the Action Plan referred to in Paragraph 65 of this Agreement.

(65) <u>Action Plan</u> Within one hundred and twenty (120) days after the effective date of this Agreement, the State shall prepare and submit to the DOJ a comprehensive action plan ("Action Plan") identifying the specific measures the State intends to take in order to bring the Facilities into compliance with each paragraph containing substantive requirements in Sections III through V of this Agreement ("Substantive Provisions"), including a timeline for completion of each of the measures.

(66) <u>Compliance Reporting</u> The State shall prepare and submit reports regarding compliance ("Compliance Reports") with each of the Substantive Provisions of this Agreement. The State shall submit its first Compliance Report within ninety (90) days after submitting the Action Plan described in Paragraph 65 of this Agreement, and then every six (6) months. The Compliance Reports shall identify the State's progress in implementing the Action Plan, any revisions to the Action Plan, and shall include a summary of steps taken to implement this Agreement, along with supporting documentation and certifications. Upon achieving substantial compliance as determined by DOJ with any substantive

19

paragraph(s) of this Agreement for one (1) year, no further **reporting** shall be required on that paragraph.

(67) <u>Selection of Monitor</u> Within ninety (90) days after entry of **this** Agreement, the State and DOJ shall together select a Monitor. If the Parties are unable to agree on a Monitor, each Party shall submit two names of persons who have experience in corrections and who may have served as a correctional practices expert or monitor, or as a Federal, state, or county prosecutor or judge along with resumes or curricula vitae and cost proposals to a third party neutral, selected with the assistance of the Federal Mediation and Conciliation Service, and the third party neutral shall appoint the Monitor from among the names of qualified persons submitted. The selection of the Monitor **shall** be conducted solely pursuant to the procedures set forth in this Agreement, and **will** not be governed by any formal or legal procurement requirements.

(68) <u>Limitations on Public Disclosures by Monitor</u> The Monitor **shall** not be retained by any current or future litigant or claimant in a claim or suit against **the** State, its agents or employees. The Monitor shall not issue statements or make **findings** with regard to any act or omission of the State, or their agents or representatives, **except** as required by the terms of this Agreement. The Monitor may testify in any **case brought** by any Party to this Agreement regarding any matter relating to the implementation, enforcement, or dissolution of this Agreement.

(69) <u>Monitoring Resources</u> The Monitor, at any time, may associate such additional persons or entities as are reasonably necessary to perform the monitoring tasks specified by this Agreement. The Monitor shall notify in writing DOJ and **the State** if and when such additional persons or entities are selected for association by **the** Monitor. The notice shall identify and describe the qualifications of the person or entity **to be** associated and the monitoring task to be performed.

(70) <u>Monitor's Fees</u> The State shall bear all reasonable fees and **costs** of the Monitor. In selecting the Monitor, DOJ and the State recognize the **importance** of ensuring that the fees and costs borne by the State are reasonable, and accordingly **fees** and costs shall be one factor considered in selecting the Monitor. In the event **that any** dispute arises regarding the payment of the Monitor's fees and costs, the State, DOJ, and the Monitor shall attempt to resolve such dispute cooperatively.

(71) <u>Monitor's Duties and Responsibilities</u> The Monitor shall review and report on the State's implementation of, and assist with the State's compliance with, **this** Agreement. The Monitor shall only have the duties, responsibilities and authority conferred by this Agreement. The Monitor shall not, and is not intended to, **replace** or take over the role and duties of the State or the Commissioner of the Delaware **Department** of Corrections. The Monitor may testify in any action brought to enforce this **Agreement** regarding any matter relating to the implementation or enforcement of the **Agreement**. The Monitor

20

shall not testify in any other litigation or proceeding with regard to any act or omission of the State, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his or her performance under this Agreement. Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees. The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records. The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement. Provided, however, that this paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

(72)   Technical Assistance by the Monitor  The Monitor shall offer the State technical assistance regarding compliance with this Agreement. The Monitor may not modify, amend, diminish, or expand this Agreement.

(73)   Monitor's Access  The State shall provide the Monitor with full and unrestricted access to all of the Facilities, relevant State and facility staff and employees, and any documents (including databases) necessary to carry out the duties assigned to the State by this Agreement. The Monitor's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention, or protocols or analyses involving one of those subject areas. The Monitor shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or DOJ, absent written notice to the State and either written consent by the State or a court order authorizing disclosure.

(74)   Monitor's Communication with the Parties  In monitoring the implementation of this Agreement, the Monitor shall maintain regular contact with the State and DOJ. The Monitor shall be permitted to initiate and receive ex parte communications with the Parties and the Parties' consultants.

(75)   Compliance Monitoring  In order to monitor and report on the State's implementation of each substantive provision of this Agreement, the Monitor shall conduct periodic reviews as the Monitor deems appropriate, but no less than quarterly at each of the Facilities. The Monitor may make recommendations to the Parties regarding measures necessary to ensure full and timely implementation of this Agreement.

(76)   Compliance Coordinator  The Parties agree that the State shall hire and retain, or reassign a current State employee, for the duration of this Agreement, a Compliance Coordinator.

21

The Compliance Coordinator shall serve as a liaison between the State, the Monitor and DOJ, and shall assist with the State's compliance with this Agreement. At a minimum, the Compliance Coordinator shall: (a) coordinate the State's compliance and implementation of activities required by this Agreement; (b) facilitate the provision of data, documents and other access to State employees and material to the Monitor and DOJ as needed; (c) ensure that all documents and records are maintained as provided in this Agreement; (d) assist in assigning compliance tasks to State personnel, as directed by the Commissioner of the Delaware Department of Corrections or his designee; take primary responsibility for collecting information to provide the State's status reports specified in paragraph 61.

(77)   <u>DOJ Access</u>  DOJ shall continue to have full and unrestricted access to all documents (including databases), staff, inmates and the Facilities that are relevant to evaluate compliance with this Agreement, except any documents protected by the attorney-client privilege or applicable self-evaluative privileges (e.g., 24 Del. C § 1768). Should the State decline to provide DOJ with access to a document based on attorney-client privilege, the State shall provide the Monitor and DOJ with a log describing the document. DOJ's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention and any protocols or analyses involving those subject areas. This Agreement does not authorize, nor shall it be construed to authorize, access to any State documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the State, and the Monitor. DOJ shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or Monitor, absent written notice to the State and either written consent by the State or a court order authorizing disclosure. Throughout the duration of this Settlement Agreement, letters between counsel for the DOJ and counsel for the State shall be confidential and subject to the Confidentiality Agreement between the DOJ and the State entered into on May 3, 2006 and supplemented by the Non-Waiver Agreement dated September 28, 2006.

(78)   <u>Timeliness of DOJ Review of Documents and Information</u>  DOJ shall review documents and information provided by the State and the Monitor and shall provide its analysis and comments to the State and the Monitor at appropriate times and in an appropriate manner, consistent with the purpose of this Agreement to promote cooperative efforts.

(79)   <u>Monitor Reports</u>  The Monitor shall issue semi-annual public reports detailing the State's compliance with and implementation of this Agreement. The first report shall issue six months from the effective date of this Agreement. The Monitor may issue reports more frequently if the Monitor determines it appropriate to do so. At least ten business days prior to issuing a report, the Monitor shall provide a draft to the Parties for review and comment to determine if any factual errors have been made. The Monitor shall consider the Parties' responses and then promptly issue the report.

(80)    <u>Noncompliance</u>  If DOJ believes that the State has failed to substantially comply with any obligation under this Agreement, DOJ will, prior to seeking judicial action to enforce the terms of this Agreement, give written notice of the failure to the State. The Parties shall conduct good-faith discussions to resolve the dispute. If the Parties are unable to reach agreement within 15 days of the DOJ's written notice, the Parties shall submit the dispute to mediation. Michael Bromwich, Esq., shall serve as the mediator unless the Parties expressly agree to an alternative selection. The Parties shall split the cost of the mediator. The Parties shall attempt in good faith to mediate the dispute for a minimum of 30 days prior to initiating any court action. DOJ commits to work in good faith with the State to avoid enforcement actions. However, in case of an emergency posing an immediate threat to the health or safety of inmates, the DOJ may omit the notice and cure requirements herein (including the provision regarding mediation), before seeing judicial action. Non-action by the DOJ shall not constitute a waiver of the right to seek judicial action.

(81)    <u>Successors</u>  This Agreement shall be binding on all successors, assignees, employees, and all those working for or on behalf of the State.

(82)    <u>Defense of Agreement</u>  The Parties agree to defend the provisions of this Agreement. The Parties shall notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, the Parties shall seek to remove the matter to a federal court.

(83)    <u>Enforcement</u>  Failure by either Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreement.

(84)    <u>Non-Retaliation</u>  The State agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Agreement.

(85)    <u>Severability</u>  In the event any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

(86)    <u>Notice</u>  "Notice" under this Agreement shall be provided via overnight delivery and shall be provided to the Governor of the State of Delaware and to the Attorney General of the State of Delaware.

(87)  <u>Subheadings</u>  All subheadings in this Agreement are written for convenience of locating individual provisions.  If questions arise as to the meanings of individual provisions, the parties shall follow the text of each provision.


For the DOJ:


WAN J. KIM
Assistant Attorney General
Civil Rights Division


SHANETTA Y. CUTLAR
Chief
Special Litigation Section


DANIEL H. WEISS
Deputy Chief


CATHLEEN S. TRAINOR
LASHANDA BRANCH CHIRUNGA
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB Room 5908
Washington, D.C. 20530
(202) 514-6255

For the State of Delaware:    December 29, 2006

CARL C. DANBERG
Attorney General of Delaware

STANLEY W. TAYLOR, Jr.
Commissioner
Delaware Department of Correction
245 McKee Road
Dover, DE  19904

MICHAEL R. BROMWICH
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE STATE OF DELAWARE**

ESTATE OF LOUIS  W. CHANCE JR.

                Plaintiff

          v.                                 C.A No: 05-449-SLR

FIRST CORRECTIONAL MEDICAL
INC., DR. NIRANJANA SHAH, DR
JOSE A. ARAMBURO, JR.,
COMMISSIONER STANLEY TAYLOR
and JOYCE TALLEY

                Defendants

**SECOND REQUEST FOR PRODUCTION DIRECTED TO DEFENDANTS
STANLEY TAYLOR AND JOYCE TALLEY**

       Plaintiff named above hereby requests that Defendants Taylor and Talley

produce at Produce at attorney's office for the purpose of inspection and copying,

all of the following documents or evidence within 30 days pursuant to

Fed.R.Civ.P. 34. These requests for production are continuing and the items

requested must be kept current by supplementation.  The term "Documents"

includes any handwritten or electronically created and stored information,

including tape recordings, text, photographs, e-mail, spreadsheet files, multimedia

files, press announcements or releases in any format.

       As used in this request for production, "you" or "yours" means and refers to

Defendants, their attorney(s), The Delaware Department of Correction and its

agents and employees.  For any claim or objection to the production of a requested

document that is based upon Privilege, Attorney Work Product, Confidentiality, or Peer Review Protection, identify the document(s) and for each, set forth the specific content and the objection or protection afforded within the context of a Sec. 1983 Civil Rights Claim brought under the United States Constitution as distinguished from a Medical Malpractice Tort/Trespass claim.

1.    All NON-PRIVILEDGED documents, correspondence, memoranda, addressing, pertaining to, or referencing the reasons for the entry of a Consent Decree or Agreement with the United States Department of Justice relating to Medical Care provided to inmates in the Delaware Department of Correction.

2.    Copies of Orders or Consent Decrees or any other  proposed Document, whether approved by any District Court or not, which purports to contain a listing of prospective remedial conduct  addressing prison medical care to be undertaken or performed by the Delaware Department of Correction on or after December 1, 2006.

3.    Copies of any document containing findings of fact by a United States District Court in support of prospective remedial conduct to be performed by the Delaware Department of Corrections on or after December 1, 2006.

4.    Copies of all Documents provided to, copied for, or inspected by the United States Department of Justice, whether subpoenaed or produced in response

to a request by any staff of the United States Department of Justice in connection

with any investigation of health care in the Delaware Department of Correction.


January 3, 2007                    /s/_____

                                   Jeffrey Bartels, Esq.
                                   Kenneth W. Richmond, Esq.
                                   Attorneys for Plaintiff
                                   401 South Maryland Avenue
                                   Wilmington, DE 19804
                                   302-995-6211

**EXHIBIT G**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

ESTATE OF LOUIS W. CHANCE, JR., :
                                                                :
           Plaintiff,                           :
                                                                :
    v.                                                  :          C.A. No. 05-449-SLR
                                                                :
FIRST CORRECTIONAL MEDICAL          :
INC., et al.,                                                  :
                                                                :
          Defendants.                        :

## DEFENDANTS' TAYLOR AND TALLEY RESPONSE TO PLAINTIFF'S 2nd REQUEST FOR PRODUCTION

*1.      All NON-PRIVILEDGED documents, correspondence, memoranda, addressing, pertaining to, or referencing the reasons for the entry of a Consent Decree or Agreement with the United States Department of Justice relating to Medical Care provided to inmates in the Delaware Department of Correction.*

**RESPONSE:**  Defendants object to requests for documents that are clearly irrelevant and are not reasonably calculated to lead to admissible evidence.  The record in this case reveals that in April 2003, plaintiffs' decedent, Louis Chance, Jr., was committed to the custody of the Department of Correction by the Superior Court for New Castle County for the felony crime of driving under the influence of drugs or alcohol.  The undisputed record reveals that plaintiffs' decedent was serving his sentence at the Webb Correctional Facility, when on September 9, 2003, he complained of a headache for which he was transferred to receive medical treatment at the infirmary within the Howard R. Young Correctional

Institution ["HRYCI"]. On September 23, 2003, while at the infirmary at HRYCI the decedent was found non-responsive and sent by ambulance to the St. Francis Hospital where he was subsequently pronounced dead.  The postmortem examination revealed that decedent dies as result of a very rare fungal infection of the brain which was enabled by undiagnosed HIV/AIDS.

Without waiving said objection, the non-privileged documents responsive to this request are the U.S. Department of Justice finding letter at the conclusion at the CRIPA inquiry,  and the Memorandum of Agreement ["MOA"]between the State of Delaware and the U.S. D.O.J.  Plaintiff attached these documents to a motion filed on January 18, 2007, and is therefore already in possession of the responsive documents.

*2.     Copies of Orders or Consent Decrees or any other  proposed Document, whether approved by any District Court or not, which purports to contain a listing of prospective remedial conduct  addressing prison medical care to be undertaken or performed by the Delaware Department of Correction on or after December 1, 2006.*

 **RESPONSE**:  Without waiving the prior objections, responding defendants have no responsive documents to this request.

*3.     Copies of any document containing findings of fact by a United States District Court in support of prospective remedial conduct to be performed by the Delaware Department of Corrections on or after December 1, 2006.*

**RESPONSE**:  Without waiving the prior objections, responding defendants have no responsive documents to this request.

  4. *Copies of all Documents provided to, copied for, or inspected by the United States Department of Justice, whether subpoenaed or produced in response to a request by any staff of the United States Department of Justice in connection with any investigation of health care in the Delaware Department of Correction.*

  **RESPONSE**:  Without waiving the prior objections, additional objection is made as many of the documents are  privileged or not discoverable under a number of laws including attorney client privilege, work product, peer review, self-critical analysis, HIPAA, 11 *Del.C*. § 4322, 16 *Del.C*. § 711, 42 USC § 260 and other laws that protect substance abuse and treatment records. Additionally, some of the information provided is propriety and protected as commercial secrets. Additionally, this request is unduly burdensome as more than 26,000 documents were produced by the Department of Correction to the U.S. D.O.J. under the terms of a confidentially agreement. Without waiving any of these objections, counsel for responding defendants had a Concordia search perform on all those documents and only a single document with the decedent's name was identified which is Bates Stamped as DDOC 008896.  This document will not be produced as it was created by a representative of the Department of Correction on October 4, 2006, and is protected as work product privilege.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Marc P. Niedzielski
Marc P. Niedzielski (#2616)
Deputy Attorney General
820 North French Street
6th Floor
Wilmington, DE 19801
(302) 577-8324