IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Estate of Louis W. Chance, Jr.<br>by:  Amanda Humphreys and<br>Louis Chance, III, Personal<br>Representatives<br>506 W. Summit Avenue<br>Wilmington, Delaware 19804<br><br>           Plaintiff<br><br>    v<br><br>First Correctional Medical-Delaware,<br>LLC.  et al.<br><br>          Defendant | Civil Action No. 05-449 (SLR) |

## PLAINTIFF'S  APPENDIX  TO
## RESPONSE  BRIEF CONTRA
## MOTION OF TALLEY AND TAYLOR
## FOR SUMMARY JUDGMENT

**Attorneys for Plaintiff**

Jeffrey K. Bartels, Esquire
Kenneth W. Richmond *pro hac vice*
401 S. Maryland Avenue
Wilmington, DE 19804



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                          *Washington, D.C. 20530*

DEC 2 9 2006

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl.
Dover, DE  19901

      RE:   <u>Investigation of Delaware Correctional Center, Symrna,</u>
            <u>Delaware; Howard R. Young Correctional Institution,</u>
            <u>Wilmington, Delaware; Sussex Correctional Institution,</u>
            <u>Georgetown, Delaware; John L. Webb Correctional</u>
            <u>Facility, Wilmington, Delaware; and Delores J. Baylor</u>
            <u>Women's Correctional Institution, New Castle, Delaware</u>

Dear Governor Minner:

    I am writing to report the findings of the Civil Rights
Division's investigation of conditions and practices at the
following five Delaware Department of Correction ("DOC")
facilities:  the Delaware Correctional Center ("DCC"), the
Howard R. Young Correctional Institution ("HRYCI"), the Sussex
Correctional Institution ("SCI"), the John L. Webb Correctional
Facility ("Webb"), and the Delores J. Baylor Women's Correctional
Institution ("BWCI").

    On March 7, 2006, we notified you of our intent to conduct
an investigation of these facilities pursuant to the Civil Rights
of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997,
which gives the Department of Justice authority to seek remedies
for any pattern and practice of conduct that violates the
constitutional or federal rights of incarcerated persons.  We
informed you that our investigation would focus on medical and
mental health care.

    We note that the State has cooperated thoroughly with our
investigation and, under the leadership of DOC Commissioner
Stanley W. Taylor, Jr., has unequivocally indicated its clear
desire to improve medical and mental health care services at the

- 2 -

facilities.  From the outset of our investigation, the State has
been proactive in evaluating the conditions at the facilities.
Indeed, the State retained its own expert consultants, Dr. Ronald
Shansky and Dr. Roberta Stellman, to evaluate medical and mental
health care services, respectively, at DCC, HRYCI, SCI, Webb, and
BWCI in July and September 2006.  Following these evaluations,
the State shared the results of its internal evaluations with us.

The State's experts identified systemic deficiencies in
medical and mental health care at four of the five facilities:
DCC, HRYCI, SCI, and BWCI (hereinafter, "the facilities").  These
findings were presented to the Department of Justice in oral and
written presentations by Fried, Frank, Harris, Shriver &
Jacobson, outside counsel for the State.  To facilitate our
investigation, the State agreed to stipulate to the accuracy of
these factual findings.  Given the State's complete cooperation
with our investigation, the unsolicited disclosure of its
comprehensive internal audit of medical and mental health care
services, and the State's stipulation, we elected to limit our
expert tours to a representative subset of the facilities.

Department of Justice staff toured the five facilities on
June 22, 2006, July 17-19, 2006 and August 14-16, 2006.  We
conducted additional tours of HRYCI, Webb and BWCI, accompanied
by expert consultants in the fields of medicine, mental health
care, and suicide prevention on October 4-6, 2006, October 23-25,
2006, and November 15-17, 2006.  During these tours, we reviewed
a wide variety of State and facility documents, including
policies, procedures, and medical and mental health records
relating to the care and treatment of inmates.  We interviewed
prison administrators, professionals, staff and inmates at each
facility.  In keeping with our pledge of transparency and to
provide technical assistance where appropriate regarding our
investigatory findings, we conveyed our preliminary findings to
certain State and facility administrators and staff during verbal
exit presentations at the close of each of our on-site visits.
As detailed below, our investigative findings mirrored those of
the State's experts.

We commend the administrators and staff of the five
facilities we toured for their helpful and professional conduct
throughout the course of the investigation.  In particular,
facility personnel cooperated fully and expeditiously with our
document requests.

We are confident that our work with the State will continue
in the same cooperative manner we have enjoyed throughout our
investigation.  However, consistent with our statutory obligation

- 3 -

under CRIPA, we set forth below the findings of our
investigation, the facts supporting them, including those facts
stipulated to by the State, and the minimum remedial steps that
are necessary to address the deficiencies we have identified.  As
described below, we conclude that inmates confined at the
facilities suffer harm or are placed at the risk of harm from
constitutional deficiencies in certain aspects of the medical and
mental health care services, including suicide prevention.
Notwithstanding the foregoing, we are pleased to report that we
find no constitutional deficiencies at Webb.

## I.   BACKGROUND

Delaware is one of six states that house both pre-trial
detainees and sentenced prisoners in a single unified system,
although detainees and prisoners are not housed together.
Medical and mental health care services at the facilities are
provided through a contract with a private vendor.  DCC is
located in Smyrna, Delaware, and houses approximately 2,500 male
inmates, including both pre-trial detainees and sentenced
prisoners.  DCC also contains the Security Housing Unit ("SHU"),
which houses inmates with disciplinary problems or who otherwise
require the maximum level of security.  DCC also contains the
State's death row.  HRYCI is located in Wilmington, Delaware.
The facility houses approximately 1800 males, both pre-trial
detainees and sentenced inmates.  SCI is located in Georgetown,
Delaware, and houses approximately 1200 male inmates, including a
100-bed boot camp.  BWCI is located in New Castle, Delaware, and
houses approximately 400 female pre-trial detainees and sentenced
inmates at all security levels.  Webb is located in Wilmington,
Delaware, and houses approximately 80 minimum security male
inmates.

## II.   FINDINGS

### A.  MEDICAL CARE

Under CRIPA, the Department of Justice has authority to
investigate violations of the constitutional rights of inmates in
prisons, and pre-trial detainees in jails.  The rights of
sentenced inmates fall under the Eighth Amendment, which
prohibits the imposition of cruel and unusual punishment.  Under
the Eighth Amendment, jails must provide humane conditions of
confinement, which include adequate medical care.  Farmer v.
Brennan, 511 U.S. 825, 832 (1994).  Failure to provide adequate
care to address the serious medical needs of inmates can
constitute deliberate indifference, a violation of the Eighth
Amendment prohibition against cruel and unusual punishment.

- 4 -

Estelle v. Gamble, 429 U.S. 27 (1976).  The responsibility to provide adequate medical care includes mental health care. Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990).  Failure to protect a suicidal prisoner from self-harm can also amount to a constitutional violation.  Inmates of Allegheny County v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979); Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir. 1988).  The responsibility to protect inmates from harm includes the possibility of future harm as well as present harm.  Helling v. McKinney, 509 U.S. 25, 33 (1993); Tillery, 907 F.2d at 426.

     With regard to pre-trial detainees, the Fourteenth Amendment prohibits imposing conditions or practices on detainees not reasonably related to the legitimate governmental objectives of safety, order, and security.  Bell v. Wolfish, 441 U.S. 420 (1979).  The Third Circuit has opined that the protections afforded to pre-trial detainees are at least as great as those afforded to sentenced prisoners.  Hubbard v. Taylor, 399 F.3d 150, 166-167 (3d Cir. 2005) (pre-trial detainees claims of constitutional violations to be analyzed under Fourteenth Amendment).

     Our investigation revealed that the medical care provided at the facilities falls below the standard of care constitutionally required in the following areas, all of which were also identified by the State as deficient:  intake; medication administration and management; nursing sick call; provider sick call; scheduling, tracking, and follow-up on outside consults; monitoring and treatment of communicable diseases; monitoring and treatment of chronic diseases; medical records documentation; scheduling; infirmary care; continuity of care following hospitalizations; grievances; and patient confidentiality. In addition, we found that care for patients with acute medical urgencies was also constitutionally inadequate.

     1.  Sick Call

     The State's expert found that sick call is not being regularly conducted at the facilities and that sick call "no-shows" (inmates who do not appear for their scheduled medical appointments) are not tracked.  Our investigation confirmed that there are inadequate sick call systems in place which directly interferes with inmates' access to care for their serious medical needs.  Specifically, the systems are deficient in scheduling appointments, and tracking no-shows.  For example, the inadequate scheduling system at HRYCI resulted in only seven of the representative sample of 14 patients scheduled for sick call on one day being seen.  In addition, we found that inmates who

- 5 -

missed sick call were not tracked and, as a consequence, often
not rescheduled. The sick call process for inmates' requiring
mental health care suffers from similar inadequacies in
scheduling and follow-up. During our tours of BWCI and HRYCI, we
found that the sick call process is not functioning properly and
that there were significant delays for inmates who had requested
to see the psychiatrist. Overall, these conditions place inmates
at serious risk of harm.

   2. **Acute Care**

   Our investigation revealed that patients with life-
threatening conditions are not receiving timely care. We
reviewed the records of ten patients sent to the local emergency
room; six of these patients were admitted. One patient, known to
be infected with HIV, was admitted from HRYCI with pneumocystis
carinii pneumonia ("PCP"), a potentially fatal infection in
people with AIDS. We determined that this inmate's care had been
mismanaged at HRYCI for one month before the inmate was finally
sent to the hospital. In addition, this inmate was never tested
for active tuberculosis, a likely diagnosis for patients with HIV
and pneumonia. The failure to properly diagnose and treat this
inmate could have put other inmates and staff at risk of
contracting tuberculosis.

   3. **Chronic Care**

   The State's expert found that there are consistent backlogs
with respect to the treatment of chronic care inmates as
evidenced by infrequent scheduled appointments. When
appointments are scheduled, they are subject to cancellation
without explanation or follow-up. The State's expert also found
that the chronic care rosters are not adequately maintained.

   Our investigation confirmed that there is no functioning
chronic disease registry at HRYCI. The absence of a chronic
disease registry means that patients with chronic diseases, such
as diabetes, hypertension, asthma, HIV, and Hepatitis C are not
being followed and treated according to generally accepted
medical standards for chronic care. As a result, inmates with
chronic disease are at risk for deterioration in function,
including blindness, kidney disease, heart disease, liver
failure, and death.

   We found that care was especially poor for inmates with
diabetes, asthma, and HIV. Of nine inmates with diabetes whose
charts we reviewed, only four had received tests deemed necessary
pursuant to generally accepted professional standards for care of

- 6 -

persons with these serious, chronic diseases.  In addition, only two inmates had been immunized against pneumococcus, a bacterium that is the leading cause of bacterial pneumonia.  The failure to immunize chronically ill inmates against pneumococcus places them at serious risk of harm, including death from pneumococcal pneumonia, and constitutes a substantial departure from generally accepted standards of care.  Another diabetic inmate whose chart we reviewed went without insulin for three days, despite severely elevated blood sugar levels that were known to staff, placing him at risk of death.

Similarly, for inmates with asthma, the chronic care practices also fall below a minimally acceptable standard of care.  For example, of nine asthmatic inmates who should have been seen in the chronic care clinic over a three month period, only three were seen.  Only two had documented measurement of peak expiratory flow, which is a departure from the generally accepted standard of care for asthmatic patients.

Finally, with respect to HIV-infected inmates, we found that chronic care practices also fall below a minimally acceptable standard of care.  Only two of five patients whose records our medical consultant reviewed had documented laboratory measurements of their CD4 cells[1] and their viral load, both of which are necessary to gauge response to medication.

## 4.  Specialty Care

The State's expert found that outside consultations are delayed by days or even weeks in non-emergency situations because of bureaucratic obstacles within the private vendor's system for obtaining authorization.  The State's expert also found that shortages of security staff available to transport inmates to outside medical appointments contributes to the inadequacy of care.  In addition, the State's expert determined that, even when outside consults are scheduled, post-consult follow-up does not consistently occur.

Similarly, our investigation found that access to specialty care is untimely, and that tracking of outside care is deficient, creating an unacceptable barrier to adequate medical care ordered by physicians.  For example, of 10 patients who were referred by facility doctors for outside care, three received no care at all.

---

[1]    CD4 cells are white blood cells that identify, attack and destroy infections.  A normal CD4 cell count measures the strength of a person's immune system.

- 7 -

All three patients had serious medical issues: two had upper gastrointestinal symptoms, including one patient who had documented possibly cancerous polyps with a biopsy ordered and performed, but no results in his file. A third patient had no documented follow-up with an orthopedist following serious trauma to his finger.

And, in the most extreme example, specialty care may have been denied altogether: in March, 2002, an SCI inmate died from a malignant brain tumor that had grown so large that it distorted his facial features, and was so noticeable that other inmates referred to him as "the brother with two heads." Fourteen months before he died, SCI medical staff allegedly misdiagnosed the cancerous growth as a cyst or an ingrown hair, and allegedly made no specialty care referral nor provided any specialty care to the inmate before he died.

## 5. Skin Infections

It is well-documented that, across the country, the incidence of skin infections among inmates is rising. These skin infections can include methicillin-resistant staphylococcus aureus ("MRSA"), a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death. MRSA transmission can be prevented by environmental controls, scrupulous laundry practices, early identification, effective treatment, wound care, and follow-up.

The State's expert found that, until recently, the medical staff were generally unfamiliar with the diagnosis and treatment of MRSA, and that the medical staff did not culture potential MRSA infections or educate inmates on proper precautions against the spread of MRSA until Fall 2005.

Our investigation revealed that proper diagnosis of and care for skin infections falls below the minimally acceptable level of care. We also found that medical staff routinely failed to culture skin infections; in addition, we found that wound care and follow-up were inadequate. For example, we reviewed the charts of eight inmates with skin infections at HRYCI; only two of these inmates received adequate care. One had a deep skin infection of the neck, but had no follow-up to see if his infection was spreading. Another inmate had inappropriate treatment for an infection that was accompanied by fever and chills, indicative of a systemic infection that could have led to pneumonia, brain infection, and death. Both of these patients were treated with the antibiotics that are ineffective in treating MRSA. With respect to wound care, we found another

- 8 -

inmate at BWCI who was inappropriately treated with a topical
cream for an infection on her face, but who did not see the
doctor for six days, by which time she had developed cellulitis,
a deep skin infection that ultimately required hospitalization.
Our investigative findings and the State's stipulation are also
consistent with reports that DCC staff failed to properly
diagnose and treat an MRSA infection in an inmate for four months
in 2005. This failure to recognize and treat MRSA allegedly
caused the inmate to be hospitalized for five weeks, lose the
skin on his scrotum, and undergo painful skin grafts, resulting
in permanent deformity.

     Our investigation confirmed that the existence of the above
inadequacies place inmates and staff at risk of acquiring the
infection and passing it to others in the community beyond the
prison walls. We also found that identification and treatment of
skin infections at the facilities is inadequate, including
failure to culture and treat wounds. We found that facility
staff does not keep adequate logs of skin infections, which
prevents staff from being able to analyze data and identify
potential sources of transmission. Notably, in many cases
physicians were prescribing the antibiotic Keflex, which not only
is rarely effective for skin infections, including MRSA, but
actually leads to prolonged infection and increased opportunities
for the infection to spread. Finally, we found that laundry
practices at the Facilities are inadequate to prevent the spread
of skin infections, including MRSA.

     6.  Medication Administration and Management

     The State's expert found that prescribed medications are
routinely discontinued or delayed and that the current vendor has
no systems in place for ensuring that medications do not run out,
for notifying inmates when their medications have arrived, or for
verifying that the vendor is providing inmates with the correct
medications.

     Our investigation confirmed these deficiencies which put
inmates at risk of harm, particularly those with chronic
conditions such as HIV. We observed significant lapses in
medication, due either to lack of availability of medications or
the failure to administer medications consistently. For example,
one inmate had missed 20 consecutive days of his anti-viral
medication used to treat the HIV, a potentially life-threatening
situation; another inmate with HIV had a one month lag in
receiving his HIV medications.

- 9 -

We also found that serial refusals to take medications were not monitored. Numerous inmates missed three or more doses of medications on three consecutive days, without any evidence of follow-up by the prescribing practitioner, or evidence that the inmate was sought out or counseled.

The State's expert found that numerous systemic problems with medication administration and management exist at the facilities, including: failure to distribute medications at the proper time intervals, leading to over- or under-prescribing medications; failure to provide necessary food at night to diabetic inmates; failure to properly monitor whether inmates are actually swallowing their medications; and pre-pouring medications.

Our investigation found similar deficiencies. Our review of medication administration records at HRYCI revealed that approximately ten percent of the entries were left blank, indicating that inmates had not received their medication, or that the medication administration was undocumented. We also found that the State routinely prescribes Keflex, an antibiotic, for skin infections, despite the fact that Keflex is rarely effective when used to treat skin infections. We also learned that the State plans to administer each dose of medication from stock bottles, instead of filling prescriptions for each patient, a practice which we believe will lead to poor inventory control, diversion, error, and lack of accountability.

B.  **MENTAL HEALTH CARE**

The responsibility to provide adequate medical care includes mental health care. <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 763 (3d Cir. 1979); <u>Tillery v. Owens</u>, 907 F.2d 418 (3d Cir. 1990). The State is constitutionally required to provide adequate mental health care to inmates with serious mental or emotional disturbances. The failure to provide necessary psychological or psychiatric treatment to such individuals will result in the "infliction of pain and suffering just as real as would result from the failure to treat serious physical ailments." <u>Inmates of Allegheny County Jail</u>, 612 F.2d at 763. The key to determining whether the State has provided constitutionally adequate mental health care depends on whether inmates have reasonable access to "medical personnel qualified to diagnose and treat such illnesses or disturbances." Id.

The State's mental health expert found substantial deficiencies with the mental health care provided at the facilities. The State's expert conducted a number of on-site

- 10 -

visits and determined that there is a "continuing need for
substantial remedial efforts, training and auditing of mental
health services provided by [the State's medical care provider]."
The State identified the following deficiencies:  poor responses
to sick call requests, particularly in cases involving
potentially suicidal inmates; inadequate group and individualized
therapy; staffing inadequacies, lack of privacy for inmate mental
health counseling, insufficient discharge planning, inadequate
administration and management of psychotropic medications,
failure to properly develop treatment plans that are regularly
updated, failure to develop site-specific policies and procedures
for mental health care, failure to properly document
medical/mental health records, and failure to obtain consent
forms.  Our investigation confirmed the serious systemic
deficiencies in psychiatric staffing, treatment and counseling,
medication administration and management, and intake and
screening identified by the State's mental health expert.  We
conclude that these deficiencies violate inmates' constitutional
right to adequate care for serious mental illness.

    1.  Psychiatric Staffing Deficiencies

    The State's expert found that low psychiatric staffing at
the facilities have caused a backlog of inmates requiring
psychiatric care.  Although the facilities do have psychiatrists
who are available to provide care on-site, their hours at the
various facilities are limited.

    Our investigation confirmed that psychiatric staffing is
inadequate to provide for inmates' serious mental health needs.
For example, during our tour of HRYCI, the State informed us that
there are two part-time psychiatrists who provide care at HRYCI,
but our investigation revealed that their combined time on-site
totals less than twenty hours, and there is no on-site
psychiatric coverage provided for two days out of the week.
Psychiatric coverage at BWCI is even more limited.  Our
investigation revealed that a psychiatrist is on site only four
hours per week, and the "on-call psychiatrist" generally provides
guidance only via telephone.  Further, we understand that
included in the four hours is time that the psychiatrist spends
at the Violation of Probation Center attached to BWCI for two
hours every other week.  Such limited psychiatric staffing is not
constitutionally adequate care because inmates do not have
reasonable access to psychiatrists.  See Inmates of Allegheny
County Jail v. Pierce, 487 F. Supp. 638, 643 (W.D. Pa. 1980).

    As a result of inadequate psychiatric staffing, we found
numerous instances in which the mental health clinical staff are

- 11 -

providing care that they are not licensed to provide (e.g., diagnosis of mental health disorders, treatment development without proper psychiatric consultation, decisions regarding suicide watch step-downs, etc.). We found that psychiatrists are routinely unavailable for treatment team and staff meetings, and often are not involved in crucial decision-making, and are not adequately involved in monitoring and supervision of staff. In addition, we found that the psychiatrist who provides most of the care at HRYCI was not familiar with the procedures utilized for making decisions about which medications to prescribe for patients with psychotic disorders. Generally accepted standards of care dictate that a psychiatrist be responsible for providing mental health treatment to seriously mentally ill patients should lead treatment teams, direct medication procedures, and be meaningfully involved in treatment decisions.

## 2.  Treatment Planning and Counseling Deficiencies

The State's expert found that treatment plans for inmates need to be developed more regularly so that psychologists do not unnecessarily change diagnoses and so that patients are put on the appropriate problem list. Treatment plan development is an integral part of mental health care. One aspect of treatment planning consists of psychiatric and clinical staff providing consistent notations in medical records to ensure that important information regarding an inmate's care is documented. The State's expert, Dr. Stellman, concluded that there is a continued need for remedial efforts and training in the area of medical records documentation at DOC facilities. Dr. Stellman also found that many medical records do not contain consent forms, and contain improperly completed mental health forms.

Likewise, we found that the poor documentation impacts treatment because it is virtually impossible for a qualified mental health professional to review patient medical records and determine how basic clinical decisions are being made (e.g., why an inmate was admitted to the infirmary; why medications are prescribed; why and how psychiatric close observation levels are changed; what are the bases for diagnostic conclusions). During our tour of BWCI, we reviewed the medical record of an inmate who had recently attempted suicide and found the psychiatric notes were deficient and difficult to interpret. Both the on-site and "on-call" psychiatrists made adjustments to this inmate's medication without any explanation. Also, despite the fact that this inmate had been on suicide watch on three occasions within a four-month period and was obviously in distress, there were sparse psychiatric notes in her file.

- 12 -

Generally accepted standards of care dictate that discharge treatment planning be provided for inmates who have serious mental illness to ensure continuity of care.  The State's expert found that its inmate treatment plans fail to address how the patient's care will continue once he or she is released from the DOC facility.[2]

The State's expert also found deficiencies in the individual and group counseling services provided at DOC correctional facilities.  There appears to be a limited ability to provide individual counseling sessions to inmates because of a lack of privacy.  The State's expert found that when inmates are housed in the infirmary, psychiatrists and mental health staff do their interviews through the cell door and that, because cells typically have at least one other occupant when these interviews are being conducted, the encounters are not confidential.  This is a wholly inadequate practice evidencing a denial of reasonable access to psychiatric diagnosis and care.  See Inmates of Allegheny County Jail, 612 F.2d at 763.

Group counseling services at the facilities fall below accepted standards, as well.  The State's expert found that there was a need for remedial measures and training with respect to the provision of group and individualized therapy.

Similarly, we found the counseling services to be constitutionally inadequate.  Because the facilities are substantially understaffed with respect to psychiatrists, physicians generally do not participate in the treatment team or staff meetings.  For example, during our tour of BWCI we found that the master's level clinicians who run the group psychotherapy program (e.g., depression group, anger management group, and addiction group) in the Harbor House Unit do not receive any oversight from a psychiatrist.  Generally accepted professional standards dictate that the psychiatrist be the treatment team leader and be meaningfully involved in key treatment decisions.  However, clinicians are making important treatment decisions that should be left to the professional

---

[2]    NCCHC standards J-E-13 and P-E-13 require jurisdictions to develop discharge planning for inmates with serious mental illness (e.g., medication for a short period of time following release and referrals to community health providers).  Also see, Foster v. Fulton County, 223 F. Supp 2d 1301, 1310 (N.D. Ga. 2002) (holding that a jurisdiction was required to develop meaningful discharge planning for physically and mentally ill prisoners).

- 13 -

judgment of a psychiatrist, or at least made with the consultation of a psychiatrist. Our review of the medical records at BWCI and HRYCI revealed that clinicians are recording psychiatric diagnoses and making observation status decisions about patients in the infirmary, including which inmates should be removed from suicide watch, and at what pace. Psychiatrists should be performing these tasks because psychiatric diagnoses drive treatment decisions.

The State's practice of allowing clinicians to make important decisions regarding the care and treatment of inmates with serious mental illness puts patients at risk. There were three suicides at HRYCI in 2006. A clinician's decision, in May 2006, to downgrade an inmate's observation status may have aided the inmate's ability to commit suicide a few days after he entered the facility. The State took custody of this inmate after his release from a local hospital for treatment related to a suicide attempt. Apparently he was initially placed on one-to-one observation status, but he was later downgraded to a less-restrictive suicide watch despite warnings from a mental health advocate about his vulnerable mental state and need for a mental health evaluation.

### 3. Psychotropic Medication Administration and Management

The State's expert found that there is a continuing need for substantial remedial efforts, training, and auditing with respect to the management of psychotropic medications.

Our investigation revealed that the medication administration and management of psychotropics at DOC facilities is constitutionally inadequate. We observed during our tours at BWCI and HRYCI that there are systemic problems with initiating drug therapy for newly admitted inmates. It appears that this problem may be partially the result of a deficient intake and screening process. Because the intake process is deficient there is rarely an attempt to obtain psychiatric records from community providers which would identify any psychotropic medications that were previously prescribed. If outside records were routinely obtained the delay that we observed with regard to initiating drug therapy for newly admitted inmates might be eradicated or at least greatly diminished.

We also found that the psychotropic medications that newly admitted inmates are often prescribed by community providers were substituted with other medications which may not be as therapeutically effective. We encountered inmates at HRYCI who appeared to have diminished symptom control and decreased

- 14 -

functional ability as a result of the substitution of
psychotropic medications. Another deficiency that we found with
psychotropic medication administration is a lack of consistent
and timely distribution of medications. Because the medication
inventory does not appear to be properly controlled, medication
shortages have resulted in interrupted drug therapy.

Finally, we found that monitoring of medication is deficient
at the facilities. The use of certain psychotropic medications
may cause metabolic effects, such as weight gain, hyperlipidemia,
and type II diabetes mellitus. As such, generally accepted
standards of care require prescribing physicians to monitor
weight, body mass index, and abdominal girth on a regular basis.
Our review of medical records at BWCI and HRYCI indicate that the
State is not following this practice. Another side effect of
certain psychotropic drugs is tardive dyskinesia (involuntary
movement disorder). Psychiatrists generally monitor this side
effect by performing the Abnormal Involuntary Movement Scale
("AIMS") on a regular bases. The State's expert found that AIMS
tests are not being done once every six months as required.

### 4. Intake and Screening

We found the intake and screening process with respect to
the identification of seriously mentally ill inmates to be
constitutionally inadequate. The intake and screening process
for medical and mental health is combined and performed by
nursing staff members who do not appear to have received adequate
mental health training or have a sufficient background in mental
health. Accordingly, they are unable to appropriately identify
symptoms of mental illness.

During our tour of HRYCI, we found that the staff's lack of
experience with mental health issues is exacerbated by the high
volume of newly admitted inmates that are processed per shift.
These deficiencies have resulted in the failure to identify
inmates with serious mental illness which causes delays in
treatment. Another impact of failing to identify inmates with
mental illness is that disciplinary sanctions may be
inappropriately imposed on mentally ill inmates, because of
behavior that could be more appropriately addressed by mental
health care and treatment instead of discipline. For example,
during our tour of BWCI, we observed inmates in isolation who had
not been properly identified has having mental illness, or who
had not received adequate treatment for their diagnosed mental
illness. For such inmates, care should be taken to ensure that
they are not unfairly disciplined for "acting out" when mental
health intervention is a more appropriate response.

- 15 -

We also found that intake and screening for juveniles was
constitutionally inadequate at HRYCI. During our tour, we
reviewed a number of juvenile medical records to determine
whether this special needs population was receiving comprehensive
mental health evaluations subsequent to their initial intake
survey. However, it appeared that such evaluations were not
being routinely performed.

C.  Suicide Prevention

Our investigation revealed that the State's practices
regarding suicide prevention substantially depart from generally
accepted professional standards and expose inmates to significant
risk of harm. Our investigation uncovered a system in which
inmates at risk for suicide are not adequately identified, housed
and supervised.

The State fails to adequately assess and identify inmates at
risk for suicide. While the form used to conduct intake
assessments is good, the personnel conducting the assessment lack
appropriate training and experience with issues related to mental
health and suicide prevention. Assessments are often performed
by contract or agency LPN's who have not been trained adequately
in suicide prevention techniques. Additionally, while the
State's medical provider conducts training of its employees on
suicide prevention, it has not implemented its training curricula
as policy or standard operating procedure. Similarly,
correctional staff receive insufficient training in the area of
suicide prevention. Training at the academy is only two or three
hours, and annual refresher training methods are not adequate.

The intake process also fails to ensure that appropriate
action is taken when an inmate reports a history of suicidal
thoughts or actions. In these instances, the inmate signs a
release, but outside confirmations of their medical and mental
health records/histories are not consistently obtained and
verified. Furthermore, post-intake follow-up of new inmates,
which should be conducted within 14 days, is not done. Instead,
follow-up is rolled into the initial intake process, increasing
the possibility that at-risk inmates will not be identified.

The State fails to ensure that inmates identified as being
at risk for suicide are housed in cells which are sufficient to
ensure their safety. Protrusions from walls and ceilings, window
frames and grates, and even the design of bunk beds in some cells
provide potential anchors strong enough to support an inmate's
weight in an attempt at hanging. For example, in August 2006, an

- 16 -

HRYCI inmate who hanged himself at HRYCI was housed in an
infirmary cell following his admission because he was recovering
from a gunshot wound sustained during his arrest.  It is not
clear what fixture the inmate used to hang himself, but it is
apparent that the cells in the infirmary, like those in the other
areas of the facility, are not sufficient to ensure the safety of
inmates with suicidal ideations.  Hanging was the means used in
the May 2006 and February 2005 suicides at HRYCI.  Additionally,
unsafe light fixtures in some cells, if broken, provide a
potential source of sharp-edged pieces of plastic or glass that
could be used for self-harm.

The State fails to ensure that appropriate levels of
observation are maintained.  Documentation of 15- and 30-minute
checks does not indicate that these checks are being done.  Staff
at one facility reported conflicting requirements for checks at
lesser levels of observation, highlighting confusion about which
interval was the actual policy.  Rounds by mental health staff
for inmates in isolation and on special units are not regularly
done.  Additionally, staff at some facilities incorrectly
suggested that the various undocumented incidental contacts with
at-risk inmates throughout the day, such as dispensing medication
or picking up sick call slips, sufficed as a periodic check for
inmates' safety.

### III.  MINIMUM REMEDIAL MEASURES

In order to address the constitutional deficiencies
identified above and to protect the constitutional rights of
inmates, we recommend the following measures:

1.  The State should ensure that appropriate access to medical
    care, including development and implementation of a
    functional sick call system that appropriately schedules
    medical appointments, and properly tracks and reschedules
    "no shows."

2.  The State should ensure that chronic disease registries are
    implemented and maintained at DOC facilities.

3.  The State should provide appropriate continuing care for
    patients with chronic diseases and ensure that backlogs are
    eliminated and do not redevelop.

4.  The State should ensure that outside consultations are not
    unnecessarily delayed and that appropriate post-consult
    follow-up care is provided.  The State should ensure that

- 17 -

security staffing levels do not negatively impact the
provision of outside consultations.

5.   The State should implement appropriate measures to identify,
     track, and treat skin infections, including culturing and
     treating wounds and prescribing effective antibiotics.

6.   The State should ensure the distribution of medication to
     patients at proper time intervals.  The State should
     implement a system to ensure that proper medications are
     being received and that sufficient stocks of medications are
     maintained to avoid interruptions or delays in their
     delivery.

7.   The State should track serial refusals of medication by
     patients and ensure that prescribing physicians are notified
     of such occurrences and that appropriate follow-up with
     patients takes place.

8.   The State should ensure that there is adequate psychiatric
     coverage provided at DOC facilities.

9.   The State should ensure that psychiatrists are actively
     involved in inmate care, including:  functioning as the
     treatment team leader; making psychiatric diagnoses;
     providing necessary monitoring and supervision of staff; and
     promoting quality mental health care.

10.  The State should provide appropriate medication distribution
     and management systems to ensure that psychotropic
     medications are available, distributed in a timely manner,
     and adequately monitored.

11.  The State should ensure that psychiatrists prescribe
     therapeutically effective medications.  If a decision is
     made to adjust or substitute the medications that an inmate
     was on prior to their detention or incarceration at a DOC
     facility, the psychiatrist should provide a clear
     justification for making the adjustment or substitution in
     the inmate's medical record.

12.  The State should ensure that appropriately trained staff
     perform a mental health screening at intake.

13.  The State should provide appropriate counseling space for
     qualified mental health professionals to provide mental
     health treatment to inmates with serious mental illness.

- 18 -

14. The State should ensure that the mental health staff is appropriately documenting the care provided to inmates with serious mental illness.

15. The State should provide appropriate treatment plans for inmates with serious mental illness. The treatment plans will be reviewed on a routine bases to ensure quality of care.

16. The State should develop site specific mental health policies for HRYCI and DCC.

17. The State should develop a comprehensive policy regarding suicide prevention for DOC facilities.

18. The State should ensure that all medical, mental health and correctional staff are appropriately trained regarding issues of suicide prevention, and that the content of their training is reflective of that State's suicide prevention policy.

19. The State should ensure that intake staff are sufficiently experienced and qualified to identify inmates that pose a risk for suicide, and that follow mental health staff conduct appropriate follow-up evaluations of new inmates within 14 days of intake.

20. The State should ensure that inmates identified as at risk for suicide are housed in safe cells, free from fixtures and design features that could facilitate a suicide attempt.

21. The State should ensure that 15- and 30-minute checks of inmates under observation for risk of suicide are timely performed and appropriately documented.


*  *  *


Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website and we will provide a copy of this letter to any individual or entity upon request.

- 19 -

As stated above, we appreciate the cooperation we have received throughout this investigation from State officials and staff at the facilities.  We appreciate the State's proactive measures to respond to its own internal audit and our feedback to date to improve the quality of services at the facilities.  We hope to be able to continue working with the State in an amicable and cooperative fashion to resolve the deficiencies we found at the facilities.  Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover.  Although their report are their work - and do not necessarily represent the official conclusions of the Department of Justice - their observations, analyses and recommendations provide further elaboration of the relevant concerns, and offer practical assistance in addressing them.  We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter.  See 42 U.S.C. § 1997b(a)(1).  We would very much prefer, however, to resolve this matter by working cooperatively with you.  Accordingly, we will soon contact State officials and counsel to discuss this matter in further detail.

If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

Wan J. Kim
Assistant Attorney General

cc:  Carl C. Danberg
     Attorney General

     Stanley W. Taylor, Jr.
     Department of Correction Commissioner

     Thomas L. Carroll, Warden
     Delaware Correctional Center

- 20 -

Raphael Williams, Warden
Howard R. Young Correctional Institution

Rick Kearney, Warden
Sussex Correctional Institution

Robert Young, Acting Warden
John L. Webb Correctional Facility

Patrick Ryan, Warden
Delores J. Baylor Women's Correctional Institution

Colm Connelly
United States Attorney
District of Delaware

Michael R. Bromwich, Esq.
Beth C. McClain, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP

JOYCE A. TALLEY

1  like that.
2        THE WITNESS: Oh, it's not a fixed rate
3  per fee or per service or anything.
4  BY MR. RICHMOND:
5     Q. Just to get back to this, the contract amount
6  as you just indicated or that Mr. Niedzielski made
7  clear was that capitation rate is essentially based
8  upon the number of inmates. They got so much per
9  inmate and it fluctuated depending upon the CPI,
10 consumer price index, and the inmate population? In
11 other words, if they would get a bump in the contract
12 amount if the population increased above a certain
13 amount; is that correct?
14    A. If the population went above what the
15 contracted amount was, yes, but if the population was
16 lower, you know, there was no adjustment downward.
17    Q. So, let me see if I can clarify this in my
18 own mind.
19    A. Okay.
20    Q. During this review process by The Medical
21 Review Committee, were you aware that the contract was
22 based upon what we just described that they would make
23 more money, for example, if the population, inmate
24 population declined; is that correct, they would profit
25 more?

1     A. I don't know that.
2     Q. All right. You didn't know that at the time
3  either, I take it; right? Would they make more money
4  if you used fewer outside services, fewer outside
5  referrals?
6     A. I mean --
7     Q. I'm talking about FCM.
8     A. I don't know if I would know that.
9     Q. Well, did you ever investigate as to how the
10 money they received was being applied to the healthcare
11 of the inmates?
12    A. No.
13    Q. Did you ever request any information from the
14 FCM reporting staff concerning how much was being spent
15 outside the institution for the medical care of
16 inmates?
17    A. No, not that I know, no.
18    Q. And you did not know as a member of this
19 medical committee whether or not the profit of FCM, as
20 the medical vendor, would vary depending upon how much
21 they spent outside the institutions on medical care; is
22 that correct?
23    A. Do you want to repeat that again?
24    Q. Sure, be happy to. Anytime I ask a question
25 and it's not clear, by all means.

1        Wasn't FCM's profit dependent upon how
2  much they spent on each inmate?
3     A. I mean, I can only make the assumption that
4  it would be, but I mean, I would not know how they
5  created their proposal, and how much by a profit margin
6  there was. I wouldn't know that. So I'm not sure what
7  would have driven their profit to go up or to go down.
8     Q. Well, would it not have something to do with
9  how much they were spending per inmate?
10       MR. NIEDZIELSKI: Asked and answered.
11       You can go ahead and answer.
12       THE WITNESS: I mean, I can only assume
13 that it would be.
14 BY MR. RICHMOND:
15    Q. All right. Well, was there any undertaking,
16 any attempt on the part of The Medical Review Committee
17 to determine whether or not they were spending an
18 adequate amount on the care of the inmates?
19    A. I would say no. I mean, we did not go and
20 look into how they spent their money.
21    Q. Addressing the grievances, you indicated that
22 one of the data that you developed was addressing how
23 many grievances there were, and the resolution of those
24 grievances, is that one of the things that you examined
25 during these meetings?

1     A. It would just be a review to see if there
2  were spikes in the types of grievances.
3     Q. But no specific grievances that you can
4  recall, no specific inmate grievances?
5     A. Not as a rule, no.
6     Q. If an inmate had a grievance, how was that
7  addressed?
8     A. Okay. That would not be coming through my
9  bureau or through The Medical Review Committee. That
10 would be handled through The Bureau of Prisons, which
11 is over -- and then the grievance process is overseen
12 by the Delaware Center of Justice.
13    Q. What about medical grievances?
14    A. The medical grievances were also would go
15 through The Bureau of Prisons and would also be done
16 through -- overseen by the Delaware Center for Justice.
17    Q. Did Mr. Seifert take any special interest in
18 the grievances, the medical grievances?
19    A. Mr. Seifert, there would be times that he
20 would ask for, I guess, additional information and he
21 would bring them before myself or whatever, and then we
22 would just kind of indicate to him that he needed to go
23 to the healthcare provider that could then give him the
24 chronological events as far as what type of care was
25 provided. They would be able to get those from the

5 (Pages 17 to 20)

JOYCE A. TALLEY

Page 5

1    A.  I was a division director within the
2  Department of Correction called the Bureau Chief of
3  Management Services.
4    Q.  And what did your duties consist of at that
5  time?
6    A.  I oversee all of his support units within the
7  Department of Correction, which consist of all of the
8  fiscal, whether it's payroll, accounts payable,
9  budgeting, purchasing, warehousing, food services,
10  healthcare for the inmates, substance abuse treatment,
11  facilities maintenance and construction, and management
12  information systems.
13    Q.  That sounds like a very broad category of
14  responsibility.  It seems like you cover everything
15  here, but the one I'm specifically interested in is the
16  budgeting and your functions or responsibilities with
17  respect to inmate medical care during that period in
18  2002/2003; all right?
19    A.  Uh-uh.
20    Q.  You made reference to the budget for medical
21  care, what was your duties or responsibilities as far
22  as the budget for medical care is concerned within the
23  Department of Correction?
24    A.  As far as for the medical we -- well, myself
25  and a staff member, we would develop what our request

Page 6

1  would be for the medical needs for the medical
2  contract, the additional funding we would need to fund
3  the contract that was in existence at that time.
4  Within the healthcare contracts there is a, like a CPI,
5  a consumer price index or a certain percentage that the
6  contract will increase each year and we would have to
7  calculate that and make that request through our budget
8  process.
9    Q.  So other than the CPI provisions of the
10  contract, you had no other specific review function,
11  I'm talking about you personally, review function as
12  far as reviewing what was being spent by the vendor or
13  anything like that; is that correct?
14    A.  Well, another piece that would be a cost
15  driver as far as a budget request would be with the
16  population.  Inmate population would be what the
17  projections of that would be, and if that was going to
18  be above what the contract allowed for whether we would
19  need to request additional funds because we have
20  additional inmates or projected that we would have
21  additional inmates.
22    Q.  So the contracts also tied to the inmate
23  population?
24    A.  Yes.
25    Q.  And contract was tied to the CPI?

Page 7

1    A.  Yes.
2    Q.  And those were two things that required
3  adjustment, upward or downward I suppose, or some
4  adjustment of some kind?
5    A.  Yes.
6    Q.  Beyond that, what other functions did you
7  have for administering or overseeing or reviewing the
8  contracts between medical vendors and the Department of
9  Correction?
10    A.  Are you talking about just overseeing the
11  contracts, we're not talking about the budget now?
12    Q.  Yes.
13    A.  I just want to make sure.
14    Q.  Yeah.
15    A.  I was responsible in overseeing that the
16  healthcare services were being provided in compliance
17  with the NCCHC standard, and therefore be in compliance
18  with the contract that we had.
19    Q.  And how did you do that?
20    A.  One of the ways was with the -- we had
21  established what is called The Medical Review Committee
22  and with that we would have monthly meetings as
23  required by the NCCHC with the healthcare provider.
24  And we would review various reporting data that they
25  would report to us as far as the services that they

Page 8

1  provided, the numbers of intakes, the numbers of
2  various testings and so forth that were required.
3    Q.  Did that also consist of grievances, raising
4  grievance issues with the provider?
5    A.  We really were not involved in the
6  grievances.  That was another whole process.  We did
7  have where they did submit to us in their monthly
8  reporting listing of grievances and we would look and
9  just kind of monitor that they were being handled at
10  the different levels, but we were not involved in the
11  actual grievance process.
12    Q.  All right.  I just want to be really clear on
13  this, when you say we?
14    A.  The Medical Review Committee, I'm sorry.
15    Q.  The Medical Review Committee?
16    A.  Yes.
17    Q.  And the membership on that committee
18  consisted of you and who else?
19    A.  It would have been -- at that time it would
20  have been Kathy English, she was Deputy Bureau Chief.
21  We had Warden Raphael Williams, he's the Warden of
22  Howard R. Young Correctional Institution.  Phillip
23  Morgan, which is the Warden at the Plummer Work Release
24  Center.  Tom Carroll, which is the Warden of the
25  Delaware Correctional Center.  Michael DeLoy, the

2 (Pages 5 to 8)

KARASCH & ASSOCIATES
800-621-5689

U022

STANLEY TAYLOR

Page 69

1  information from The Medical Review Committee, I assume
2  it addressed some concerns about the quality of medical
3  care being provided by the vendor FCM; is that correct?
4      A.  You're talking about the verbal request to me
5  from my staff?  I'm not -- please restate the question.
6      Q.  Sure.  I'm sorry.
7          The Medical Review Committee in some form,
8  verbal or in writing, expressed concerns about the
9  quality of the medical care being delivered by the
10  vendor FCM; am I correct?
11      A.  That's correct.
12      Q.  All right.  Upon receiving that information,
13  what immediate, if any, action was taken to determine
14  or to address those concerns other than arranging for a
15  secret audit or unannounced audit, a surprise audit by
16  NCCHC?
17      A.  The Medical Review Committee would continue
18  to make efforts to address items of their concern.
19      Q.  Was any outside doctor, physician called in
20  to review the grievances that were being reviewed by
21  The Medical Review Committee?
22      A.  I couldn't specifically say.
23      Q.  Was that a matter of concern to you
24  personally as Commissioner?
25      A.  Was what a matter of concern to me?

Page 70

1      Q.  The grievances that were being filed by
2  inmates at the time that led to the Medical Review
3  Committee's request to you for an audit, was the
4  medical care being provided to the inmates, or the
5  grievances that were submitted by the inmates, were
6  they of any personal concern to you?
7      A.  I am not saying that it was inmate grievances
8  that specifically led The Medical Review Committee to
9  make that request of me.  I don't know the total of the
10  details that had The Medical Review Committee make the
11  request to me.  The answer is yes, that would be a
12  concern having the NCCHC come in and do the audit would
13  dispel any disagreements between the medical staff and
14  my administrative staff, and so, we were looking for
15  this objective body who also has the medical
16  credentials to come in and give us an assessment of
17  what is really going on.  And in the meantime, my staff
18  have to continue to work with the existing staff that
19  are there to try to make the improvements they can make
20  as best they can.
21          They may have -- I don't want to sit here
22  and speculate as to what all they did.
23      Q.  Okay.  You don't have any personal knowledge?
24  That was all I was getting at this point.
25      A.  That's correct.

Page 71

1      Q.  Was that --
2      A.  That would be speculating and I don't want to
3  do that.
4      Q.  Of course not.
5          Was any part of the complaint that The
6  Medical Review Committee brought to you, was any part
7  of that complaint made up of outside vendors that were
8  not being paid by FCM?
9      A.  That was part of the conversation.
10      Q.  Was that the only part of the conversation?
11      A.  That was at least the major part of the
12  conversation as I recall.
13      Q.  Was the care of any inmate discussed with
14  you, or presented to you, by the medical grievance
15  committee, medical care being provided by FCM?
16      A.  No specific inmate, no.
17      Q.  Are you acquainted with Dr. Keith Ivens,
18  I-V-E-N-S, do you know who that is?
19      A.  I know the name, yes.
20      Q.  Who is that?
21      A.  He is a doctor that I know has worked for us
22  with one or more vendors.  I'm going to be careful
23  about -- I'm not sure which contract he was with and
24  when, but I know he's been employed with vendors that
25  have worked for us.

Page 72

1      Q.  At any time prior to the termination of the
2  Department of Correction contract with CMS in 2002, did
3  you become aware of any dispute concerning Dr. Ivens'
4  surgical qualifications?
5      A.  Not that I recall.
6          MR. NIEDZIELSKI:  Can I just say, I know
7  we reserved our objections, but this is so irrelevant
8  to this case.  I mean, I know that this is a favorite
9  of Steve Hampton, Dr. Keith Ivens, but he has nothing
10  to do with this case, absolutely nothing.
11          MR. RICHMOND:  Okay.
12          MR. NIEDZIELSKI:  Okay.
13          MR. RICHMOND:  Anything else?
14          MR. NIEDZIELSKI:  Well, I just think that
15  we're wasting a lot of time here.  I mean, really none
16  of this has anything to do with Louis Chance and I just
17  thought -- I mean, I think we've been fairly patient
18  here, but can you go on to something that has something
19  to do with Louis Chance?
20          MR. RICHMOND:  All of this has to do with
21  Louis Chance.
22          MR. NIEDZIELSKI:  No.  Keith Ivens has
23  nothing to do with Louis Chance, absolutely nothing.
24          MR. RICHMOND:  All of this has to do with
25  the quality of care that should have been addressed --

18 (Pages 69 to 72)

Kathy English stated that SCI did a drill early this morning and took a nurse hostage. One of the issues is ensuring that someone is available to be contacted to give profile information about the hostage. The information may be at the facility but if access cannot be gained to that facility someone else may have to be called.

Information should the hostage's family, where he/she lives, any contacts, people he/she may know in the facility, why this particular person was taken hostage, etc.

Linda Hunter will be the contact person.

The staffing matrix of the monthly report is very confusing to read and will be put into a different format. FCM will have the updated version in next month report.

The hourly base rate for RN's across the state (except at DCC) is $23.00 per hour. They also get paid for shift differentials and weekend differentials.

LPN hourly base rates are $18.00 per hour.

## Contract Compliance:

Kathy English informed Dr. Kastre of a very critical issue in relationship to contract compliance and it revolves around the Medicaid issue.

In review of the contract by the DOC's attorneys the DOC is considering the fact that FCM is currently in breach of the contract.

Page 31 of the contract specifically says that FCM will pay their sub-vendors their bills within two weeks.

The DOC has notification from Bayhealth and written notification from their attorneys stating that they have not been paid. The bills are well over $800,000.00 at this point.

The DOC also has notification from private providers that had been offering services, as well as x-ray providers that FCM has not been paying their bills either.

The DOC anticipates that the bills are at least $1,000,000.00 and that they currently only have a $500,000.00 retainer from FCM.

Kathy English gave verbal notice to FCM considering them of being in breach of contract.

The MRC has had conversations with the Commissioner. He is extremely concerned about this issue.

Dr. Kastre stated that FCM's attorneys had sent a letter to the Commissioner.

Kathy English said that the Commissioner had not received the letter yet.

She added that the DOC is in receipt of a letter from the Medicaid office and their attorneys in relationship to their position on the issue and that the DOC also has notification from their attorneys and the DOC's position on the issue.

Dr. Kastre stated that there is a very simple answer.

Kathy English stated that it might be in relationship to Medicaid but that the real critical issue is how FCM handled the situation and not paying their providers. This is bad

business practice and the DOC cannot tolerate it. It makes the DOC liable for FCM's medical bills.

Dr. Kastre stated that there is a quick answer this can be fixed in a couple of weeks. She feels that FCM has pushed very, very diligently to try to get people to return phone calls from the Medicaid office and from a variety of sources FCM has been working with since November.

Dr. Kastre feels as if FCM has been put in a business position of no return and they have to evade this move or they will not survive it.

She stated that it is very clear that FCM obviously needs some help from the DOC because FCM is not getting the answer from the Medicaid office.

She added that these bills could be processed under Medicaid; the DOC would receive 50% of that money back from the Feds and the other 50% back from FCM. The consequence is that FCM stays viable and gets to use the way they do business under instead of having to pay the hospitals at 95% of the cost. The hospitals would get the appropriate amount of money; they would get the Medicaid rate.

Dr. Kastre stated that FCM wants to pay these hospitals but they need to get paid at the Medicaid rate.

Dr. Kastre thinks that if the attorneys sit down with FCM, and the AG actually gets on the phone with Medicaid and FCM, it could be solved in 10 days and FCM would release the funds and it would go out.

Kathy English noted that this may be true but that is not DOC's contractual issue. The DOC paid FCM $17,000.000.00 to provide hospital care for Delaware's inmate population.

Dr. Kastre said that there is no other option. The losses that FCM has experienced in the first six months of the contract, because they could not get Medicaid to pay and FCM went ahead and kept paying the bills anyway, were phenomenal. She will not be able to recover those losses and as of January 1 FCM was not prepared to go through that again.

Dr. Kastre said that Kay Holmes and the Medicaid office have an obligation to issue Medicaid cards and ironically after pushing very hard for about nine months FCM is receiving some cards.

Dr. Kastre stated that they have only processed applications for people that fall under the waiver criteria, people that are hospitalized for greater than 23 hours. It is the Medicaid's office to decide under the federal regulations whether the people are Medicaid qualified.

Kathy English told Dr. Kastre that she could not require a hospital to access Medicaid. The letter that Dr. Kastre sent the hospitals on May 26 clearly tells them to go and get Medicaid reimbursement for that.

Kathy English stated that the Medicaid office under the 1115 waiver only allows the Medicaid office to apply for the funds. The Medicaid office has clearly told that to the DOC in a letter; Kathy English will give a copy of that letter to Dr. Kastre as well.

Dr. Kastre commented that FCM couldn't pay the bills at the current rate that is not how the contract was negotiated; that was not how FCM went into it. FCM went in believing that they would be paying 50%.

Kathy English stated that the DOC gave no indication in the contract or in FCM's fee that Medicaid would kick in. She said that nowhere in the current contract is Medicaid

mentioned at all and that Medicaid is a payer of last resort. Medicaid clearly states that there is exclusion for inmates.

Dr. Kastre said that Medicaid has a qualifier in the 1115 waiver and that there is no exclusion for inmates. Dr. Kastre stated that she even spoke to the contracting people that build the Delaware waiver and they said that it could be used the same way as Vermont and the other states that have the waivers.

Kathy English stated that the DOC will give FCM 30 days to fix it and that FCM has to schedule the attorney meeting within 30 days.

Dr. Kastre stated that the letter should already be at Stan Taylor's desk; it went out by FedEx yesterday afternoon.

Dr. Kastre stated that this will terminate FCM and the DOC will obliterate FCM Delaware if this cannot be resolved. She sees no reason in the world why it would not be pursued to the fullest to get this money back form the Feds.

Kathy English said that the DOC cannot be pushed to do it in a certain timeframe and the approach FCM is taking is just not good business practice.

Dr. Kastre stated that from a business perspective, sitting here and trying to deal with this for nine months and getting no response from people like Stuart Drowos, gives FCM the perception that when there is an issue that relates to money or other really tough issues, FCM gets no responses.

FCM's attorney has contacted Stuart Drowos 8 or 9 times and had no answer back. They cannot have a dialog with people they need to have dialogs with.

Phil Soule, Deputy Director of Medical Services for DHSS, will not return FCM's phone calls; they cannot set up a meeting with him.

Dr. Kastre said that she does not have a lot of recourse since she has not been here a long time, long enough to have a Congressman to talk to or anybody else and she really does not want to do that, usually FCM starts with the low man on the totem pole and works their way up.

Kathy English stated that the DOC and FCM have had extensive conference calls. Carl Danberg has clearly said where the DOC stands on the issue.

The AG clearly said that the DOC's contract with FCM is in black and white.

Medicaid is final on the issue; it is not a DOC issue; it is a Medicaid office issue. If FCM wants a contract specifically with DHSS in reference to Medicaid that is FCM's issue not the DOC's.

The DOC is paying FCM $17,000.000.00 to pay for those services.

Dr. Kastre said that the DOC paid FCM to pay those services out at 50% of Medicaid for the patients that qualify.

Kathy English said that the DOC did not.

Dr. Kastre said that is what their assumption was when they ran the bid. She added that when the DOC changes vendors or does it themselves instead of paying 2 or 3 million dollars for outside hospitalization it is going to end up being 8 million.

Phil Morgan stated that the MRC is at a loss. They have never had a vendor that made the statements and the moves that FCM is making, and that Medicaid never crossed the minds of the people involved with the RFP.

U026

Dr. Kastre stated that she has 30 days to work on the potential breach and if there would have been another avenue she would have much rather taken it and she clearly hears what the DOC is saying.

Dr. Kastre stated that she does not have any other venues or avenues to pursue for assistance; it is not a workable arrangement. All the other option doors are closed.

FCM is not going to pay the hospitals at full rate. Their interpretation on all of this is that it clearly is legal, it is a win-win situation, the DOC gets money back from the Feds and the rest of the money from FCM and the hospitals still get payment for services at a State rate.

Kathy English said that she understands the process completely but it is not a DOC process and if FCM needs a contract in reference to Medicaid then FCM has to work directly with DHSS.

Dr. Kastre stated that she does not need a contract with Medicaid to pursue this she needs them to actually do their job; she needs them to actually function in the office capacity that they have been given by their state.

Dr. Kastre said that FCM needed help with this whether it is Kathy English, Joyce Talley, Stan Taylor, or somebody; they need to understand that this is a very real issue.

Kathy English said that the DOC has tried to help. She sat with Kay, sat with Elaine, and she sat with Norma and they had extensive conference calls to Vermont, they talked to everyone. But the DOC is not the 1115 waiver and they cannot tell Medicaid what to do and what not to do.

When FCM puts it in perspective that now they are not paying bills, from a contract FCM has with the DOC, it makes the DOC liable.

Kathy English told Dr. Kastre that she used the wrong technique to make her point and now putting it on the DOC making the DOC liable to pay those bills. Which in return translates to the DOC that FCM has breached the contract, which would mean that the DOC holds future payments to ensure that liabilities that FCM is not paying are covered.

Dr. Kastre asked how FCM could get the Medicaid office to work so FCM does not only receive 1 in 10 Medicaid cards.

Kathy English told Dr. Kastre that threatening and not paying the bills will not get her anywhere.

Kathy English told Dr. Kastre she would give her a contact number to call Elaine Archangelo, Kay Holms' boss. She will also give Dr. Kastre a copy of the letter from Elaine Archangelo that tells specifically where DHSS stands on the issue; it is not a closed door but it is not a DOC issue. DHSS is willing to work with FCM.

Dr. Kastre will definitely try going to Elaine. Dr. Kastre stated that FCM has worked very hard this year and she is not going to see it fail because FCM cannot get a State agency to participate.

Kathy English stressed that FCM needs to understand too what Medicaid's participation level really is. She believes that there is some misinterpretation of what the 1115 waiver really allows. Kathy English realizes that FCM has had their policy advisors review it but the Medicaid folks do it everyday and they have had their policy advisors review it.

Kathy English stated that the DOC couldn't get claims information either so that is a battle too.

Dr. Kastre stated that she was told by Theresa not to pass out the claims information because the DOC was going to illegally use that to try to guard the federal funds without paying the claims.

Kathy English stated that was not true. The DOC claimed all of CMS' prior year data, every one of them. Refusing to give claims information to the DOC, again just puts a bad taste in the mouth of the Medicaid office.

Medicaid asked FCM for claims information and FCM said no and FCM wants Medicaid information and Medicaid says no.

Kathy English is very concerned that even at last month's MRC meeting FCM did not bring this up as an issue to be brought to the Commissioner's attention and it was not referenced in June's minutes either, but yet Kathy English had to sit in a meeting with the Commissioner 2-3 weeks ago and bring it to his attention.

The DOC had received a letter from the attorneys at Bayhealth stating that there are outstanding bills over $800,000.00. That is a big problem since the DOC only has a $500,000.00 retainer; chances are that any future payment will be held until the DOC is sure that they can cover those medical costs. The DOC does not know how much the bills for Christiana Care, Beebe hospital, etc.

Kathy English stated that their issue is that FCM is not paying their bills and if FCM is not paying their bills the DOC has to hold their money.

This issue needs to be brought to the Commissioner's attention.


     Adjourn
* The next monthly meeting will be August 28, 2003 at 10:15 am at the DOC's Administration Building in Dover in conference room #300*

STANLEY TAYLOR

Page 59

1      A.    Correct.

2            MR. NIEDZIELSKI:  You're talking the time

3   period 2002?

4            MR. RICHMOND:  2002, yeah.

5   BY MR. RICHMOND:

6      Q.    Among the things you discussed at any of the

7   conferences that you attended, 2002, 2003 or 2004, was

8   inmate mortality ever discussed?

9      A.    Not that I recall.

10     Q.    Do you know what Delaware's national standing

11  was in terms of inmate mortality as a percentage or a

12  function of its population during 2002, 2003 or 2004?

13     A.    We will have -- I think the high death is

14  two, on a given year we may have none.  So our rate,

15  mortality rate can swing around pretty dramatically

16  from none to something that reflects two, I think our

17  highest is three deaths in a calendar year.

18     Q.    That's what you think it was at the highest

19  three?

20     A.    I believe, yes.  So mortality rates I believe

21  were comparable with the country, but in any given year

22  because of our size a zero to three can have quite a

23  aberration I guess statistically is what I would say,

24  but raw numbers I believe, our high is three and our

25  low is zero in those years.

KARASCH & ASSOCIATES

HOME > LOCAL

# Prison chief admits not eyeing care

By LEE WILLIAMS and ESTEBAN PARRA, The News Journal



Guard Beverly McQuaid stands outside the Delaware Correctional Center, near Smyrna, where an inmate died last week, in June.



Stanley W. Taylor Jr. will retire Feb. 1 after 11 years as correction commissioner.

Correction Commissioner Stanley W. Taylor Jr. never personally investigated health care complaints lodged by inmates or their families, denied responsibility for overseeing the prison medical staff, and grossly understated the number of inmates who died during the latter part of his tenure, according to court documents obtained by The News Journal.

Taylor was recently deposed under oath, in one of the numerous wrongful death lawsuits filed against him, his department and the state, on behalf of an inmate who died in state custody.

Many more lawsuits are pending, attorneys say.

Lawmakers and civil rights advocates say the next person to head the Department of Correction should be more engaged, more concerned with inmate care, and more involved in the day-to-day operations of the department than Taylor, who ran the prison system for 11 years.

They hope former state Attorney General Carl C. Danberg, whose nomination to replace Taylor is to be debated today in the Senate, will be more accessible and accountable.

"I want a commissioner who is passionate, who has a keen sense of justice, who's hands-on without micromanaging," said state Sen. Karen E. Peterson, D-Stanton. "I want somebody who cares about human beings, who will deal with these inmates as people, who will have a heart."

"I don't mean a bleeding heart. I mean a heart."

Legal experts say Taylor's recent testimony is a blemish to his agency's ability to defend itself in future civil rights lawsuits, and could hinder the state's ability to reach fair and equitable settlements for the cases, which could cost state taxpayers millions of dollars.

In his responses during the deposition, Taylor appears detached and ill-informed. For example, Taylor drastically understated the number of inmate deaths in state prisons during 2002, 2003 and 2004

"We will have — I think the high death is two. On a given year we may have none. So our rate, mortality rate, can swing around pretty dramatically from none to something that reflects two. I think our highest is three deaths in a calender year," Taylor said at the deposition.

The attorney taking the testimony asked Taylor to confirm the number, and he asked the commissioner whether three deaths was the actual high for either 2002, 2003 or 2004.

"I believe, yes," Taylor said. "So mortality rates I believe were comparable with the country, but in any given year, because of our size, a zero to three can quite an aberration, I guess statistically, is what I would say, but raw numbers I believe our high is three and our low is zero in those years."

According to documents provided to The News Journal -- before the deposition -- by Taylor's Department of Correction, there were 16 inmate deaths in 2002, 20 in 2003 and 14 in 2004.

Although Taylor's comments are not evidence that there was deliberate indifference to serious medical need -- a legal standard needed for successful lawsuits against his department -- they describe an administration not engaging in proper supervision, said Jules Epstein, associate professor at Widener University School of Law.

"When people say things that look like they have no idea of the seriousness of the problem, it shows at a minimum that they are not hands-on administrators," Epstein said.

If there were 16 deaths in one year and the head of the prison system thinks there were about two, Epstein said, "that's a fair piece of evidence that nobody is running the shop."

High death rates for AIDS and suicide in Delaware prisons prompted a Justice Department investigation into prison health care that ended last month with an 87-point settlement between the state and federal prison regulators. One lawmaker put the price tag on complying with the agreement at $30 million.

Through spokeswoman Gail Stallings Minor, Taylor declined comment about his testimony during the deposition. Taylor is scheduled to retire Feb. 1

"As for your questions about information listed in a deposition, we cannot and do not talk about issues that are in litigation, to be litigated or in the appeals process," Minor said in an e-mail.

**On complaints**

According to his deposition, Taylor can't recall receiving any calls or letters in 2003 from family members of inmates addressing medical care at any of the facilities he oversees.

He said he doesn't track or even maintain a file of complaints he receives from inmates in prison care. Asked if he destroys the written complaints, Taylor said: "They're typically farmed out to people to respond to the request." The written complaints, he said, may be routed to a bureau chief or internal affairs.

"I'll pin a note to the letter itself and say 'please look into,' to respond or address an issue. Sometimes they're founded. Sometimes they're unfounded, but that's typically the process," he said. "I don't keep a file."

If he would have tracked or investigated these complaints, Taylor would have known how many people were dying in prison, and how many people were in need of better medical treatment, said Francine Wright, whose son, Darnell Anderson, died while an inmate.

"I'd like to see someone who is going to know how to do their job, and do their job," Wright said of Taylor's replacement. "They need someone in there that's going to need to know what's going on."

Wright's son was serving a four-year drug sentence when he was taken to Wilmington's St. Francis Hospital in 2004. During his hospitalization, doctors learned Anderson had pneumocystis carinii pneumonia, an AIDS-related infection that is usually preventable and treatable when caught early, which attending physicians said did not occur. He died at St. Francis.

If the department has an engaged commissioner, Wright said, "it should cut back the number of deaths in prison and the number of sick people in prison who are not receiving medical treatment.

The Rev. Christopher Bullock, one of the founding members of the Delaware Coalition for Prison Reform and Justice, has comforted dozens of family members who have lost loved ones inside Delaware prisons.

"First of all, I'm absolutely against the nomination of Carl Danberg," Bullock said. "But the new commissioner should be very engaged, involved and sensitive to every element and dimension of corrections, be it medical, mental, physical or spiritual."

He wants more from the new commissioner than he thinks Danberg can offer.

"What we expect is someone different from the Stan Taylor out-of-touch approach," Bullock said. "He was insensitive to a degree, and he just didn't care."

Bullock hopes the new commissioner will provide regular briefings on physical health at all of the institutions.

From 2000 to July 2005, 46 of the 89 inmates who died in Delaware custody were black, according to records obtained by The News Journal.

"I am convinced that many in the corrections system and in the General Assembly view African-Americans as a disposable commodity within the Department of Corrections," Bullock said. "It's morally wrong, and I will continue to talk about it. I'm not talking about racism. I'm talking about realism."

**On medical contractors**

Under oath, Taylor denied any personal responsibility for overseeing prison medical care.

Instead, he relies on audits by the National Commission on Correctional Health Care, which occur every three years, as his yardstick to determine whether inmates receive quality medical services. He also relies on advice from his own Medical Review Committee, which was staffed by members of his department, the contract medical provider and a public health nurse, who is now working in the Department of Correction.

"If they believe something is so far out of whack that they can't address it, that's when the issue comes up, and it may come to my attention to request a special audit," Taylor said.

As to whether his committee has a set of procedures or guidelines, Taylor replied: "I don't believe so, but I don't know."

Taylor was asked in the deposition if he ever ordered his staff to conduct an investigation of the quality of care, or the qualifications of those providing care, as a result of a lawsuit.

"An investigation, no," he testified.

Drewry Fennell, executive director of the American Civil Liberties Union of Delaware, said the time for anyone within the department to monitor medical care has ended. She wants the Justice Department to appoint independent observers.

"We'd like to see a commissioner who is more engaged in the day-to-day operations of the department, but we'd also like to see third-party monitoring," Fennell said. "It's incumbent for the Legislature or the administration to appoint someone who will have free and unfettered access to information within the DOC, but who will also have reporting obligations to the public."

Fennell is supportive of Danberg. "I hope Cari will bring the type of transparency to the Department of Correction that we all know is needed."

**On oversight**

Taylor said lawmakers are better informed about certain prison conditions than he is.

"I chuckle because any Legislature has their informants everywhere, and so they would be receiving information that I would never know about," he said at the deposition.

Prior to legislative hearings, even ones at which his management team is present, Taylor said he requires prep time with his staff. "They're typically preparing me. I don't prepare them," he said. "I'm being fed what we think -- what I think are relevant issues, make me aware of. Each legislator tends to have pet issues with trying to be current and have answers ready, that kind of thing."

Prison medical care, he explained, was never the topic which his staff briefed him about prior to a legislative hearing during 2002, 2003 or 2004.

"I don't believe so. Not beyond -- not beyond the budget, the typical budget conversations and questions that arise."

Taylor was asked if he ever provided the governor's office with any reports concerning medical care in 2002 or 2003.

"No," he said.

Asked if inmate deaths were ever discussed during any of the conferences he attended with the medical contractors, Taylor said: "Not that I recall."

John Flaherty, of Common Cause of Delaware, hopes lawmakers seek more oversight, and he hopes the new commissioner is one who will assume personal responsibility.

"We need someone who is fully responsible for the department," Flaherty said. "Someone who's responsible for the entire department would go a long way to improving conditions and making the prison system more accountable to the public."

**On the federal investigation**

Last month, Danberg and Taylor signed the 87-point federal settlement, ending a nine-month investigation into prison health care and management.

The state promised to correct deficiencies and "meet generally accepted professional standards," but did not admit to violating any inmate's civil rights or breaking other federal law.

The federal investigation was launched after a series of articles in The News Journal.

Taylor denied the newspaper's articles prompted him to take any official actions. "I'm not aware of any," he said. "Number one: news media doesn't generate investigations for us."

Delaware Public Defender Larry Sullivan considers Danberg an "excellent choice" to replace Taylor. "He's seen the thing from the inside, for eight or nine years. He is co-author of the agreement between the Department of Correction and federal government, so he knows what standards the federal government expects him to follow."

ATTACH TO DEPOSITION OF: ___Stanley Taylor

DATE TAKEN: ___November 28, 2006

IN THE MATTER OF: ___Chance v. First Medical, et al.

## ERRATA SHEET

<u>INSTRUCTIONS</u>: After reading the transcript of your deposition, please note any change or correction and the reason therefore on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 59 | 13-25 | Actual inmate deaths from all causes throughout the entire Department |
| | | of Correction was 17, in the year 2002; 20 in the year 2003 and 13 in |
| | | year 2004. I mistakenly thought the question was asking about the |
| | | number of suicides for those years. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: ___1/30/07___          _____
                                    (Signature of Deponent)