IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Estate of Louis W. Chance, Jr.
by:  Amanda Humphreys and
Louis Chance, III, Personal
Representatives
506 W. Summit Avenue
Wilmington, Delaware 19804

              Plaintiff

        v

First Correctional Medical-Delaware,
LLC.  et al.                                   Civil Action No. 05-449 (SLR)

              Defendant

---

### PLAINTIFF'S  APPENDIX  TO
### RESPONSE  BRIEF CONTRA
### MOTION OF FIRST CORRECTIONAL MEDICAL, SHAH AND ARAMBURO
### FOR SUMMARY JUDGMENT

**Attorneys for Plaintiff**

Jeffrey K. Bartels, Esquire
Kenneth W. Richmond *pro hac vice*
401 S. Maryland Avenue
Wilmington, DE 19804



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

DEC 2 9 2006

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl.
Dover, DE  19901

> RE:  Investigation of Delaware Correctional Center, Symrna,
> Delaware; Howard R. Young Correctional Institution,
> Wilmington, Delaware; Sussex Correctional Institution,
> Georgetown, Delaware; John L. Webb Correctional
> Facility, Wilmington, Delaware; and Delores J. Baylor
> Women's Correctional Institution, New Castle, Delaware

Dear Governor Minner:

I am writing to report the findings of the Civil Rights
Division's investigation of conditions and practices at the
following five Delaware Department of Correction ("DOC")
facilities:  the Delaware Correctional Center ("DCC"), the
Howard R. Young Correctional Institution ("HRYCI"), the Sussex
Correctional Institution ("SCI"), the John L. Webb Correctional
Facility ("Webb"), and the Delores J. Baylor Women's Correctional
Institution ("BWCI").

On March 7, 2006, we notified you of our intent to conduct
an investigation of these facilities pursuant to the Civil Rights
of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997,
which gives the Department of Justice authority to seek remedies
for any pattern and practice of conduct that violates the
constitutional or federal rights of incarcerated persons.  We
informed you that our investigation would focus on medical and
mental health care.

We note that the State has cooperated thoroughly with our
investigation and, under the leadership of DOC Commissioner
Stanley W. Taylor, Jr., has unequivocally indicated its clear
desire to improve medical and mental health care services at the

- 2 -

facilities.  From the outset of our investigation, the State has been proactive in evaluating the conditions at the facilities. Indeed, the State retained its own expert consultants, Dr. Ronald Shansky and Dr. Roberta Stellman, to evaluate medical and mental health care services, respectively, at DCC, HRYCI, SCI, Webb, and BWCI in July and September 2006.  Following these evaluations, the State shared the results of its internal evaluations with us.

The State's experts identified systemic deficiencies in medical and mental health care at four of the five facilities: DCC, HRYCI, SCI, and BWCI (hereinafter, "the facilities").  These findings were presented to the Department of Justice in oral and written presentations by Fried, Frank, Harris, Shriver & Jacobson, outside counsel for the State.  To facilitate our investigation, the State agreed to stipulate to the accuracy of these factual findings.  Given the State's complete cooperation with our investigation, the unsolicited disclosure of its comprehensive internal audit of medical and mental health care services, and the State's stipulation, we elected to limit our expert tours to a representative subset of the facilities.

Department of Justice staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006.  We conducted additional tours of HRYCI, Webb and BWCI, accompanied by expert consultants in the fields of medicine, mental health care, and suicide prevention on October 4-6, 2006, October 23-25, 2006, and November 15-17, 2006.  During these tours, we reviewed a wide variety of State and facility documents, including policies, procedures, and medical and mental health records relating to the care and treatment of inmates.  We interviewed prison administrators, professionals, staff and inmates at each facility.  In keeping with our pledge of transparency and to provide technical assistance where appropriate regarding our investigatory findings, we conveyed our preliminary findings to certain State and facility administrators and staff during verbal exit presentations at the close of each of our on-site visits. As detailed below, our investigative findings mirrored those of the State's experts.

We commend the administrators and staff of the five facilities we toured for their helpful and professional conduct throughout the course of the investigation.  In particular, facility personnel cooperated fully and expeditiously with our document requests.

We are confident that our work with the State will continue in the same cooperative manner we have enjoyed throughout our investigation.  However, consistent with our statutory obligation

- 3 -

under CRIPA, we set forth below the findings of our
investigation, the facts supporting them, including those facts
stipulated to by the State, and the minimum remedial steps that
are necessary to address the deficiencies we have identified.  As
described below, we conclude that inmates confined at the
facilities suffer harm or are placed at the risk of harm from
constitutional deficiencies in certain aspects of the medical and
mental health care services, including suicide prevention.
Notwithstanding the foregoing, we are pleased to report that we
find no constitutional deficiencies at Webb.

## I.  BACKGROUND

Delaware is one of six states that house both pre-trial
detainees and sentenced prisoners in a single unified system,
although detainees and prisoners are not housed together.
Medical and mental health care services at the facilities are
provided through a contract with a private vendor.  DCC is
located in Smyrna, Delaware, and houses approximately 2,500 male
inmates, including both pre-trial detainees and sentenced
prisoners.  DCC also contains the Security Housing Unit ("SHU"),
which houses inmates with disciplinary problems or who otherwise
require the maximum level of security.  DCC also contains the
State's death row.  HRYCI is located in Wilmington, Delaware.
The facility houses approximately 1800 males, both pre-trial
detainees and sentenced inmates.  SCI is located in Georgetown,
Delaware, and houses approximately 1200 male inmates, including a
100-bed boot camp.  BWCI is located in New Castle, Delaware, and
houses approximately 400 female pre-trial detainees and sentenced
inmates at all security levels.  Webb is located in Wilmington,
Delaware, and houses approximately 80 minimum security male
inmates.

## II.  FINDINGS

### A.  MEDICAL CARE

Under CRIPA, the Department of Justice has authority to
investigate violations of the constitutional rights of inmates in
prisons, and pre-trial detainees in jails.  The rights of
sentenced inmates fall under the Eighth Amendment, which
prohibits the imposition of cruel and unusual punishment.  Under
the Eighth Amendment, jails must provide humane conditions of
confinement, which include adequate medical care.  Farmer v.
Brennan, 511 U.S. 825, 832 (1994).  Failure to provide adequate
care to address the serious medical needs of inmates can
constitute deliberate indifference, a violation of the Eighth
Amendment prohibition against cruel and unusual punishment.

- 4 -

Estelle v. Gamble, 429 U.S. 27 (1976).  The responsibility to
provide adequate medical care includes mental health care.
Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990).  Failure to
protect a suicidal prisoner from self-harm can also amount to a
constitutional violation.  Inmates of Allegheny County v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Colburn v. Upper Darby
Township, 838 F.2d 663 (3d Cir. 1988).  The responsibility to
protect inmates from harm includes the possibility of future harm
as well as present harm.  Helling v. McKinney, 509 U.S. 25, 33
(1993); Tillery, 907 F.2d at 426.

    With regard to pre-trial detainees, the Fourteenth Amendment
prohibits imposing conditions or practices on detainees not
reasonably related to the legitimate governmental objectives of
safety, order, and security.  Bell v. Wolfish, 441 U.S. 420
(1979).  The Third Circuit has opined that the protections
afforded to pre-trial detainees are at least as great as those
afforded to sentenced prisoners.  Hubbard v. Taylor, 399 F.3d
150, 166-167 (3d Cir. 2005) (pre-trial detainees claims of
constitutional violations to be analyzed under Fourteenth
Amendment).

    Our investigation revealed that the medical care provided at
the facilities falls below the standard of care constitutionally
required in the following areas, all of which were also
identified by the State as deficient:  intake; medication
administration and management; nursing sick call; provider sick
call; scheduling, tracking, and follow-up on outside consults;
monitoring and treatment of communicable diseases; monitoring and
treatment of chronic diseases; medical records documentation;
scheduling; infirmary care; continuity of care following
hospitalizations; grievances; and patient confidentiality. In
addition, we found that care for patients with acute medical
urgencies was also constitutionally inadequate.

    1.  Sick Call

    The State's expert found that sick call is not being
regularly conducted at the facilities and that sick call
"no-shows" (inmates who do not appear for their scheduled medical
appointments) are not tracked.  Our investigation confirmed that
there are inadequate sick call systems in place which directly
interferes with inmates' access to care for their serious medical
needs.  Specifically, the systems are deficient in scheduling
appointments, and tracking no-shows.  For example, the inadequate
scheduling system at HRYCI resulted in only seven of the
representative sample of 14 patients scheduled for sick call on
one day being seen.  In addition, we found that inmates who

- 5 -

missed sick call were not tracked and, as a consequence, often
not rescheduled.  The sick call process for inmates' requiring
mental health care suffers from similar inadequacies in
scheduling and follow-up.  During our tours of BWCI and HRYCI, we
found that the sick call process is not functioning properly and
that there were significant delays for inmates who had requested
to see the psychiatrist.  Overall, these conditions place inmates
at serious risk of harm.

### 2.  Acute Care

Our investigation revealed that patients with life-
threatening conditions are not receiving timely care.  We
reviewed the records of ten patients sent to the local emergency
room; six of these patients were admitted.  One patient, known to
be infected with HIV, was admitted from HRYCI with pneumocystis
carinii pneumonia ("PCP"), a potentially fatal infection in
people with AIDS.  We determined that this inmate's care had been
mismanaged at HRYCI for one month before the inmate was finally
sent to the hospital.  In addition, this inmate was never tested
for active tuberculosis, a likely diagnosis for patients with HIV
and pneumonia.  The failure to properly diagnose and treat this
inmate could have put other inmates and staff at risk of
contracting tuberculosis.

### 3.  Chronic Care

The State's expert found that there are consistent backlogs
with respect to the treatment of chronic care inmates as
evidenced by infrequent scheduled appointments.  When
appointments are scheduled, they are subject to cancellation
without explanation or follow-up.  The State's expert also found
that the chronic care rosters are not adequately maintained.

Our investigation confirmed that there is no functioning
chronic disease registry at HRYCI.  The absence of a chronic
disease registry means that patients with chronic diseases, such
as diabetes, hypertension, asthma, HIV, and Hepatitis C are not
being followed and treated according to generally accepted
medical standards for chronic care.  As a result, inmates with
chronic disease are at risk for deterioration in function,
including blindness, kidney disease, heart disease, liver
failure, and death.

We found that care was especially poor for inmates with
diabetes, asthma, and HIV.  Of nine inmates with diabetes whose
charts we reviewed, only four had received tests deemed necessary
pursuant to generally accepted professional standards for care of

- 6 -

persons with these serious, chronic diseases. In addition, only two inmates had been immunized against pneumococcus, a bacterium that is the leading cause of bacterial pneumonia. The failure to immunize chronically ill inmates against pneumococcus places them at serious risk of harm, including death from pneumococcal pneumonia, and constitutes a substantial departure from generally accepted standards of care. Another diabetic inmate whose chart we reviewed went without insulin for three days, despite severely elevated blood sugar levels that were known to staff, placing him at risk of death.

Similarly, for inmates with asthma, the chronic care practices also fall below a minimally acceptable standard of care. For example, of nine asthmatic inmates who should have been seen in the chronic care clinic over a three month period, only three were seen. Only two had documented measurement of peak expiratory flow, which is a departure from the generally accepted standard of care for asthmatic patients.

Finally, with respect to HIV-infected inmates, we found that chronic care practices also fall below a minimally acceptable standard of care. Only two of five patients whose records our medical consultant reviewed had documented laboratory measurements of their CD4 cells[1] and their viral load, both of which are necessary to gauge response to medication.

### 4.    Specialty Care

The State's expert found that outside consultations are delayed by days or even weeks in non-emergency situations because of bureaucratic obstacles within the private vendor's system for obtaining authorization. The State's expert also found that shortages of security staff available to transport inmates to outside medical appointments contributes to the inadequacy of care. In addition, the State's expert determined that, even when outside consults are scheduled, post-consult follow-up does not consistently occur.

Similarly, our investigation found that access to specialty care is untimely, and that tracking of outside care is deficient, creating an unacceptable barrier to adequate medical care ordered by physicians. For example, of 10 patients who were referred by facility doctors for outside care, three received no care at all.

---

[1]    CD4 cells are white blood cells that identify, attack and destroy infections. A normal CD4 cell count measures the strength of a person's immune system.

- 7 -

All three patients had serious medical issues:  two had upper gastrointestinal symptoms, including one patient who had documented possibly cancerous polyps with a biopsy ordered and performed, but no results in his file.  A third patient had no documented follow-up with an orthopedist following serious trauma to his finger.

And, in the most extreme example, specialty care may have been denied altogether:  in March, 2002, an SCI inmate died from a malignant brain tumor that had grown so large that it distorted his facial features, and was so noticeable that other inmates referred to him as "the brother with two heads." Fourteen months before he died, SCI medical staff allegedly misdiagnosed the cancerous growth as a cyst or an ingrown hair, and allegedly made no specialty care referral nor provided any specialty care to the inmate before he died.

   5.  Skin Infections

   It is well-documented that, across the country, the incidence of skin infections among inmates is rising.  These skin infections can include methicillin-resistant staphylococcus aureus ("MRSA"), a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death.  MRSA transmission can be prevented by environmental controls, scrupulous laundry practices, early identification, effective treatment, wound care, and follow-up.

   The State's expert found that, until recently, the medical staff were generally unfamiliar with the diagnosis and treatment of MRSA, and that the medical staff did not culture potential MRSA infections or educate inmates on proper precautions against the spread of MRSA until Fall 2005.

   Our investigation revealed that proper diagnosis of and care for skin infections falls below the minimally acceptable level of care.  We also found that medical staff routinely failed to culture skin infections; in addition, we found that wound care and follow-up were inadequate.  For example, we reviewed the charts of eight inmates with skin infections at HRYCI; only two of these inmates received adequate care.  One had a deep skin infection of the neck, but had no follow-up to see if his infection was spreading.  Another inmate had inappropriate treatment for an infection that was accompanied by fever and chills, indicative of a systemic infection that could have led to pneumonia, brain infection, and death.  Both of these patients were treated with the antibiotics that are ineffective in treating MRSA.  With respect to wound care, we found another

- 8 -

inmate at BWCI who was inappropriately treated with a topical
cream for an infection on her face, but who did not see the
doctor for six days, by which time she had developed cellulitis,
a deep skin infection that ultimately required hospitalization.
Our investigative findings and the State's stipulation are also
consistent with reports that DCC staff failed to properly
diagnose and treat an MRSA infection in an inmate for four months
in 2005. This failure to recognize and treat MRSA allegedly
caused the inmate to be hospitalized for five weeks, lose the
skin on his scrotum, and undergo painful skin grafts, resulting
in permanent deformity.

Our investigation confirmed that the existence of the above
inadequacies place inmates and staff at risk of acquiring the
infection and passing it to others in the community beyond the
prison walls. We also found that identification and treatment of
skin infections at the facilities is inadequate, including
failure to culture and treat wounds. We found that facility
staff does not keep adequate logs of skin infections, which
prevents staff from being able to analyze data and identify
potential sources of transmission. Notably, in many cases
physicians were prescribing the antibiotic Keflex, which not only
is rarely effective for skin infections, including MRSA, but
actually leads to prolonged infection and increased opportunities
for the infection to spread. Finally, we found that laundry
practices at the Facilities are inadequate to prevent the spread
of skin infections, including MRSA.

### 6. Medication Administration and Management

The State's expert found that prescribed medications are
routinely discontinued or delayed and that the current vendor has
no systems in place for ensuring that medications do not run out,
for notifying inmates when their medications have arrived, or for
verifying that the vendor is providing inmates with the correct
medications.

Our investigation confirmed these deficiencies which put
inmates at risk of harm, particularly those with chronic
conditions such as HIV. We observed significant lapses in
medication, due either to lack of availability of medications or
the failure to administer medications consistently. For example,
one inmate had missed 20 consecutive days of his anti-viral
medication used to treat the HIV, a potentially life-threatening
situation; another inmate with HIV had a one month lag in
receiving his HIV medications.

- 9 -

We also found that serial refusals to take medications were
not monitored. Numerous inmates missed three or more doses of
medications on three consecutive days, without any evidence of
follow-up by the prescribing practitioner, or evidence that the
inmate was sought out or counseled.

The State's expert found that numerous systemic problems
with medication administration and management exist at the
facilities, including:  failure to distribute medications at the
proper time intervals, leading to over- or under-prescribing
medications; failure to provide necessary food at night to
diabetic inmates; failure to properly monitor whether inmates are
actually swallowing their medications; and pre-pouring
medications.

Our investigation found similar deficiencies.  Our review of
medication administration records at HRYCI revealed that
approximately ten percent of the entries were left blank,
indicating that inmates had not received their medication, or
that the medication administration was undocumented.  We also
found that the State routinely prescribes Keflex, an antibiotic,
for skin infections, despite the fact that Keflex is rarely
effective when used to treat skin infections.  We also learned
that the State plans to administer each dose of medication from
stock bottles, instead of filling prescriptions for each patient,
a practice which we believe will lead to poor inventory control,
diversion, error, and lack of accountability.

B.  MENTAL HEALTH CARE

The responsibility to provide adequate medical care includes
mental health care.  Inmates of Allegheny County Jail v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Tillery v. Owens, 907 F.2d 418
(3d Cir. 1990).  The State is constitutionally required to
provide adequate mental health care to inmates with serious
mental or emotional disturbances.  The failure to provide
necessary psychological or psychiatric treatment to such
individuals will result in the "infliction of pain and suffering
just as real as would result from the failure to treat serious
physical ailments."  Inmates of Allegheny County Jail, 612 F.2d
at 763.  The key to determining whether the State has provided
constitutionally adequate mental health care depends on whether
inmates have reasonable access to "medical personnel qualified to
diagnose and treat such illnesses or disturbances."  Id.

The State's mental health expert found substantial
deficiencies with the mental health care provided at the
facilities.  The State's expert conducted a number of on-site

- 10 -

visits and determined that there is a "continuing need for
substantial remedial efforts, training and auditing of mental
health services provided by [the State's medical care provider]."
The State identified the following deficiencies:  poor responses
to sick call requests, particularly in cases involving
potentially suicidal inmates; inadequate group and individualized
therapy; staffing inadequacies, lack of privacy for inmate mental
health counseling, insufficient discharge planning, inadequate
administration and management of psychotropic medications,
failure to properly develop treatment plans that are regularly
updated, failure to develop site-specific policies and procedures
for mental health care, failure to properly document
medical/mental health records, and failure to obtain consent
forms.  Our investigation confirmed the serious systemic
deficiencies in psychiatric staffing, treatment and counseling,
medication administration and management, and intake and
screening identified by the State's mental health expert.  We
conclude that these deficiencies violate inmates' constitutional
right to adequate care for serious mental illness.

    1.  Psychiatric Staffing Deficiencies

    The State's expert found that low psychiatric staffing at
the facilities have caused a backlog of inmates requiring
psychiatric care.  Although the facilities do have psychiatrists
who are available to provide care on-site, their hours at the
various facilities are limited.

    Our investigation confirmed that psychiatric staffing is
inadequate to provide for inmates' serious mental health needs.
For example, during our tour of HRYCI, the State informed us that
there are two part-time psychiatrists who provide care at HRYCI,
but our investigation revealed that their combined time on-site
totals less than twenty hours, and there is no on-site
psychiatric coverage provided for two days out of the week.
Psychiatric coverage at BWCI is even more limited.  Our
investigation revealed that a psychiatrist is on site only four
hours per week, and the "on-call psychiatrist" generally provides
guidance only via telephone.  Further, we understand that
included in the four hours is time that the psychiatrist spends
at the Violation of Probation Center attached to BWCI for two
hours every other week.  Such limited psychiatric staffing is not
constitutionally adequate care because inmates do not have
reasonable access to psychiatrists.  See Inmates of Allegheny
County Jail v. Pierce, 487 F. Supp. 638, 643 (W.D. Pa. 1980).

    As a result of inadequate psychiatric staffing, we found
numerous instances in which the mental health clinical staff are

- 11 -

providing care that they are not licensed to provide (e.g., diagnosis of mental health disorders, treatment development without proper psychiatric consultation, decisions regarding suicide watch step-downs, etc.). We found that psychiatrists are routinely unavailable for treatment team and staff meetings, and often are not involved in crucial decision-making, and are not adequately involved in monitoring and supervision of staff. In addition, we found that the psychiatrist who provides most of the care at HRYCI was not familiar with the procedures utilized for making decisions about which medications to prescribe for patients with psychotic disorders. Generally accepted standards of care dictate that a psychiatrist be responsible for providing mental health treatment to seriously mentally ill patients should lead treatment teams, direct medication procedures, and be meaningfully involved in treatment decisions.

## 2. Treatment Planning and Counseling Deficiencies

The State's expert found that treatment plans for inmates need to be developed more regularly so that psychologists do not unnecessarily change diagnoses and so that patients are put on the appropriate problem list. Treatment plan development is an integral part of mental health care. One aspect of treatment planning consists of psychiatric and clinical staff providing consistent notations in medical records to ensure that important information regarding an inmate's care is documented. The State's expert, Dr. Stellman, concluded that there is a continued need for remedial efforts and training in the area of medical records documentation at DOC facilities. Dr. Stellman also found that many medical records do not contain consent forms, and contain improperly completed mental health forms.

Likewise, we found that the poor documentation impacts treatment because it is virtually impossible for a qualified mental health professional to review patient medical records and determine how basic clinical decisions are being made (e.g., why an inmate was admitted to the infirmary; why medications are prescribed; why and how psychiatric close observation levels are changed; what are the bases for diagnostic conclusions). During our tour of BWCI, we reviewed the medical record of an inmate who had recently attempted suicide and found the psychiatric notes were deficient and difficult to interpret. Both the on-site and "on-call" psychiatrists made adjustments to this inmate's medication without any explanation. Also, despite the fact that this inmate had been on suicide watch on three occasions within a four-month period and was obviously in distress, there were sparse psychiatric notes in her file.

- 12 -

Generally accepted standards of care dictate that discharge treatment planning be provided for inmates who have serious mental illness to ensure continuity of care.  The State's expert found that its inmate treatment plans fail to address how the patient's care will continue once he or she is released from the DOC facility.[2]

The State's expert also found deficiencies in the individual and group counseling services provided at DOC correctional facilities.  There appears to be a limited ability to provide individual counseling sessions to inmates because of a lack of privacy.  The State's expert found that when inmates are housed in the infirmary, psychiatrists and mental health staff do their interviews through the cell door and that, because cells typically have at least one other occupant when these interviews are being conducted, the encounters are not confidential.  This is a wholly inadequate practice evidencing a denial of reasonable access to psychiatric diagnosis and care.  See Inmates of Allegheny County Jail, 612 F.2d at 763.

Group counseling services at the facilities fall below accepted standards, as well.  The State's expert found that there was a need for remedial measures and training with respect to the provision of group and individualized therapy.

Similarly, we found the counseling services to be constitutionally inadequate.  Because the facilities are substantially understaffed with respect to psychiatrists, physicians generally do not participate in the treatment team or staff meetings.  For example, during our tour of BWCI we found that the master's level clinicians who run the group psychotherapy program (e.g., depression group, anger management group, and addiction group) in the Harbor House Unit do not receive any oversight from a psychiatrist.  Generally accepted professional standards dictate that the psychiatrist be the treatment team leader and be meaningfully involved in key treatment decisions.  However, clinicians are making important treatment decisions that should be left to the professional

_____

    [2]    NCCHC standards J-E-13 and P-E-13 require jurisdictions to develop discharge planning for inmates with serious mental illness (e.g., medication for a short period of time following release and referrals to community health providers).  Also see, Foster v. Fulton County, 223 F. Supp 2d 1301, 1310 (N.D. Ga. 2002) (holding that a jurisdiction was required to develop meaningful discharge planning for physically and mentally ill prisoners).

- 13 -

judgment of a psychiatrist, or at least made with the
consultation of a psychiatrist. Our review of the medical
records at BWCI and HRYCI revealed that clinicians are recording
psychiatric diagnoses and making observation status decisions
about patients in the infirmary, including which inmates should
be removed from suicide watch, and at what pace. Psychiatrists
should be performing these tasks because psychiatric diagnoses
drive treatment decisions.

The State's practice of allowing clinicians to make
important decisions regarding the care and treatment of inmates
with serious mental illness puts patients at risk. There were
three suicides at HRYCI in 2006. A clinician's decision, in May
2006, to downgrade an inmate's observation status may have aided
the inmate's ability to commit suicide a few days after he
entered the facility. The State took custody of this inmate
after his release from a local hospital for treatment related to
a suicide attempt. Apparently he was initially placed on one-to-
one observation status, but he was later downgraded to a less-
restrictive suicide watch despite warnings from a mental health
advocate about his vulnerable mental state and need for a mental
health evaluation.

### 3. Psychotropic Medication Administration and Management

The State's expert found that there is a continuing need for
substantial remedial efforts, training, and auditing with respect
to the management of psychotropic medications.

Our investigation revealed that the medication
administration and management of psychotropics at DOC facilities
is constitutionally inadequate. We observed during our tours at
BWCI and HRYCI that there are systemic problems with initiating
drug therapy for newly admitted inmates. It appears that this
problem may be partially the result of a deficient intake and
screening process. Because the intake process is deficient there
is rarely an attempt to obtain psychiatric records from community
providers which would identify any psychotropic medications that
were previously prescribed. If outside records were routinely
obtained the delay that we observed with regard to initiating
drug therapy for newly admitted inmates might be eradicated or at
least greatly diminished.

We also found that the psychotropic medications that newly
admitted inmates are often prescribed by community providers were
substituted with other medications which may not be as
therapeutically effective. We encountered inmates at HRYCI who
appeared to have diminished symptom control and decreased

- 14 -

functional ability as a result of the substitution of
psychotropic medications. Another deficiency that we found with
psychotropic medication administration is a lack of consistent
and timely distribution of medications. Because the medication
inventory does not appear to be properly controlled, medication
shortages have resulted in interrupted drug therapy.

Finally, we found that monitoring of medication is deficient
at the facilities. The use of certain psychotropic medications
may cause metabolic effects, such as weight gain, hyperlipidemia,
and type II diabetes mellitus. As such, generally accepted
standards of care require prescribing physicians to monitor
weight, body mass index, and abdominal girth on a regular basis.
Our review of medical records at BWCI and HRYCI indicate that the
State is not following this practice. Another side effect of
certain psychotropic drugs is tardive dyskinesia (involuntary
movement disorder). Psychiatrists generally monitor this side
effect by performing the Abnormal Involuntary Movement Scale
("AIMS") on a regular bases. The State's expert found that AIMS
tests are not being done once every six months as required.

### 4.   Intake and Screening

We found the intake and screening process with respect to
the identification of seriously mentally ill inmates to be
constitutionally inadequate. The intake and screening process
for medical and mental health is combined and performed by
nursing staff members who do not appear to have received adequate
mental health training or have a sufficient background in mental
health. Accordingly, they are unable to appropriately identify
symptoms of mental illness.

During our tour of HRYCI, we found that the staff's lack of
experience with mental health issues is exacerbated by the high
volume of newly admitted inmates that are processed per shift.
These deficiencies have resulted in the failure to identify
inmates with serious mental illness which causes delays in
treatment. Another impact of failing to identify inmates with
mental illness is that disciplinary sanctions may be
inappropriately imposed on mentally ill inmates, because of
behavior that could be more appropriately addressed by mental
health care and treatment instead of discipline. For example,
during our tour of BWCI, we observed inmates in isolation who had
not been properly identified as having mental illness, or who
had not received adequate treatment for their diagnosed mental
illness. For such inmates, care should be taken to ensure that
they are not unfairly disciplined for "acting out" when mental
health intervention is a more appropriate response.

- 15 -

We also found that intake and screening for juveniles was constitutionally inadequate at HRYCI. During our tour, we reviewed a number of juvenile medical records to determine whether this special needs population was receiving comprehensive mental health evaluations subsequent to their initial intake survey. However, it appeared that such evaluations were not being routinely performed.

C. Suicide Prevention

Our investigation revealed that the State's practices regarding suicide prevention substantially depart from generally accepted professional standards and expose inmates to significant risk of harm. Our investigation uncovered a system in which inmates at risk for suicide are not adequately identified, housed and supervised.

The State fails to adequately assess and identify inmates at risk for suicide. While the form used to conduct intake assessments is good, the personnel conducting the assessment lack appropriate training and experience with issues related to mental health and suicide prevention. Assessments are often performed by contract or agency LPN's who have not been trained adequately in suicide prevention techniques. Additionally, while the State's medical provider conducts training of its employees on suicide prevention, it has not implemented its training curricula as policy or standard operating procedure. Similarly, correctional staff receive insufficient training in the area of suicide prevention. Training at the academy is only two or three hours, and annual refresher training methods are not adequate.

The intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions. In these instances, the inmate signs a release, but outside confirmations of their medical and mental health records/histories are not consistently obtained and verified. Furthermore, post-intake follow-up of new inmates, which should be conducted within 14 days, is not done. Instead, follow-up is rolled into the initial intake process, increasing the possibility that at-risk inmates will not be identified.

The State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety. Protrusions from walls and ceilings, window frames and grates, and even the design of bunk beds in some cells provide potential anchors strong enough to support an inmate's weight in an attempt at hanging. For example, in August 2006, an

- 16 -

HRYCI inmate who hanged himself at HRYCI was housed in an
infirmary cell following his admission because he was recovering
from a gunshot wound sustained during his arrest. It is not
clear what fixture the inmate used to hang himself, but it is
apparent that the cells in the infirmary, like those in the other
areas of the facility, are not sufficient to ensure the safety of
inmates with suicidal ideations. Hanging was the means used in
the May 2006 and February 2005 suicides at HRYCI. Additionally,
unsafe light fixtures in some cells, if broken, provide a
potential source of sharp-edged pieces of plastic or glass that
could be used for self-harm.

The State fails to ensure that appropriate levels of
observation are maintained. Documentation of 15- and 30-minute
checks does not indicate that these checks are being done. Staff
at one facility reported conflicting requirements for checks at
lesser levels of observation, highlighting confusion about which
interval was the actual policy. Rounds by mental health staff
for inmates in isolation and on special units are not regularly
done. Additionally, staff at some facilities incorrectly
suggested that the various undocumented incidental contacts with
at-risk inmates throughout the day, such as dispensing medication
or picking up sick call slips, sufficed as a periodic check for
inmates' safety.

### III.  <u>MINIMUM REMEDIAL MEASURES</u>

In order to address the constitutional deficiencies
identified above and to protect the constitutional rights of
inmates, we recommend the following measures:

1.    The State should ensure that appropriate access to medical
      care, including development and implementation of a
      functional sick call system that appropriately schedules
      medical appointments, and properly tracks and reschedules
      "no shows."

2.    The State should ensure that chronic disease registries are
      implemented and maintained at DOC facilities.

3.    The State should provide appropriate continuing care for
      patients with chronic diseases and ensure that backlogs are
      eliminated and do not redevelop.

4.    The State should ensure that outside consultations are not
      unnecessarily delayed and that appropriate post-consult
      follow-up care is provided. The State should ensure that

- 17 -

security staffing levels do not negatively impact the
provision of outside consultations.

5.    The State should implement appropriate measures to identify,
      track, and treat skin infections, including culturing and
      treating wounds and prescribing effective antibiotics.

6.    The State should ensure the distribution of medication to
      patients at proper time intervals.  The State should
      implement a system to ensure that proper medications are
      being received and that sufficient stocks of medications are
      maintained to avoid interruptions or delays in their
      delivery.

7.    The State should track serial refusals of medication by
      patients and ensure that prescribing physicians are notified
      of such occurrences and that appropriate follow-up with
      patients takes place.

8.    The State should ensure that there is adequate psychiatric
      coverage provided at DOC facilities.

9.    The State should ensure that psychiatrists are actively
      involved in inmate care, including:  functioning as the
      treatment team leader; making psychiatric diagnoses;
      providing necessary monitoring and supervision of staff; and
      promoting quality mental health care.

10.   The State should provide appropriate medication distribution
      and management systems to ensure that psychotropic
      medications are available, distributed in a timely manner,
      and adequately monitored.

11.   The State should ensure that psychiatrists prescribe
      therapeutically effective medications.  If a decision is
      made to adjust or substitute the medications that an inmate
      was on prior to their detention or incarceration at a DOC
      facility, the psychiatrist should provide a clear
      justification for making the adjustment or substitution in
      the inmate's medical record.

12.   The State should ensure that appropriately trained staff
      perform a mental health screening at intake.

13.   The State should provide appropriate counseling space for
      qualified mental health professionals to provide mental
      health treatment to inmates with serious mental illness.

- 18 -

14. The State should ensure that the mental health staff is appropriately documenting the care provided to inmates with serious mental illness.

15. The State should provide appropriate treatment plans for inmates with serious mental illness.  The treatment plans will be reviewed on a routine bases to ensure quality of care.

16. The State should develop site specific mental health policies for HRYCI and DCC.

17. The State should develop a comprehensive policy regarding suicide prevention for DOC facilities.

18. The State should ensure that all medical, mental health and correctional staff are appropriately trained regarding issues of suicide prevention, and that the content of their training is reflective of that State's suicide prevention policy.

19. The State should ensure that intake staff are sufficiently experienced and qualified to identify inmates that pose a risk for suicide, and that follow mental health staff conduct appropriate follow-up evaluations of new inmates within 14 days of intake.

20. The State should ensure that inmates identified as at risk for suicide are housed in safe cells, free from fixtures and design features that could facilitate a suicide attempt.

21. The State should ensure that 15- and 30-minute checks of inmates under observation for risk of suicide are timely performed and appropriately documented.

* * *

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website and we will provide a copy of this letter to any individual or entity upon request.

- 19 -

As stated above, we appreciate the cooperation we have received throughout this investigation from State officials and staff at the facilities. We appreciate the State's proactive measures to respond to its own internal audit and our feedback to date to improve the quality of services at the facilities. We hope to be able to continue working with the State in an amicable and cooperative fashion to resolve the deficiencies we found at the facilities. Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover. Although their report are their work – and do not necessarily represent the official conclusions of the Department of Justice - their observations, analyses and recommendations provide further elaboration of the relevant concerns, and offer practical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you. Accordingly, we will soon contact State officials and counsel to discuss this matter in further detail.

If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

Wan J. Kim
Assistant Attorney General

cc:  Carl C. Danberg
     Attorney General

     Stanley W. Taylor, Jr.
     Department of Correction Commissioner

     Thomas L. Carroll, Warden
     Delaware Correctional Center

- 20 -

Raphael Williams, Warden
Howard R. Young Correctional Institution

Rick Kearney, Warden
Sussex Correctional Institution

Robert Young, Acting Warden
John L. Webb Correctional Facility

Patrick Ryan, Warden
Delores J. Baylor Women's Correctional Institution

Colm Connelly
United States Attorney
District of Delaware

Michael R. Bromwich, Esq.
Beth C. McClain, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP

# Joe Goldenson, M.D.

1406 Cypress Street
Berkeley, CA 94703
(510) 524-3102
FAX (510) 528-5134
jgoldenson@sfgh.org

June 13, 2005

Mr. Kenneth Richmond, Esq.
Richmond & Hevenor
Attorneys at Law
2019 Walnut Street
Philadelphia, PA 19103

Re:  Estate of Louis Chance vs. First Correctional Medical and Delaware
     Department of Justice

Dear Mr. Richmond,

I have reviewed the Death Certificate, the St. Francis Hospital emergency
room records from September 12, 2003, and the medical records from the
Delaware Department of Corrections of Mr. Louis Chance. In my opinion,
based on my training, experience and extensive knowledge of correctional
medical care, the actions and inactions of the First Correctional Medical
staff fall well below the accepted standard of care in correctional facilities.
Their failures to appropriately diagnose and treat Mr. Chance's
cryptococcal meningitis lead to his death and constitute gross negligence
and deliberate indifference to a serious medical need.

Sincerely yours,

Joe Goldenson, MD

0021

# CURRICULUM VITAE

**JOE GOLDENSON, MD**
**1406 CYPRESS STREET**
**BERKELEY, CA 94703**
**(510) 524-3102**
**jgoldenson@sfgh.org**

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-Present | Director/Medical Director Jail Health Services San Francisco Department of Public Health |
| 1991-1993 | Medical Director Jail Health Services San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice Jail Health Services San Francisco Department of Public Health |
| 1987-1990 | Staff Physician Jail Health Services San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician United Farm Workers Health Center, Salinas, CA |

**Consulting**

| | |
|---|---|
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-Present | Federal Court Monitor, *Austin, et. al vs Wilkinson, et al*, Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 4/02-Present | Federal Court Monitor, *Plata v. Schwarzenneger*, Class Action Law Suit re: Prisoner medical care in California State Prison System |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-Present | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-Present | Medical Expert for the Office of the Special Master, *Madrid vs Alameida*, Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility |
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |
| 2/98 | Medical Expert, Department Of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, INS Detention Center, El Centro, CA |

**Work Related Committees**

| | |
|---|---|
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-Present | Director's Cabinet San Francisco Department of Public Health |
| 9/97-Present | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-Present | Chairperson, Regional Bay Area Correctional Facility/Local Health Department Tuberculosis Group |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate |



|            | Treatment Program, San Francisco Department of public Health |
|------------|--------------------------------------------------------------|
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |
| 2/922/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |
| 1/93-7/93 | Medical Staff Bylaws Committee, San Francisco Department of Public Health |

## ACADEMIC APPOINTMENT
1980-Present        Assistant Clinical Professor
                    University of California, San Francisco

## PROFESSIONAL AFFILIATIONS
Society of Correctional Physicians, Past-Treasurer and Secretary
American Correctional Health Services Association, Past-President of California Chapter
American Public Health Association, Jails and Prison's Subcommittee
Academy of Correctional Health Professionals
California Medical Association
San Francisco Medical Society

## PROFESSIONAL PRESENTATIONS
*Prisoners the Unwanted and Underserved Population, Why Public Health Should Be in Jail*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04

*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities*, Francis J. Curry National Tuberculosis Center, 10/7/04

*Public Health and Correctional Medicine*, American Public Health Association Annual Conference, 11/19/2003

*Correctional Medicine*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 12/16/02

*Hepatitis in Corrections*, CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 1/17/02

*SuperMax Prisons*, American Public Health Association Annual Conference, 11/8/01

*Chronic Care Programs in Corrections*, CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 9/19/02

*Tuberculosis in Corrections - Continuity of Care*, California Tuberculosis Controllers Association Spring Conference, 5/12/98

U0025
U024

*HIV Care Incarcerated in Incarcerated Populations*, UCSF Clinical Care of the AIDS Patient Conference, 12/5/97

*Tuberculosis in Correctional Facilities*, Pennsylvania AIDS Education and Training Center, 3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS
*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings,* Morbidity and Mortality Reports, January 24, 2003/ Vol. 52/ No. RR-1 (External Consultant to Centers for Disease Control)

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 2002;162:1044-1050,

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis*, International Journal of STD & AIDS; 12: 380-385

*Tuberculosis Prevalence in an urban jail: 1994 and 1998*, International Journal of Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release*, American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail*, International Journal of Tuberculosis Lung Disease, 2(6):506-512,1998

## AWARDS
Certificate for Excellence in Teaching, California Department of Health Services, 2001
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

## LICENSURE AND CERTIFICATION
Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)

RAMESH VEMULAPPALI, M.D.

Page 13

1    A.  Can I ask you something?
2    Q.  Sure.  Of course.
3    A.  With the advent of antiretroviral medications,
4 these infections have become less and less common.  So
5 that's one of the reasons why we don't see them as often
6 now as 20 years ago.
7    Q.  Okay.
8    A.  So that's why the numbers are small.
9    Q.  Okay.  Now, during your affiliation with First
10 Correctional Medical of Delaware, did you ever have any
11 contact with Dr. Kastry?
12    A.  I have only spoken to her on the phone once.
13    Q.  Did she identify herself --
14    A.  Yes.
15    Q.  -- as Dr. Kastry to you?
16    A.  Yes.
17    Q.  Okay.  You were able to determine it was
18 Dr. Kastry?
19    A.  Yes.
20    Q.  All right.  During this discussion you had
21 with Dr. Kastry, what was the subject matter?
22    A.  It was -- I actually called her to discuss one
23 of the tests that she denied for an inmate that I
24 ordered, and I wanted to ask her the reason why it was

Page 14

1 denied.
2    Q.  Okay.  Can you tell us what kind of test was
3 ordered?
4    A.  It was an HIV test called genotype.  There's
5 another one called phenotype.  I don't recall which one
6 it was.  But either one of those two tests.
7    Q.  All right.  Doctor, can you just briefly
8 describe what the need for those tests is?
9    A.  We do HIV genotype or phenotype test to detect
10 if the virus has any mutations or resistance to the
11 medications the patient is taking.  For some reason, if
12 the patient is not responding as you would like, we would
13 want to know if the patient's virus is resistant to those
14 medications.  So by doing the genotype or phenotype test,
15 you can pick a more appropriate combination of
16 medications for the patient to suppress the virus
17 completely.  So that's the purpose of ordering those
18 tests.
19    Q.  Okay.  So you had ordered those tests.
20       Were the tests performed?
21    A.  No.  It was denied.
22    Q.  When you say it was denied, what was the
23 discussion about?  What did Dr. Kastry tell you?
24    A.  When the nurses told me that the test was

Page 15

1 being denied by Dr. Kastry, I called her to ask or at
2 least explain my point of view as to why the test was
3 needed.  And she, you know, basically said that she was
4 not going to authorize a test that would cost $400.
5    Q.  Okay.  Was that the only occasion --
6       MS. SPRING-MONZO:  Objection.
7 BY MR. RICHMOND:
8    Q.  -- you had that kind of a discussion?
9    A.  Yeah.  That's correct.  To my knowledge, that
10 was the only time I ever spoke to her on the phone.  I
11 never met her in person.
12    Q.  Now, the purpose for your association with FCM
13 was for infectious diseases in the institution?
14    A.  Yes.
15    Q.  What kind of outreach did FCM perform in terms
16 of identifying or having people with hepatitis infections
17 or HIV infections come forward?
18    A.  None to my knowledge.
19    Q.  Was there any particular difficulty with the
20 questionnaire that they were responding to in your
21 estimation?
22    A.  I recall having one form -- kind of an
23 inclusion/exclusion kind of a form for hepatitis C
24 patients -- which was so stringent that it almost

Page 16

1 appeared that it was more to exclude people from being
2 treated than to include people from being treated for
3 hepatitis C.
4    Q.  With regard to hepatitis C and HIV, were you
5 restricted in who you could treat?
6       Suppose you had a dual infection --
7    A.  Right.
8    Q.  -- a double infection.  Can you describe --
9       MS. SPRING-MONZO:  Objection.
10 BY MR. RICHMOND:
11    Q.  Can you describe whether or not you could
12 treat both of those diseases simultaneously under FCM's
13 protocols?
14       MS. SPRING-MONZO:  Objection.  That's a
15 misleading question.
16       MR. RICHMOND:  If the doctor has an
17 understanding, he can indicate it.
18 BY MR. RICHMOND:
19    Q.  Do you understand my question, Doctor?
20    A.  Mm-hmm.
21       You want me to answer it?
22    Q.  Yes.
23    A.  During that same phone conversation I had with
24 Dr. Kastry, she also told me that she was not going to

4 (Pages 13 to 16)

0026

RAMESH VEMULAPPALI, M.D.

Page 17

1 authorize anybody who has HIV to be treated for
2 hepatitis C. Okay. Did she explain why?
3    Q. Okay. Did she explain why?
4    A. There is -- the success rates are too low.
5    Q. Is that what Dr. Kastry has indicated to you?
6    A. Mm-hmm.
7    Q. Was that statement supported by your
8 experiences --
9    A. No.
10    Q. -- as an infectious disease --
11    A. No.
12       MS. SPRING-MONZO: Objection.
13    Q. What is your experience?
14    A. We treat patients who are coinfected with both
15 HIV and hepatitis C, and they can be successfully
16 treated.
17    Q. When a person has HIV, is it common for them
18 to have hepatitis C also?
19    A. Yes.
20    Q. What's the frequency that that occurs in your
21 experience?
22    A. In the patient population I treat, roughly a
23 quarter of the HIV-infected patients also have
24 hepatitis C.

Page 18

1    Q. During your experience with the FCM inside the
2 institution, did you ever have any difficulty with your
3 orders being carried out?
4    A. Yes.
5    Q. Could you give us an example of what
6 difficulties you had with your orders?
7    A. Like, for example, I was seeing a patient and
8 I -- let's say HIV patient. I would order certain tests
9 to be done --
10       MS. SPRING-MONZO: Objection.
11       THE WITNESS: -- certain tests to be
12 done prior to the patient's arrival for the next follow-
13 up visit with the intent to either, you know, change or
14 to see if the treatment was even being effective or not.
15 And those tests would not be done. In other words, those
16 orders would not be carried out. And the patient would
17 show up for the next appointment without any labs done.
18       MR. RICHMOND: Okay.
19       THE WITNESS: Or the lab was not
20 available.
21 BY MR. RICHMOND:
22    Q. Did that happen on more than one occasion?
23    A. Definitely, yes.
24    Q. Okay. What was the reporting procedure? When

Page 19

1 that happened, Doctor, what did you do about it?
2    A. We -- I would ask the nurse, and they would
3 say they just didn't get done or didn't get carried out.
4 And that's it.
5    Q. What about the administration of medications?
6 What was your observations --
7       MS. SPRING-MONZO: Objection.
8 BY MR. RICHMOND:
9    Q. -- with respect to the administration of
10 medications that, for example, you ordered?
11    A. Medications for HIV had to be taken a certain
12 way -- for example, certain medicines with food, certain
13 medicines without food -- and they would not be given to
14 them that way. In one specific instance I recall, the
15 patient was supposed to be on a medication that needed to
16 be refrigerated. And even though the medicine was listed
17 on the patient's MAR, the patient was not getting it.
18 And the nurse -- when I asked her about it, she opened
19 the refrigerator and showed me the bottle, and it was
20 never opened. So, in other words, the patient had that
21 listed on his MAR but was never getting it.
22    Q. Was this an HIV patient?
23    A. Yes.
24    Q. Doctor, what was the reporting procedure for

Page 20

1 making those kinds of incidents known --
2       MS. SPRING-MONZO: Objection.
3 BY MR. RICHMOND:
4    Q. -- to the staff of FCM?
5    A. I was not aware of any procedure that was in
6 place to report those types of events.
7    Q. Was any kind of procedure made known to you
8 for reporting those kinds of incidents?
9    A. No.
10    Q. Okay. Doctor, with respect to correctional
11 care as opposed to the kind of care you're practicing now
12 in the community, is there a difference?
13       MS. SPRING-MONZO: Objection.
14    A. Yes.
15    Q. Can you describe what that difference is?
16    A. Again, restricting to HIV and hepatitis C, the
17 standard of care which we follow in my office or in my --
18 you know, in the hospital was not being followed at the
19 corrections in Delaware -- the place I worked in.
20    Q. In what respect was it different? In order
21 words, you say the standard of care had not been
22 followed. Can you describe specifically what was not
23 being followed?
24    A. The -- some of the things which -- like

5 (Pages 17 to 20)

RAMESH VEMULAPPALI, M.D.

Page 9

1  the FCM staff -- in providing medical care to the inmates
2  in Smyrna?
3     A.  Can you ask that again?
4     Q.  Sure.
5        Did you have any control over the staff
6  as to how they were going to deliver medical care that
7  you prescribed?
8     A.  No.
9     Q.  Okay.  You in fact did prescribe medical care
10 to patients within the institution?
11    A.  Yes.
12    Q.  Do you know how many patients you treated
13 approximately while you were connected with FCM?
14    A.  I would say, between the HIV patients and
15 hepatitis C patients, anywhere between 50 to 70, maybe.
16    Q.  Okay.  Now, in connection with your experience
17 with FCM, did you have an opportunity to observe, for
18 example, the intake or the means of intake or screening
19 that was performed by FCM staff while you were affiliated
20 with FCM?
21    A.  Okay.
22    Q.  Okay.  Do you know anything about their intake
23 screening procedures?  I'm talking about FCM's intake
24 screening procedures while you were connected with them

Page 10

1     A.  No.
2     Q.  Okay.  Do you know whether FCM ever screened
3  incoming inmates for hepatitis or for HIV?
4     A.  No.
5     Q.  Okay.  Do you know whether or not they
6  administered any questionnaires to inmates coming into
7  the institution?
8     A.  I was not aware of that.
9     Q.  Okay.  Now, are you acquainted with the
10 cryptococcal meningitis?
11    A.  Yes.
12    Q.  Okay.  Can you tell us what cryptococcal
13 meningitis is?
14    A.  Cryptococcal meningitis is an opportunistic
15 infection that occurs in patients with AIDS, or acquired
16 immune deficiency syndrome.
17    Q.  All right.  Does it appear in a person who's
18 HIV positive, for example?
19    A.  There is a distinction between HIV positive
20 and AIDS.  Usually, cryptococcal meningitis is an AIDS-
21 defining illness.  So somebody who has died would
22 ultimately have AIDS.
23    Q.  All right.  As far as you know, within the
24 context of your specialty as an infectious disease

Page 11

1  board-certified physician, is that a treatable disease?
2     A.  Yes.
3        MS. SPRING-MONZO:  Objection.
4        MR. RICHMOND:  Okay.  You have your
5  objection.
6        MR. NEIDZIELSKI:  It's okay.
7        MS. SPRING-MONZO:  Okay.
8  BY MR. RICHMOND:
9     Q.  Is that a treatable illness?
10    A.  Yes.
11    Q.  How is it treated, Doctor?
12    A.  It is -- cryptococcus is a fungus, so we
13 usually treat it with antifungal medications.
14    Q.  All right.
15    A.  One of them is called Amphotericin B.
16    Q.  What are the symptoms of that?
17    A.  Cryptococcal meningitis can cause fevers.  It
18 can cause headaches, you know, visual disturbances,
19 auditory or hearing disturbances, altered mental status.
20 Patients could be confused.  Those are some of the
21 symptoms.
22    Q.  Okay.  Now, Doctor, in your experience as an
23 infectious disease board-certified physician --
24       MS. SPRING-MONZO:  Objection.

Page 12

1        MR. RICHMOND:  All right.
2  BY MR. RICHMOND:
3     Q.  -- have you treated people with cryptococcal
4  meningitis?
5     A.  Yes.
6     Q.  Have you treated cryptococcal meningitis
7  effectively?
8     A.  Yes.
9     Q.  Is it always fatal?
10    A.  No.
11    Q.  With what frequency, upon discovering
12 cryptococcal meningitis, is it fatal if you have an
13 opportunity to treat it?
14    A.  Speaking of my personal experience, in the
15 ones -- the patients who were diagnosed appropriately on
16 time, I didn't have any fatalities.
17    Q.  Okay.
18    A.  I'm speaking only for myself.
19    Q.  Approximately how many patients did you treat
20 with cryptococcal meningitis, Doctor?
21    A.  I'd say -- I would say, on an average,
22 since -- I've been here since 2000.  So I would say maybe
23 about five.
24    Q.  Okay.

3 (Pages 9 to 12)

NIRANJANA SHAH, M.D.

Page 61

1  you refer to those, then, and we'll be consistent. 108
2  and 107.
3      Q.  So that we can be clear, I guess we've
4  gotten that all on the record?
5      THE COURT REPORTER:  Uh-uh.
6      MR. RICHMOND:  Okay.
7  BY MR. RICHMOND:
8      Q.  So then referring to Pages 108 and 107, Dr.
9  Shah, does that reflect the physical exam which
10  resulted in order that appears at the top of Page 55?
11     A.  Correct.
12     Q.  Can you indicate what your physical exam
13  consisted of on 9/16/03?
14     A.  Consisted of a complete findings are here.
15  Do you want me to read everything?
16     Q.  Yes, because I can't read the handwriting,
17  Doctor.
18     A.  H-E-E-N-T, HEENT, eyes, ears, nose, throat
19  clear.  Neck, supple.  No enteropathy, lungs clear, to
20  (inaudible) oscitation bilaterally,  normal heart
21  sound, abdomen soft, miles sounds present, no mass
22  tenderness, no distension or organomegaly, exterior
23  normal exam, lymph node non-palpable, muscular skeletal
24  exam normal exam.
25      Family history, no family history,

Page 62

1  medical family history.  Obesity, no.  Other, no.
2  Medication, Tylenol as it's prescribed over there.  PRN
3  for headache.  History of bilateral frontal episodic
4  headache.  Diagnosis, hepatitis C, and this is the same
5  thing which is ordered there and refer to chronic care.
6      Q.  Okay.  So you're noting a headache in this
7  examination, bilateral headache episodic?
8      A.  Uh-uh.
9      Q.  What is an episodic headache, Doctor?
10     A.  It can come any time and it's not persistent,
11  it comes.  It can resolve, duration of the headache may
12  vary.
13     Q.  Referring you over to Page 107 Bate stamp.  I
14  believe this is a continuation of the sheet that you
15  just referred to consisting of part of your
16  examination?
17     A.  This is a complete examination for that visit
18  that I just narrated.  This is a vocation sheet where
19  we write down patient education if there is anything to
20  be added but instead of writing here (indicating), I
21  prefer to write complete physical exam.
22     Q.  All right.
23     A.  So answer coming here, I choose to have this
24  page.
25     Q.  I see.  So instead of filling out the columns

Page 63

1  in 107, you indicate that you fill out Page 108?
2      A.  Yes.
3      Q.  Am I correct?
4      A.  Yes, sir.
5      Q.  I see that there's some handwriting at the
6  bottom of Page 107?
7      A.  Yes.
8      Q.  Is that correct?
9      A.  Yes.
10     Q.  What does that handwriting say?
11     A.  Disease process which is hepatitis C, disease
12  process and possible complications, discuss nausea,
13  vomiting, abdominal pain, liver failure, cancel GI
14  bleeding, discuss medications side effects and benefits
15  are discussed.
16     Q.  And that means you discussed it with Louis
17  Chance?
18     A.  Yes.
19     Q.  So you had a discussion with him at the time
20  of this physical examination?
21     A.  Yes.
22     Q.  Okay.  Did you have access to his complete
23  chart at the time that you saw him on the 16th and made
24  those notations?
25     A.  I believe, yes.

Page 64

1      Q.  I'm going to refer you to Page 95, and
2  there's a headache, nursing assessment protocol, can
3  you tell me what this document is, why is it --
4      A.  It's a nursing assessment protocol sheet that
5  is usually used when the inmate presence to the nurse
6  with a medical complaint and this is a nursing
7  assessment.
8      Q.  And does this come out of -- this form, I'm
9  getting at -- does this form come out of that protocol
10  book that you referred to earlier?
11     A.  This is a nursing protocol.  I do not refer
12  to nursing protocol.
13     Q.  All right.  You didn't refer to nursing
14  protocol?
15     A.  Because I'm a physician.
16     Q.  So there's a nursing protocol and a
17  physician's protocol --
18     A.  Nursing --
19     Q.  -- handbook?
20     A.  Nursing protocol is there.
21     Q.  And there's a physician protocol?  They're
22  separate?
23     A.  Physicians do not have a protocol book
24  because they practice medicine.
25     Q.  As far as physicians are concerned, you don't

16 (Pages 61 to 64)

DR. JOSE ARAMBURO

Page 33

1 complicated things. Because ordinary people complain
2 of headache every day. You try to give whatever is
3 available. It depends on how they respond to this
4 medication. Sometimes they go away, sometimes they
5 don't. You need to follow-up those things. In this
6 case it is just a one time call.
7 Q. You said they need to follow-up those kind of
8 things?
9 A. Exactly.
10 Q. Who needs to follow-up?
11 A. Patients -- let the provider know the
12 medication is not helping them. They are the only one
13 that can complain of headache. There are headaches
14 that can give you trouble and can be brain tumors,
15 meningitis.
16 Other than that, most headaches are
17 typical headaches, tension headaches, classic
18 headaches.
19 Q. Why were you called?
20 A. It looks like from reading the notes,
21 complaint of headache.
22 Q. I'm going to refer you to a page bait stamped
23 131 by the plaintiff in their production documents.
24 I'm going to ask you to read the entry that relates to
25 the Ativan, Haldol prescription.

Page 34

1 Can we agree that entry is 9/13/03 at
2 12:40?
3 A. I have no recollection at all, but I assume
4 yes, because it was documented.
5 Q. Can you tell me what NS means?
6 A. Nursing.
7 Q. Can you read that entry?
8 A. IM is inmate agitated, noncompliant. Inmate
9 yelling out profanity. Nurse attempt to assess vital
10 sign plus lungs. Inmate attempted to hit nurse.
11 Inmate continued to yell and scream. Inmate not
12 cooperative. Mental health attempted to talk to inmate
13 but inmate not cooperative and severely agitated.
14 Doctor on call was called. Orders given
15 for Haldol, ten milligram IM. Ativan, one milligram
16 IM. Benadryl 50 milligrams IM for severe agitation.
17 IM refused meds at first, but took meds
18 after five minutes. Inmate given 2 CC gluteal,
19 buttock. Then two CC on left gluteal. Inmate is
20 calmed and resting after 20 minutes of injection. Will
21 continue to monitor.
22 Q. After that, Doctor, what was your follow-up?
23 A. We don't usually follow-up unless they call
24 us again. Because I'm not in the facility.
25 There are -- you see mental health. They

Page 35

1 are being followed by the mental health people, which
2 is mostly psychologists. And they relate to the
3 psychiatrist. A psychologist, they don't prescribe
4 medication. It is us or the psychiatrist. Some
5 psychiatrists is also prescribing medication also.
6 They call us also.
7 Q. You didn't confer or consult with any
8 psychiatrist?
9 A. No, I don't have to.
10 Q. I'm not asking whether you have to or not.
11 I'm asking whether you did?
12 A. I didn't.
13 Q. Did you get any history from anybody at the
14 Gander Hill facility before calling in that?
15 A. Regarding --
16 Q. Regarding that inmate?
17 A. No.
18 Q. Was there a reason why you didn't?
19 A. The immediate problem is the agitation.
20 Patient is suicidal, patient is homicidal, looks like.
21 First response is to protect him or others. That's my
22 job.
23 Q. You said he was suicidal or homicidal?
24 A. Let me see. Looks like the way it is written
25 here -- when I prescribed this medication only two

Page 36

1 things I consider.
2 I tell the nurses that I don't use this to
3 discipline them. Because sometimes they give us a call
4 patient keeps yelling, the nurses can't sleep. No, I
5 don't give this medication to discipline them.
6 Sometimes inmates will rock the process. I said, no,
7 as long as they are not homicidal or suicidal I don't
8 give this medication. That is my job, to protect him
9 and others.
10 Q. From what I take it then, you had only one
11 other entry in the chart that relates to Mr. Chance?
12 A. Yes.
13 Q. Do you know what that was?
14 A. I think it looks like to me he woke up
15 probably -- once she give this medication, it is
16 assumption, they usually calm down.
17 Then in the same day, in the evening,
18 looks like the nurse called me again complaining of
19 headache.
20 Q. And you are not able to tell who that nurse
21 was that called you?
22 A. I can't even recall the call, actually.
23 Q. Doctor, I'm going to be referring you to Page
24 88 of the bait stapled material provided in response to
25 discovery requests by the plaintiff.

9 (Pages 33 to 36)

DR. JOSE ARAMBURO

Page 37

1          I'm referring to the top physician entry
2    on that physician order sheet.  Is that your
3    handwriting?
4       A.  No.
5       Q.  Whose handwriting is that?
6       A.  I guess whoever called me.  Most likely a
7    nurse.
8       Q.  What is the date of that entry?
9       A.  It says noted 9/13/03, 20:30.
10      Q.  That's local time?
11      A.  10:30 I guess, p.m.
12      Q.  10:30 p.m.?
13      A.  Of 9/13/03.
14      Q.  What does that physician order say?
15      A.  Cafergot, 1/100.  Tab one, PO, BID, PRN
16   headache, times two days.
17      Q.  I take it that somebody told you at that
18   point that Mr. Chance had a headache and you were
19   prescribing for his headache?
20      A.  Exactly.
21      Q.  That first order on that Page 88 has another
22   entry just below it.
23          That is that entry in that section, the
24   middle section there?
25      A.  Discharge D/C meaning discharge.  PCO,

Page 38

1    protective custody -- it is like when they are becoming
2    agitated, homicidal, suicidal, the mental health people
3    will make that decision to put him in the infirmary to
4    hold them there for their own protection and the
5    protection of others, which is usually not our decision
6    to make.
7       Q.  Your decision is for medication?
8       A.  Exactly.
9       Q.  In order to prescribe medication you have to
10   have something of a history; is that correct?
11      A.  Yes.
12      Q.  What history did you have at the time that
13   you prescribed that medication?
14      A.  I don't have any recollection, but I'm
15   assuming since I gave Cafergot I probably asked
16   previous medications that he was taking to help his
17   headache.
18          Normally we try to -- when you talk about
19   headaches, there's so many medications to give.  Most
20   of this -- some medication help other people, some not
21   help other people.
22          There's so many classification of headache
23   medication.  Because it depends exactly what kind of
24   headache you have.  I said maybe try Cafergot, which is
25   basically a migraine headache medication.

Page 39

1       Q.  At that point, based upon the record that you
2    just looked at, you were concluding that he had perhaps
3    a migraine headache?
4       A.  All I know it is a headache and probably can
5    be a migraine headache.  The reason I put it two days
6    because I want them to see a provider because I always
7    worry about headache that doesn't go away, headaches
8    that are persistent.
9          Even if I see them in the clinic I tell
10   them that.  You start worrying about headaches that
11   wakes you up in the middle of the night or a headache
12   you think is the worst headache you ever felt in your
13   life.  Or a headache that doesn't go away with
14   over-the-counter medications.  There are headaches that
15   can hurt you.
16      Q.  Were you aware that Mr. Chance had taken what
17   was assumed to be an overdose of the medication he had
18   been prescribed for his headache?
19      A.  No, I didn't know.
20      Q.  You weren't aware of that?
21      A.  No.
22      Q.  No one told you that?
23      A.  As far as I'm concerned, no.
24      Q.  I'm going to refer you to an incident report
25   which is bait stamped 26 on the plaintiff's disclosure

Page 40

1    packet.
2          Do you see the incident report, Doctor?
3       A.  Yes.
4       Q.  Do you see the nurse to whom it refers?
5       A.  Yes.
6       Q.  Did you know Beverly Anderson?
7       A.  Yes, actually, yes.
8       Q.  Is Beverly Anderson the one that you spoke
9    to?
10      A.  I don't think -- I have no recollection, I
11   don't know.  She works in Plummer or Web -- I can't
12   remember.  I think Web.  She works in Web.  She's the
13   nurse in Web.  I go there half a day, so I know her.
14      Q.  Did you discuss Mr. Chance with Nurse
15   Anderson at any time?
16      A.  About what?
17      Q.  About his medical condition?
18      A.  No, never met the patient.  Never knew the
19   patient until I got this.
20      Q.  To be utterly clear on this, you never met or
21   had any contact with Louis Chance personally,
22   face-to-face?
23      A.  Not at all.
24      Q.  You never prescribed anything for Louis
25   Chance after the entry that you just --

10 (Pages 37 to 40)

NIRANJANA SHAH, M.D.

Page 65

1  refer to the protocol book, the nurses do?
2      A.  I have not used protocol for physical exam.
3      Q.  What about for the treatment or diagnosis, do
4  you use a protocol for any of that?
5      A.  Medical practice teaches, medical school
6  teaches you that and the training teaches you that.
7  So I don't understand your question.
8      Q.  Do you refer to and I'm talking about the
9  period now between April and September 2003, did you
10 ever refer to any protocols in treatment of an inmate
11 at Gander Hill?
12     A.  For hepatitis C they have a protocol.
13     Q.  Is that the only thing they have a protocol
14 for?
15     A.  That I have seen.  I have not referred to
16 protocol, per say, for treatment of other diseases.
17     Q.  But there is such a protocol then?
18     A.  Yes.
19     Q.  Only that you haven't referred to it?
20     A.  Right.
21     Q.  I see.  Now, getting back then to Page 95
22 Bate stamp, this is a nursing assessment protocol, is
23 this part of Louis Chance's chart at the time that you
24 saw him?
25     A.  I don't recall if this was there or not.

Page 66

1      Q.  If it was dated September 8th, '03 --
2      A.  Yes.
3      Q.  -- and you saw Louis Chance on the 9th, would
4  this be part of his chart in the ordinary circumstances
5  of practice?
6      A.  Isn't that speculation?  Would it be part of
7  the chart, that should be -- it would be already a part
8  of the chart, yes.
9      Q.  All right.  And this item indicates that on
10 September 8th, '03 that the date of onset of Mr.
11 Chance's complaints was eight days as of 9/8/03, does
12 it not?
13     A.  Yes.
14     Q.  So that Mr. Chance's complaints as described
15 in this headache protocol, nursing protocol, commenced
16 on or about the 1st of September, '03?
17     A.  Yes.
18     Q.  Getting back then to --
19         MS. MONZO:  Can we just take a five-minute
20 break?
21         MR. RICHMOND:  Of course, yeah.
22         (Whereupon, a break was taken.)
23 BY MR. RICHMOND:
24     Q.  Doctor, you've --
25         MS. MONZO:  What page is that?

Page 67

1          MR. RICHMOND:  55.  We're back to Page 55.
2  BY MR. RICHMOND:
3      Q.  You already referred to physician's order
4  sheet which is Bate stamped 55 here, did you make any
5  other entries on this sheet that's been Bate stamped
6  Page 55?
7      A.  This is my entry.
8      Q.  And you've indicated just the top one?
9      A.  Yes, sir.
10     Q.  Okay.  And just to be clear on this, we see
11 three different -- I don't know how to describe it
12 as -- three different start places for physician's
13 orders.  You're only making an order at the top one
14 that says top start; correct?
15     A.  Yes.
16     Q.  Referring to Bate stamp 56, are any of these
17 items, physician orders yours?
18     A.  No.
19     Q.  Can you tell what dates appear in these
20 different physicians orders?
21         MR. McKENTY:  What page?
22         MR. RICHMOND:  Page 56.
23         THE WITNESS:  I see 9/13 here.
24 BY MR. RICHMOND:
25     Q.  And you're pointing to the bottom --

Page 68

1      A.  Yes.
2      Q.  -- the bottom entry?
3      A.  Bottom entry.
4      Q.  Is there a date at the middle entry?
5      A.  9/11.
6      Q.  And is there a date at the top entry?
7      A.  I don't see it.
8      Q.  Can you tell who the physicians were who made
9  these entries?
10     A.  No.
11     Q.  Looking at page Bate stamp 57, are any of
12 these yours?
13     A.  No.
14     Q.  And these are also physician order sheets;
15 correct?
16     A.  Yes.
17     Q.  And what are the dates that appear here
18 (indicating) on these entries?
19     A.  Bottom one is 9/9; middle one is 9/8.  I
20 don't see the date on the top one.
21     Q.  Okay.  Incidentally, Doctor, I'm going
22 through these page, if you want me to stop on a page,
23 by all means tell me and I'll stop.  Okay?
24         Going to Page 59 Bate stamp, can you tell
25 me what this is?

17 (Pages 65 to 68)

NIRANJANA SHAH, M.D.

Page 81

1  made that entry?
2     A.  Yes.
3     Q.  What does she say at the time that she made
4  this order on Page 76?
5     A.  Referral slash headache, Tylenol 325
6  milligrams three times a day, PRN for headache for five
7  days.  Aspirin, 325 milligrams TID PRN for headaches
8  for five days, no dash meds.
9     Q.  So, no medications; right?
10    A.  No other -- I don't know.  I can't decipher
11  this.  No meds, two words I can.
12    Q.  Do you know what time that entry was made in
13  that physician's order?
14    A.  It appears 9:55.
15    Q.  9:55?
16    A.  I can see 9 and 5, that's what I can see
17  here.  See the 9, 5?
18    Q.  And what time was the entry made at the
19  bottom of Page 76?
20    A.  11:05 a.m.
21    Q.  So you made this entry an hour after this
22  entry was made?  I'm referring to the middle entry.
23    A.  Yes.
24    Q.  Are you sure about that?
25    A.  Yes.

Page 82

1     Q.  Okay.  What is the date of the top entry on
2  Page 76?
3     A.  21.
4     Q.  What does the top entry say?
5     A.  Clear liquid diet for 48 hours.
6     Q.  And who made that entry?
7     A.  Handwriting looks similar.  I would say it's
8  Diane.  The signature says BSN.  I'm reading what I see
9  here.
10    Q.  And you don't know what that means?
11    A.  B, this is not Diane Hernandez.  I don't
12  know, but I can -- this looks like this (indicating),
13  so this is Diane's handwriting.
14       MS. MONZO:  Objection.  I just want for
15  the record that Dr. Shah is not a handwriting expert;
16  is that correct?
17       THE WITNESS:  That's correct.
18       MR. RICHMOND:  What's the objection?
19       MS. MONZO:  I just want to put on the
20  record that she's not a handwriting expert and she's
21  not qualified to state whose handwriting that is.  She
22  might be familiar with it, but to say for certain, I
23  just -- she's not qualified to do that.
24       MR. RICHMOND:  She's not qualified to read
25  the handwriting of someone in a medical chart, is that

Page 83

1  what you're saying?
2       MS. MONZO:  She's qualified to read it.  I
3  don't think she's qualified to tell you exactly who
4  wrote it.
5       MR. RICHMOND:  She's not qualified to say
6  who signed the medical chart?  I just want to get this
7  cleared up.
8       MS. MONZO:  If she can read the signature,
9  yes.
10       MR. RICHMOND:  She can indicate whether
11  she can read the signature or not.
12       MS. MONZO:  You're asking if Diane
13  Hernandez wrote this.
14       MR. RICHMOND:  No, I'm asking whatever's
15  on the record.
16       MS. MONZO:  I'm just saying she's not
17  qualified to testify about who wrote things unless she
18  can read the signature.  Maybe I misunderstood the
19  question.
20  BY MR. RICHMOND:
21    Q.  Now, Doctor, I just want to be real clear on
22  this, at the time that you made this entry at the
23  bottom of Page 76 --
24    A.  Yes.
25    Q.  Okay.  Did you make that entry at the time on

Page 84

1  the date that's indicated?
2     A.  Yes, sir.
3     Q.  Okay.  Do you know what Page 79 is?
4     A.  It says on the 24-hour surveillance.
5     Q.  And what is that used for, if you know?
6     A.  I don't know.
7     Q.  Do you know whether or not this 24-hour
8  surveillance occurred at Web or at Gander Hill?
9     A.  I couldn't tell you.
10    Q.  Is there anything on this document that would
11  help you know that?
12    A.  No.
13    Q.  Referring to Page 86, are any of these
14  entries yours?
15    A.  No.
16    Q.  Can you read these entries?
17    A.  No.
18    Q.  You cannot read them?
19    A.  No.
20    Q.  Do you know what this sheet is?
21    A.  Infirmary observation progress notes.
22    Q.  Is there dates on these entries?
23    A.  Yes.
24    Q.  Does this indicate that Mr. Chance was in an
25  infirmary and there was some sort of observation?

21 (Pages 81 to 84)

NIRANJANA SHAH, M.D.

Page 77

1 an optometrist, is that what you're saying today?
2    A.  Right.
3    Q.  And what's the optometrist's name?
4    A.  I can't read that.  I don't remember his
5 name.  I don't know if it's DeMillo or I haven't seen
6 him on regular basis, so I don't know.
7    Q.  What does he look like?
8    A.  All I know is he's a caucasian male, average
9 height.
10    Q.  Is he taller than you?
11    A.  Yes.
12    Q.  How much taller?
13    A.  Few inches.
14    Q.  Is he more than a head taller than you?
15    A.  I didn't pay attention, I don't pay attention
16 to other mens' height or anything and I don't remember.
17    Q.  How old is he?  How old is he?
18    A.  How old?
19    Q.  Yes.
20    A.  I would say middle age.  I can't give you the
21 number.
22    Q.  What color is hair?
23    A.  I don't remember.  People change the color.
24    Q.  Okay.  Doctor, let's turn to Page 70, did you
25 make any entries in Page 70?

Page 78

1    A.  Yes.
2    Q.  Which entries did you make in Page 70?
3    A.  9/30, the top entry.  9/23, I'm sorry.
4    Q.  9/23?
5    A.  7:45 a.m.
6    Q.  That's all just the top entry?
7    A.  Continuation of this over there (indicating.)
8    Q.  Okay.  So you've just indicated that Page 71,
9 the entries of Page 71, is a continuation of the
10 entries that appear on Page 70?
11    A.  Yes.
12    Q.  Am I correct?
13    A.  This note started here (indicating).
14    Q.  And you're pointing to Page 71?
15    A.  Right, yeah.
16    Q.  Now, on Page 71, you have an entry and what's
17 the date and time on that entry?
18    A.  7:45 a.m.
19    Q.  And what was the date?
20    A.  It's a continuation, so this (indicating) is
21 the date.
22    Q.  And the date was the 23rd?
23    A.  Yes, sir.
24    Q.  Okay.  What's the date that appears at the
25 top of that page?

Page 79

1    A.  9/23 here (indicating).
2    Q.  At the top of the page and we're referring to
3 Page 71?
4    A.  It appears to be 22nd.
5    Q.  And what time?
6    A.  9:55, I couldn't tell you whether it's p.m.
7 or a.m.
8    Q.  So just to be clear on this, Doctor, at Page
9 71, which contains an entry made by you at the bottom,
10 above that is an entry dated 9/22/03 made at what time?
11    A.  0955, I don't -- I can't make out what this
12 is.
13    Q.  At 10 o'clock; right?  Sometime a little
14 before 10 o'clock?
15    A.  Yes.
16    Q.  Doctor, I'm now referring you to Page 76, are
17 any of these entries yours?  I don't know, you're
18 pointing to something, but I'm not sure --
19    A.  At the bottom section.
20    Q.  And what's the date of that entry?
21    A.  9/22.
22    Q.  And what does that say?
23    A.  11:05 a.m.  MRI of brain, urgent.
24    Q.  So it was urgent on 9/22, MRI of the brain?
25    A.  That's what I have written here.

Page 80

1    Q.  Okay.  And if it was urgent, why wasn't Mr.
2 Chance sent out right away?
3    A.  I have it in the order.  I have written the
4 consult and I had communicated with people who arranged
5 for the transportation and the appointment.
6    Q.  And you pointed to the bottom entry of 76; is
7 that correct?
8    A.  Yes, sir.
9    Q.  What's the one that appears above that,
10 what's the date of the one that appears above that?
11    A.  9/22.
12    Q.  And who made that entry?
13    A.  If I see the signature -- it appears to be
14 one of the staff members, perhaps Diane I don't
15 recognize if her name is here or not because --
16    Q.  What's the order say above yours?
17    A.  This one (indicating?)
18    Q.  Yes.
19    A.  Here is the signature, PAC.
20    Q.  Who is that?
21    A.  A PA.
22    Q.  Do you know the PA's name?
23    A.  I can read Diane Hernandez are the two PAs
24 there.
25    Q.  So Diane Hernandez designee was the PA who

20 (Pages 77 to 80)