## Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - -

ESTATE of LOUIS W. CHANCE,          :
                                     :
        Plaintiffs,                  : C.A. No. 05-449-SLR
                                     :
    Vs.                              :
                                     :
FIRST CORRECTIONAL MEDICAL           :
LLC, DR. NIRANJANA SHAH              :
and DR. JOSE ARAMBURO,               :
et. al,                              :
                                     :
        Defendants.                  :

- - -

TUESDAY, NOVEMBER 28, 2006

- - -

Oral deposition of STANLEY W. TAYLOR, JR., taken pursuant to Notice, before Shari Bowen, Certified Shorthand Reporter and Notary Public, at State of Delaware, Department of Justice, 820 North French Street, 6th Floor, Wilmington, Delaware, commencing at 10:00 a.m.

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

## Page 2

1  APPEARANCES:
2  RICHMOND & HEVENOR
   BY: KENNETH W. RICHMOND, ESQUIRE
3  2019 Walnut Street
   Philadelphia, PA 19103
4  (215)523-9200
5  Counsel for Plaintiffs
6
7  McCULLOUGH & McKENTY, P.A.
   BY: DANA SPRING MONZO, ESQUIRE
8  1225 N. King Street, Suite 1100
   P.O. Box 397
9  Wilmington, DE 19899
   (302)655-6749
10
   Counsel for Defendant - First Correctional Medical
11
12 STATE OF DELAWARE
   DEPARTMENT OF JUSTICE
13 BY: MARC NIEDZIELSKI, ESQUIRE
   Deputy Attorney General
14 820 North French Street, 6th Floor
   Wilmington, DE 19801
15 (302)577-8324
16 Counsel for Defendants - Taylor & Talley
17
18
19
20
21
22 Also Present:
23 Jeffrey K. Bartels, Esquire
24 Joyce Talley
25

## Page 3

                 INDEX

 WITNESS                              PAGE

 STANLEY W. TAYLOR, JR.
   By MR. RICHMOND                       4




              EXHIBITS

 NO.       DESCRIPTION              PAGE
           (NONE OFFERED)

## Page 4

1       (Whereupon, the deposition began
2   at 10:00 a.m.)
3       ...STANLEY W. TAYLOR, JR., having been duly sworn
4  and/or affirmed, was examined and testified as
5  follows...
6       (It is stipulated by and among
7  counsel for the respective parties that signing,
8  sealing, certification and filing are waived; and that
9  all objections, except as to the form of the question,
10 are reserved until the time of trial.)
11      MR. NIEDZIELSKI: Read and sign.
12             EXAMINATION
13 BY MR. RICHMOND:
14   Q.  Good morning, Mr. Taylor.
15   A.  Good morning.
16   Q.  By way of introduction, my name, once again,
17 is Kenneth Richmond and I'm prohac vitchie (ph) counsel
18 for the Estate of Louis Chance, which is commenced in
19 an action against you personally, Ms. Talley, who's
20 also sitting in the room during this deposition, in
21 connection with the death of Louis Chance which
22 occurred September of 2003. Now, that's the essential
23 background.
24      If I ask you a question and you respond to
25 it, we're going to assume that you understood the

Page 73

1  MR. NIEDZIELSKI: That has nothing to do
2  with Louis Chance's lawsuit.
3  MR. RICHMOND: It has to do with the
4  quality care being provided --
5  MR. NIEDZIELSKI: No, it doesn't.
6  MR. RICHMOND: -- by the Delaware
7  Department of Correction.
8  MR. NIEDZIELSKI: Look, I don't want to
9  waste a lot of time. I'm asking you to be very
10 considerate of this man's time and this lady's time and
11 ask them questions that are relevant to this lawsuit.
12 That's what I'm asking you to do.
13 MR. RICHMOND: Marc, at any time you want
14 to instruct him not to answer a question you can do
15 that --
16 MR. NIEDZIELSKI: The rules do not permit
17 me to do that for irrelevance. I'm asking you to take
18 some time to be considerate about peoples time. It has
19 nothing to do with this lawsuit.
20 MR. RICHMOND: Well, I don't know about
21 Steve Hampton, and I'm not addressing any aspect of
22 Steve Hampton's --
23 MR. NIEDZIELSKI: Well, these are his
24 favorite questions that have nothing to do with
25 anything.

Page 74

1  MR. RICHMOND: Well, I don't know whether
2  they're his favorite questions or not. Let's just move
3  on.
4  MR. NIEDZIELSKI: Okay.
5  MR. RICHMOND: I don't know anything about
6  his questions.
7  BY MR. RICHMOND:
8  Q. With respect to the contract that was entered
9  into with FCM, do you know whether or not any specific
10 changes were made to the contract as compared with the
11 contract that CMS had?
12 A. No.
13 Q. You're not aware of any changes?
14 A. No, I'm not aware, but not necessarily be
15 aware.
16 Q. All right. What x-ray facilities exist
17 within the Delaware Department of Correction
18 institutions? I'm talking about full security
19 institutions or maximum security institutions.
20 A. I couldn't sit here and specifically tell
21 you.
22 Q. Are there any written reports, other than
23 what we already referred to that are routinely
24 generated and given to you by The Medical Review
25 Committee?

Page 75

1  A. No.
2  Q. Did you review any news articles or hear any
3  television reports that addressed the medical care that
4  was provided to inmates by FCM?
5  MS. MONZO: Objection. I'm not sure what
6  the relevance of something that happened after --
7  MR. RICHMOND: You can answer the
8  question.
9  THE WITNESS: Would you please restate it?
10 BY MR. RICHMOND:
11 Q. Did you review any news articles or hear
12 television reports that addressed the medical care
13 being provided by FCM to the Delaware Department of
14 Correction inmates?
15 A. If you are referring to the news articles of
16 last year, I read those articles. I believe there was
17 some confusion about which vendor they referred to at
18 times. I believe the articles referred to care being
19 provided by FCM and CMS.
20 Q. Right.
21 A. But I couldn't specifically cite which
22 offenders were affected by which vendor relative to
23 those articles. There was a lot of incorrect
24 information in those articles.
25 Q. Did the content of any of those articles, did

Page 76

1  that result in any investigation of FCM by the
2  Department of Correction other than what you've already
3  described in making the referral to the NCCHC?
4  MR. NIEDZIELSKI: They were already gone.
5  MR. RICHMOND: All right. Well, you're
6  answering, I'm asking him.
7  MR. NIEDZIELSKI: No, he just said they
8  came out in 2005, summer of 2005.
9  MS. MONZO: It was actually September.
10 MR. RICHMOND: They were earlier.
11 MS. MONZO: It was after FCM left.
12 MR. NIEDZIELSKI: It was September 2005
13 was when the articles came out.
14 MR. RICHMOND: There were earlier articles
15 to my understanding. No? Okay.
16 BY MR. RICHMOND:
17 Q. I don't want to confuse you.
18 A. I'm not sure what you -- you're not confusing
19 me. I'm trying to decipher what you're asking me. If
20 you're referring to the news journal series of
21 articles?
22 Q. Yeah.
23 A. That was well after the effect. If you're
24 asking me if FCM is involved in any investigation, the
25 answer is I don't believe so.

19 (Pages 73 to 76)

Page 77

1  Q. All right.
2  A. So I'm not sure what your -- maybe we should
3  start again.
4  Q. I assumed, and I apologize for the
5  assumption, but I had assumed that Lee Williams'
6  articles were in 2005, there were the earlier articles?
7  A. He was very late to the game. He was trying
8  to take credit --
9  Q. Yeah, he was very late to the game.
10 A. He was trying to take credit for work that
11 the state was already well involved in. Wouldn't be
12 the first time a news journal has done that.
13 Q. Well, I understand that. And that's what I'm
14 referring to, sir.
15    You were already involved in an
16 investigation, I take it, as a result of other reports
17 that you received through the news media at the time
18 that the Williams articles were being published?
19 A. I'm not aware of any. Number one, news media
20 doesn't generate investigations for us.
21 Q. Okay. Let me back it up.
22 A. Yeah, I'm going to stop assuming that I
23 understand what you're asking me. Let's start over.
24 Q. All right. What I'm getting at is that apart
25 from the audit that was performed by NCCHC, the

Page 78

1  Department of Correction had an investigation going on;
2  is that correct of FCM?
3  A. No.
4  Q. Oh, they did not?
5  A. An investigation?
6  Q. Yeah, other than the report.
7  A. An investigation of what?
8  Q. The medical care that was being delivered by
9  FCM.
10 A. No.
11 Q. There was no investigation and other than the
12 audit report?
13 A. I think if you look back, I said we had the
14 audit report, we had efforts working with FCM with
15 staff from NCCHC and my staff to work with FCM to
16 develop a corrective action plan to address
17 deficiencies in the report. That effort was in place
18 for two to three months was not successful and
19 ultimately they left. We had a very -- if you heard
20 me say an hour ago -- typical transition is six months,
21 we now had 30 days to find a new vendor, get them in
22 place, and assume medical healthcare in 30 days.
23 That's where our energies were at that point in time.
24 Q. Now, with respect to the compliance with the
25 NCCHC standards, how did you insure that the staff that

Page 79

1  was put in place by FCM and immediately after they took
2  over the contract for the provision of medical care in
3  the Department of Correction, what, if anything, did
4  your staff do to insure compliance with those
5  standards?
6  A. You're going back to 2002, the beginning of
7  FCM's --
8  Q. Correct.
9  A. -- taking over?
10    Again, as part of the -- their applying to
11 the RFP, they had to assure us that they understood and
12 could operate by NCCHC standards. My staff have been
13 working with those kinds of standards for a number of
14 years, and members of my staff, members of The Medical
15 Review Committee have attended a number of conferences
16 by The American Correctional Association that include
17 presentations by The National Commission on
18 Correctional Healthcare to assist them in monitoring
19 contracts of that nature, and have conversation with
20 staff From The National Commission on Correctional
21 Healthcare to help in that process as well.
22 Q. So if I can assume, then, that there were
23 earlier problems, either financial problems, or
24 problems with staff, or problems with staff
25 qualifications within CMS in spite of the objection to

Page 80

1  the question concerning Dr. Ivens, what, if anything,
2  did your staff do to address the qualifications of the
3  new staff coming in by FCM other than what you've just
4  described as receiving their assurance that they were
5  going to comply with the standards of the NCCHC?
6  A. I don't recall making any statement about
7  problems with quality or standards or anything about
8  CMS prior to FCM. As I recall, most of that
9  conversation was about their departure was relative to
10 their financial constraints.
11 Q. Weren't you named in lawsuits addressing the
12 medical care prior to 2002?
13 A. That's quite possible. I'm named in lawsuits
14 a lot.
15 Q. All right. I'm talking about specifically
16 with regard to medical care.
17    Did any of these lawsuits result in
18 investigation or inquiry on your part or direction to
19 any of your subordinate staff to investigate the
20 quality of care in the qualifications of the people
21 rendering care?
22 A. An investigation, no.
23 Q. It did not?
24 A. Not beyond The National Commission on
25 Correctional Healthcare reviews.

20 (Pages 77 to 80)