Page 33

1  Q. Have you ever examined the records of Louis
2  Chance, Jr.?
3  A. No.
4  Q. Mr. Richmond told you that the plaintiff in
5  this lawsuit is an estate -- Louis Chance, Jr. Do you
6  know anything about Louis Chance, Jr.?
7  A. (The witness indicated.)
8      MR. RICHMOND: Indicating no.
9      THE WITNESS: No.
10     MR. NEIDZIELSKI: That's all the
11 questions I have. Thank you.
12     THE WITNESS: Thank you.
13     MR. NEIDZIELSKI: I'm sorry. You were
14 getting ready to say something.
15     THE WITNESS: Yeah. I apologize.
16     You asked about whether Mr. Trottman had
17 any risk factors or whether he denied and all. I could
18 have asked him certain questions when I did my initial
19 consultation, and I -- it could be there in that
20 consultation.
21     MR. NEIDZIELSKI: Okay.
22     THE WITNESS: You know, if I asked him,
23 you know, have you ever been tested for HIV, did you have
24 any risk factors, like IV drug use or unprotected sex --

Page 34

1 those are part of questions sometimes we ask when doing a
2 history and physical on a patient. So that could be in
3 that consultation.
4 BY MR. NEIDZIELSKI:
5  Q. So in follow-up to that: If you're in the
6 hospital setting and a patient, like an inmate, is
7 unconscious or not responsive, there are circumstances
8 where you can take and do an HIV test. Correct?
9  A. Yes.
10 Q. And that's appropriate? That's considered
11 appropriate?
12 A. Yeah. Because you're acting in the patient's
13 best interest.
14     MR. NEIDZIELSKI: All right. That's all
15 the questions I have. Thank you, Doctor.
16     THE WITNESS: You're welcome.
17 BY MS. SPRING-MONZO:
18 Q. Doctor, my name is Dana Monzo. I represent
19 First Correctional Medical and the employees of First
20 Correctional Medical.
21 A. Okay.
22 Q. I have a couple of questions for you --
23 A. Sure.
24 Q. Same rules apply.

Page 35

1      If you don't understand what I've asked
2 you, please feel free to ask me --
3  A. Sure.
4  Q. -- to say it again.
5      Okay. You just told Mr. Neidzielski
6 that you had never reviewed the chart of Louis Chance and
7 didn't have any knowledge of Louis Chance; is that
8 correct?
9  A. Yes.
10 Q. So you never met Mr. Chance when he was alive?
11 A. Yes. That's correct.
12 Q. Can I ask you: When did you first hear of
13 Mr. Chance or this lawsuit?
14 A. Today.
15 Q. Today?
16 A. Mm-hmm.
17 Q. Okay. Had you ever spoken with Mr. Richmond
18 or Mr. Bartels or any person from his law firm before
19 this deposition today?
20 A. Only when we agreed on the date and time when
21 I returned Mr. Richmond's call.
22 Q. Okay. So you only discussed the date and
23 time?
24 A. Yes.

Page 36

1  Q. Okay. You didn't --
2  A. I mean -- and also about, I guess, the
3 compensation.
4  Q. Okay. Have you ever had any correspondence or
5 letters or e-mails or faxes from Mr. Richmond or
6 Mr. Bartels' office or them individually?
7  A. No.
8  Q. No.
9      Okay. You said you were being paid $500
10 for today's services?
11 A. Mm-hmm.
12 Q. Have you provided any other services or have
13 you negotiated for any other services in the future?
14 A. No, ma'am.
15 Q. No.
16     Okay. Have you been contacted by any
17 other attorneys or law firms or individuals regarding
18 litigation?
19 A. No.
20 Q. No.
21     You haven't met with any attorneys or
22 firms or --
23 A. No.
24 Q. -- anyone else regarding litigation?

9 (Pages 33 to 36)