**IN THE UNITED STATES DISTRICT COURT**

**FOR THE STATE OF DELAWARE**

| | |
|---|---|
| ESTATE OF LOUIS W. CHANCE JR.<br><br>　　　　　　　　Plaintiff<br><br>　　　　v.<br><br>FIRST CORRECTIONAL MEDICAL INC., DR. NIRANJANA SHAH, DR JOSE A. ARAMBURO, JR., COMMISSIONER STANLEY TAYLOR and JOYCE TALLEY<br><br>　　　　　　　　Defendants | C.A No: 05-449-SLR |

<u>PLAINTIFF'S MOTION FOR
RECONSIDERATION OF THE ORDER
OF JUNE 15, 2007</u>

　　　　AND NOW, comes the Plaintiff, the Estate of Louis Chance, by its attorneys to respectfully request the Court to reconsider its Order of June 15, 2007 relating to Plaintiff's Motions to Compel, and for Extensions of Time in the Scheduling Order and asserts the following as reasons therefore.

　　　　1. On June 12, 2007, the Plaintiff's attorneys received copies of the correspondence and affidavit of Stanley Taylor which were produced in the unrelated Delaware Superior Court case of <u>Fossette v. Taylor, et al.</u> No: 06C-07-042 WLW. These documents are marked collectively as Exhibit "A" to this Motion for Reconsideration.

1

2. At no time during the discovery in this matter did the Defendants Taylor or Talley produce or refer to the attached correspondence which alleges and statistically documents the Department of Corrections lack of custodial cooperation in delivery and transport of inmates for needed medical care and followup.

3. At pages 71-80 of the deposition of Dr. Niranjana Shah, M.D. she testified about a sequence of events as described in the chart that preceded the death of Louis Chance on September 23, 2003. The chart shows that at 11:05 AM on 9/22/03, following an optometrist's suspicion of pappilledema OU (swelling of eyes) and MRI was ordered "urgent" to rule out a brain lesion in the decedent. The medical director of FCM, Dr. Ali was contacted by Shah to relate the request, and at page 80, lines 1-5, Dr. Shah was asked, " Okay, it was urgent, why wasn't Mr. Chance sent out right away?"

A. " I have it in the order. I have written the consult and I had communicated with people who arranged for the transportation and the appointment."

4. At paragraph 8 of the Plaintiff's Amended Complaint, it was alleged that:

> "As part of the contract, the Delaware Department of Corrections required FCM to minimize offsite transport of inmates for any health care services, because offsite services were deemed expensive for the FCM and for the Department of Corrections that must incur security expenses."

5. At paragraph 27 of the Plaintiff's Amended Complaint, it is alleged that:

> "It is believed and therefore averred that the general cost containment practices of FCM and Defendant Taylor caused inadequate medical staffing, inadequate training, and reliance upon the judgment of persons other than qualified physicians, and psychiatrists to make medical decisions, refusal to

2

        provide required transport to needed off site medical facilities for decedent Chance all of which resulted in a policy of deliberate denial of access to the medical care decedent clearly required.

6. The legal correspondence to Stanley Taylor directly addresses the conscious failure of Stanley Taylor with the particularly incriminating language that appears on the second page:

> "…In the Fall of 2003, FCM's complaints were briefly addressed at HRYCI, where the warden increased staffing to allow all incmates to meet health care appointments for a two week period. Thereafter the warden advised FCM that he would no longer provide that staffing, and the prior limitations on transports resumed.  Medical access concerns have been discussed orally and are documented in e-mails going back two years, and specific medical no-show data has been provided in monthly reporting to the MRC since December."

7.  Louis Chance was at "Gander Hill" on September 22, 2003.  This is the Henry R. Young Correctional Institution. (pg. 71 lines 1-3 Dep. of  Shah).

8.  None of the e-mail, or the documentation attached in this Motion has been produced and is believed to form a substantial part of the evidence submitted voluntarily by the Department of Correction to the United States Department of Justice.

Wherefore, the Plaintiff most respectfully prays that the Court reconsider the June 15, 2007 Order addressing the Defense failure to produce, the Defense

4

assertion of privilege based on peer review and the Extension of the Schedule requested by the Plaintiff.

                            Respectfully submitted,

/s/_____
        Jeffrey K. Bartels, Esq.
        Kenneth W. Richmond, *pro hac*
        Attorneys for the Plaintiff

4

STATEMENT PURSUANT TO LOCAL RULE 7.1.1

Counsel for the Plaintiff has undertaken reasonable efforts to reach agreement on the substance of the foregoing Motion for Reconsideration with Counsel for Defendants Taylor and Talley by e-mailing a copy of the proposed motion on June 19, 2007 and requesting that Defense Counsel provide access to the material submitted as evidence to the U.S. Department of Justice in connection with the Civil Rights Investigation. Defense Counsel objects to reconsideration of the Order of June 15, 2007.

June 19, 2007

/s/_____
Jeffrey K. Bartels, Esq.
Kenneth W. Richmond, *pro hac*
Attorneys for the Plaintiff

# EXHIBIT "A"



15180727
Jun 11 2007
2:21PM

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR KENT COUNTY

| | | |
|---|---|---|
| WILLIAM P. FOSSETTE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE No.:06C-07-042 WLW |
| | ) | |
| v. | ) | NON-ARBITRATION CASE |
| | ) | |
| STANLEY W. TAYLOR, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### STATE DEFENDANTS' 2ND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Responding defendants Stan Taylor and Tom Carroll, by and through their attorney, hereby supplements or revises their prior responses to Plaintiff's 1st Request for Production of Documents for the second time.

\*\*\*

*11. Copies of all written, Instant Message (IM) or email correspondence between defendants or defendant's agents and any other person concerning William P. Fossette or his care and treatment.*

RESPONSE: Objection, his request seeks documents that are privileged communication between counsel and his clients. On October 12, 2006, October 24, 2006 and again on October 24, 2004, counsel sent an e-mail to his clients Taylor and Carroll about this lawsuit and the clients responded. Not protected by attorney client or work product privilege, are the e-mail regarding this lawsuit between Plaintiff's counsel and defense counsel's offices. Plaintiff has copies of those e-mails.

\*\*\*

*17.    Copies of all written complaints against CMS, FCM, defendant Chucks, defendant Carroll, defendant Alie, or defendant Taylor in the possession of or available to any defendant or defendants' counsel in which the allegations are that one of the above failed in their duty to see that inmates under their control or supervision, received adequate medical care.*

RESPONSE:  Objection, this request seeks information that is beyond the scope of Rule 26 and is not reasonably calculated to lead to admissible evidence.  By way of further response, please refer to Taylor and Carroll's supplement to plaintiff's 1st Set of interrogatories No. 14 and 15.

\*\*\*

*23.    A copy of all written complaints concerning medical care provided by FCM, CMS defendant Alie, or defendant Chuks in the possession of any defendant regardless of the time of the complaint or the location of the complainant.*

RESPONSE:  Objection, this request seeks information that is beyond the scope of Rule 26 and is not reasonably calculated to lead to admissible evidence. By way of further response, please refer to Taylor and Carroll's Supplement to Plaintiff's 1st Set of Interrogatories No. 14 and 15.

- 3 -

          STATE OF DELAWARE
          DEPARTMENT OF JUSTICE

          <u>/s/ Marc P. Niedzielski</u>
          Marc P. Niedzielski, I.D. #2616
          Deputy Attorney General
          Carvel State Office Building
          820 N. French Street, 6th Floor
          Wilmington, DE 19801
          (302) 577-8324
          Attorney for Taylor and Carroll

DATED: June 11, 2007



# MCNAMARA, GOLDSMITH,
# JACKSON & MACDONALD, P.C.

Attorneys at Law
1670 East River Road, Suite 200
Tucson, Arizona 85718
Telephone: (520) 624-0126
Fax: (520) 624-9238

Writer's Information:
G. Todd Jackson
tjackson@mgjlegal.com

Nogales Office:
274 West View Point Drive
Nogales, Arizona 85621

May 10, 2005

**Via Hand Delivery, First Class Mail,
and Certified Mail, Return Receipt Requested**

Stanley W. Taylor
Commissioner, Delaware Dept. of Corrections
245 McKee Road
Dover, Delaware 19904

Re: *FCM Health Services Contract, Notice of Termination*

Dear Commissioner Taylor:

This firm represents First Correctional Medical-Delaware, L.L.C. ("FCM").

Paragraph 10 of the Health Care Services Contract dated June 17, 2002 (the "Contract") provides that "[i]f DOC defaults hereunder, FCM may, at its discretion, terminate this contract upon no less than thirty days written prior notice." This shall serve as FCM's notice of termination pursuant to this provision and other applicable law, with such termination to become effective June 30, 2005 unless otherwise agreed in writing by the parties in advance of such date.

Without limitation, this termination is based upon DOC's continual failure in New Castle and Kent Counties to provide FCM with the cooperation and inmate access necessary to permit FCM to properly discharge its professional and contractual responsibilities to the inmate populations in these facilities. As the wardens and their staff in these counties are aware, this has been a persistent and continuing problem since July 2002, and FCM's ongoing efforts at a cooperative solution have been ignored. FCM staffs medical providers for 8-10 hours per day for these facilities to meet the services required by the RFP and applicable standards. DOC, however, has restricted clinical hours to between 2.5 and 6.5 hours per day at DCC and 4 to 5 hours per day at HRYCI. At HRYCI, these reduced hours are limited to five to six days per week at the West Side Medical Unit, and have been reduced to 3 days per week at the East side unit, when not cancelled entirely due to lack of staffing or security. FCM has been limited to only 15 inmates per hour for all clinics, labs, nurse sick call, doctor, dental, x-ray, and 2 midlevel lines. Appointments from segregation units, other sites, and juveniles result in further limitations.

These restrictions alone would preclude proper and effective provision of medical care at these facilities, but they have been exacerbated immensely by DOC's failure in these regions to

Stanley W. Taylor
May 10, 2005
Page 2

---

transport inmates for even the limited appointments that can be scheduled within the restricted clinical hours. Recent data tracked by FCM shows that the failure to present inmates for scheduled appointments at DCC and HRYCI far exceeds that of all other facilities, with no-show rates that are double and triple ordinary benchmarks. Indeed, at HRYCI, DOC fulfills only two out of three clinical appointments scheduled by FCM. *See exhibit A.*

Though access to the inmates that FCM is charged with treating is an obvious and fundamental assumption underlying the parties' contractual relationship, it is also expressed throughout the contract documents and incorporated standards. NCCHC Essential Standard J-A-01 requires that "inmates have access to care to meet their serious medical, dental, and mental health care needs." Compliance with these standards is required by the contract, and financial penalties are permitted for noncompliance. In addition, the RFP contemplates a scope of care and timelines that require regular and timely access to the entire inmate population and sufficient facilities, hours, staffing, and security from DOC for the same. It specifically requires that "[e]ach facility will have a mechanism in place that enables all inmates (including those in segregation) to request health care services daily." FCM cannot properly discharge its professional duties and contractual obligations without proper access at all facilities to the patients whom it has been retained to treat.

DOC's actions and omissions thus constitute a breach of DOC's express and implied contractual obligations arising from the Contract, its incorporated documents, and Delaware law. They have frustrated the purpose of the Contract, and rendered FCM's performance impossible and impracticable. They have substantially altered the present and reasonably anticipated future relations created by the Contract to FCM's detriment, and thus amount to a repudiation of the Contract by DOC. For all of these reasons, FCM is entitled to terminate the remaining term of the contract pursuant to both Paragraph 10 of the Contract and Delaware law. *E.g., Pami-Lemb I, Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014-16 (Del.Ch. 2004); *Freidco of Wilmington, Del., Ltd. v. Farmers Bank*, 529 F.Supp. 822, 824-25 (D.Del. 1981).

FCM has attempted to secure a cooperative solution repeatedly, without success. Medical access issues have been raised at monthly facility-specific meeting and weekly operations meetings at DCC throughout the contract period. In the Fall of 2003, FCM's complaints were briefly addressed at HRYCI, where the warden increased staffing to allow all inmates to meet health care appointments for a two week period. Thereafter, the warden advised FCM that he would no longer provide that staffing, and the prior limitations on transports resumed. Medical access concerns have been discussed orally and are documented in emails going back two years, and specific medical no-show data has been provided in monthly reporting to the MRC since December. Dental no-show rates have been documented in the monthly MRC reports since July 2002 and were the subject of a formal grievance to the DCC administrative staff. Yet no corrective action has been taken.

FCM worked hard to avoid adversity on these issues and seek cooperative resolutions. The response from the deficient facilities and the MRC has been nothing but antagonism and, most recently, attempts to divert attention from these systemic and ongoing problems with a series of pre-textual compliance citations to FCM. These began after FCM had repeatedly raised

Stanley W. Taylor
May 10, 2005
Page 3

---

access concerns, and shortly after FCM received reports that the wardens in the affected counties were lobbying for FCM's replacement as a result. Two of the citations were mailed so as to be received by FCM during the Christmas holiday, failed to enclose referenced attachments, and required corrective action plans within 24 hours. One related to a one-time outside service made necessary by the resignation of a nurse distraught from a stalking incident by a released inmate. The others were factually false and/or related to treatment timing and backlog, and perceived reporting deficiencies, that were a direct function of shortfalls in DOC's own procedures, patient access, and recordkeeping. Valid appeals and corrective actions plans to address the issues in a cooperative spirit were perfunctorily rejected. The MRC also hired NCCHC to perform an unannounced chart audit, and then noticed termination before FCM could implement a corrective action plan, as is customary and which can and will address all findings therein. Notably, FCM's urgings that DOC secure a similar audit of the access to care afforded at the facilities in New Castle and Kent Counties has been flatly ignored.

FCM would prefer to solve these problems and restructure this relationship in a manner that serves the mutual interests of all concerned parties going forward. FCM, however, is no longer willing to work under the conditions described above, the continued roadblocks to the care it contracted to provide at DOC facilities, or the ongoing financial losses the current situation has caused FCM. If the parties are unable to finalize a new contract that adequately and conclusively resolves all of these issues in a satisfactory and binding manner, FCM's termination shall become effective June 30, 2005. If DOC intends to litigate fault or financial penalties, FCM has retained Delaware counsel and stands ready to do so and pursue its past damages. FCM, however, is also willing to forego its damage claims, effectuate an orderly transition, and end its relationship with DOC in a professional manner without unnecessary rancor or distraction. To these ends, FCM solicits immediate discussions of either an amended contract or agreed procedures for transition, final payment, release of claims, and an agreed, mutual termination of the parties' relationship.

Please direct your response to my attention.

Very truly yours,

McNAMARA, GOLDSMITH,
JACKSON, & MACDONALD, P.C.

G. Todd Jackson

GTJ/yrc
Enclosure/as stated/
Cc    Tammy Y. Kastre, M.D.
        Jeff Weiner, Esq.

Summary of Provider (MD and Midlevel) and Nurse Appointments Not Including Lab, Mental Health, and Radiology Services

| | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | AVERAGE |
|---|---|---|---|---|---|---|---|
| **SCI-MED** | | | | | | | |
| Total # Appts | 967 | 887 | 733 | 880 | 782 | 1017 | 878 |
| # no shows | 14 | 28 | 9 | 23 | 21 | 35 | 22 |
| % no shows | 1.45 | 3.16 | 1.23 | 2.61 | 2.69 | 3.44 | 2.43 |
| **SCI-DENTAL** | | | | | | | |
| Total # Appts | 286 | 186 | 285 | 345 | 254 | 348 | 284 |
| # no shows | 19 | 13 | 18 | 17 | 6 | 25 | 16 |
| % no shows | 6.64 | 6.99 | 6.32 | 4.93 | 2.36 | 7.18 | 5.74 |
| **DGC-MED** | | | | | | | |
| Total # Appts | 809 | 782 | 812 | 1158 | 696 | 1292 | 925 |
| # no shows | 176 | 156 | 169 | 174 | 73 | 119 | 145 |
| % no shows | 21.76 | 19.95 | 20.81 | 15.03 | 10.49 | 9.21 | 16.21 |
| **DCC-DENTAL** | | | | | | | |
| Total # Appts | 461 | 413 | 385 | 345 | 367 | 408 | 397 |
| # no shows | 71 | 104 | 112 | 80 | 106 | 93 | 94 |
| % no shows | 15.40 | 25.18 | 29.09 | 23.19 | 28.89 | 22.79 | 24.09 |
| **HRYCI-MED** | | | | | | | |
| Total # Appts | 1036 | 943 | 982 | 1038 | 918 | 1152 | 1012 |
| # no shows | 348 | 368 | 281 | 232 | 255 | 277 | 294 |
| % no shows | 33.59 | 39.02 | 28.62 | 22.35 | 27.78 | 24.05 | 29.23 |
| **HRYCI-DENTAL** | | | | | | | |
| Total # Appts | 333 | 191 | 277 | 267 | 281 | 290 | 273 |
| # no shows | 116 | 37 | 79 | 80 | 107 | 102 | 87 |
| % no shows | 34.83 | 19.37 | 28.52 | 29.96 | 38.08 | 35.17 | 30.99 |

SCI is the benchmark of excellent teamwork between DOC and FCM

FCM April 2005

15180727
Jun 11 2007
2:21PM



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
245 McKee Road
Dover, Delaware 19904

Stan Taylor
Commissioner

May 27, 2005

(302) 739-5601
Fax: (302) 739-8221
E-Mail: sttaylor@state.de.us

**Via Facsimile, First Class Mail & Certified**

G. Todd Jackson, Esquire
McNamara, Goldsmith, Jackson & McDonald, P.C.
Attorneys At Law
1617 East River Road, Suite 200
Tuscon, AZ 85718

Re:   DOC Health Services Contract #2828, Notice of Termination

Dear Mr. Jackson:

This will acknowledge receipt of your letter dated May 10, 2005 concerning First Correctional Medical's (FCM) notice to terminate the above contract. The DOC accepts FCM's offer to terminate the contract by mutual agreement, effective June 30, 2005.

The DOC, however, disputes your assertion that inmate access is a basis for FCM to declare the DOC in default of its contractual obligations. First, neither the contract nor the RFP requires the DOC to provide specified levels of inmate access. Second, the questions raised by FCM concerning inmate access are unrelated to, and do not excuse, the serious deficiencies in the delivery of health care outlined in the National Commission on Correctional Health Care (NCCHC) audit report dated February 28, 2005. Third, the information concerning failure of the inmates to appear for visits is incomplete. To properly assess the impact on contractual obligations, the reasons for no-show rates must be taken into account. For instance, inmates may be released or required to appear in court.

The deficiencies noted in the NCCHC audit report go to the core of FCM's obligation to provide health care in accordance with NCCHC standards under the contract. The NCCHC health care standards are expressly required in section IV. A. of the RFP and performance is the essence of the contract per sections 5 and 6 of the contract. The NCCHC report identified several serious problems with medical administration and clinical practice. Because these deficiencies concern the delivery of health care in accordance with NCCHC standards, which are expressly incorporated into the contract, there is a basis for the DOC to declare breach.

RE: DOC Health Services Contract #2828, Notice of Termination
May 27, 2005
Page Two

     The DOC properly issued non-compliance letters pursuant to section V. J. 6 of the RFP. Further, the DOC exercised its right to perform an audit at any time in its discretion under section III. A. 2 of the agreement. As a result of the February 28, 2005 audit, the DOC issued a notice of intention to terminate the agreement on March 23, 2005 and provided FCM with an opportunity to cure. In response to the notice of intention to terminate, on April 18, 2005, Dr. Kastre submitted a detailed corrective action plan. FCM followed up with correspondence to the NCCHC on April 21, 2005 stating its intention to cure the deficiencies in the audit report. On May 10, 2005 the NCCHC notified the DOC that FCM's proposed corrective action plan could not be reliably measured until August, at the earliest. On that same date, the DOC received FCM's notice of termination.

     Despite the cooperative efforts of both parties to resolve this matter, the DOC believes that re-negotiating the present contract is not in the best interests of the State. Accordingly, the DOC accepts FCM's offer to mutually terminate the contract, effective June 30, 2005. The DOC otherwise reserves its rights and remedies under the contract. The DOC anticipates FCM's cooperation in the orderly transition of inmate health care services.

                                                    Sincerely,

                                                   Stanley W. Taylor, Jr.
                                                   Commissioner

Cc: Richard W. Hubbard, Esquire
     Lawrence W. Lewis, Esquire
     Deputy Attorneys General

Page 69

1    A. Medical summary of offender in transit.
2    Q. Do you know what the purpose of this document
3 is in the chart? If I can assist you, Doctor, it says
4 here, departing from, do you see that line --
5    A. I see that.
6    Q. -- departing from?
7    A. Yes.
8    Q. Would that indicate to you that Mr. Chance
9 was departing from Gander Hill on this date?
10    A. It appears that way.
11    Q. All right. And who would fill in this sheet?
12    A. There's a signature here it says RN.
13    Q. So that would be a registered nurse?
14    A. Yes.
15    Q. What is the date of that sheet?
16    A. 9/17.
17    Q. Okay. And does it indicate that this
18 offender in transit is going to be taking medication?
19    A. Medication required for care in route,
20 aspirin and Tylenol.
21       THE COURT REPORTER: Does it say offender
22 in transit?
23       MR. NIEDZIELSKI: Medical summary of
24 offender in transit.
25 BY MR. RICHMOND:

Page 70

1    Q. Going over to Page 68, do you see this sheet,
2 Page 68, Doctor?
3    A. Yes.
4    Q. All right. Can you tell me whether or not
5 this was part of the medical chart of Louis Chance?
6    A. I don't recall.
7    Q. Okay. You don't know whether you saw it in
8 his medical chart?
9    A. I do not remember.
10    Q. All right. Does it indicate, this memorandum
11 indicates it's dated 9/13/03. It says, it's a
12 memorandum 2, Primary Control.
13       Do you know who Primary Control is or what
14 that would refer to?
15    A. No. This form is not used by physicians, so
16 I'm not familiar with this.
17    Q. Okay. Do you know who Kent Johnson is?
18    A. No.
19    Q. LCSW, would that be licensed --
20    A. -- social worker.
21    Q. -- social worker?
22    A. Yes, sir.
23    Q. Did you ever have any contact with Kent
24 Johnson?
25    A. No.

Page 71

1    Q. Do you know whether or not he's at Gander
2 Hill or where?
3    A. I do not know.
4    Q. Okay. Did you ever have any contact with any
5 social worker, licensed or otherwise, to discuss Louis
6 Chance?
7    A. No.
8    Q. Okay. Do you remember Louis Chance?
9    A. By reading the chart, whatever I see I
10 remember.
11    Q. What I'm getting at is, could you describe
12 him physically?
13    A. No.
14    Q. So just to be clear on this, you don't have
15 any physical recollection of what he looked like or --
16    A. No.
17    Q. -- or any independent recollection outside of
18 the chart of Louis Chance, is that fair to say?
19    A. I don't recall.
20    Q. Okay. You don't recall --
21    A. -- anything other than what is in the chart.
22    Q. All right. Now, looking at page Bate stamped
23 69, are there any injuries on this chart that are
24 yours?
25    A. Yes, sir.

Page 72

1    Q. Okay. And can you tell me, first of all,
2 there are two entries on this chart; is that correct?
3    A. Yes, sir.
4    Q. And can you tell me what entry is yours?
5    A. The bottom one.
6    Q. The bottom one corresponding to what date?
7    A. 9/22/2003.
8    Q. And what time is that?
9    A. 11:15 a.m.
10    Q. Now, the time that is indicated in there, and
11 the date that's indicated in there, is that an
12 indication of when you made that entry?
13    A. At the time that I made the time I made the
14 entry.
15    Q. So you made this entry then on 9/22 at 11:15,
16 is that what --
17    A. Yes, sir.
18    Q. -- this says?
19    A. Yes, sir.
20    Q. What does the entry say?
21    A. Optometrist was consulted to get dilated for
22 fundoscopic exam. He diagnosed to have papilledema OU
23 and advise to rule out space occupying lesions in the
24 brain. Dr. Ali was called. First I wrote CT scan and
25 I wrote an error and wrote MRI on the same time -- at

18 (Pages 69 to 72)

Page 73

1 the same time when I was writing this, of brain is
2 ordered. For cell phone and page number. Left a
3 message -- delivered the message before and then I have
4 signed it here.
5     Q.  I'm really not clear on what you just said
6 there, Doctor. I would like you to just read it word
7 for word on --
8     A.  Optometrist was consulted to get dilated
9 fundoscopic exam.
10    Q.  That's frontalscopic?
11    A.  Fundoscopic.
12    Q.  Oh, fundo --
13    A.  Front part of the eyes.
14    Q.  Fundoscopic?
15    A.  Right. Comma, he diagnosed to have
16 papilledema.
17    Q.  What is that?
18    A.  Some swelling of the eyeball.
19    Q.  So what you're saying here is that Mr. Chance
20 had some swelling of his eyeball?
21    A.  That's what optometrist indicated.
22    Q.  Now, what optometrist was that?
23    A.  (Indicating.)
24    Q.  This is the optometrist and you're pointing
25 to the line above?

Page 74

1     A.  Right.
2     Q.  Okay. Now, your finger is on a word here
3 (indicating.)
4     A.  OU. OU is both eyes. And advise to rule out
5 space occupying lesion in brain.
6     Q.  What does the rest of it say?
7     A.  Dr. Ali was called, and as I pointed, MRI of
8 brain is ordered.
9     Q.  Is that everything that's said there?
10    A.  This is Dr. Ali was called on the cell phone
11 and pager. This is how we communicate because she is
12 not in one given institution at any time. So the way
13 to contact her is by page.
14    Q.  Why did you call her, then?
15    A.  Why did I call her?
16    Q.  Yeah.
17    A.  Because as I indicated previously, if I have
18 to have MRI I have to inform medical director.
19    Q.  Okay. So the only reason you were ordering
20 an MRI, as you indicate on 9/22/03, is because of what
21 the optometrist told you?
22        MR. NIEDZIELSKI: Ophthalmologist, wasn't
23 it?
24        THE WITNESS: Optometrist.
25        MR. NIEDZIELSKI: It was an optometrist?

Page 75

1 BY MR. RICHMOND:
2     Q.  Is that correct?
3     A.  A headache and this findings I would like to
4 know if there is any pathology in the brain.
5     Q.  So I just want to be really clear on this,
6 the headache coupled with what?
7     A.  With papilledema.
8     Q.  So it wasn't until the papilledema appeared
9 that you decided to order an MRI?
10    A.  Yes, sir.
11    Q.  And not any time before that?
12    A.  No.
13    Q.  Is that correct?
14    A.  That's correct.
15    Q.  Now, the entry that appears on above yours is
16 dated 9/22/03 also at 10:45?
17    A.  Yes.
18    Q.  All right. Which is approximate one-half
19 hour before your entry?
20    A.  Right.
21    Q.  Okay. What does that say, can you read that?
22    A.  If I can read his writing I will try.
23    Q.  All right.
24    A.  Subjective, bad headache and disorientation
25 for eight days. Objective, dilated fungus.

Page 76

1 Evaluation, no optic cup, OU. Papilledema, OU.
2 Papilledema, OU is assessment and a client (sic) is
3 sent out for CT scan to rule out space occupation
4 lesion.
5     Q.  So the ophthalmologist --
6     A.  Optometrist.
7     Q.  Optometrist, I'm sorry. The optometrist at
8 that point on this date ordered --
9     A.  No, he's optometrist. He would only suggest
10 that a CT scan or MRI, whichever test would be
11 appropriate to find out what is, you know, if there is
12 any pathology in the brain.
13    Q.  Okay. So the optometrist is the one who
14 suggested that Mr. Chance go out and have this CT scan?
15    A.  Based on my request to evaluate fundoscopy,
16 which was my recommendation to have a fundoscopic exam,
17 and I made that -- I wrote that suggestion which was
18 MRI for the patient.
19    Q.  When did you do that? When did you have that
20 consultation with this optometrist?
21    A.  Time.
22    Q.  And you're pointing to Page 69 and you're
23 pointing to the top entry?
24    A.  Right.
25    Q.  9/22/03 at 10:45, you had a consultation with

19 (Pages 73 to 76)

Page 77

1  an optometrist, is that what you're saying today?
2  A. Right.
3  Q. And what's the optometrist's name?
4  A. I can't read that. I don't remember his
5  name. I don't know if it's DeMillo or I haven't seen
6  him on regular basis, so I don't know.
7  Q. What does he look like?
8  A. All I know is he's a caucasian male, average
9  height.
10  Q. Is he taller than you?
11  A. Yes.
12  Q. How much taller?
13  A. Few inches.
14  Q. Is he more than a head taller than you?
15  A. I didn't pay attention, I don't pay attention
16  to other mens' height or anything and I don't remember.
17  Q. How old is he? How old is he?
18  A. How old?
19  Q. Yes.
20  A. I would say middle age. I can't give you the
21  number.
22  Q. What color is hair?
23  A. I don't remember. People change the color.
24  Q. Okay. Doctor, let's turn to Page 70, did you
25  make any entries in Page 70?

Page 78

1  A. Yes.
2  Q. Which entries did you make in Page 70?
3  A. 9/30, the top entry. 9/23, I'm sorry.
4  Q. 9/23?
5  A. 7:45 a.m.
6  Q. That's all just the top entry?
7  A. Continuation of this over there (indicating.)
8  Q. Okay. So you've just indicated that Page 71,
9  the entries of Page 71, is a continuation of the
10  entries that appear on Page 70?
11  A. Yes.
12  Q. Am I correct?
13  A. This note started here (indicating).
14  Q. And you're pointing to Page 71?
15  A. Right, yeah.
16  Q. Now, on Page 71, you have an entry and what's
17  the date and time on that entry?
18  A. 7:45 a.m.
19  Q. And what was the date?
20  A. It's a continuation, so this (indicating) is
21  the date.
22  Q. And the date was the 23rd?
23  A. Yes, sir.
24  Q. Okay. What's the date that appears at the
25  top of that page?

Page 79

1  A. 9/23 here (indicating).
2  Q. At the top of the page and we're referring to
3  Page 71?
4  A. It appears to be 22nd.
5  Q. And what time?
6  A. 9:55, I couldn't tell you whether it's p.m.
7  or a.m.
8  Q. So just to be clear on this, Doctor, at Page
9  71, which contains an entry made by you at the bottom,
10  above that is an entry dated 9/22/03 made at what time?
11  A. 0955, I don't -- I can't make out what this
12  is.
13  Q. At 10 o'clock; right? Sometime a little
14  before 10 o'clock?
15  A. Yes.
16  Q. Doctor, I'm now referring you to Page 76, are
17  any of these entries yours? I don't know, you're
18  pointing to something, but I'm not sure --
19  A. At the bottom section.
20  Q. And what's the date of that entry?
21  A. 9/22.
22  Q. And what does that say?
23  A. 11:05 a.m. MRI of brain, urgent.
24  Q. So it was urgent on 9/22, MRI of the brain?
25  A. That's what I have written here.

Page 80

1  Q. Okay. And if it was urgent, why wasn't Mr.
2  Chance sent out right away?
3  A. I have it in the order. I have written the
4  consult and I had communicated with people who arranged
5  for the transportation and the appointment.
6  Q. And you pointed to the bottom entry of 76; is
7  that correct?
8  A. Yes, sir.
9  Q. What's the one that appears above that,
10  what's the date of the one that appears above that?
11  A. 9/22.
12  Q. And who made that entry?
13  A. If I see the signature -- it appears to be
14  one of the staff members, perhaps Diane I don't
15  recognize if her name is here or not because --
16  Q. What's the order say above yours?
17  A. This one (indicating?)
18  Q. Yes.
19  A. Here is the signature, PAC.
20  Q. Who is that?
21  A. A PA.
22  Q. Do you know the PA's name?
23  A. I can read Diane Hernandez are the two PAs
24  there.
25  Q. So Diane Hernandez designee was the PA who