**IN THE UNITED STATES DISTRICT COURT**

**FOR THE STATE OF DELAWARE**

| | |
|---|---|
| ESTATE OF LOUIS W. CHANCE JR.<br>                Plaintiff<br>      v.<br><br>FIRST CORRECTIONAL MEDICAL INC., DR. NIRANJANA SHAH, DR JOSE A. ARAMBURO, JR., COMMISSIONER STANLEY TAYLOR and JOYCE TALLEY<br><br>                Defendants | C.A No: 05-449-SLR |

**PLAINTIFF'S REPLY TO THE STATEMENT OF**
**UNDISPUTED FACTS OF DEFENDANTS TAYLOR AND TALLEY**
**IN SUPPORT OF SUMMARY JUDGMENT**

And now comes the Plaintiff, Estate of Louis W. Chance, Jr., to respond to the Statement of Undisputed Facts of Defendants Taylor and Talley in accordance with the Court's Order of February 13, 2008. (D.I. 88).

1.     The statement incompletely characterizes the Plaintiff's Amended Complaint against these specific Defendants who are the senior state officials charged with providing and overseeing constitutionally adequate medical care to inmates in the Delaware Department of Correction. Paragraph 29 of the Plaintiff's Amended Complaint (D.I. 3) charges these two Defendants with failure to insure constitutionally adequate

medical care resulting from a system wide policy of deliberate indifference in violation of the proscriptions contained in the United States Constitution, amend. VIII.

2.     These statements are disputed by the Plaintiff's expert report of an extremely well qualified prison healthcare specialist Joseph Goldman, MD who stated specifically that the care provided to the Plaintiff's decedent before his death was a product of "gross deliberate indifference to a serious medical need." The medical chart relating to the decedent reveals that his care was neither constant, nor constitutionally adequate and the Defendants have offered no rebuttal to this medical conclusion in their Motion for Summary Judgment.  See: (D.I.66 Taylor and Talley Motion for Summary Judgment.

3-5.    The facts recited here are incomplete and are the conclusions of counsel who is unqualified as a medical expert. The assertions disputed because the medical chart shows that on September 8, 2003, the decedent complained of headache for the prior week.  On the next day, the decedent complained to a physician that he had headache front to back for five days (Bates 129) following the ineffective administration of Motrin the previous day.  On 9/11/03 he again complained of headache that was unrelieved by 800 mg. of Motrin (Bates 130).  On 9/12/03 he described his headache with a pain level of 10 on a ten point scale after taking Motrin. On 9/13/03, the Decedent was observed and described as "acting bizarrely by the Quick Response Team who secured him in isolation with a "security blanket". A social worker (not a psychiatrist) described the decedent as "non-compliant" unable to contract for his own safety.  (Bates 131).

Louis Chance kept saying that, "I cannot hear you" to the staff and nurse (Bates 5) and this was confirmed by "mental health" interdisciplinary staff who noted that the decendent kept saying, "What? What?" and appeared confused, parnoic and possibly psychiotic. (Bates 90). After an injection of Haldol and Atavan, he complained of headache on the same date and on the next day, in spite of administration of cafergot, he had a "terrible headache" (Bates 89). On 9/15/03 and on 9/16/03, Louis Chance reported, "I am in severe pain" (Bates 85, 86). On 9/17/03 Louis Chance reported, "I have a freakin' headache." in spite of analgesics (Bates 84). On 9/18/03, Chance was discharged from the infirmary, but curiously on 9/21/03 he is reported to have abdominal pain, and to have a follow-up for headache. He was given Motrin (Bates 74). He was given more Motrin on 9/22/03 (Bates 76). On 9/22/03, an Ophthalmologist performing a fundiscopic exam noticed that the decedent appeared disoriented and complained of bad headache (Bates 69), after which a chart entry indicates that a brain scan was ordered, "URGENTLY". At 5:45 AM on the next day, a note in the chart state that Louis Chance was to have a brain scan. (Bates 71). At 7:45AM Louis Chance was found to be unresponsive to ammonia and oxygen. (Bates 70).

6.    Louis Chance died on 9/23/03 of cryptococcal meningitis an opportunistic infection that afflicts only the immune-compromised. Far from being rare, it has, *for fifteen years, been the diagnostic criteria for full blown AIDS* in a patient and is readily treatable. (Deposition interrogation of Ramesh Vemulappalli, MD, Board Certified FCM

sub contractor in infectious diseases, by Marc Niedzielski, January 9, 2007, pp 30-31.) There is no defense rebuttal evidence supporting defense counsel's conclusions here.

7.     This statement, "that the sole factual dispute identified by the plaintiff regarding the decedent's medical care" understates the content of the Plaintiff's Amended Complaint (D.I. 3) and Plaintiff's Motion for Reconsideration (D.I. 78) relating to the Plaintiff's Request for the Production of the Evidence submitted to the U.S. Attorney's in connection with the CIPRA investigation of the U.S. Department of Justice.  On the contrary, the grossly deliberate indifference to the decedent's medical need is not disputed or rebutted by any expert or evidence proffered by these moving Defendants. The factual dispute remaining is whether the conduct of the senior Department of Correction Officials, who admit to being responsible for the delivery of health care to inmates incarcerated in Delaware, failed to insure that Constitutionally Adequate medical care was provided to inmates by a practice, policy and pattern of self-insulation and constitutionally inadequate oversight, all of which has been publically stipulated to and made part of a public conclusions of  CIPRA legal experts in the Department of Justice. (D.I. 69 Appendix pp. 1-20).

8.     It is not disputed and the Plaintiff has no evidence at this time that either of the moving Defendants had direct participation in the medical decisions or the medical care of the decedent.

9.      Cost containment by FCM and the financial limits imposed by the Contract, coupled with the lack of adequate oversight of the medical provider during the period of the decedent's incarceration and, more particularly in the two months preceding the onset of his symptoms is, inferentially, the only explanation for the failure to medically address the decedent's symptoms.  Plaintiff's deposition evidence and the evidence of the Medical Review Committee minutes unequivocally demonstrate that FCM was not paying outside medical facilities and owed more than $800,000.00.  In spite of that, the moving Defendants failed to inquire or investigate the potential for the increased constitutional risk this financial condition represented. (D.I. 69 Appendix pp. 21-23) The lack of oversight, and the delegation of oversight to a bi-annual accreditation process placed the decedent, as well as many other inmates, at impermissible risk.  This was the expert conclusion of the U.S. Department of Justice, who stated that, "…Our investigation revealed that the medical care provided at the facilities was constitutionally inadequate…In addition we found that the care for inmates with acute medical urgencies was constitutionally inadequate."  (D.I. 69 Appendix p.4).

10.     The accreditation of Webb and Gander Hill did not prevent or eliminate the risk to the decedent in the present case, nor did the accreditation of HRYCI prevent the Department of Justice or the State's own experts from determining the constitutional inadequacy of the medical care at that facility. (D.I. 69 Appendix p. 4)

## Legal Issues

11. It is disputed that there is no evidence that Defendants Taylor and Talley participated in conduct traceable to the decedent's injury. These defendants instituted a custom and policy of detachment and unjustified reliance upon an accreditation agency that resulted in a pattern of deliberate indifference to the constitutional rights of inmates incarcerated in Delaware. A prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. **Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811, 1994 U.S. LEXIS 4274 (1994.**

12. In order for conditions of confinement to be unconstitutional, they must be shown to be cruel and unusual under the Eighth Amendment, and the evidence must reveal widespread deprivation of the "minimal civilized measures of life's necessities**." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).** Stanley Taylor has stipulated to facts in a public document demonstrating widespread deficiencies that, in the conclusion of legal experts in the field, make up impermissible Eighth Amendment depriivations. (D.I. 69 Appendix, pg. 4)

13. There are two theories of supervisory liability that are applicable to this case. The first involves then Defendants in their roles as policymakers or overseers for the Department of Correction. Individual defendants who are policymakers may be liable

under § 1983 if it is shown that such defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." **Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989).** The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right**." Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); see also Acierno v. Cloutier, 40 F.3d 597, 616 (3d Cir. 1994)** (en banc). "In determining whether defendants are entitled to claim qualified immunity, we engage in a three-part inquiry: (1) whether the plaintiffs alleged a violation of their constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official knew or should have known that the alleged action violated the plaintiffs' rights." The documentation submitted as Plaintiff's Appendix (D.I. 69) to the response to the Defense Motion for Summary Judgment contains sufficient evidence from which a jury could conclude that the policies, customs and practices of these defendants created a substantial risk of constitutional violations.

                                                            Respectfully submitted

                                                            /s/   Jeffrey Bartels, Esquire
                                                            /s/   Kenneth W. Richmond, *pro hac*
                                                            401 South Maryland Avenue
                                                            Wilmington, DE  19804

   Dated March 18, 2008                          Attorneys for the Plaintiff

# CERTIFICATION OF SERVICE

      The undersigned certifies that on March 18, 2008, he caused the attached document to be served by hand delivery upon the following persons:

>Marc P. Niedzielski
>Deputy Attorney General
>Carvel State Office Building
>820 N. French Street, 6th. Fl.
>Wilmington, DE  19801

Dated:  March 18, 2008           /s/<u>Kenneth W. Richmond</u>, *pro hac*
                                       Jeffrey K. Bartels, Esquire
                                         401 S. Maryland Avenue
                                         Wilmington, DE  19804

.