IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESTATE OF LOUIS W. CHANCE JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. 05-449-SLR |
| ) | |
| FIRST CORRECTIONAL MEDICAL ) | |
| INC., DR. NIRANJANA SHAH, ) | |
| DR. JOSE A. ARAMBURO, JR., ) | |
| COMMISSIONER STANLEY TAYLOR, ) | |
| and JOYCE TALLEY, ) | |
| ) | |
| Defendants. ) | |

Jeffrey K. Bartels, Esquire, of Wilmington, Delaware and Kenneth W. Richmond, Esquire, of Philadelphia, Pennsylvania. Counsel for Estate of Louis W. Chance, Jr.

Marc Niedzielski, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Stanley Taylor and Joyce Talley.

**MEMORANDUM OPINION**

Dated: September  30,  2008
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiffs Amanda Humphreys and Louis Chance, III ("plaintiffs") are the mother and son of decedent Louis W. Chance Jr. ("Chance"). (D.I. 1, 3) They were appointed administrators of his estate on June 20, 2005 and soon after filed this 42 U.S.C. § 1983 action alleging that defendants violated Chance's right under the Eighth Amendment to be free from the infliction of cruel and unusual punishment or death by the intentional denial of medical treatment. (Id.)

On June 15, 2007, the court entered an order dismissing defendants First Correctional Medical, Inc. ("FCM"), Dr. Shah, and Dr. Aramburo based on a stipulation of partial dismissal between plaintiff and those settling defendants. (D.I. 74) On March 15, 2007, defendants Stanley Taylor ("Taylor") and Joyce Talley ("Talley") (collectively "defendants") moved for summary judgment. (D.I. 65) On March 26, 2007, plaintiffs filed a responsive brief opposing the motion for summary judgment. (D.I. 67) Subsequently, the court ordered the parties to file statements detailing the material facts not in dispute and the legal issues upon which summary judgment was sought. (D.I. 88) On February 29, 2008, defendants filed their statement of undisputed facts to which plaintiffs filed their reply. (D.I. 89, 90) For the reasons that follow, defendants' motion for summary judgment will be granted.

## II. BACKGROUND

According to plaintiffs, FCM contracted with the Delaware Department of Correction ("DOC") to provide medical care to inmates incarcerated in the State of Delaware penal institutions, including the Howard R. Young Correctional Institution ("Gander Hill") and Webb Correctional Facility ("Webb"). (D.I. 3 at ¶ 3) Dr. Shah and

Dr. Aramburo were licensed Delaware physicians employed by FCM to provide medical care to inmates at Gander Hill and Webb. (*Id.* at ¶ 4) Taylor, Commissioner of the DOC from Fall of 1995 until February 2007, executed, in his official capacity on behalf of the State of Delaware, an agreement with FCM to provide comprehensive medical care for inmates incarcerated by the DOC. (*Id.* at ¶ 5) Talley, the DOC's Bureau Chief for the Bureau of Management Services, was responsible for oversight of inmate health care services. (*Id.* at ¶ 6)

After pleading guilty to his fourth DUI charge, Chance was sentenced to six months of imprisonment under the custody of the DOC, beginning on April 1, 2003. His prospective release date was September 30, 2003. (D.I. 3) On September 8, 2003, Chance submitted a sick call request concerning a persistent headache that had lasted for three days. (*Id.* at ¶ 12) From that date until September 23, 2003, Chance received care[1] from nurses, physician assistants and physicians. (D.I. 89 at ¶ 2; D.I. 90 at ¶ 2) During this period, Chance was transferred twice from Webb to the infirmary of Gander Hill. (D.I. 89 at ¶ 3) On September 23, 2003, Chance was transported by ambulance to St. Francis Hospital where he died from crypotococcal meningitis, a fungal infection of the brain enabled by a compromised immune system, in this case HIV/AIDS. (D.I. 89, 90)

Plaintiffs argue that defendants, as supervisors responsible for the delivery of health care to inmates, failed to insure that Constitutionally adequate medical care was provided by a practice, policy and pattern of self-insulation and inadequate oversight.

_____

[1]The consistency and constitutional adequacy of the care Chance received remains in dispute. (D.I. 90)

3

(D.I. 90) They offer the findings of the United States Department of Justice (DOJ) investigation as evidence that the medical care provided by DOC was constitutionally inadequate and was the result of policy and practice that condoned inadequate medical care and oversight.[2] (D.I. 90) Specifically, the investigation "revealed that patients with life-threatening conditions [were] not receiving timely care" and "care was especially poor for inmates with . . . HIV." (D.I. 69 at 6)

Plaintiffs also submit a letter from FCM to defendant Taylor notifying DOC that they were terminating their contract "based on DOC's continual failure . . . to provide FCM with the cooperation and inmate access necessary to permit FCM to properly discharge its professional and contractual responsibilities." (D.I. 78 at ex. A at 4) Plaintiffs claim that defendants "instituted a custom and policy of detachment and unjustified reliance upon an accreditation agency that resulted in a pattern of deliberate indifference to the constitutional rights of inmates incarcerated in Delaware." (*Id.* at ¶ 11) Plaintiffs also argue that such a policy can be inferred by the cost containment by FCM, the financial limits imposed by the contract between DOC and FCM, and the lack of oversight by DOC. (D.I. 90 at ¶ 9)

_____

[2]The Civil Rights Division of the DOJ conducted an investigation of five Delaware prison facilities pursuant to the Civil Rights of Institutionalized Persons Act, which authorizes the federal government to identify and root out systemic abuses. The investigation found substantial civil rights violations at four of the five facilities: Delores J. Baylor Women's Correctional Institution, Howard R. Young Correctional Institution, Delaware Correctional Center, and Sussex Correctional Institution. The investigation resulted in the entry of a memorandum of agreement on December 29, 2006, between the DOJ and the State of Delaware regarding the four institutions.  Paragraph I.F. of the agreement provides that it may not be used as evidence of liability in any other legal proceeding. *See Price v. Kozak, __ F. Supp.2d ___, 2008 WL 2960058 (D. Del. 2008).*

4

With regard to the care provided to Chance, plaintiff's expert, Joseph Goldman,

M.D. opines that,

> based on my training, experience, and extensive knowledge
> of correctional medical care, the actions and inactions of the
> First Correctional Medical staff fall well below the accepted
> standard of care in correctional facilities. Their failure to
> appropriately diagnose and treat Mr. Chance's cryptococcal
> meningitis lead to his death and constitute gross negligence
> and deliberate indifference to a serious medical need.

(D.I. 68-2)

Defendants assert that there is no evidence of record demonstrating they

participated in the medical care provided to Chance. They aver that DOC does not

have a policy to delay or deny medical care to inmates based on costs. Summary

judgment is appropriate, argue defendants, because "there cannot be an Eighth

Amendment claim against a correctional official regarding the medical care of an inmate

where the inmate is under the care of licensed healthcare professionals." (D.I. 89 at ¶

12)

With respect to the care provided, defendant Taylor states:

> [T]here was never a program to deny or delay any health care to an
> inmate based on the cost of the healthcare. Throughout my tenure
> as Commissioner, the Department sought to provide inmates with
> healthcare that was within standards of the National Commission
> on Correctional Healthcare ["NCCHC"]. I am aware that both
> Webb and HRYCI were re-accredited in 2003. The Department
> would seek to increase the amount and quality of healthcare services
> provided to inmates within the State budget through the RFP process
> and by suggestions of the medical vendor.
>
>       *            *            *
>
> Until the commencement of this lawsuit, I had no knowledge of plaintiffs'
> decedent Louis W. Chance, Jr. and I [sic] not participate in any
> decision regarding him or his health care nor was any participation
> requested on my part. I do not possess any medical training.

5

(D.I. 81-2 at 1-2) Moreover, according to defendant Talley:

> Since July 1996, I have served as chief of the Bureau of Management Services.
>
> \*                    \*                    \*
>
> The Bureau of Management Services provides support to all units within the Department, including: fiscal, payroll, accounts payable, budgeting, purchasing, warehousing, food services, healthcare for the inmates, substance abuse treatment, management information services, facilities maintenance and construction. The Bureau of Management Services is assigned by the Department the administration of the health services contract . . .
>
> \*                    \*                    \*
>
> The claim that the Department attempts to contain medical costs by delaying or denying health services for inmates is not true. The Department and the various vendors do look for ways of increasing the quality and quantity of medical services within the budget. For example, if a number of inmates need to see an outside specialist, the specialist would be brought into the facility to see the inmates. As another example, the Department recognized that it could save money by buying a number of dialysis machines and placing them in the institutions for the inmates that needed them rather than arranging for inmates to transport outside the facility for dialysis.
>
> \*                    \*                    \*
>
> At no time during 2003, was I aware of the plaintiff's decedent Louis W. Chance, Jr. nor did I participate in any decision regarding him or his health care. I have no medical training and do not provide medical care to anyone.

(D.I. 81-3 at 3-4) Further, defendants submit that both the Webb and Gander Hill

healthcare facilities were reaccredited in 2003. (D.I. 71-2; 71-3)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears

the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). In order to set forth a cognizable claim, an inmate must prove (1) a serious medical need and (2) acts or omissions by prison officials that

7

indicate deliberate indifference to that need. *Estelle v. Gamble,* 429 U.S. at 104; *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by intentionally denying or delaying access to medical care. *Estelle*, 429 U.S. at 104-05.

[A] prisoner has no right to choose a specific form of medical treatment, so long as the treatment provided is reasonable. *Harrison v. Barkley,* 219 F.3d 132, 138-140 (2d Cir.2000). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle,* 429 U.S. at 107. Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon,* 897 F.2d 103, 108-09 (3d Cir.1990) (citations omitted); *see also Daniels v. Williams,* 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, mere disagreement as to the proper medical treatment is insufficient to state a Constitutional violation. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir.2004) (citations omitted). Significantly, when an inmate is under the care of medical experts,

> a non-medical prison official will generally be justified in
> believing that the prisoner is in capable hands. This follows
> naturally from the division of labor within a prison. Inmate
> health and safety is promoted by dividing responsibility for
> various aspects of inmate life among guards, administrators,
> physicians, and so on. Holding a non-medical prison official
> liable in a case where a prisoner was under a physician's care

8

would strain this division of labor.

*Spruill*, 372 F.3d at 236; *see also Woloszyn v. County of Lawrence,* 396 F.3d 314, 321 (3d Cir. 2005).

Liability in a § 1983 action cannot be predicated solely on the operation of respondeat superior. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) (citations omitted). A plaintiff may, however, set forth a claim for supervisory liability under § 1983 if he (1) identif[ies] the specific supervisory practice or procedure that the supervisor failed to employ, and show[s] that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir.2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989)). It is not enough for a plaintiff to argue that the alleged injury would not have occurred if the supervisor had done more. *Id.* He must identify specific acts or omissions of the supervisor that evidence deliberate indifference and establish a link between the act or omission and the ultimate injury.

Considering the record in the light most favorable to plaintiffs, summary judgment is appropriate for several reasons. First, there is no record evidence demonstrating that either defendant was involved in or even knew of Chance during the events in dispute. Second, plaintiffs have not presented anything that refutes the declarations of defendants nor shown anything more than conjecture to establish liability. Third, although plaintiffs' expert avers that the care provided to Chance

9

constituted gross negligence,  Dr. Goldenson does not opine as to the actions or
conduct of the defendants at bar.    Finally, while plaintiffs urge the court to consider the
DOJ investigation, the court declines to embrace any findings in light of the specific
caveat that the agreement between the State of Delaware and the DOJ may not be
used as evidence of liability in any other legal proceeding.

## V.  CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted.
An appropriate order shall issue.

10